**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District Eastern Tennessee |
|---|---|
| Name (under which you were convicted): Christa Gail Pike | Docket or Case No.: 1:12-cv-35 |
| Place of Confinement: Tennessee Prison for Women | Prisoner No.: 261368 |
| Petitioner (include the name under which you were convicted)<br>Christa Gail Pike | v. Respondent (authorized person having custody of petitioner)<br>Debra Johnson, Warden |
| The Attorney General of the State of Tennessee | |

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging: Knox County Criminal Court, Division III, Knox County, Tennessee

   (b) Criminal docket or case number (if you know): 58183A

2. (a) Date of the judgment of conviction (if you know): March 30, 1996

   (b) Date of sentencing: March 30, 1996

3. Length of sentence: death

4. In this case, were you convicted on more than one count or of more than one crime? Yes ☒ No ☐

5. Identify all crimes of which you were convicted and sentenced in this case:
   First degree murder - sentenced to death
   Conspiracy to Commit 1st Degree Murder - sentenced to 25 years consecutive to death sentence

6. (a) What was your plea? (Check one)

   (1) Not guilty ☒ (3) Nolo contendere (no contest) ☐

   (2) Guilty ☐ (4) Insanity plea ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ☒ Judge only ☐

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes ☐ No ☒

8. Did you appeal from the judgment of conviction?

Yes ☒ No ☐

9. If you did appeal, answer the following:

(a) Name of court: Tennessee Court of Criminal Appeals

(b) Docket or case number (if you know): 03C01-9611-CR-00408

(c) Result: Affirmed

(d) Date of result (if you know): November 26, 1997

(e) Citation to the case (if you know): State v. Pike, 1997 Tenn. Crim. App. LEXIS 1186

(f) Grounds raised: See Appendix A.

(g) Did you seek further review by a higher state court? Yes ☒ No ☐

If yes, answer the following:

(1) Name of court: Tennessee Supreme Court

(2) Docket or case number (if you know): 03S01-9712-CR-00147

(3) Result: Affirmed

(4) Date of result (if you know): October 5, 1998

(5) Citation to the case (if you know): State v. Pike, 978 S.W.2d 904 (Tenn. 1998)

(6) Grounds raised: See Appendix A.

(h) Did you file a petition for certiorari in the United States Supreme Court? Yes ☒ No ☐

If yes, answer the following:

(1) Docket or case number (if you know): 98-8226

(2) Result: Certioari denied

(3) Date of result (if you know): June 1, 1999

(4) Citation to the case (if you know): Pike v. Tennessee, 526 U.S. 1147 (1999)

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

Yes ☒ No ☐

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Knox County Criminal Court

(2) Docket or case number (if you know): 68280

(3) Date of filing (if you know): June 3, 1999

(4) Nature of the proceeding: Petition for Relief from Conviction or Sentence

(5) Grounds raised: See Appendix A.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? Yes ☒ No ☐

(7) Result: Petition denied

(8) Date of result (if you know): December 10, 2008

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? Yes ☐ No ☐

(7) Result:

(8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? Yes ☐ No ☐

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: Yes ☒ No ☐

(2) Second petition: Yes ☐ No ☐

(3) Third petition: Yes ☐ No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:** For the grounds of relief and their procedural history, including reference to where each Ground for Relief was raised, refer to the full petition attached to this form.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground One, explain why:

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes ☐ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know): ____________________

Date of the court's decision: ____________________

Result (attach a copy of the court's opinion or order, if available): ____________________

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ____________________

Docket or case number (if you know): ____________________

Date of the court's decision: ____________________

Result (attach a copy of the court's opinion or order, if available): ____________________

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: ____________________

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: ____________________

**GROUND TWO:** ____________________

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): ____________________

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☐ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available): ______________________

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: ______________________

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: ______________________

**GROUND THREE:** ______________________

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Three, explain why: ______________________

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: ______________________

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes ☐ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: ______

Name and location of the court where the motion or petition was filed: ______

______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

______

______

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ______

______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

______

______

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: ______

______

______

______

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: ______

______

______

**GROUND FOUR:** ______________________________

______________________________

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

(b) If you did not exhaust your state remedies on Ground Four, explain why: ______________________________

______________________________

______________________________

______________________________

______________________________

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: ______________________________

______________________________

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes ☐ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: ______________________________

Name and location of the court where the motion or petition was filed: ______________________________

______________________________

Docket or case number (if you know): ______________________________

Date of the court's decision: ______________________________

Result (attach a copy of the court's opinion or order, if available): ______________________________

______________________________

______________________________

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ____________________

____________________

Docket or case number (if you know): ____________________

Date of the court's decision: ____________________

Result (attach a copy of the court's opinion or order, if available): ____________________

____________________

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: ____________________

____________________

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: ____________________

____________________

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? Yes ☒ No ☐

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: ____________________

____________________

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: ____________________

____________________

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? Yes ☐ No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? Yes ☐ No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: William ("Bill") Talman, 706 Walnut St., Suite 602, Knoxville, TN 37901

(b) At arraignment and plea: Bill Talman (same address as above)
William L. Brown (BPR attorney details show his is presently in Japan)

(c) At trial: Bill Talman (same address as above)
Julie Martin (now Julie Rice), P.O. Box 30074, Knoxville, TN 37923

(d) At sentencing: Bill Talman (same address as above)
Julie Rice (same address as above)

(e) On appeal: Bill Talman (same address as above)
Julie Rice (same address as above)

(f) In any post-conviction proceeding: Don Dawson and Avram ("Avi") Frey, P.C. Defender's Office
530 Church Street, Nashville, TN 37243; Catherine Brockenborough, Nashville, TN; James Crowson

(g) On appeal from any ruling against you in a post-conviction proceeding:
Don Dawson and Avi Frey, Post Conviction Defender's Office (same address as above)

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes ☒ No ☐

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: Knox County Criminal Court, Division III, Knox County, Tennessee

(b) Give the date the other sentence was imposed: June 6, 1996

(c) Give the length of the other sentence: 25 years consecutive to death sentence

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? Yes ☐ No ☒

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.* The statute of limitations was tolled from 6/3/99 until 11/15/11 because Ms. Pike had a properly filed petition for post conviction relief pending in the state courts. See 28 U.S.C. § 2244(d)(2).

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —

(continued...)

Therefore, petitioner asks that the Court grant the following relief: ______________________________

______________________________

______________________________

or any other relief to which petitioner may be entitled.

Stephen A. Ferrell

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on

______________________________ (month, date, year).

Executed (signed) on 9-26-12 (date).

[signature]

Signature of Petitioner

---

*(...continued)

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. ____________________________________________

____________________________________________

____________________________________________

____________________________________________

**APPENDIX A TO CHRISTA PIKE'S**
**PETITION UNDER 28 U.S.C. § 2254**
**FOR WRIT OF HABEAS CORPUS**

**Grounds Raised on Direct Appeal**
**to Tennessee Court of Criminal Appeals**

**(Responsive to Form Petition question 9(f)).**

I. Whether the evidence presented in its entirely and as contained in the record was insufficient as a matter of law to support the verdict of the jury finding the Defendant guilty of murder in the first degree and conspiracy to commit murder in the first degree. Additionally, the evidence presented was insufficient to justify the jury's verdict sentencing the Defendant to death by electrocution.

II. The trial court erred by refusing to grant Defendant's motion to deny television and photographic coverage of pretrial proceedings in order to minimize the public's exposure to the details of this case.

III. The trial court erred by failing to grant the Defendant's motion for a change of venue in this case.

IV. The trial court erred by failing to allow the Defendant to select a jury composed of a fair cross section of the citizens of the State of Tennessee.

V. Whether the trial court erred by allowing the introduction of the skull of the victim into evidence where such use of the skull was duplicative of other evidence, was wholly unnecessary in light of other admitted evidence, was destined to arouse and incite the passions of the jury against Defendant, and whose probative value was substantially outweighed by its highly prejudicial effect.

VI. Whether the trial court erred by refusing to enter a judgment of acquittal as to the second Count of the indictment charging conspiracy where the State failed to prove each and every element charged in the indictment.

VII. Whether the punishment imposed in this case, death by electrocution, is cruel and unusual punishment under both the United States and Tennessee Constitutions.

VIII. Whether the trial court erred in allowing the State the same number of peremptory challenges as Defendant in violation of the ex post facto clauses of the United States and Tennessee Constitutions.

IX. Whether the trial court erred in sentencing Defendant to the maximum sentence allowed under Count 2 of the indictment charging conspiracy to commit first-degree murder and running it consecutively to the death sentence imposed under Count 1.

## Grounds Raised on Direct Appeal to the Tennessee Supreme Court

**(Responsive to Form Petition question 9(g)(3)).**

I. Whether the evidence presented in its entirety and as contained in the record was insufficient as a matter of law to support the verdict of the jury finding the Defendant guilty of murder in the first degree and conspiracy to commit murder in the first degree. Additionally, the evidence presented was insufficient to justify the jury's verdict sentencing the Defendant to death by electrocution.

II. The trial court erred by refusing to grant Defendant's motion to deny television and photographic coverage of pretrial proceedings in order to minimize the public's exposure to the details of this case.

III. The trial court erred by failing to grant the Defendant's motion for a change of venue in this case.

IV. The trial court erred by failing to allow the Defendant to select a jury composed of a fair cross section of the citizens of the State of Tennessee.

V. Whether the trial court erred by allowing the introduction of the skull of the victim into evidence where such use of the skull was duplicative of other evidence, was wholly unnecessary in light of other admitted evidence, was destined to arouse and incite the passions of the jury against Defendant, and whose probative value was substantially outweighed by its highly prejudicial effect.

VI. Whether the trial court erred by refusing to enter a judgment of acquittal as to the second count of the indictment charging conspiracy where the State failed to prove each and every element charged in the indictment.

VII. Whether the punishment imposed in this case, death by electrocution, is cruel and unusual punishment under both the United States and Tennessee Constitutions.

VIII. Whether the trial court erred in allowing the State the same number of peremptory challenges as Defendant in violation of the ex post facto clauses of the United States and Tennessee Constitutions.

IX. Whether the trial court erred in sentencing Defendant to the maximum sentence allowed under Count 2 of the indictment charging conspiracy to commit first-degree murder and running it consecutively to the death sentence imposed under Count 1.

**Issues Raised in Consolidated**
**Petition for Post Conviction Relief**[1]

**(Responsive to Form Petition question 9(g)(6)).**

I. Trial Court's violation of Petitioner's constitutional right to conflict-free counsel.

II. Ineffective assistance of counsel at trial.

1. Counsel failed to establish the proper working relationship with the Petitioner.
2. Counsel failed to adequately prepare for the representation of the Petitioner.
3. Counsel failed to engage in the motions practice necessary to protect Petitioner's rights.
4. Counsel were ineffective both for failing to file motions in a timely manner and for failing to ensure that they were heard in a timely manner.
5. Counsel failed to obtain and use experts in a manner consistent with effective representation.
6. Lead counsel was ineffective for operating under an actual conflict of interest.
7. Counsel were ineffective in their *voir dire* of prospective jurors.
8. Petitioner inadvertently skipped paragraph 8.
9. Trial counsel were ineffective for failing to investigate or present evidence of Petitioner's diminished capacity and state of mind around the time of the offense.
10. Counsel were ineffective in the penalty phase of Petitioner's trial for not presenting expert testimony or lay testimony on compelling mitigation in Petitioner's life history.
11. Counsel failed to be aware of the law applicable to Petitioner's case, as evidenced by the deficiencies in counsel's performance outlined in this petition.
12. Counsel rendered ineffective assistance of counsel regarding the jury instructions in both the guilt/innocence phase and the penalty phase of Petitioner's trial.
13. Counsel failed to maintain their workload at the level acceptable to handling a capital murder trial.
14. Trial counsel were ineffective for failing to object to prosecutorial misconduct in the penalty phase closing argument to the jury.
15. Trial counsel were ineffective in failing to object, during voir dire to the State's suggesting that the jury should not consider Ms. Pike's age (18 at the time of the offense) as mitigating evidence that alone would justify a life sentence.
16. Counsel failed to file pre-trial motions challenging the constitutionality of Tennessee's murder statute and its sentencing provisions.

---

[1]R.9-2, Add.4, Doc.2, PC Tech. Rec., Page ID # 4057 through R.9-10, Add.4, Doc.3, PC Tech. Rec., Page ID # 4110.

17. Counsel were ineffective for failing to move to strike the death penalty as punishment because it violates treaties which have been ratified by the United States and violates established international law.
18. Counsel were ineffective for failing to move to strike the death penalty as punishment because it denies Petitioner her right to life under the State and Federal Constitutions.

III. Ineffective assistance of counsel on appeal.

1. Counsel failed to include on the appeal many of the issues that counsel had earlier failed to raise by pretrial motion.
2. Counsel failed to raise on appeal issues concerning the jury instructions.
3. Counsel were ineffective for failing to raise on appeal that the death penalty violates treaties which have been ratified by United States, and violates established international law in violation or Article VI, clause 2 of the United States Constitution, the Supremacy Clause, and customary international law were disregarded.
4. Counsel failed to raise on appeal that the death penalty in this case violates Petitioner's right to life as the State has not shown a compelling state interest in executing Petitioner.
5. Mr. Talman's representation of Ms. Pike was tainted by the actual conflict of interest created by his own financial interest in discussing movie/book production deals regarding Ms. Pike and her case with interested parties.
6. Mr. Talman was ineffective on appeal by failing to inform Ms. Pike that his misconduct in over billing the indigent defense fund for court appointed work from 1990 to 1993 and the pending actions against him created a conflict of interest for his handling the direct appeal.

IV. Independent constitutional claims

V. Prosecutorial misconduct

VI. The death penalty violates international law

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| **vs.** | ) | Case No. 1:12-cv-35 |
| | ) | Judge Mattice/Lee |
| **DEBRA JOHNSON**, Warden, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

---

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

---


Stephen A. Ferrell
Assistant Federal Community Defender
Federal Defender Services
of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

**TABLE OF CONTENTS**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {i}

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {1}

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {3}

I. Christa Pike's death sentence was the result of a series of mis-steps by lead counsel, an attorney who "had his own problems.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {3}
   A. Inexperienced attorneys, one of whom was experiencing serious legal and professional ethical issues of his own, were appointed to this high-profile capital case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {3}
   B. Christa Pike was found guilty of first-degree murder. . . . . . . . . . . . . . . . . . . . . {6}
   C. Defense counsel's plans for the penalty phase were scrapped at the last minute, forcing counsel to improvise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {8}

II. Evidence presented during the post-conviction gave a complete picture of Christa's life of abuse and neglect, her organic brain damage and severe mental illness as well as how these factors accounted for her behavior throughout her young life, including at the time of the offense in this case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {14}
   A. Defense counsel's last-minute decision not to call Dr. McCoy deprived the jury of any explanation as to how family members' testimony could be given mitigating effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {15}
   B. In post-conviction, Christa Pike presented evidence that she suffers from organic brain damage that probably resulted from her mother's drinking alcohol during pregnancy. This brain damage affected her ability to regulate her behavior. . {17}
   C. Christa Pike's early life was characterized by instability, neglect and physical abuse. Furthermore, she was exposed to violence in an environment that condoned that violence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {20}
   D. During Christa's adolescence, as the neglect and abuse continued, she was repeatedly sexually assaulted and began to be "out of control.". . . . . . . . . . . . {25}
   E. Knoxville's Job Corps was a violent, unsafe environment where Christa's psychological make-up made her vulnerable to the influence of her new boyfriend, Tadaryl Shipp. Her background, along with the new dangers from the Job Corps led post-conviction expert, Dr. Kenner, to diagnose her with Post-Traumatic Stress Disorder (PTSD). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {29}
   F. The evidence also demonstrates that Christa Pike suffers from bipolar disorder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {31}
   G. Despite her tragic background and despite the facts surrounding the offense in this case, many witnesses were willing to come forward to testify about Christa Pike's positive characteristics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {34}
   H. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {37}

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {38}

1. 28 U.S.C. § 2254(d)(1): A decision that was contrary to, or involved an unreasonable application of, clearly established federal law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {38}

2. 28 U.S.C. § 2254(d)(2): A decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. . . . . . . . . . . {41}

NOTICE OF INTENT TO CHALLENGE STATE COURT FINDINGS OF FACT. . . . . . . . {43}

PETITIONER PIKE'S CONSTITUTIONAL CLAIMS FOR RELIEF.. . . . . . . . . . . . . . . . . . {47}

GROUND ONE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {47}

Christa Pike's attorneys were constitutionally ineffective during the penalty phase of her capital trial and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . {47}

A. Counsel's performance in the penalty phase was sub-standard because they failed to present mitigating evidence that had been uncovered in their investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {48}

B. Petitioner Pike's trial counsel were ineffective due their failure to discover relevant and compelling mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . {56}

   1. Trial counsel failed to uncover and present evidence that Christa Pike suffers from organic brain damage. . . . . . . . . . . . . . . . . . . . . . . . . . . {57}

   2. Counsel's failure to discover and present evidence that Christa Pike suffers from bipolar disorder and post-traumatic stress disorder constitutes ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . {58}

   3. Counsel failed to contact and present lay witnesses who could have presented mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {60}

C. Trial counsel were ineffective when they disclosed protected work product to the prosecutor.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {61}

D. Counsel failed to present effective penalty phase arguments to the jury in this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {62}

E. Counsel were ineffective when they failed to conduct a meaningful *voir dire* of potential jurors in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {63}

F. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {64}

GROUND TWO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {64}

Petitioner Pike was deprived of the right to unconflicted counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. The Tennessee courts' denials of this claim were contrary to or an unreasonable application of clearly established federal law or were based on the state court's unreasonable determination of the facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {64}

A. The possibility of ethical and criminal charges based on a history of fraudulently over-billing the courts for his work in indigent cases caused Attorney Talman to place his own interests ahead of those of his client during the penalty phase of Christa Pike's capital trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {65}

B. Trial counsel created an unconstitutional conflict of interest that affected their performance when they procured a release of media rights from Petitioner Pike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {69}

GROUND THREE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {72}

Christa Pike's attorneys were constitutionally ineffective during the guilt/innocence phase of her capital trial for their failure to present available evidence that Christa Pike did not form the required *mens rea* to be guilty of first degree premeditated murder and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {72}

GROUND FOUR.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {76}

The imposition of the death sentence on Christa Pike, an immature, mentally ill, and brain-damaged eighteen-year-old violates the Eighth Amendment prohibition against Cruel and Unusual Punishment. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).. . . . . . . . {76}

GROUND FIVE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {80}

The death sentence in this case violates Christa Pike's rights to a fair jury and due process of law because the trial court dismissed for cause a juror who was qualified to serve. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {80}

GROUND SIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {84}

The appointment of counsel with an active conflict of interest known to the trial court constitutes a violation of Christa Pike's Sixth Amendment right to counsel and this Court must issue the writ of habeas corpus due to this structural error. . . . . . . . . . . . . . . . . . {84}

GROUND SEVEN.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {85}

The trial court erred in violation of Petitioner Pike's rights to due process guaranteed by the Fourteenth Amendment to the United States Constitution by allowing television and photographic coverage of the pretrial proceedings. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {85}

GROUND EIGHT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {88}

Petitioner Pike's Sixth Amendment right to a fair and impartial jury was violated by the trial court's refusal to grant her motion for a change of venue. The Tennessee courts' denial of this claim was contrary to, or an unreasonable application of, clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {88}

GROUND NINE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {90}

Petitioner Pike's Sixth Amendment rights to a fair and impartial jury as well as her right to equal protection were violated when the trial court applied a new rule in violation of the *ex post facto* clause that gave the State the same number of peremptory challenges as the Defendant. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . . . . . . . . {90}

GROUND TEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {92}

Christa Pike's death sentence must be set aside because the Tennessee death penalty scheme is unconstitutional; its protocol for lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment. . . . . . . . . . . . . . . . . . {92}

A. Tennessee's death scheme fails to meaningfully narrow the class of death eligible defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {92}

B. The death penalty is imposed capriciously and arbitrarily under the Tennessee statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {93}

C. Execution by Tennessee's protocol for lethal injection would violate Christa Pike's rights under the Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {94}
D. The death sentence is unconstitutional because it infringes on Christa Pike's fundamental right to life, and imposition of the death penalty is not necessary to promote any compelling state interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {95}
E. The indictment returned by the Grand Jury in this case was unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {95}

GROUND ELEVEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {96}

In violation of the Fifth, Sixth and Fourteenth Amendment, the cumulative effect of the errors addressed above deprived Christa Pike of due process and a fair trial. . . . . . . . . . . . . {96}

RELIEF REQUESTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {97}

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {98}

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| **vs.** | ) | Case No. 1:12-cv-35 |
| | ) | Judge Mattice/Lee |
| **DEBRA JOHNSON**, Warden, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

---

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

---

**STATEMENT OF THE CASE**

On April 12, 1995, Christa Pike, Shadolla Peterson and Tadaryl Shipp were indicted for the premeditated murder and conspiracy to commit the premeditated murder of Colleen Slemmer. (R.7-1, Add.1, Doc.1, Trial Tech. Rec., Page ID # 34).[1] Ms. Pike was the first to be tried. Her trial was held March 18-30, 1996. (R.7-3, Add.1, Doc.3, T. Tech. Rec., Page ID # 403-29). She was convicted of both charges and sentenced to death for the murder and to a consecutive 25 years for conspiracy. (*Id*. at 430-31; 445-46).

[1] Citations to the record contain the district court record number (R.__), the Addenda and Document number assigned by the State (Add.___, Doc.___) and the Page ID #. The abbreviations are as follows: "T. Tech. Rec." is Trial Technical Record; "PC Tech. Rec." is Post-Conviction Technical Record; "TT" is Trial Transcript; "PCT" is Post-Conviction Transcript; "T. Exh." is Trial Exhibit and "PC Exh." is Post-Conviction Exhibit. All transcript citations identify the name of the person testifying.

Ms. Pike's convictions and sentences were affirmed on appeal. *State v. Pike*, 978 S.W.2d 904 (1998). The United States Supreme Court denied certiorari on June 1, 1999. *Pike v. State*, 526 U.S. 1147 (1999).

On June 3, 1999, Ms. Pike filed a pro se Petition for Relief from Conviction and Sentence. (R.9-1, Add.4, Doc.1, PC Tech. Rec., Page ID # 3781-92). Evidentiary hearings were conducted in the post-conviction court in January 2007, July 2007 and April 2008. On September 22, 2008, Ms. Pike filed her closing brief. (R.9-4, Add.4, Doc.4, PC Tech. Rec., Page ID # 4237-4337). The State filed a responsive brief on November 14, 2008. (*Id*. at 4340-76). Ms. Pike filed a brief in reply on December 8, 2008. (*Id*. at 4377-84). On December 10, 2008, the post-conviction trial court entered its Findings of Fact and Conclusions of Law denying Ms. Pike's petition for post-conviction relief. (R. 9-5, Add. 4, Doc. 5, PC Tech. Rec., Page ID # 4387-4489).

On April 25, 2011, the Tennessee Court of Criminal Appeals affirmed the post-conviction court's denial of relief. *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. April 25, 2011). Ms. Pike filed an Application seeking permission to appeal to the Tennessee Supreme Court. (R. 13-7, Add.7, Doc.7, Page ID # 9449-9520). The Tennessee Supreme Court denied Ms. Pike's application for permission to appeal on November 15, 2011. *Pike*, 2011 WL 1544207.

Having exhaused her state court remedies, Ms. Pike now files this Petition for Writ of Habeas Corpus.

## STATEMENT OF FACTS

In 1995, Petitioner, Christa Pike was indicted on charges of First Degree Murder and Conspiracy to Commit First Degree Murder in connection with the death of Colleen Slemmer. (R.7-1, Add.1, Doc.1, T. Tech. Rec., Page ID # 34-35). The trial court appointed William Talman as her lead attorney. In March of 1996, the case proceeded to trial where Ms. Pike was convicted and sentenced to death. Talman continued as Ms. Pike's attorney until the Tennessee Supreme Court affirmed her convictions and sentence on appeal.

### I. Christa Pike's death sentence was the result of a series of mis-steps by lead counsel, an attorney who "had his own problems."

#### A. Inexperienced attorneys, one of whom was experiencing serious legal and professional ethical issues of his own, were appointed to this high-profile capital case.

The entire time Talman served as Ms. Pike's lead counsel, he was under investigation and his law license was in jeopardy. Numerous agencies investigated Talman for fraudulently billing the Indigent Defense Fund for working numerically-impossible amounts of hours.[2] He frequently billed the Fund for providing more than 24 hours of legal services in a single day. An audit uncovered this numeric impossibility and an investigation into the over-billing scandal was launched. The final Comptroller's Report found Talman in egregious violation of proper billing practices. Talman's counsel was eventually able to persuade prosecutors not to seek a criminal conviction against him, but he was required to repay $67,027 to the Defense Fund. The

---

[2]*See* correspondence between Randy Nichols, Attorney General for the 6th Judicial District, who prosecuted Ms. Pike's case, and the District Attorney for the 20th Judicial District, referencing TBI's investigation into Talman. The correspondence indicates involvement by the TBI, the Tennessee Administrative Office of the Courts, the State Attorney General's Office, the Comptroller of the Treasury, and the Tennessee District Attorneys General Conference. (R.11-2, Add.6, Doc.2, PC Exh.1, Comptroller's Report, Page ID # 7256-77).

prosecutor's office who prosecuted Pike's case accepted the settlement negotiated with Talman. (R.12-3, Add.6, Doc.8, Supp. PC Exh.2A, BPR Report, Page ID # 8471-72). Talman was never officially released of criminal liability and criminal prosecution for theft over $60,000, a Class B felony with a minimum sentencing range of 8 to 12 years.

The end result of this investigation was that one day after denying rehearing in Ms. Pike's capital case, the Tennessee Supreme Court stripped Talman of his law licence for eleven months and twenty-nine days. This sanction was suspended upon Talman's compliance with numerous conditions, including that his practice be monitored by a court appointed representative. (*Id*.).

Literally days after paying out almost seventy thousand dollars in illegally gained fees as part of a settlement with the Knox County District Attorney General's Office, and just as the Board of Professional Responsibility was beginning its own investigation into Talman's improprieties, Talman was appointed as lead counsel in Ms. Pike's case. Eighteen-year-old Christa Pike, seventeen-year-old Tadaryl Shipp and nineteen-year-old Shadolla Peterson were accused of killing Colleen Slemmer on January 12, 1995. Ms. Pike gave a detailed statement admitting her involvement in this murder. (R.8-15, Add.2, Doc.30, T. Exh.28, KPD Statement, Page ID # 3375-3420). The case was highly publicized in the local media and media coverage was extensive during the trial. (R.7-1, Add.1, Doc.1, T. Tech. Rec., Page ID # 135-80; R.7-2, Add.1, Doc.2, Tech Rec., Page ID # 183-267). Even a brief overview of Ms. Pike's situation revealed that if she were convicted of first degree murder the State would be able to prove at least one aggravating factor and she would be facing the death penalty.

At the time of his appointment, Mr. Talman had never handled a death penalty case. (R.9-19, Add.5, Doc.14, Bill Talman, PCT, Page ID # 5909). Given the gravity of the case

against Ms. Pike, the trial court's appointment of Talman, whose law license was literally still in jeopardy, was inexplicable and should give this Court pause. The trial court admitted, "I knew; we all knew that Mr. Talman had his own problems." (R.10-7, Add.5, Doc.27, Judge Leibowitz, PCT, Page ID # 7083).

On January 23, 1996, just 55 days before the trial started, the trial court appointed Julie (Martin) Rice (hereinafter "Rice") as second counsel in Pike's case. Rice was appointed upon her agreement that she would not to seek a continuance to prepare for trial. (R.11-2, Add.6, Doc.2, PC Exh.3, Excerpt of Pretrial Motions Transcript, Page ID # 7325-26). At the time of her appointment, Rice had at least one other trial scheduled prior to Ms. Pike's capital trial. (*Id*. at 7326).

Rice had been licensed for approximately three and a half years at the time of Ms. Pike's trial. (R.9-17, Add.5, Doc.12, Julie Rice, PCT, Page ID # 5677-78). She had never handled a murder case, or any prosecution more serious than a Class B felony. (*Id*. at 5679-81). She had little or no experience working with expert witnesses or investigators and no particular knowledge of psychological issues. (*Id*. at 5681-84).

Rice did not remember how she and Talman divided the work on Pike's case, but she recalled that she was responsible for the family witnesses. (*Id*. at 5696). Talman said he assigned the penalty phase to Rice. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 5979). He thought that a female attorney would provide a "softer appearance to the jury and - - that's why we divided the functions . . . and let her handle the mitigation." (*Id.*).

Nonetheless, at the time of Rice's appointment, and more significantly, at the time of her pledge to the trial court that she would not seek a continuance though trial was only eight weeks

off, she had not reviewed the social history report prepared by the mitigation specialist, Dr. McCoy. Nor had she met with the defense team's psychologist, Dr. Engum. (R.9-17, Add.5, Doc.12, Julie Rice PCT, Page ID # 5690, 5692-93). In fact, even though Rice handled the testimony of all three of the witnesses who actually testified during the penalty phase, she only had one meeting with Dr. McCoy. (R.9-24, Add.5, Doc.19, McCoy, PCT, Page ID # 6292, 6303-05). That meeting took place just three days before *voir dire* began. (*Id*. at 6303).

**B. Christa Pike was found guilty of first-degree murder.**

The testimony generally established that Christa Pike, co-defendants Tadaryl Shipp, and Shadolla Peterson, and the victim, Colleen Slemmer were all students at Job Corps, a residential program designed to help troubled teens gain job skills. Pike was romantically involved with co-defendant Shipp, when she began to suspect that Slemmer was interested in him. (R.8-8, Add.2, Doc.23, Dr. Engum, TT, Page ID # 2761). This fueled a feud between Pike and Slemmer. Pike and her co-defendants enticed Slemmer to join them in a secluded area near Job Corps and then attacked her. Slemmer's skull was bashed in by a large piece of asphalt, her throat was slit multiple times, and a pentagram was carved in her chest. (R.8-2, Add.2, Doc.17, Dr. Elkins, TT, Page ID # 2232-33; R.8-3, Add.2, Doc.18, Dr. Elkins, TT, Page ID # 2288-91, 2321). The prosecution generally established its case through the testimony of the medical examiner and admission of Pike's confession.

The defense theory at trial was that Pike was guilty of reckless homicide, not first-degree murder. The defense offered the testimony of clinical psychologist, Eric Engum, to testify about Pike's mental state "along [the] line[s]" of diminished capacity. (R.8-7, Add.2, Doc.22, Dr. Engum, TT, Page ID # 2708-10). Dr. Engum told the jury Pike suffers from borderline

personality disorder. He reached this conclusion based on his meetings with Pike and her performance on a battery of psychological tests. (*Id*. at 2732-35, 2739). Dr. Engum never discussed Pike's social history to explain the possible origins of this disorder.

Dr. Engum told the jury Pike was not legally insane but that she did not act with deliberation or premeditation. Instead, she basically "went out of control." (*Id*. at 2753). On cross-examination, Dr. Engum acknowledged his opinion was based entirely upon Pike's self-report of the homicide and his testing. (R.8-8, Add.2, Doc.23, Dr. Engum, TT, Page ID # 2764). He also conceded she could be aggressive and impulsive. (*Id.* at 2771-72).

The defense also offered the testimony of William Bernet, Medical Director of the Psychiatric Hospital at Vanderbilt University, an expert in analyzing satanic rituals. He testified that due to the "mutilation of [the] body," there are "satanic elements in this crime." (*Id*., Dr. Bernet TT, Page ID # 2841). But he did not think that the "whole picture fits the pattern of a satanic ceremony, or a satanic sacrifice, or a planned satanic sacrifice." (*Id*. at 2842). Despite this opinion, he added to the jury's consideration of a possible satanic angle by discussing a copy of *The Satanic Bible* by Anton Lavey. (R.8-8, Add.2, Doc.23, Dr. Bernet, TT, Page ID # 2839; R.8-6, Add.2, Doc.21, T. Exh.76, Page ID # 2636). When trial counsel asked Dr. Bernet if he had an opinion, to a reasonable degree of medical certainty as to whether the crime was premeditated, Dr. Bernet stated he had no such opinion because he never examined Ms. Pike. (R.8-9, Add.2, Doc.24, Page ID # 2880).

At the conclusion of Dr. Bernet's direct examination, the trial court admonished defense counsel for failing to disclose Dr. Bernet's report, as Tenn. R. Crim. P. 26.2 required. (*Id*. at 2884). Dr. Bernet testified that in discussing the matter with Talman, he "came to understand

that it was not necessary . . . to do a report." (*Id.*). The trial court explained to defense counsel that he was not in compliance with the rule and defense counsel apologized. (*Id.*).

In closing argument, defense counsel argued the testimony of Drs. Engum and Bernet established Ms. Pike was guilty of reckless homicide. (*Id.* at 2956). The jury disagreed and convicted Ms. Pike of first degree, premeditated murder.

### C. Defense counsel's plans for the penalty phase were scrapped at the last minute, forcing counsel to improvise.

Prior to and during the trial, forensic psychologist Dr. McCoy acted as mitigation specialist. The substance of Dr. McCoy's work was contained in three volumes consisting of a 60-page social history, numerous records she had collected and her memoranda of all of the interviews she had conducted with Pike, her family, friends, and a small number of juvenile court workers who worked with Pike. From the beginning, Talman planned on presenting the entire case for a life sentence through the testimony of Dr. McCoy alone. (*See* R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 5986; R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, Page ID # 6388, 6414).

At the close of the guilt phase of the trial, after the jury had returned a conviction of murder in the first degree, the trial court called an *in camera* meeting with both parties. Defense counsel failed to request that this meeting be recorded, and because it took place out of the presence of the court reporter, there is no definitive record of what was said. However, during this *in camera* meeting, Talman provided the prosecutor with Dr. McCoy's three-volume Mitigation Materials and Social History, possibly by court order.[3] (R.8-10, Add.2, Doc.25, TT,

---

[3] The Tennessee Court of Criminal Appeals determined that the trial court must have ordered Talman to turn over the materials. *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011

Page ID # 3030). However, the record reflects no such order, no objection by the defense nor any request that the disclosure be limited.

Immediately after the meeting, once again in court and on the record, the prosecutor expressed agitation at having received voluminous materials pertinent to Dr. McCoy's testimony so near to her taking the stand. (*Id*. at 3030-34). The trial court then continued the start of the penalty phase until the following morning to allow the prosecutor time to review Dr. McCoy's Mitigation Materials and Social History. (*Id*. at 3030).

According to Dr. McCoy's post-conviction testimony, Talman contacted her that afternoon in a panic. He informed her that he had lied to the trial court and prosecutor by saying he had only received the materials himself the prior evening, March 28, 1996. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, Page ID # 6413). He was also panicking because the prosecutor had complained it was all hearsay. (*Id*.). In point of fact, Dr. McCoy had repeatedly asked Talman when she should complete her materials and provide them to him. In response, Talman had continually answered that there was no rush, because he planned to provide any discoverable materials to the State only at the last possible instant. (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID # 6346-47). Ultimately, Dr. McCoy gave her three volumes of work to Talman on Sunday, March 24, five days earlier than Mr. Talman had represented to the trial court and prosecutor. (R.9-25, Add.5, Doc.20, Page ID # 6413). When Talman asked Dr. McCoy to corroborate his version of events in the course of her testimony by stating that she had just given him the materials, (*id*.), Dr. McCoy refused. She also offered to call other attorneys regarding the

---

WL 1544207, at *55 (Tenn. Crim. App. April 25, 2011).

potential hearsay issue. (*Id*.). When she could not reach them, Talman told her that she would not be called to testify, and in fact, she was not. (*Id.* at 6413-16).

After making the rash decision to scrap the previously-planned mitigation case, on the eve of the penalty phase of Pike's trial, counsel was left with only 12 hours to concoct an alternative strategy. Talman ultimately called the three witnesses who had been present throughout the trial and were available on short notice: Pike's maternal aunt, father, and mother. However, the prosecution had access to these witnesses' numerous prior statements included in Dr. McCoy's materials and used them to take apart the mitigation case presented.

Ms. Pike's aunt, Carrie Ross, was the first witness to testify in mitigation. She told of how Christa was born prematurely in Beckley, West Virginia and was immediately taken to a regional medical center in Charleston. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, Page ID # 3050-51). Shortly thereafter, her mother went back to work, leaving Christa in the care of her paternal grandmother, Delpha Pike. (*Id*. at 3051). Christa spent much of her time with Delpha Pike and "was totally and absolutely devoted to [her.]" (R.8-11, Add.2, Doc.26, Carrie Ross, TT, Page ID # 3070). Delpha Pike died when Christa was about 12 years old. Christa was devastated and hysterical at her grandmother's funeral. (*Id*. at 3072).

Ms. Ross also related an incident that she thought took place when Christa was three or four years old, her mother did not want to take her to the hospital even though she was having a seizure. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, Page ID # 3063-64). Ms. Ross also testified that Christa grew up in a number of different homes, staying sometimes with her mother, her father, and both sets of grandparents.

On cross-examination (using the material turned over by the defense) the prosecutor elicited testimony that Ms. Ross took in Christa's half-sister Alicia, but refused to do so with Christa because Ms. Ross was afraid to leave Christa alone with her children. (R.8-11, Add.2, Doc.26, Carrie Ross, TT, Page ID # 3074). The State also got Ms. Ross to admit that she had called Christa a pathological liar. (*Id*.)

Glenn Pike, Christa's father, testified and described himself as a strict disciplinarian. When Christa did something wrong, he spanked her. (*Id*., Glenn Pike, TT, Page ID # 3083). Christa's parents married and divorced twice. After the second divorce, Mr. Pike married Kathleen Allman, who ultimately insisted that he not spend time with Christa. Mr. Pike stated that his relationship with Christa deteriorated completely when Christa told him that she no longer wanted his name and wanted to be adopted. Mr. Pike signed the necessary papers to voluntarily relinquish all parental rights. (*Id*. at 3083-84).

On cross-examination, again through use of materials disclosed by defense counsel, the prosecutor elicited testimony that Christa lied to her father, was manipulative (*id*. at 3085-86) and that she allegedly abused her younger half-sister. (*Id*. at 3088).[4]

Christa's mother, Carissa Hansen, was the third and final witness during the penalty phase. (R.8-11, Add.2, Doc.26, Carissa Hansen, TT, Page ID # 3091). She admitted kicking her daughter out of the house, at the request of one of her husbands who said he did not like children. (*Id*. at 3093). She recalled that Christa was close to her Grandmother Pike. (*Id*. at 3096). Christa wanted to stay in West Virginia to care for her grandmother and believed that her

[4] The trial court found that "[t]here is no proof in the record that Ms. Pike was in any way abusive to any children in her family, or otherwise." (R.9-5, Add.4, Doc.5, PC Tech. Rec., Findings of Fact and Conclusions of Law, Page ID # 4413).

grandmother died because she was not there to care for her. (*Id.*). Christa cried for days after the funeral, did not go to school, and not long afterward, attempted suicide. (*Id.*). After Grandmother Pike died, Christa was frequently shuffled back and forth between her parents but later spent more time with her mother. (*Id*. at 3094). Carissa admitted that while Christa was being cared for by her either of her two grandmothers, Carissa drank heavily, smoked marijuana, and used other drugs. (*Id*. at 3095). She admitted smoking marijuana with Christa in an attempt to be closer to her and her friend. (*Id.*).

She also admitted never getting regular medical treatment for Christa. Carissa testified that she took Christa to see a psychiatrist the day of her suicide attempt following her grandmother's death and for a couple of outpatient visits. (*Id.* at 3098).

Christa repeatedly ran away and lived on the streets for short periods. Carissa took no action to bring Christa home in such circumstances. Instead, Carissa testified, she usually responded by drinking and feeling sorry for herself. (R.8-11, Add.2, Doc.26, Carissa Hansen, TT, Page ID # 3100).

On cross-examination, using materials turned over by the defense, the prosecutor brought out that when Christa was 12 years old she threatened Carissa's then-boyfriend, with a butcher knife, was found with a knife on another occasion, was uncontrollable since the age of eight, had a live-in boyfriend when she was 14, grew marijuana in the house, was not allowed around her father's young children, and was a liar who had many second chances and blew them all. (*Id.* at

3102-10). All of this information was derived from the material turned over in the mitigation materials.[5]

Testimony from these three witnesses covers less than 60 pages of transcript. (R.8-10, Add.2, Doc.25, Page ID # 3049-65 through R.8-11, Add.2, Doc.26, Page ID # 3069-3111). Information was elicited almost as if counsel were checking off items from a list. The prosecutor and trial court often had to instruct counsel to offer testimony on time and place. At one point, counsel attempted to elicit testimony about Christa's family history of substance abuse and the trial court would not allow it because "[n]one of you are experts as to substance abuse." (R.8-10, Add.2, Doc.25, Judge Leibowitz, TT, Page ID # 3058).

Trial counsel's sentencing phase argument was brief. They never mentioned Christa's borderline personality disorder, her history of abuse, abandonment and neglect or even told the jury that Christa's youth was a statutory mitigating factor. Rather, counsel argued that if the jury imposed death, his client would receive lots of attention, which is what she was after, and thus a life sentence was the best punishment. (*Id.*, Talman Penalty Phase Opening, TT, Page ID # 3046.)

The jury imposed death.

---

[5] *See* R.11-3, Add.6, Doc.3, PC Exh.1A, Dr. McCoy's Social History, Page ID # 7485; *Id.*, Mitigation Materials, Page ID # 7569, 7573; R.11-5, Add.6, Doc.5, PC Exh.1C, Mitigation Materials, Page ID # 8096-97.

## II. Evidence presented during the post-conviction gave a complete picture of Christa's life of abuse and neglect, her organic brain damage and severe mental illness as well as how these factors accounted for her behavior throughout her young life, including at the time of the offense in this case.

On post-conviction, Ms. Pike presented the case for mitigation that her sentencing jury was never given the chance to hear. This included Dr. McCoy's testimony as well as evidence to show that her participation in the murder of Colleen Slemmer as the product of brain damage, mental illness, and a history of severe abuse and neglect. Moreover, all of the evidence presented by Ms. Pike on post-conviction would have been available to diligent counsel. Some of the evidence was in counsel's immediate possession, and was simply withheld for reasons stemming either from Talman's conflict over lying to the court or counsel's general incompetence. Even more mitigating evidence could have been easily discovered if counsel had made even minimally diligent efforts to investigate potential issues and incorporate the opinions of experts into their trial presentation.

Ms. Pike put on expert testimony that individuals exhibiting three characteristics in particular: (1) brain damage; (2) mental illness, and (3) a history of abuse are predisposed to commit acts of violence. Ms. Pike then made the case that she suffers from all three characteristics. She has: (1) brain damage in the form of a heterotopia of the frontal lobe; (2) bipolar disorder, and (3) post-traumatic stress disorder resulting from a history of physical and sexual abuse. Additionally, Ms. Pike demonstrated that she was raised in an environment that condoned, normalized, and even glorified extreme levels of violence. Ms. Pike also demonstrated that, in the months leading up to the murder in this case, she was under mounting stress and exposure to violence while a student at Job Corps, both because of the generalized

level of danger and violence at the Job Corps facilities, and more specifically because of her relationship with co-defendant Tadaryl Shipp. Had the jury been able to consider this evidence that gave a completely different view of the defendant and that gave some explanation for her actions, there is a reasonable probability that at least one juror would have voted for a life sentence.

### A. Defense counsel's last-minute decision not to call Dr. McCoy deprived the jury of any explanation as to how family members' testimony could be given mitigating effect.

One of the mitigating themes trial counsel had planned to present during the sentencing phase was that Christa suffered from borderline personality disorder. (R.11-2. Add.6, Doc.2, PC Exh. 6, Suggested Mitigation Themes, Page ID # 7340). But counsel failed to present background evidence to tie into this theory. Counsel had originally planned to present the mitigating evidence through their mitigation specialist, Diana McCoy, Ph.D. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 5986-87; R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, Page ID # 6414). The "plan was to try and have Dr. McCoy bring all this stuff in . . . about her background and tie it in with Dr. Engum's report." (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 5987). However, once counsel decided not to call Dr. McCoy, this plan was never implemented and the jury never heard Dr. McCoy's testimony and never heard any tie-in to Dr. Engum's testimony.

Dr. McCoy was called in post-conviction to give the mitigation testimony she would have presented at trial. She would have testified that borderline personality disorder is defined as a "pervasive pattern of instability of interpersonal relationships, self-image and affect, and marked by impulsivity . . . ." (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID # 6365). It is

characterized by "efforts to avoid real or imagined abandonment." (*Id.* at 6366). As a result, people with borderline personality disorder "often have very inappropriate anger that they express, way out of proportion to the incident." (*Id.*) Typically there are a number of recurrent suicide gestures or threats and self-mutilating behavior. (*Id.* at 6367). In addition, a borderline individual will have mood swings during which they may be really happy one minute, then irritable and, then anxious. (*Id.* at 6368). The intense anger and stress can cause transient psychotic episodes. (*Id.*) That individual will also experience extremes and instability in relationships. (*Id.* at 6358).

Dr. McCoy would also have informed the jury that the origins of Christa's disorder were instability, abuse and neglect seen in Christa's life. (*Id*. at 6358-59). Dr. McCoy would have described Christa's dysfunctional family, their lack of stability causing her to move back and forth between parents and other caretakers, along with the volatility of the mother's relationships with a series of men. (R.9-25, Add.5, Doc.20, McCoy, PCT, Page ID # 6443). Such a background contributed to Christa's frantic efforts to avoid real or imagined abandonment. (*Id.* at 6438). Dr. McCoy would also have testified that Christa's mental difficulties were caused by multiple traumatic events in her childhood and adolescence, including two rapes and physical abuse by a number of care givers. (*Id.* at 6447, 6466).

Dr. McCoy could have explained that many of the negative behaviors exposed by the trial prosecutor's cross-examination of Christa's family members could be attributed to her borderline diagnosis. Christa's continual childhood efforts to run away, her dishonesty, her being described as "out of control," were all manifestations of the borderline personality disorder which was a product of her childhood circumstances. (*Id.* at 6392, 6468-69). Her self-destructiveness,

including her suicide attempts, and her failure to take advantage of the "chances" she was given, were also symptoms. (*Id.* at 6377-78).

Dr. McCoy also provided the link between Christa's borderline personality disorder and her relationship with her co-defendant, Tadaryl Shipp. Christa's friends, Brandi and Mandy, both told Dr. McCoy that Ms. Pike was so hungry for attention that she would do anything to impress a boy. Dr. McCoy opined that this intense need for a romantic relationship was consistent with Christa's disorder. When Christa arrived at Job Corps and Shipp showed interest in her, it played into her borderline issues of unstable identity and low self-esteem. Because Shipp was feared by other Job Corps students, Christa also saw him as her protector. (*Id.* at 6395-96). All of these facts played an important role in the tragic events that underlie this case. Yet, none of it was presented to the jury in mitigation.

**B. In post-conviction, Christa Pike presented evidence that she suffers from organic brain damage that probably resulted from her mother's drinking alcohol during pregnancy. This brain damage affected her ability to regulate her behavior.**

Also in post-conviction, Ms. Pike presented extensive evidence that she suffers from organic brain damage. She presented the expert neurological testimony of Dr. Pincus and the expert psychiatric testimony of Dr. Kenner. She also presented lay witnesses who testified to their observations of her behavior that corroborate the effects and manifestations of that brain damage.

Dr. Jonathan Pincus, Chief of Neurology at the Veterans Administration Hospital in Washington, D.C., board-certified in Psychiatry and Neurology, and a Professor of Neurology at Georgetown University School of Medicine, concluded that Christa Pike's brain was seriously

damaged even before she was born. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4738). Dr. Pincus explained that the frontal lobe is the region of the brain where moral teaching is encoded. Later in life, this same region functions to regulate conduct in accordance with learned ethical standards. (*Id.* at 4773). Damage to an individual's frontal lobe thus obstructs moral learning. (*Id.*). Mental illness compounds this problem. Finally, individuals with a history of abuse often internalize a sense that violence is an appropriate response to confusion or agitation, and that chaotic, irrational behavior is normal. When all three of these factors are present, the individual is at a high risk for committing violent crimes.

Dr. Pincus testified Ms. Pike was born with brain damage. (*Id.* at 4764). Abnormality in Ms. Pike's *basil ganglia* was clear to Dr. Pincus from consistent indications across a variety of tests, including in the physical examination he performed on Ms. Pike, and in the electroencephalography (EEG) that had been conducted in 1977 when she was 14 months old, and in a small heterotopia, visible to the naked eye, on a magnetic resonance imaging (MRI) scan performed on Ms. Pike at Dr. Pincus' request. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4764-70; R.12-5, Add.6, Doc.10, PC Exh.7, Christa Pike Birth Records, Page ID # 8778). The EEG results were abnormal, "showing frequent high voltage sharp spikes and biphasic sharp waves . . . mostly from the right frontal temporal site focal." (R.12-5, Add.6, Doc.10, PC Exh.7, Christa Pike Birth Records, Page ID # 8786). This was the first evidence of Christa's brain damage. Dr. Pincus explained that heterotopia is a phenomenon that occurs in a fetus as brain cells are developing and gray matter grows where gray matter does not belong. This happens because of some problem the mother is having, or perhaps, because she is drinking alcohol. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4771-72). A heterotopia is normally visible

on an MRI only with the aid of a microscope, making Ms. Pike's heterotopia significant because when you can see it with the naked eye you can be "certain that there's plenty more heterotopic areas and nests that exist that you can't see on MRI." (*Id.* at 4774-75). According to Dr. Pincus, this heterotopia found in Christa was consistent with her childhood seizures.

Christa's brain damage is most likely the result of her mother's drinking while pregnant with her. (*Id.* at 4771-72). The record is replete with evidence that Christa's mother is an alcoholic and drank throughout her pregnancy with her. Christa's father, Glenn Pike, testified that he did not remember Carissa slowing her drinking anytime during their marriage, a period which included her pregnancy with Christa. (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4975). Furthermore, Christa's half-sister, Alicia Wills, testified that her mother always drank a lot and that she often attended parties where there was drinking when her children were small. (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, Page ID # 4912).

Dr. Pincus testified that Christa's brain damage diminished her capacity for moral reasoning because it was significant enough to interfere with her frontal lobe function. Consequently, Dr. Pincus concluded, Christa was likely born with a faulty system for incorporating morality from the world around her, and was likewise unable to place effective moral constraints on her conduct.

William Kenner, M.D., confirmed the findings of Dr. Pincus. Dr. Kenner stated that Christa's EEG at 14 months suggested that her brain was not wired properly and the location of the damage was in the area that controls executive functioning and behavior regulation. Dr. Kenner agreed with Dr. Pincus that Christa's frontal lobe was significantly impaired. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID # 6788-93).

Lay testimony shows that Christa exhibited symptoms of this brain damage from a very early age. Christa's aunt, Carrie Ross, testified that Christa did not seem to understand instructions, she would go right back to playing with something someone had told her not to touch. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4705-06). Christa's sister, Alicia Wills, testified similarly, recalling that Christa's Grandmother Fotos did not like to keep Christa because she was frustrated by Christa's failure to understand when she was being told what to do, she would just "blank out." (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, Page ID # 4901-02). Thus, from the very beginning, Christa's brain damage caused her problems.

### C. Christa Pike's early life was characterized by instability, neglect and physical abuse. Furthermore, she was exposed to violence in an environment that condoned that violence.

After suffering prenatal brain damage, Christa's life outside the womb began traumatically. She was born prematurely in Beckley, West Virginia, and rushed to the intensive neonatal care unit of a hospital in Charleston, West Virginia. She suffered respiratory failure after birth and again in the ambulance on the way to the hospital. Christa was afflicted with hyaline membrane disease, which occurs when immature lungs prevent an infant from holding sufficient oxygen. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, Page ID # 4575; R.12-5, Add.6, Doc.10, PC Exh. 7, Christa Pike Birth Records, Page ID # 8795, 8800).

Because Christa was in the neonatal unit for the first week of her life, she had no bonding experience with her parents. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6848). This first experience constituted early attachment abandonment trauma. This deficit might have been overcome by reasonable stability after Christa was sent home, but that did not happen, which resulted in lasting emotional and psychological damage. (*Id.*).

The evidence is overwhelming that from birth, Christa's parents were disinterested in her well-being and treated her as an unwelcome nuisance. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4702-03; R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4785; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4978-80, 4985-90). This is best substantiated by the fact that when she was 14 months old, during the aforementioned seizures, Christa's mother was out drinking and had to be chided into checking on her daughter. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, Page ID # 3063-64).

Christa's parents had a tendency to leave her with abusive caretakers. Among these was her maternal grandmother, Zola Fotos, an alcoholic who resented having to care for Carissa's second daughter. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4698, 4709-10). While Christa's grandmother Fotos was loving and nurturing to Carissa's first daughter, Alicia, Christa was scorned, abused, and neglected. (*Id.* at 4709). Grandmother Fotos showed her resentment of Christa with physical abuse. (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, Page ID # 4901).

Christa was also left in the care of an abusive great-aunt, Norma Privett. Carrie Ross testified about Aunt Norma's abuse from having known it as a child. While caring for Ms. Ross, Aunt Norma was very abusive and would drag Ms. Ross around by the hair. Ms. Ross did not allow Aunt Norma to babysit any of her children. However, Aunt Norma did babysit Christa and Alicia until Ms. Ross persuaded Christa's mother against it. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4686-88).

The one bright spot in Ms. Pike's life was her Grandmother Pike. Shortly after Christa's birth, Grandmother Pike became her most consistent caretaker and appeared to be the only person in the world who loved her. Unfortunately, Grandmother Pike died when Christa was 12.

Christa felt she no longer had anyone who cared about her after Grandmother Pike's passing, and was devastated by the loss. (R.8-11, Add.2, Doc.26, Carrie Ross, TT, Page ID # 3070-72; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4994).

Although Christa's Grandmother Pike brought a singularly positive dimension to Christa's childhood, even this relationship was not without its harmful side. When Grandmother Pike's boyfriend, Ernest, spent the night, Christa would sleep between him and her grandmother. Christa's aunt, Carrie Ross noticed that Christa often stroked Grandmother Pike's breasts in an inappropriate, sexual manner when she was two or two and half years old. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4712-13). Furthermore, when Christa was in the first grade, her teacher reported that she had been drawing pornographic pictures in class, suggesting exposure to sex. (*Id.* at 4715).

Neither of Christa's parents played a consistent role in raising her. While her parents were married, her primary care was delegated to Grandmother Pike. Once they were divorced, Christa was passed back and forth between them haphazardly, each reluctantly taking her in for a brief period before tiring of her and sending her to the other. (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4990-91). When Christa was eight or nine years old, her mother sent her to live with her father because her latest husband, Danny Thompson, told her that he did not like children and that Christa and her sister had to go. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4696-98). Christa's father initially took her in, but he later forbade her from entering his home after his wife alleged that Christa sexually abused their infant daughter even though he

stated he never believed the allegations.[6] (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4992-93, 4997).

Christa's schooling was greatly disrupted because she was sent back and forth between her parents. She changed schools often (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID # 6325), and never spent more than two years in the same school. (*Id.* at 6360). Despite her above-average intelligence, she failed the seventh grade because she changed schools so many times that year. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, Page ID # 6462).

When Christa's father was not neglecting his daughter, he was "disciplining" her in a physically abusive manner. Glenn Pike admitted during his post-conviction testimony that he whipped Ms. Pike with a belt when she disobeyed him. (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4985). He would beat her when she did not complete her homework. (*Id.* at 4986-87). On at least one occasion, he beat her five or six times on the same day because she did not complete her homework to his satisfaction. (*Id.* at 4988-89). While Mr. Pike downplayed these beatings as routine discipline, Mr. Pike grossly understated the violent nature of these whippings. Christa's back bears scars from these beatings that were most likely caused by a belt or switch. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4782).

During the times that Christa spent in her mother's house, she was left to fend for herself. Christa's aunt testified that Christa's mother placed her appearance, clothing, drinking and the whims of her various husbands and boyfriends before the interests of her children. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4702). Christa's sister recalled one boyfriend in

[6] The post-conviction court found that "[t]here is no proof in the record that Ms. Pike was in any way abusive to any children in her family, or otherwise." (R.9-5, Add.4, Doc.5, PC Tech. Rec., Findings of Fact and Conclusions of Law, Page ID # 4413).

particular who frequently brought fast food and candy into the house and ate it in front of the girls, offering them nothing, though there was no food in the house. (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, Page ID # 4913-14).

Christa was also allowed to spend time in places where she was exposed to things that were inappropriate for her age. Christa was first exposed to pornography at five or six, when she played with her father's pornographic playing cards. She took these cards to school in either kindergarten or first grade to show her classmates. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6868).

From the time that Christa was a toddler, she frequently spent days with her grandfather in his slaughterhouse. According to the testimony of Carrie Ross, Christa would first play with the cows in the holding pen. (R.9-23, Add.5, Doc.18, Carrie Ross, PCT, Page ID # 6251-52; R.9-24, Add.5, Doc.19, Carrie Ross, PCT, Page ID # 6278). Then, Christa would go into the slaughterhouse and watch as her grandfather knocked a cow unconscious, hoisted it by its hind leg, cut its throat, drained its blood, removed the guts, then bisected the cow down the spine using a meat saw. (R.9-23, Add.5, Doc.18, Carrie Ross, PCT, Page ID # 6253-57). Dr. Kenner explained this overstimulation removes the natural inhibition to escalating violence that is inherent in individuals not similarly exposed. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6857).

Christa was raised with an extended family that condoned and revered violence as a means of problem solving. This value system was firmly entrenched. Christa's mother would commonly threaten physical violence whenever she was angry. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4692-93). Ms. Ross testified that the family was taught that the

appropriate response to verbal or physical attack was physical violence. (*Id.*). On one occasion, Ms. Ross was ridiculed by her mother, Zola Fotos, for walking away when another woman tried to pick a fight with her. Ms. Fotos challenged her daughter to go back and finish the altercation, asking, "what are you going to kill her with?" and calling her a "coward." (R.9-23, Add.5, Doc.18, Carrie Ross, PCT, Page ID # 6239-40).

This same message was delivered to Christa. Her Grandfather Fotos repeatedly told the grandchildren that if someone started a fight with them and they did not finish it, then he would "kick [their] ass" when they got home. (*Id.* at 6244). Grandmother Fotos echoed this message and family violence was the subject of many proud stories. Stories of murder and violence were passed down with pride and often told with humor. (*Id.* at 6236-44).

**D. During Christa's adolescence, as the neglect and abuse continued, she was repeatedly sexually assaulted and began to be "out of control."**

When Christa was in fourth or fifth grade, her mother moved to North Carolina as a result of her latest marriage. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, Page ID # 4578). About this time, Christa was sexually assaulted for the first time.

A man named Claude Davis, who lived in Christa's neighborhood, sexually assaulted her when she was 11 years old, violating her vaginally with sticks and allowing his dog to lick her genitalia. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4787; R.12-5, Add.6, Doc.10, PC Exh.5, Court Records from S. Carolina, Page ID # 8735-40). Criminal charges were later reduced. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, Page ID # 4589). Christa attempted suicide in response to her mother not believing she had been raped. (R.12-2, Add.6, Doc.7, PC Exh.1E, McCoy Mitigation Materials, Page ID # 8315).

Christa was also subject to physical and sexual abuse from another of her mother's boyfriends. Steve Kyaw had boxes of pornographic pictures that Christa had access to, and would wrestle with Christa and twist her nipples. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4793-95; R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6855). When she was alone, Christa would occupy herself by watching the stacks of porno flicks until her mother came home from work. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6868). Kyaw was eventually charged with assaulting Christa when he punched her in the nose. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, Page ID # 4586). Carol Goehring, a childhood friend of Christa's, testified that she witnessed Kyaw assault Christa after she locked him out of her room. (R.9-11, Add.5, Doc.6, Carol Goehring, PCT, Page ID # 5076-77). According to Goehring, Christa tried to defend herself with a knife and had to adjust her pants after getting away from Kyaw.[7] (*Id.*).

After Kyaw was charged with assault, Children Services became involved in Christa's life. Kerry Clement Sherrill testified that she met Christa while employed as a social worker for the Child Protective Services Unit of Orange County, North Carolina. (R.9-11, Add.5, Doc.6, Kerry Sherrill, PCT, Page ID # 5107). Christa's case was assigned to Ms. Sherrill as a case of child abuse and neglect. Christa was in middle school at the time. (*Id.*). Ms. Sherrill devised a treatment plan that entailed Christa not being left alone with Kyaw, parental counseling for Christa's mother, and development of a better relationship between Christa and her mother, beginning with the two spending more time together. (*Id.* at 5108).

---

[7]This is the "butcher-knife" incident that the prosecutor was able to use in cross-examination of Christa's mother to show she was "out of control." (R.8-11, Add.2, Doc.26., Carissa Hansen, TT, Page ID # 3103-04).

Through Ms. Sherrill's intervention, Christa was removed from her home and temporarily placed in the Scheaffer House boarding facility. (*Id.* at 5109). Ms. Sherrill testified that she had recommended that Christa's mother take parenting classes while finding a job that would allow her to be home more, Christa's mother did not take any of the steps prescribed in the treatment plan and she seemed disinterested in assuring Christa's return home. (*Id.* at 5115-16).

However, Christa did eventually return home where her mother's parenting skills had not improved. Christa's mother's friend, Faye Guy, testified that Christa was inappropriately exposed to graphic images of gore and violence when Christa and her mother watched horror movies together. (R.9-10, Add.5, Doc.5, Faye Guy, PCT, Page ID # 5033-34). Ms. Guy described these particular movies as "horrible, horrible bloody gory movies" that were simply not age-appropriate for Christa at the time. (*Id.*). She once told Christa's mother that these movies were inappropriate, but her mother laughed it off, saying, "[w]ell, she loves them. She's been watching those movies since she was two or three years old." (*Id.* at 5034-35). Christa's aunt, Carrie Ross, corroborated Christa's exposure to graphic violence in movies from a young age. (R.9-8, Add.5, Doc.3, Carrie Ross, PCT, Page ID # 4733). Counter-intuitively, these movies had pleasant connotations for Christa because watching them was virtually the only way she was able to spend time with her mother as a child. (R.9-10, Add.5, Doc.5, Faye Guy, PCT, Page ID # 5033-34).

Christa was beginning to act out and suffered more abuse for it. Her sister's boyfriend, Brian Hammond, was dispatched to check on Christa while Christa's mother was out of town with a husband, and was angered to find that Christa was having a party at the house. He gave Christa a bloody nose. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, Page ID # 4583-84).

Eventually, Christa, was put on probation for a larceny charge and running away. When she did not comply with the conditions of her probation, she was sent to juvenile detention at a facility named Swannanoa. (R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, Page ID # 5134-35). While she was there, Christa's mother rarely visited and her father never did. (R.9-12, Add.5, Doc.7, Peggy Hamlett, PCT, Page ID # 5179; R.12-1, Add.6, Doc.6, PC Exh.1D, McCoy Mitigation Materials, Page ID # 8121; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4995). Employees at Swannanoa testified that Christa stayed there longer than most children placed in such facilities. Each conjectured that when Christa was doing well, she sabotaged herself to avoid being sent home. (R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, Page ID # 5136-37; R.9-13, Add.5, Doc.8, Onas Perry, PCT, Page ID # 5279).

Onas Perry, a cottage technician at Swannanoa, testified that on many occasions Christa sought her out late at night to talk one-on-one. On these occasions, Christa spoke about wanting a better relationship with her mother. Christa said that her mother was unavailable, and that she wished her mother loved and cared for her more. (R.9-13, Add.5, Doc.8, Onas Perry, PCT, Page ID # 5266, 5270-71). Ms. Perry thought that Christa had a bad family situation (*id*. at 5279); she believed that the reason Christa was at the Juvenile Evaluation Center for 15 or 16 months was that it was a safe haven for her. (*Id.* at 5274).

At age 17, Christa was living on the streets. (R.9-11, Add.5, Doc.6, Jamie Robinson, PCT, Page ID # 5088-89, 5100). Her friend, Jamie Robinson, who spent much of this time with her, recalled once spending the night at Christa's house and noted that there was not much communication between Christa and her mother. (*Id.* at 5093). She also remembered an incident in which she and Christa were stopped by security officers at a mall and the officers called their

parents. She recalled that her mother spent a long time on the phone with them, asking about her condition and asking to speak with her. Christa's mother, in contrast spent "two seconds" on the phone. (*Id.* at 5096-97). Jamie felt that Christa's mother did not seem to care what was happening to her. (*Id.*)

Around this time, Christa was raped by a man who grabbed her when she was going to the store. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, Page ID # 4590-91). Hospital records confirmed the rape. (R.12-5, Add.6, Doc.10, PC Exh.6, UNC Hospital Records, Page ID # 8759-70).

Despite all of these difficulties, Christa decided that she still wanted to make something of herself. She wanted to help others and wanted a career. She decided she would go to the Job Corps in Knoxville. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, Page ID # 4594-95).

### E. Knoxville's Job Corps was a violent, unsafe environment where Christa's psychological make-up made her vulnerable to the influence of her new boyfriend, Tadaryl Shipp. Her background, along with the new dangers from the Job Corps led post-conviction expert, Dr. Kenner, to diagnose her with Post-Traumatic Stress Disorder (PTSD).

William Joseph Mode, an instructor at the Job Corps, testified that the Job Corps facility was dangerous for both students and faculty. (R.9-13, Add.5, Doc.8, William Mode, PCT, Page ID # 5306, 5309-13). Many students were armed with either knives or guns, and Tadaryl Shipp, Christa's boyfriend was widely known to carry a gun. (*Id.* at 5313).

Andrew Scott Drace attended Job Corps at the same time as Christa and testified that Job Corps was a very violent place due to the presence of gangs and predatory students who picked on others. (R.9-12, Add.5, Doc.7, Andrew Drace, PCT, Page ID # 5219). He indicated that

because he was white, the gang members would come into his room and put a towel or sheet over him and beat him up. (*Id.* at 5221). Tadaryl Shipp was one of these gang members. (*Id.*).

Drace stated that on one occasion, Shipp tried to pick him up and throw him off of a bridge onto a railroad track some 200 feet below. (*Id.* at 5225). Drace managed to get away when several cars crossing over the bridge stopped to investigate and Shipp was distracted. (*Id.* at 5226).

Kimberly Iloilo Rhodes was a student at Job Corps and a friend of Christa's. (R.9-13, Add.5, Doc.8, Kimberly Rhodes, PCT, Page ID # 5336). Rhodes testified for the State at Christa's 1996 trial. (*Id.* at 5336-37). She said that Job Corps was scary at times, and that she was afraid for her personal safety. She elaborated that there was a lot of animosity between different groups, and that this sometimes led to violence. (*Id.* at 5339-40).

Tyrone Comfort testified that he was a friend of Christa's at the Job Corps where they were both students. According to Comfort, Shipp was very controlling of Christa and was physically abusive. (R.9-15, Add.5, Doc.10, Tyrone Comfort, PCT, Page ID # 5533, 5536-37, 5545).

Dr. Kenner explained how Christa's psychological state and all of these factors around the Job Corps affected her relationship with co-defendant Shipp, with whom she was infatuated. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6911). Shipp was violent and dangerous. He had been involved in gang-related violence before coming to Job Corps and he, "was flirting with voodoo, and black magic [and] devil worship . . . ." (*Id.* at 6912). His appreciation of violence and Satanic worship exerted a strong influence on Christa. Christa was willing to adopt his interests in an effort to please him just as she had once shared her mother's interest in horror

movies to spend time with her. Around the time of the offense in this case, Shipp was sexually involved with other women besides Christa. Shipp had a history of both manipulating and abusing adolescent females, he also had a history of threatening the girls he dated if he did not get his way. (R.9-15, Add.5, Doc.10, DeAndrea Gates, PCT, Page ID # 5559-61; R.9-16, Add.5, Doc.11, Amanda Robertson, PCT, Page ID # 5597-5605).

Christa's young life was marred by neglect, abuse, overstimulation and glorification of violence, which affected the development of her brain. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6885-88, 6891). The danger and violence of the Job Corps affected it further. Dr. Kenner explained how various stress hormones--produced in response to near-perpetual fear of something bad happening--lead to development of post-traumatic stress disorder ("PTSD"). (*Id.* at 6889). After reviewing the criteria for PTSD, Dr. Kenner indicated to a reasonable degree of medical certainty that Christa suffers from PTSD. (*Id.* at 6891-95).

Christa's PTSD is evident in looking at the events that led up to the offense in this case. In the months leading up to it, Christa was surrounded by circumstances that greatly amplified her potential for violent behavior.

### F. The evidence also demonstrates that Christa Pike suffers from bipolar disorder.

In addition to evidence of brain damage and PTSD, Christa Pike presented extensive evidence that she suffers from another significant mental illness, bipolar disorder. This evidence, like that in support of her brain damage, was presented through both expert and lay witnesses. Dr. Kenner testified that he had reached an expert opinion that Christa suffers from bipolar disorder based on a review of her entire social history as well as evaluations from other mental

health professionals. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID # 6774). In addition, Dr. Kenner interviewed Christa eight times and conducted a collateral interview with Christa's mother. (*Id.* at 6765, 6775).

Dr. Kenner explained that individuals with bipolar type II disorder, which was his diagnosis for Ms. Pike, will have racing thoughts and be highly impulsive. (*Id.* at 6778). Dr. Kenner described this as being akin to driving with the cruise control on and set between 95 and 120 miles per hour. (*Id.*). As a result, when confronted with problems, hypomaniacs like Christa are certain to make rash, poor decisions. (*Id.*). Dr. Kenner further explained that bipolar disorder creates in Ms. Pike a sense of omnipotence and grandiosity, making her feel invulnerable to danger. (*Id.* at 6778-79). A person with bipolar type II disorder will also have periods of depression, which Dr. Kenner noted, explains Christa's suicide attempts. (*Id.*)

Dr. Kenner also found ample evidence of bipolar disorder in Ms. Pike's life history. For instance, Ms. Pike had long exhibited the extended periods of manic energy that are symptomatic of bipolar disorder and that are characterized by lack of sleep. (*Id.* at 6775-76). Dr. Kenner testified that another feature of Christa's bipolar disorder is periodic bouts of mounting irritability. Dr. Kenner saw evidence of this symptomatic irritability in Christa's conduct in the course of killing Ms. Slemmer. He testified that just prior to this incident, Christa was experiencing long cycles of sleep deprivation with increasing irritability. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID # 6783-84). At the time of Ms. Slemmer's killing, Christa had been awake for four days and her irritability was at its apex. (*Id.* at 6784).

Lay witness testimony supports the diagnosis of bipolar disorder. Kristina Hargis, a social worker at the Swannanoa facility, testified when she knew Christa when she was about 15

and Christa was depressed and struggling. (R.9-12, Add.5, Doc.7, Kristina Hargis, PCT, Page ID # 5192). Ms. Hargis reported that Christa exhibited drastic mood changes, alternating between being up, full of life, and mischievous on the one hand, and depressed, upset, and crying on the other. (*Id*. at 5197).

Orlando Powell, a former boyfriend of Christa's, testified that he spent a lot of time talking with Christa while she was a teenager and recalled that she was not happy. He also recalled that she had a temper and could go from " zero to 100" very quickly. However, whenever her tempered flared up, if he was around, he was able to get her to calm down and regain control. (R.9-11, Add.5, Doc.6, Orlando Powell, PCT, Page ID # 5055-56). Powell also recalled that Christa had a very high energy level. (*Id.*).

Peggy Hamlett, the Chief Court Counselor for Orange and Chatham Counties, North Carolina Department of Juvenile Justice, testified that as a young teenager, Christa was "really out of control" and exhibited impulsive behavior by skipping school, running away from home, and not keeping appointments while she was on probation. (*Id.*, Peggy Hamlett, PCT, Page ID # 5139; R.9-12, Add.5, Doc.7, Peggy Hamlett, PCT, Page ID # 5143). Similarly, Debby Howell Burchfield, the Director of the Buncombe Juvenile Detention Center in Asheville, North Carolina, testified that her records indicate that Christa was depressed and often cried in her room and that she was written up for self-mutilation which Ms. Burchfield explained is typically perceived as indicative of deeper psychological issues requiring further evaluation. (*Id.*, Debby Burchfield, PCT, Page ID # 5169-71). Ms. Burchfield also reported that Christa usually exhibited a higher energy level than most teenagers, but that Christa would very quickly go from happy to depressed. (*Id.* at 5174-75).

Onas Perry testified that she worked at the Swannanoa Juvenile Evaluation Center while Christa was there. (R.9-13, Add.5, Doc.8, Onas Perry, PCT, Page ID # 5266). Ms. Perry worked the 2:00 to 10:00 PM shift at Swannanoa and was with the students from after school until they went to sleep at night. (*Id*. at 5267). She explained that part of her job entailed checking on the girls every 15 minutes while they slept. (*Id*. at 5273). She noted that Christa would be asleep and then would wake up in her sleep as though having a nightmare. (*Id.*). Ms. Perry noted that Christa's moods were different than those of the other girls: sometimes she was calm, others she was rambunctious, out of control, and overly energetic, and still others she was depressed and would stay in her room, crying. (*Id.* at 5278).

**G. Despite her tragic background and despite the facts surrounding the offense in this case, many witnesses were willing to come forward to testify about Christa Pike's positive characteristics.**

Many witnesses came forward in post-conviction to testify about Christa's intelligence, good humor, and humanity. Christa was able to exhibit these characteristics despite her troubled background and the devastating effects it had on her. Such testimony would have been essential to humanize Christa and show the jury that Christa's life has value and a life sentence was warranted.

Kerry Sherrill, the social worker for Child Protective Services assigned to Christa's case, kept a picture of Christa, and explained that she kept pictures of the children who touched her most. (R.9-11, Add.5, Doc.6, Kerry Sherrill, PCT, Page ID # 5117-18). She recalled that she met Christa as a middle school student and described her as a was a bright, respectful, and warm young woman, easy to get along with, who enjoyed the attention of adults. (*Id.* at 5107). She

was also loyal to her friends. (*Id.* at 5117) Although Christa sometimes acted out, it was out of need for attention. (*Id.*)

Peggy Hamlett testified that Christa was clearly very bright and that her teachers reported that she had great potential. (R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, Page ID # 5139).

Carol Goehring, a one-time close friend of Christa's, testified that Christa held friendship in very high regard and was very loyal. Christa seemed happy and was very energetic, always wanting to do something fun. (*Id.*, Carol Goehring, PCT, Page ID # 5082-83). She recalled a time when a new girl in town named Brandy was put out of her home and had nowhere to go. Christa was concerned for Brandy's safety and stayed with her on the streets. (*Id.*).

Debby Burchfield, who worked with Christa while she was housed at the Swannanoa juvenile detention facility, described Christa as "bright" and "very personable." (R.9-12, Add.5, Doc.7, Debby Burchfield, PCT, Page ID # 5163). She recalled that Christa planned to enroll in technical college to study nursing with a long term goal of becoming a physician's assistant. (*Id.*). Ms. Burchfield testified that she considered Christa's goals attainable. (*Id.*). She pointed out that, while at Swannanoa, Christa completed her GED and applied to Job Corps. (*Id.* at 5165).

Marshall Muse was Christa's teacher at Swannanoa's training school. (*Id.*, Marshall Muse, PCT, Page ID # 5205). At first, he said, Christa was defiant in his class and he wrote her up for misbehavior numerous times. But after Christa understood that Mr. Muse was in charge, she began to work in his class and he saw "flashes that there's something special, something different, something that set her apart from the other students." (*Id.* at 5206-07).

Mr. Muse then made Christa a teacher's aide. (*Id.*). In that capacity, she performed tasks for him in the afternoon, and he could always count on her to do what she was assigned and nothing else. (*Id.* at 5207). She was trusted not only by Mr. Muse, but also by other faculty members. Consequently, she was given many assignments and had the run of the campus to perform various errands. Mr. Muse also indicated that he and Christa had a healthy respect for each other and that she had a delightful sense of humor. (*Id.* at 5208). Christa loved to be challenged intellectually and rose to the occasion each time. (*Id.* at 5211). According to Mr. Muse, Christa did well, whether she was working with under-achieving students or doing menial chores, like cleaning up the classroom. She respected the other students, and Mr. Muse even had her substitute for him when he was absent. (*Id.* at 5212-13).

Mr. Muse recalled that in response to one particular Thanksgiving writing assignment, Christa included him in her story as the "mean Muse" pitted against a pumpkin, the story's protagonist. Mr. Muse noted that the story was in good humor and he published it for the whole campus to enjoy. (*Id*. at 5209).

On a different writing assignment, however, he recalled writing Christa up for not doing the assignment satisfactorily. He had asked the students to write about heroes and observed that Christa had waited until the last seven minutes of the period to write anything and then simply scrawled a "smart-alec" response. (R.12-2, Add.6, Doc.7, PC Exh.1E, Mitigation Materials, Page ID 8368). However, he was impressed when she wrote a lengthy appeal in which she explained why she had trouble writing about "heros." (R.9-12, Add.5, Doc.7, Marshall Muse, PCT, Page ID # 5210-11).

Onas Perry, Christa's cottage technician at Swannanoa, testified that Christa generally got along with the other girls in the cottage. She noted that on one occasion, Christa comforted another girl who was upset, telling her that everything was going to be okay. (R.9-13, Add.5, Doc.8, Onas Perry, PCT, Page ID # 5282). She also recalled that each time a new girl arrived, Christa would take the lead in trying to make the girl feel welcome. (*Id.*).

Kimberly Iloilo Rhodes met Christa on Kim's first day at Job Corps. After she finished orientation, Kim sat with Christa and they talked for four or five hours, immediately becoming close friends. (*Id.*, Kim Rhodes, PCT, Page ID # 5341). Kim and Christa had a "really good relationship" and shared with each other whatever they had. Kim thought that she felt close to Christa because neither of them felt like they fit in with their family. (*Id.* at 5341-42). They confided in one another. (*Id.*).

**H. Conclusion**

In sum, the facts of this case add up to a case in mitigation that is very different from the one presented at trial. Whether because of trial counsel's incompetence in abandoning the evidence uncovered in Dr. McCoy's investigation or due to their incompetent investigation, trial counsel failed to present mitigation evidence that would have made a difference. Instead of advocating for a life sentence because that would punish Christa by depriving her of notoriety, counsel could have argued for a life sentence because Christa suffered from brain damage, serious mental illness as well as a tragic history of abuse and neglect. They could have further shown that she had positive characteristics and worthy of being spared.

## STANDARD OF REVIEW

Petitioner, Christa Pike, respectfully requests the federal courts to give plenary and meaningful review to this petition for writ of habeas corpus in which she alleges that the State of Tennessee tried and sentenced her to death in violation of her federal constitutional rights. Most notably, she was deprived of the effective assistance of counsel.

Federal review of constitutional claims is a "central part of the review process for prisoners sentenced to death." *Murray v. Giarratano*, 492 U.S. 1, 14 (1989) (Kennedy, J., concurring). Because habeas corpus review is designed to assure that state courts have provided due process and that the guilt and sentencing decisions of these courts are reliable, it is especially critical in capital cases. *See, e.g., Barefoot v. Estelle*, 463 U.S. 880, 888 (1983) (admonishing federal habeas corpus courts "to give non-frivolous claims of constitutional error the careful attention they deserve.").

**1. 28 U.S.C. § 2254(d)(1): A decision that was contrary to, or involved an unreasonable application of, clearly established federal law.**

The Supreme Court's decision in (*Terry*) *Williams v. Taylor*, 529 U.S. 362 (2000) (*Williams I*), clarified in several ways the standard of review and the methodology to be employed by federal courts entertaining habeas corpus petitions pursuant to 28 U.S.C. § 2254 as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA) which governs all habeas petitions filed after its enactment. Under *Williams I*, the emphasis of the federal court's inquiry is on the nature and quality of the state court decision.

In *Williams I*, the Court interpreted and applied amended 28 U.S.C. § 2254(d) and granted relief on an ineffective assistance of counsel claim, something the Court had never done

previously. Under § 2254(d)(1), relief may not be granted in federal habeas corpus on a claim that was adjudicated on the merits in state court, unless the state court decision was "contrary to or an unreasonable application" of clearly established federal law, as determined by the Supreme Court of the United States. Furthermore, under (d)(2), a habeas petitioner may obtain relief if the decision reached by the state court "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The *Williams I* Court rejected the Warden's argument that the Virginia Supreme Court's decision on the petitioner's ineffective assistance of counsel claim was entitled to "deference" under § 2254(d) because the Virginia Supreme Court had not properly applied federal law to the petitioner's claim. Under a proper application of federal law, the petitioner was entitled to relief from his unconstitutional state court judgment.

In *Williams I*, the Court elaborated on the phrase "contrary to" clearly established law and explained that a "state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams I*, 529 U.S. at 405. For example, the state court decision could have: identified the wrong precedent; identified the correct precedent but misstated the rule of that precedent; misunderstood the rule established by the governing precedent; incorrectly determined that the governing precedent had been modified; or, made some other mistake in selecting or stating the governing federal rule. *See generally, Williams I*, 529 U.S. at 391-97. A state court decision can be "contrary to" controlling decisions of the United States Supreme Court if it misinterprets the Supreme Court's precedents. This is true even though the state court's reading of the relevant precedents is supported by a substantial number of other lower-court decisions, including a

majority of the federal circuit court opinions on point. This was the situation in *Williams I*, in which the Supreme Court found the Virginia Supreme Court's conclusion that *Lockhart v. Fretwell*, 506 U.S. 364 (1993) clarified the *Strickland v. Washington*, 466 U.S. 668 (1984) standard of prejudice in an ineffective assistance of counsel claim was "contrary to" *Strickland* and *Fretwell*. The Court reached this ruling despite the fact that nine federal circuits had read *Fretwell* as clarifying *Strickland*.

The Court also explained that a state court may conduct an "unreasonable application" of Supreme Court precedent in a number of situations. In order to decide whether a state court decision is an unreasonable application of federal law, the habeas court must carefully review the state court's explanation for denying relief. The state court's application of federal law is objectively unreasonable when the state court fails to consider all record facts legally relevant to the federal question. *Williams I*, 529 U.S. at 397. It is also unreasonable where the state court fails to recognize or appreciate the impact of legal principles made relevant, but not necessarily controlling, by the facts of the case. *See Williams I*, 529 U.S. at 398 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").

The federal habeas court may still grant relief by finding that a state court decision is "objectively unreasonable" in finding that prejudice has not been established or that a federal constitutional error is harmless, even though the evidence against the petitioner is quite compelling. In *Williams I*, the Virginia Supreme Court had concluded that the mitigating evidence undeveloped by Williams' trial lawyer was inconsequential in the light of the overwhelming evidence in aggravation. *Id.* at 371-72. The United States Supreme Court

subsequently determined that this holding was objectively unreasonable and reversed the denial of habeas relief. *Id.* at 396-97.

In the years since the AEDPA was enacted, the Supreme Court has continued to apply the standards enunciated in *Williams I*. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court emphasized that "a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Id.* at 520, citing *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). In *Wiggins*, the Court granted relief where the Petitioner was able to establish a "clear factual error" in the state court record as well as demonstrate that the state court's conclusion about the standards for an adequate mitigation investigation "represented an objectively unreasonable application of [Supreme Court] precedent." *Id.* at 528-29. That same principle was reiterated in *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) and again most recently in *Lafler v. Cooper*, __ U.S. __, 132 S.Ct. 1376, 1390 (2012).

**2. 28 U.S.C. § 2254(d)(2): A decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.**

In addition to considering the reasonableness of state court legal conclusions, 28 U.S.C. § 2254(d)(2), the Supreme Court has directed habeas courts to look at the record as a whole to determine if factual determinations are "unreasonable." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Although the federal court is required to give deference to state court fact findings:

> deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Id.*

In *Miller-El v. Dretke*, 545 U.S. 231 (2005), the Court set aside state court fact-finding on the petitioner's *Batson* claim where the record did not support the conclusions reached by the state court. The Court engaged in a very detailed and fact-specific analysis of the record to test the state court's factual conclusions. *See id.* at 240-52. Thus, while the Court accorded deference as required by the habeas statute (*id.* at 240), the Court nonetheless required support for the state court's factual conclusions before accepting them. When the Court found such support lacking, it disregarded the state court's findings because they were unreasonable. *Id.* at 266. This Court must now conduct a similar analysis in Christa Pike's case which will lead it to the same conclusion: many of the state court's factual findings are unreasonable because they lack support in the record.

The Supreme Court has found that state court findings are not be entitled to deference where the state courts relied on a "clear factual error." *Wiggins*, 539 U.S. at 528. Again, as in *Miller-El*, the Court made a painstakingly close examination of the record to determine whether the state court conclusions were supported by the evidence. *See id.* at 528-33. The *Wiggins* court determined that the state courts had relied on an assumption that was proven untrue by a close examination of the record. *Id.* at 528. It also found that portions of trial counsel's testimony relied upon by the state courts were rebutted by other portions of the record. Just as this Court must do in the present case, the Court in *Wiggins* was looking at the state court's factual findings to determine whether trial counsel's investigation and decisions were reasonable ones. It concluded that counsel's testimony, accepted by the state courts, "may simply reflect a mistaken memory shaped by the passage of time." *Id.* at 533. The *Wiggins* Court looked at the record

beyond counsel's testimony to determine whether the state court's fact-finding was reasonable. This Court must do the same.

Finally, the state court's failure to rule upon or acknowledge the facts presented cannot bar relief in federal court. *Dye v. Hofbauer*, 546 U.S. 1, 2-3 (2005). As the Court did in *Dye*, this Court must look at the record to determine what arguments were made below and what facts were presented to support them to determine whether federal claims were reasonably addressed in the state courts.

Petitioner Pike will demonstrate that she is entitled to habeas relief because the Tennessee courts' decisions are contrary to, or unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d)(1). She will also show that she is entitled to relief where the Tennessee courts based their decisions on unreasonable findings of fact in light of the entire record before them. 28 U.S.C. § 2254(d)(2). This Court must review each of the following claims under these standards.

**NOTICE OF INTENT TO CHALLENGE STATE COURT FINDINGS OF FACT**

Petitioner Christa Pike hereby gives notice to this habeas court of her intention to challenge many of the state court's findings of fact as unreasonable. *See* 28 U.S.C. § 2254(d)(2). In particular, Petitioner notes that these findings were made by a state court that was directly involved in the decisions regarding the ethical conduct of lead counsel, William Talman, who was under investigation for massive over-billing of the state indigent defense system at the time he represented Ms. Pike and who was caught by Ms. Pike's trial judge breaking the rules regarding reciprocal discovery of the defense experts' opinion.

As will be developed more thoroughly in these proceedings, Mr. Talman's ethical charges were eventually resolved by the Tennessee Supreme Court just one day after that court affirmed Ms. Pike's conviction and death sentence on appeal. The Tennessee Supreme Court filed its opinion on October 5, 1998, and rehearing was denied on November 23, 1998. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *r'hrg denied*, Nov. 23, 1998. The order of enforcement against Mr. Talman was entered on November 24, 1998. That court suspended Talman's license to practice law for eleven months, twenty-nine days, but stayed that suspension. (R.12-3, Add.6, Doc.8, Supp. PC Exh. 2A, BPR Report-Order of Enforcement, Page ID # 8487-88). Thus, the Tennessee Supreme Court was aware of Talman's misconduct as well as the details of his conditional guilty plea before the Board of Professional Responsibility. Yet, it ultimately presided over all of the state court proceedings in Ms. Pike's case, including factual findings about whether the charges against Mr. Talman could have affected his decisions in representing Ms. Pike. Because the court itself was a party to proceedings that affected the outcome of the state court litigation, its findings of fact are inherently suspect.

In addition, the trial court in this case was also a party to disputed proceedings from which it issued findings of fact. During the post-conviction process, Ms. Pike alleged: (1) that the trial court was aware of a potential conflict and failed to take the necessary remedial measures; and, (2) that trial counsel's conflict of interest adversely affected his representation of Ms. Pike in violation of her rights under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). The trial court was a necessary witness to both of these claims, and indeed, did ultimately "testify" on both issues.

With regard to the first claim, Ms. Pike was required to submit proof that the trial court knew or should have known of trial counsel's potential conflict. Indeed, though the post-conviction court quashed its own subpoena, it nonetheless provided critical testimony on this issue in the course of ruling on Ms. Pike's motion to recuse, stating, "[i]n this case I think it's pretty obvious that everyone in Knox County knew that [lead counsel] had problems with his billing. . . . As it turned out he was never prosecuted in this case . . . ." (R.10-7, Add.5, Doc.27, PC Motions Hrg., Page ID # 7082). In its order denying post-conviction relief, the court further recalled "having inquired of [lead counsel] Talman the status of the issue [of his overbilling] prior to his appointment." (R.9-5, Add.4, Doc.5, PC Tech. Rec., Findings of Fact and Conclusion of Law, Page ID # 4435).

The factual basis for Ground Two of this Petition, in which Ms. Pike argues that trial counsel's conflict adversely affected his representation of her, similarly required the testimony of the state trial court. Ms. Pike's claim of adverse effect centers on the disputed facts of an off-record, *in camera* hearing in the trial court's chambers. The facts of the *in camera* meeting were essential to determining Ms. Pike's claim of attorney conflict of interest. Because the *in camera* meeting was unrecorded, and because the trial court was one of only three parties to that meeting, Ms. Pike attempted to examine the trial court on its recollection of the facts in dispute. As it turned out, Ms. Pike was denied that opportunity, but the court nonetheless expressed its recollection for the record as follows:

> I have no independent memory [of the unrecorded in camera meeting] other than that there was three volumes. I remember that there were volumes--and I'm not trying to testify; I'm just trying to--trying to make a ruling here--of mitigation materials. Those were turned over to the State as required after the verdict.

> The State had no--not enough time. And then--and I can't imagine why--why there would even be an issue about when Mr. Talman received those materials because they didn't go to the State anyway at that point. And maybe the State was arguing that they were entitled and I ordered them turned over.
>
> . . .
>
> Again, for the purposes of your Motion for a Subpoena, a judge speaks through their rulings. So you can take those rulings and say, "Okay. These are the grounds for post-conviction petition." But you can't subpoena me to ask me what I thought or what I think or what I remember. I've told you as much as I can in order to make this case go forward.
>
> I remember that evening. I remember that verdict coming in. I remember us having a discussion, and I remember us discussing whether--when the State got its materials. And everything is spoken for through the transcript, I think. And if there isn't--and if there's anything else we're going to get it out of those transcripts that we have.

(R.10-7, Add.5, Doc.27, PC Motions Hrg., Page ID # 7087-89). Ms. Pike was deprived of the opportunity to cross-examine the trial court on its recollection of both the circumstances of lead counsel's potential conflict pretrial, and the events of the *in camera* meeting. Then, a party to the proceedings, the trial court made the ultimate findings about what happened at that meeting and whether trial counsel's representation was constitutionally adequate.

The entire state court review of Ms. Pike's claims was performed by courts that had involvement and first-hand knowledge of the ethical charges against lead counsel in this high-profile death penalty case. These are hardly conditions that would inspire confidence in the reviewing federal court and Petitioner hereby gives notice of her intention to challenge the reliability of those proceedings.

## PETITIONER PIKE'S CONSTITUTIONAL CLAIMS FOR RELIEF

## GROUND ONE

**Christa Pike's attorneys were constitutionally ineffective during the penalty phase of her capital trial and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Even though Christa Pike's trial counsel recognized that the penalty phase was where her case would be won or lost, their mitigation presentation was short, limited in scope, and disjointed. Counsel failed to present important aspects of her background and failed to make any attempt to connect that background to the limited mental health testimony presented in the guilt phase. Rather than proceeding according to plan, counsel made abrupt, last-minute decisions about who to call and what to present. Because counsel failed to comply with disclosure rules, they were further having to face devastating cross-examination from the State after turning over the entirety of their mitigation investigation work product. The result was predictable: Christa Pike was sentenced to death.

This outcome was not inevitable. A wealth of mitigating evidence was available that could have been presented to the jury: both evidence that counsel had uncovered in their investigation, as well as a great deal of evidence that counsel could have found if their investigation had been adequately thorough. If this evidence had been presented to the jury by competent counsel, there is a reasonable probability that at least one juror would have voted for a life sentence.

Petitioner Pike presented the issue of counsel's ineffective assistance in the penalty phase to the Tennessee courts during post-conviction and the Tennessee courts addressed this issue on the merits. *Pike,* 2011 WL 1544207, at *51-52, *55-59. However, while the Tennessee courts correctly recognized that this issue was governed by *Strickland v. Washington*, 466 U.S. 668 (1984), the courts' resolution of this issue was an unreasonable application of *Strickland*. For one thing, the Tennessee courts failed to consider the cumulative impact of all aspects of counsel's ineffectiveness in the penalty phase. This cumulative analysis of all of the prejudice flowing from counsel's errors is required by *Strickland*, 466 U.S. at 694. The state court's piecemeal analysis was unreasonable. In addition, the Court of Criminal Appeals applied an outcome-determinative test to the prejudice prong that was unreasonable. *Pike*, 2011 WL 1544207, at *52. Finally, the state courts applied *Strickland's* prejudice prong unreasonably to the facts of this case. Habeas relief is warranted where the state courts' resolution of this issue was based on unreasonable determinations of the facts following the evidence presented to the state post-conviction court.

### A. Counsel's performance in the penalty phase was sub-standard because they failed to present mitigating evidence that had been uncovered in their investigation.

It is undisputed that a last-minute change of plans led to a very limited mitigation presentation during the penalty phase of Ms. Pike's capital trial. Such a limited presentation was not based on any researched, reasoned or legitimate legal strategy on the part of counsel. Rather, counsel abandoned plans to use compelling mitigating evidence that had already been discovered in a panicked, last-minute decision. This happened despite the fact that trial counsel admitted, "I don't think there was any question it was a penalty phase case." (R.9-20, Add.5, Doc.15, Bill

Talman, PCT, Page ID # 5982). Because counsel fully anticipated that the case would proceed to the penalty phase and because much investigation and research had been done in the six months preceding trial, there was no legitimate reason that competent counsel would have to make a sudden, last-minute decision to entirely abandon the plan that had been formulated, as well as abandon most of the evidence that had been gathered. Petitioner Pike was greatly prejudiced by counsel's incomplete and inadequate presentation.

William Talman was appointed lead counsel in Ms. Pike's case on May 25, 1995. (R.9-19, Add.5, Doc.14, Bill Talman, PCT, Page ID # 5915). He brought on Dr. Diana McCoy to serve as mitigation specialist several months later. (*Id.* at 5935). For the penalty phase, Mr. Talman recalled that, "our plan was to try and have Dr. McCoy bring all this stuff in, you know, about [Ms. Pike's] background and tie it in with Dr. Engum's report." (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 5987). Dr. McCoy spent six months interviewing Ms. Pike, her family, and friends, and assembling three volumes of notes ("Mitigation Materials") and a 60-page summation ("Social History"). That she alone would testify in mitigation, no other witnesses were slated, remained defense counsel's plan up through the day the jury returned a guilty verdict and the day the penalty phase was set to begin. (*Id.* at 5995-96, 6009).

On that Friday afternoon, the trial court called a meeting *in camera* to discuss the parties' plans for the penalty phase. The *in camera* proceedings, which immediately followed the jury's verdict of guilt, were not transcribed, and on post-conviction, no party to the meeting could recall precisely what transpired there. (R.10-7, Add.5, Doc.27, Judge Leibowitz, PC Motions Hrg., Page ID # 7087-89). The only fact generally agreed upon is that defense counsel handed over Dr. McCoy's Mitigation Materials and Social History to the prosecutor. (R.8-10, Add.2, Doc.25,

Bill Crabtree, TT, Page ID # 3030). Prior to this meeting, counsel had not disclosed any report from Dr. McCoy.[8] Immediately after the *in camera* meeting, the parties returned to the courtroom where, on the record, the trial court recessed the penalty phase until the following morning to allow the State time to review Dr. McCoy's materials. (*Id.*, Judge Leibowitz, Page ID # 3031; R.10-7, Add.5, Doc.27, Judge Leibowitz, PCT, Page ID # 7089).

The next morning, defense counsel presented its mitigation proof. Dr. McCoy was not called to testify. Instead, with no witnesses under subpoena for the sentencing phase, counsel called the members of Ms. Pike's family who happened to be present: Ms. Pike's mother, father, and aunt. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, Page ID # 3048-65; R.8-11, Add.2, Doc.26, Carrie Ross, Glenn Pike & Carissa Hansen, TT, Page ID # 3069-3111). These witnesses were asked to testify just before the proceedings began, and their testimony was unprepared. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, Page ID # 4563-64; 4569-70; R.9-7, Add.5, Doc.2, Carrie Ross, PCT, Page ID # 4682-84; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4961-62; R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, Page ID # 6415-16). On cross-examination, the State made use of Dr. McCoy's Mitigation Materials to impeach these witnesses and sully Ms. Pike's image. In this manner, Ms. Pike's planned mitigation case unraveled: the information gathered by her mitigation specialist was presented by the State, and in the worst possible light.

Mr. Talman offered the following explanation for the decision not to call Dr. McCoy:

> [I]t was just one of these little huddles outside during a break or something, you know--we're going to start this phase, going to put this witness on, going to start with this, going to put you on. To Dr. McCoy, "I'm going to have you corroborate Dr. Engum's report and go through things." And she said, "I can't do that; I didn't

---

[8] *See* Tenn. R. Crim. Pro. 16(b) Disclosure of Evidence by the Defendant, and Tenn. R. Crim. Pro. 26.2, Production of Statements of Witnesses.

> conduct an evaluation of Miss  Pike." And at that point is when I made the decision.

(R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 6010).  This explanation is completely unsupported by the record in that all of Dr. McCoy's materials corroborate the theme of borderline personality disorder.  (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID# 6308, 6319-20; R.11-2, Add.6, Doc.2, PC Exh.6, Suggested Mitigation Themes, Page ID # 7340). Furthermore, counsel had been working with Dr. McCoy for more than six months and should have known her position on this key aspect of the mitigation case.  Dr. McCoy herself testified in post-conviction that she agreed with Dr. Engum's diagnosis.  (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID # 6308).  Furthermore, even if Dr. McCoy were not asked to corroborate Dr. Engum's diagnosis, she still could have provided valuable background information.  These facts would not have been inconsistent with Dr. Engum's diagnosis.

Mr. Talman testified on post-conviction to other reasons for pulling Dr. McCoy's testimony.  He explained that he was hesitant to put Dr. McCoy on the stand because there were things in her report that he did not want to come in.  (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 6006).  However, Mr. Talman knew the facts in Dr. McCoy's Mitigation Materials long before the penalty phase began because the two were in regular contact throughout Dr. McCoy's investigation.  (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID # 6338).  In fact, on the basis of Mr. Talman's understanding of Dr. McCoy's findings, he had planned to present the entire mitigation case through Dr. McCoy up until the day before the penalty phase began. Furthermore, once defense counsel had turned over the entire file, the State was able to use it to introduce much of the negative evidence that Mr. Talman was allegedly so fearful of.  Calling Dr.

McCoy as a witness could only serve to explain and mitigate any damaging use of the facts by the State.

Mr. Talman testified that another factor in his decision to pull Dr. McCoy's testimony was the fact that Dr. McCoy had dated William Crabtree, the State's lead prosecutor on the case. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 6010). Yet, although Mr. Talman claimed to have discovered this information shortly before trial, he did not discuss it with either Mr. Crabtree or the trial court, and he did not seek a continuance for the purpose of replacing Dr. McCoy. (*Id.* at 6011, 6013-14). This was because, in Mr. Talman's own words, "I never doubted Dr. McCoy's work. I never doubted Dr. McCoy's integrity. She assured me she had never talked to Mr. Crabtree about this case. I have no reason to doubt Mr. Crabtree's integrity." (*Id.* at 6013). Again, if this factor troubled Mr. Talman, his words and actions suggested the contrary.

For her part, co-counsel, Ms. Rice, offered an additional reason for the decision not to allow Dr. McCoy to testify: on the morning that the penalty phase began, Ms. Rice and Mr. Talman saw Dr. McCoy's Social History and Mitigation Materials on the State's table covered in yellow "Post-It" notes. (R.9-17, Add.5, Doc.12, Julie Rice, PCT, Page ID # 5725). According to Ms. Rice, defense counsel were concerned that, after giving the State Dr. McCoy's materials, the prosecutor had prepared an onslaught. (*Id.*). The state trial court rejected this *post-hoc* rationale for the reason that, "[b]oth Dr. McCoy and Talman stated that the decision [not to put on Dr. McCoy] was made the evening before the penalty phase and the stickers were seen on the materials the morning of the penalty phase." (R.9-5, Add.4, Doc.5, PC Tech. Rec., Findings of Fact and Conclusions of Law, Page ID # 4473).

Defense counsels' explanations for the decision to pull Dr. McCoy's penalty phase testimony is either implausible or should have been obvious to defense counsel long before he decided to make a last-minute change. None of them qualify as adequate justification for this incompetent decision. It was defense counsel's responsibility to ensure that there were not any "miscommunications" on information so vital to their client's case. Panicked, last-minute about-faces, such as the one that happened in this case, can only be the result of a lack of preparation.

Defense counsels' performance fell below competent standards. They had an obligation to plan and prepare for the penalty phase. *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005). This planning necessarily included anticipating discovery disclosure requirements as well as the hearsay rules, so that there would be no last-minute surprises. In addition, counsel had an obligation to place the trial court's order to disclose confidential work product on the record, to object and to appeal. Finally, they had an absolute obligation to know their case and the witnesses who would establish it so that there would not be a last-minute change to the entire plan that would necessarily leave out crucial mitigating evidence and arguments. They also had an obligation to anticipate the trial court's rulings on possible hearsay objections from the State. *See Strickland*, 466 U.S. at 689 ("Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."). Christa Pike's attorneys failed in all of these obligations.

Ms. Pike was prejudiced. Because of the last-minute changes, no witnesses were under subpoena and counsel had to make do with who was available. These witnesses were Ms. Pike's family members who happened to be present and who were unprepared to testify. None of them could speak of Ms. Pike's diagnosis of borderline personality disorder and no explanation of this

disorder or its mitigating value was presented. Dr. Engum was not recalled so there was no penalty phase testimony about Ms. Pike's mental health. Almost no exhibits were presented for the jury to consider. The trial court and the prosecutor made repeated requests that the witnesses give time and place context to the events they were asked to recount. During Carrie Ross' direct examination by Ms. Rice the prosecutor requested that the Court ask the witness to identify who she was talking about, "because [he didn't] know." (R.8-10, Add.2, Doc.25, General Crabtree, TT, Page ID # 3055-56). When Ms. Ross was testifying about an incident where she and her sister were out a bar when Carrisa received a phone call about Christa, the prosecutor again interrupted the testimony to ask that the witness give "some kind of time factor . . . ." (*Id.* at 3063). The next mitigation witness defense counsel called was Christa's father, and the trial court had to ask him to "lay a time foundation for that, when that occurred[.]" (R.8-11, Add.2, Doc. 26, Judge Leibowitz, TT, Page ID # 3081). The jury was given no mitigating context for the information it received.

Most importantly, significant portions of Dr. McCoy's Social History, with context about how events in Ms. Pike's background shaped her into the adolescent she became, were never presented because Dr. McCoy's testimony was cancelled at the last minute. Dr. McCoy's testimony in post-conviction reveals a part of the case that could have been presented to Christa Pike's jury.

Dr. McCoy testified that: (1) Ms. Pike suffered neglect, abandonment, and physical and sexual abuse; and, (2) Ms. Pike's behaviors in acting out, including violent incidents such as the crime underlying this case, were largely explicable as resulting from her horrendous upbringing.

(R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID # 6347-48; R.9-25, Add.5, Doc.20, Dr. McCoy, Page ID # 6468-69; R.10-1, Add.5, Doc.21, Dr. McCoy, PCT, Page ID # 6488).

Specifically, Dr. McCoy's Social History documented the exceptionally difficult circumstances under which Ms. Pike grew up, including the following themes:

- Christa's mother was an alcoholic who was disinterested in her and often failed to provide for Christa's basic needs, such as food and clothing (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, Page ID # 7489);

- Christa's father, Glenn Pike, played little role in parenting her, was physically abusive when Christa stayed with him, and he ultimately forbade her from visiting his home based on unfounded accusations (*id*. at 7489, 7491, 7501);

- Christa was passed between assorted caretakers, several of whom were openly disdainful of her (*id*. at 7481, 7483-85);

- Christa's early life was marked by instability and chaos, not only in her shifting caretakers, but also in the number of different men living with her mother, and in constant school transfers (*id.*);

- Christa was rejected by her aunt, Carrie Ross, who was willing to care for Christa's sister, Alicia Wills, but not Christa (*id*. at 7493);

- Christa's paternal grandmother was the only caretaker who loved her, and Grandmother Pike died when Christa was 12; Christa's mother did not allow Christa to be with her grandmother when she died, and Christa blamed herself for her grandmother's death and attempted suicide shortly thereafter (*id*. at 7489; *id.*, Mitigation Materials, Page ID # 7537);

- Christa was likely sexually abused by her grandmother's companion (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, Page ID # 7481);

- Christa was raped by a stranger at age 9 and again at age 17 (*id.* at 7515, 7519);

- Christa was beaten by various adult men in her immediate surroundings, including her sister's boyfriend and her mother's husbands and boyfriends (*id.* at 7481, 7484, 7485, 7500, 7505);
- Christa was sent to juvenile facilities as a teenager where she was rarely visited by her mother and never visited by her father (*id*. at 7485, 7503).

Furthermore, counsel failed to call witnesses contacted during Dr. McCoy's investigation who could have provided compelling mitigating evidence. Ms. Pike's jury never heard from other witnesses, such as Peggy Hamlett, Rose Wilson, Kerry Clement and Matthew Martin who knew Christa during her later teens and who had much favorable testimony to impart to the jury. (R.11-2, Add.6, Doc.2, PC Exh. 5, Suggested Mitigation Witnesses, Page ID # 7336-37). These witnesses could have described a troubled teen who was starved for attention and who could be very loving, loyal and hardworking. Talman conceded on post-conviction that he should have called the majority of these individuals. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 6003-05). Yet, defense counsel had issued no subpoenas to any these potential witnesses so none of them were available to testify. (*Id.* at 6005).

Following the *in camera* hearing, defense counsel abandoned their entire plan for the penalty phase. Counsel had no back-up plan. Instead, the case simply fell apart. Counsel abandoned their plan due to their own incompetence and this constituted deficient performance. Because the case in mitigation that was abandoned was compelling, Christa Pike was prejudiced.

**B. Petitioner Pike's trial counsel were ineffective due their failure to discover relevant and compelling mitigating evidence.**

Christa Pike's trial counsel were further constitutionally ineffective for their failure to investigate, discover and present evidence of Ms. Pike's organic brain damage and its effects

along with evidence that she suffers from bipolar disorder and post-traumatic stress disorder (PTSD). Trial counsel also failed to interview many witnesses from Ms. Pike's background, including witnesses who could have provided mitigating evidence of her positive traits as well as fellow participants in the Job Corps who could have testified to its dangerous and violent atmosphere. Counsel's failure and the resulting prejudice constitute ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments.

### 1. Trial counsel failed to uncover and present evidence that Christa Pike suffers from organic brain damage.

Although trial counsel retained a psychologist to examine Ms. Pike, numerous red flags pointed to the distinct possibility that she suffered from organic brain damage. When Ms. Pike was fourteen months old, she was admitted to Appalachian Regional Hospital after being evaluated in the emergency room for two seizures she had at home. During this hospital admission, an EEG was performed which showed abnormality and the clinical diagnosis was: "seizure disorder." (R.12-5, Add.6, Doc.10, PC Exh. 7, Birth Records, Page ID # 8786). These two facts alone provided ample evidence to suggest the need for a neurological examination. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID # 6774). Furthermore, the fact that she had survived a traumatic car accident where she went through the windshield also suggested the possibility of brain damage. (*Id.* at 6787).

Defense attorneys were alerted to other red flags in the form of information obtained from prospective lay witnesses. Ms. Pike's maternal aunt told Dr. McCoy that Christa's mother, Carissa Hansen, was an alcoholic for much of her life. (R.11-5, Add.6, Doc.5, PC Exh.1-C, Mitigation Materials, Page ID # 7879). Christa's father substantiated this information and further

said that he could not recall Christa's mother ever abstaining from alcohol during pregnancy. (*Id*. at 7885). This was sufficient information to suggest that Ms. Pike had been exposed to alcohol *in-utero*, and that she may have suffered some resulting neurological impairment. Ms. Ross testified at trial that Ms. Pike was born prematurely (R.8-10, Add.2, Doc.25, Carrie Ross, TT, Page ID # 3050) which would also suggest the possibility of neurological issues.

There was a body of evidence which readily suggested brain damage, yet the defense failed to conduct an adequate neurological investigation and thus, failed to discover Ms. Pike's neurological disabilities, namely, an abnormality in the brain that impairs Ms. Pike's impulse control. This failure of investigation amounted to deficient performance.

This failure to uncover and present compelling evidence that gave some explanation for the offense in this case prejudiced Ms. Pike because frontal lobe damage impairs moral reasoning and impulse control. *See Sears v. Upton*, 130 S. Ct. 3259, 3263 (2010). Evidence presented in post-conviction demonstrates that Ms. Pike is indeed brain-damaged and that this impairment affected her at the time of the offense. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4778-79, 4808-09). This evidence could have been presented to the jury to give it some insight into why the offense happened the way it did. It would have carried strong weight in mitigation.

**2. Counsel's failure to discover and present evidence that Christa Pike suffers from bipolar disorder and post-traumatic stress disorder constitutes ineffective assistance of counsel.**

Trial counsel failed to conduct an adequate investigation in that they failed to discover that Ms. Pike suffers from bipolar disorder and post-traumatic stress disorder (PTSD). Ms. Pike's bipolar disorder and PTSD were readily discoverable at the time of trial. In his post-conviction testimony, Dr. Kenner noted several pieces of information from Ms. Pike's social

history that immediately suggested bipolar disorder, including: (1) numerous reports from family and friends that Ms. Pike exhibited extremely high levels of energy and had trouble sleeping; (2) Ms. Pike's three suicide attempts; (3) Ms. Pike's displays of belief in her own invincibility; and, (4) Ms. Pike's EEG at fourteen months, because there is a significant correlation between brain damage and the development of bipolar disorder. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID # 6774-79, 6781,6787-88). During post-conviction, Ms. Pike presented still other characteristics suggestive of bipolar disorder, including evidence of rapid and dramatic mood swings, or descriptions of Ms. Pike as "out of control," all of which were discoverable at the time of trial. (R.9-11, Add.5, Doc. 6, Orlando Powell, PCT Page ID # 5055-56; *Id*., Peggy Hamlett, PCT, Page ID # 5139).

Dr. Kenner testified that there is a danger of misdiagnosing bipolar individuals as borderline. (R.10-5, Add.5, Doc. 25, Dr. Kenner, PCT, Page ID # 6953-54). To achieve the correct diagnosis, he stated, a clinician has to acquire longitudinal information about the client, preferably through repeated clinical interviews. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID # 6824-26). Dr. Kenner opined that Dr. Engum reached the wrong diagnosis because he had not met with Christa over a sufficient period of time and he lacked her complete social history. (R.10-4, Add.5, Doc.24, Dr. Kenner, Page ID # 6769, 6826).

Regarding his diagnosis of PTSD, Dr. Kenner based his opinion on clinical interviews and Ms. Pike's history of abuse, neglect, and trauma. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, Page ID # 6891-95). He also saw evidence of PTSD in her delusional paranoia, heightened fear of abandonment, and hyper-vigilance in the face of perceived threats. (*Id.* at 6896, 6898-6900).

Counsel's failure to obtain a correct diagnosis for their client's mental illness constitutes deficient performance and Ms. Pike was prejudiced. Her organic brain damage and her illness were both important contributing factors in the offense in this case and they are factors over which she had no control. Their mitigating weight would have been significant and in tandem with the other mitigating evidence, would have likely led at least one juror to vote for a life sentence.

**3. Counsel failed to contact and present lay witnesses who could have presented mitigating evidence.**

Defense Counsel failed to uncover many aspects of Ms. Pike's life history as it pertained to her experiences in various institutional facilities, including Child Protective Services, juvenile detention, and Job Corps. This was a significant oversight, considering that Ms. Pike had spent the last eight years of her life prior to trial, from age ten to eighteen, in various institutional settings. More pointedly, however, counsel was aware that Ms. Pike was rejected by her parents and maternal aunt. The evidence uncovered by Dr. McCoy revealed that the only family member who had cared for Ms. Pike, her paternal grandmother, was dead. (*See* R.9-9, Add.5, Doc.4, Alicia Wills, PCT, Page ID # 4907-08; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, Page ID # 4994; R.8-11, Add.2, Doc. 26, Carrie Ross, TT, Page ID # 3070). As a result, it was incumbent upon counsel to seek lay witnesses who could testify to caring for Ms. Pike and about her life after she was essentially abandoned by her family. Many witnesses, such as: Faye Guy, Carol Goehring, Jamie Robinson, Orlando Powell, Debby Burchfield, Kristina Hargis, Marshall Muse, Andrew Drace and Onas Perry were never contacted prior to trial. However, these same witnesses were

able to provide important mitigating testimony during post-conviction. Such proof would have both humanized Ms. Pike and helped lead jurors to vote for a life sentence.

Counsel further failed to investigate and present witnesses who could have testified about the controlling nature of her co-defendant, Tadaryl Shipp. These witnesses could have shown that Ms. Pike had been abused and was being influenced by Mr. Shipp at the time of the offense. Witnesses from the Job Corps program could also have testified about its violent atmosphere. The following witnesses were never contacted: Joe Mode, Jacqueline Olebe, Tyrone Comfort, Deandrea Gates, Amanda Robertson, and Jermaine Bishop. Counsel's failure to contact these witnesses constitutes deficient performance.

### C. Trial counsel were ineffective when they disclosed protected work product to the prosecutor.

In the interval between the jury's verdict of guilt and the beginning of the penalty phase of Petitioner Pike's trial, defense counsel turned over all three volumes of Dr. McCoy's work product to the prosecutor. Mr. Talman and Ms. Rice could not remember whether they were ordered to turn over their work product and the trial record reflects no such order. However, the Tennessee Court of Criminal Appeals held that "[w]hile lead counsel did not specifically recall such an order, the record still seems to indicate that the court, during the *in camera* hearing, did, in fact, order production." *Pike*, 2011 WL 1544207, at *55.

Although the record is not clear that an order was issued, it is clear that trial counsel had an absolute duty to make sure that the record reflected the issuance of any such order and that it also reflected an objection from counsel. Furthermore, counsel had a duty to insure that what was turned over did not constitute privileged attorney work product. Counsel had a duty to limit

any materials to only those that were properly discoverable, which would not include the attorney work product information contained in all of the interviews. Counsel also had a duty to understand disclosure rules and that directing an expert not to prepare a report or to express an opinion and purposely trying to skirt the rules would result in adverse consequences.[9] There was no legitimate reason to turn over all of Dr. McCoy's work product. Counsel's failure to exercise the skill and knowledge of competent attorneys constitutes deficient performance. *See Strickland*, 466 U.S. at 689.

Petitioner Pike was prejudiced because the State used information from the protected work product to cross-examine the witnesses presented during the penalty phase. This cross-examination undermined any mitigating evidence the witnesses had presented. This point is well illustrated by looking at the Tennessee Supreme Court's opinion on direct appeal in which the court says that "her own relatives testified that Pike previously had been violent, manipulative, and dishonest." *Pike*, 978 S.W.2d at 919. The court also pointed out that "the testimony of Pike's own relatives reveals that Pike has refused to abide by the applicable rules of society since a very young age." *Id.* at 920. This information and other damaging testimony was elicited on cross-examination with information obtained when defense counsel turned over privileged work product.

**D. Counsel failed to present effective penalty phase arguments to the jury in this case.**

Counsel's penalty phase arguments highlighted counsel's poor performance. Counsel has a duty to make effective arguments at this most important phase of the capital defendant's trial.

---

[9] Tenn. R. Crim. P. 16(b)(2)(A)(B); Tenn. R. Crim. P. 26.

*See Strickland*, 466 U.S. at 688, (Counsel has an "overarching duty to advocate the defendant's cause.") Counsel never argued to the jury that it should spare Ms. Pike due to her age or explain youth as a statutory mitigating factor. *See* Tenn. Code Ann. § 39-13-204(j)(7). Counsel failed to discuss any of the mental health evidence presented by Dr. Engum in the guilt/innocence phase. Counsel made no mention of Ms. Pike's mental illness or her history of abuse and neglect. Ultimately, Mr. Talman presented the jury with only one reason not to sentence Ms. Pike to death: because she "derives and gains her self-esteem, her self-worth from those around her," he suggested that a life sentence would be the harshest punishment because it would deprive her of notoriety. (R.8-10, Add. 2, Doc.25, Talman Sentencing Phase Opening Argument, TT, Page ID # 3045-46). This excerpt captures Mr. Talman conceding to the jury that Ms. Pike was deserving of the worst punishment they could imagine.

This hardly qualifies as effective argument from counsel when his client's life is at stake. Counsel's arguments fell below the standard of reasonableness and constitute ineffective assistance of counsel.

**E. Counsel were ineffective when they failed to conduct a meaningful *voir dire* of potential jurors in this case.**

As argued in Ground Five, counsel failed to rehabilitate or object to the dismissal of potential juror Rutherford whose *voir dire* shows he was qualified to serve. *See* infra at p.80-83. This failure is symptomatic of counsel's failure to conduct a thorough and constitutionally adequate *voir dire*. Counsel failed to tell potential jurors that youth was a statutory mitigating factor. *See* Tenn. Code Ann. § 39-13-204(j)(7). Nor did counsel *voir dire* on any other prospective mitigation themes such as asking questions related to juror views on mental illness,

psychology, and mental health experts. Counsel thus foreclosed the possibility of striking for cause those jurors who could not consider certain mitigation evidence. Any analysis of the death-qualification process in this case shows the lack of thoroughness on the part of defense counsel.

### F. Conclusion

Although counsel recognized that this case was one where the penalty phase was most important, counsel failed to present an effective case. This Court must examine the cumulative prejudice from counsel's multiple deficiencies to determine that there is a reasonable probability that but for counsel's ineffectiveness, a different outcome would have occurred. *See Strickland*, 466 U.S. at 694. The Tennessee courts' decision otherwise represents an unreasonable application of clearly established federal law and this Court must issue the writ of habeas corpus.

## GROUND TWO

**Petitioner Pike was deprived of the right to unconflicted counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. The Tennessee courts' denials of this claim were contrary to or an unreasonable application of clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Petitioner Christa Pike's trial was marked by two distinct conflicts of interest that affected trial counsel's representation. First, Mr. Talman's legal and ethical troubles for over-billing the courts led him to protect his own interests ahead of those of his client who was on trial for her life. Second, counsel procured a release of media rights from Ms. Pike that authorized defense counsel to use or sell her story for pecuniary gain. (R.11-2, Add.6, Doc.2, PC Exh.13, Release, Page ID # 7365).

To prove a violation of the Sixth Amendment right to counsel due to a conflict of interest, a defendant must demonstrate that an "actual" conflict "adversely affected" counsel's representation at trial. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). "Adverse effect" entails a lesser burden of proof than prejudice under *Strickland*. *Cuyler*, 446 U.S. at 350. Whereas prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, adverse effect requires only that defense counsel "actively represented conflicting interests." *Cuyler*, 446 U.S. at 350.

**A. The possibility of ethical and criminal charges based on a history of fraudulently over-billing the courts for his work in indigent cases caused Attorney Talman to place his own interests ahead of those of his client during the penalty phase of Christa Pike's capital trial.**

As outlined in the Statement of Facts, Attorney Talman was implicated in an over-billing scandal that was widely publicized and that was well known to the Knoxville bar. Between 1990 and 1993, Mr. Talman defrauded the indigent defense fund of at least $67,027 by over-billing in court appointed cases. (R.12-3, Add.6, Doc.8, PC Exh.1, Comptroller's Report, Page ID # 8455, 8460). Although he was not the only lawyer investigated for over-billing, Mr. Talman was one of the two most egregious offenders. (*Id.* at 8451). In total, Mr. Talman billed for several thousand illusory hours.

When the Comptroller's Report was first publicized in the Knoxville news media, Mr. Talman obtained a lawyer, self-reported to the Board of Professional Responsibility (hereinafter "BPR" or "Board") at the advice of counsel, and eventually reached a civil settlement to repay over $67,000. (R.9-21, Add.5, Doc.16, Bill Talman, PCT, Page ID # 6118; R.12-3, Add.6,

Doc.8, PC Exh. 2A, Letter from Talman to the Board 3/30/94, Page ID # 8545-46). Ultimately, the Tennessee Supreme Court suspended Mr. Talman's law license for eleven months and twenty-nine days. (R.12-3, Add.6, Doc.8, PC Exh. 2A, BPR Report-Order of Enforcement, Page ID #8487-88). However, this sanction was not entered until November 24, 1998, just one day after the court's final action in affirming Ms. Pike's conviction and sentence. The Tennessee Supreme Court denied rehearing on November 23, 1998. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *r'hrg denied*, Nov. 23, 1998.

Mr. Talman was considered for prosecution (R.11-2, Add.6, Doc.2, PC Exh. 1, Letter to DA Randy Nichols from DA Victor "Torry" Johnson, Page ID # 7257-58) but ultimately neither he nor any other attorney was ever prosecuted. At the time of Mr. Talman's appointment in Ms. Pike's case, however, the questions of criminal or professional sanctions for his over-billing were unresolved. Review by the BPR on the ethical charges was still pending, and though the State had not initiated any prosecution, it had given no assurances that it would not prosecute in the future.

While the Court of Criminal Appeals found that Ms. Pike's arguments that this cloud of suspicion could have affected Mr. Talman's decisions during the trial were only speculation (*see Pike*, 2011 WL 1544207, at *47) there can be no denying that these were serious allegations and that they remained unresolved at the time of Ms. Pike's trial. None of the ethical charges pending before the Tennessee Supreme Court were resolved until one day after the appeal in Ms. Pike's case was denied. This renders highly suspect the state court's findings that Ms. Pike had failed to prove any relationship between the charges and the findings about Mr. Talman's actions. Mr. Talman's reputation for honesty and his standing in the Knoxville legal community were

certainly damaged by the charges for over-billing, charges that he essentially admitted by reimbursing the courts for $67,000.

Furthermore, counsel's abrupt change in plans for presenting Ms. Pike's case for life in the penalty phase necessarily raises questions about his motivations. Counsel had earlier recognized that the penalty phase was the most important part of this case since it was highly likely that Ms. Pike would be found guilty of first degree premeditated murder. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, Page ID # 5982). Despite that, counsel appears to have been unprepared for the fact that he might have to turn over, in discovery, the work product of his expert mitigation specialist.

Against this backdrop, Petitioner Pike presented evidence to show that Mr. Talman made the last-minute decision not to present the testimony of Dr. McCoy because he was worried about the admissibility of her testimony and because he had asked her to lie for him and she had refused to do so. Mr. Talman testified that it had been his plan for some time to call only Dr. McCoy as the sole witness during the mitigation phase of the trial. (R.9-19, Add.5, Doc.14, Bill Talman, PCT, Page ID # 5935-36). However, once the jury returned its guilty verdict and following an *in camera* hearing on the eve of the penalty phase, he decided that he would not be calling Dr. McCoy after all. Dr. McCoy testified that this decision was made following a conversation she had with him in which he had expressed the possibility that her testimony was inadmissible due to the hearsay rules and he asked her to lie and tell the court that he had only received her materials that day before. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, Page ID # 6413). She tried to contact other attorneys about the hearsay question but was unable to provide Talman with an answer that day. (*Id*. at 6413-14). After she refused to lie for him, he decided he

would not call her and instead presented the testimony of family members who happened to be present for the trial. (R.11-2, Add.6, Doc.2, PC Exh. 8, Letter from McCoy to Talman, Page ID # 7351-52).

It is undisputed that Mr. Talman's decision was made at the last minute. It is also undisputed that the prosecution was very angry when Dr. McCoy's materials were only turned over at the *in camera* hearing that occurred just before the penalty phase was to begin. It is also beyond dispute that Mr. Talman's reputation for honesty and ethical practice was in question and that he was facing serious ethical charges at the time of Ms. Pike's trial. If any of these self-interested issues influenced his decision to abandon his long-held plan to present his mitigation case through Dr. McCoy, then a conflict of interest affected his representation of Ms. Pike at her capital trial. The same is true if Talman turned over privileged work product out of fear of further angering the court or the prosecution.

Mr. Talman's last-minute decision to abandon his plan was either due to his conflict of interest, or it was due to his incompetence as presented in Ground One. There is no legitimate reason that his entire plan would abruptly change the night before the penalty phase presentation.

Mr. Talman offered a number of explanations for his decision at the time of the post-conviction hearing, but all of them are implausible. The state court's decision to credit these explanations represents unreasonable factual findings in light of the entire state court record. Furthermore, the Court of Criminal Appeals' finding that the record simply fails to "offer anything more than supposition that the over billing issue affected lead counsel's representation" is also unreasonable in light of the voluminous evidence Petitioner Pike presented. *Pike*, 2011 WL 1544207, at *47.

Ms. Pike presented this issue to the state courts during the post-conviction process and it was addressed on the merits. *Pike*, 2011 WL 1544207, at *45-48. The Court of Criminal Appeals cited the correct federal law in this case, but applied it unreasonably and based its findings on unreasonable findings of fact in light of the entire state court record. Lead trial counsel's decisions at trial were affected by the charges he was facing, and this Court must issue the writ.

**B. Trial counsel created an unconstitutional conflict of interest that affected their performance when they procured a release of media rights from Petitioner Pike.**

After sentencing, but prior to their representation of Ms. Pike on direct appeal, Mr. Talman and Ms. Rice had Ms. Pike sign a waiver releasing all media rights to her story. The waiver contained a clause specifically authorizing defense counsel to use or sell Ms. Pike's story for pecuniary gain. (R.11-2, Add.6, Doc.2, PC Exh.13, Release, Page ID # 7365).

An attorney's attempt to profit from sale of a client's story during the course of representation of the client constitutes a conflict of interest.[10] Tenn. Sup. Ct. Rule 8, Canon 5, EC 5-4, DR 5-104 [1996-1997]; Model Rules of Prof. Responsibility R. 1.8(d) ("Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation."); Tenn. Rules of Prof. Resp. R. 1.8(d) (same). Because counsel handled Ms. Pike's direct appeal, counsel's conduct in obtaining a waiver occurred in the course of representing Ms. Pike. This conduct also casts a shadow backwards

[10]In 2002, the Tennessee Supreme Court replaced the Rules of Professional responsibility with the Code of Professional Conduct. Releases such as the one Ms. Pike signed are now prohibited by Tenn. Sup. Ct. R. 8, RPC 1.8(d).

across Ms. Pike's trial, suggesting that defense counsel were motivated by monetary gain throughout.

As discussed above, proof of a conflict of interest entails a showing of adverse effect. This may be shown by proving: (1) an alternative strategy; (2) that was objectively reasonable; and, (3) that counsel's failure to pursue that strategy or tactic was linked to counsel's conflict. *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001), *aff'd*, 535 U.S. 162 (2002). Ms. Pike is entitled to an inference of the causation required if she can show that Mr. Talman and Ms. Rice's conflict was consistent with their failure to pursue reasonably objective strategies. *Boykin v. Webb*, 541 F.3d 638, 644 (6th Cir. 2008).

In this case, adverse effect is apparent in counsel's failure to seek a continuance. Effective representation of Ms. Pike mandated delay for two reasons. First, counsel had no experience in litigating in a complex and time consuming field. Mr. Talman had never litigated a capital case prior to Ms. Pike's, and Ms. Rice had never represented a criminal defendant in anything greater than a B-felony. (R.9-19, Add.5, Doc.14, Bill Talman, PCT, Page ID # 5909; R.9-17, Add.5, Doc.12, Julie Rice, PCT, Page ID # 5679-81). Mr. Talman was on the case for ten months, and Ms. Rice for less than two. (R.7-1, Add.1, Doc.1, T. Tech. Rec., Page ID # 40, 91). Even experienced capital defense attorneys require a great deal more than ten months to prepare for trial.

Without more time to debrief her on his trial strategy, delegate responsibility, and bring her up to speed on the facts of the case, Mr. Talman was effectively trying the case alone. Under these circumstances, it would have been objectively reasonable for Mr. Talman and Ms. Rice to seek a continuance.

Counsel's failure to seek a continuance is consistent with counsel's pecuniary interest in selling Ms. Pike's story. In the wake of Ms. Pike's arrest and indictment, her story generated considerable publicity. This media attention gave value to Ms. Pike's story, but with the passage of time, a new sensational story would have been likely to emerge and wash out interest in commercial accounts of Ms. Pike and her crime. As a result, the defense stood to gain by not seeking a continuance, because a rapid trial insured their ability to capitalize on Ms. Pike's story before the public lost interest.

Ms. Pike is not required to demonstrate prejudice on this claim. However, the evidence of prejudice is immediately apparent; failure to gain a continuance resulted in poor preparation that undermined Ms. Pike's defense in totality. Under these circumstances, Ms. Pike has established a second conflict of interest mandating reversal and invalidation of her conviction and sentence.

Petitioner Pike raised this claim during post-conviction and it was addressed on the merits in the Tennessee Court of Criminal Appeals. *Pike*, 2011 WL 1544207, at *48-49. That court's decision was an unreasonable application of federal constitutional law and was furthermore, based on unreasonable findings of fact in light of the state court record. This Court must issue the writ.

## GROUND THREE

**Christa Pike's attorneys were constitutionally ineffective during the guilt/innocence phase of her capital trial for their failure to present available evidence that Christa Pike did not form the required *mens rea* to be guilty of first degree premeditated murder and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

In Ground One of this Petition, Christa Pike has argued that trial counsel were ineffective for failing to investigate and present available mitigating evidence reducing her moral culpability and which would have lessened the impact of any finding by the jury that she had acted with premeditation. Much of that same evidence could have been presented in the guilt/innocence phase of this case to negate the element of premeditation. Counsel's failure to investigate and present this evidence constituted ineffective assistance of counsel and undermines confidence in the reliability of Pike's conviction therefore violating her Sixth, Eighth and Fourteenth Amendment rights.

Trial counsel failed to present an effective case to undermine the State's proof of deliberate and premeditated murder. This was the result of two of the same fundamental errors that plagued Ms. Pike's representation in the penalty phase: failure to make appropriate use of expert witnesses, and failure to discover relevant lay witness testimony.

First, defense counsel presented scant expert testimony with regard to Ms. Pike's mental state surrounding the killing of Ms. Slemmer. Dr. Engum was the only defense witness to testify to Ms. Pike's state of mind surrounding the offense. He testified:

> My opinion is, and it is particularly based on the test results and on a review of her statement, that she basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, borderline personality disorder, which meant that she basically went out of control.
>
> (R.8-7, Add.2, Doc.22, Dr. Engum, TT, Page ID # 2753).

Dr. Engum's testimony was insufficiently substantiated. The State was able to exploit this fact on cross-examination by repeatedly pointing out that the factual basis for Dr. Engum's opinion was limited to the statements made by Ms. Pike. (R.8-8, Add.2, Doc.23, Dr. Engum, TT, Page ID # 2764-65, 2777). Because Dr. Engum had no alternative basis for his information, and never asserted that he had reviewed her social history, the State was able to get him to admit that, if Ms. Pike had lied to him, he might be forced to change his opinion. (*Id*. at 2777).

The State also pursued a cross-examination strategy that played into the common distrust of jurors for expert witnesses. With a line of questioning concerning Dr. Engum's compensation on this case, during which he revealed that he worked only with criminal defense teams and relied on this work for 20% of his income, the State tried to paint him as an untrustworthy "hired gun." (*Id.* at 2766-67). Later, the State launched an attack on Dr. Engum's entire field of expertise, implying that Ms. Pike suffers from a "phantom" mental illness because the evidence of her disorder is psychological and thus not tangible. (*Id.* at 2775-76).[11]

---

[11] Unlike Dr. Engum's diagnosis, Dr. Kenner's diagnosis of brain damage was substantiated by a brain wave examination and brain scan, both which showed organic brain damage.

In the end, the State's tactics were effective and the jury found Ms. Pike guilty of first degree murder. There is a reasonable probability that this outcome could have been avoided. Dr. McCoy's Social History contained a wealth of information from witnesses that Ms. Pike had extreme mood swings and acted impulsively.[12] Lay witnesses could also have testified that Ms. Pike was incapable of calming down on her own, and needed to be physically restrained while in the midst of a manic rage. (R.9-11, Add.5, Doc.6, Orlando Powell, PCT, Page ID # 5055-56, 5064). Had trial counsel: (1) called these witnesses; (2) called Dr. McCoy; or, (3) provided Dr. Engum with a copy of Dr. McCoy's Social History, the lone witness testifying to Ms. Pike's mental state would not have been forced to testify that his opinion was only as good as the defendant's word.

Counsel made another significant error in their use of Dr. William Bernet during the guilt/innocence phase. Dr. Bernet was called on to testify that Ms. Slemmer's killing was not a satanic ritual, but, rather, was consistent with a phenomenon called "collective aggression." (R.8-9, Add.2, Doc.24, Dr. Bernet, Page ID # 2877-78). The relevance of this testimony was never made clear. (*Id.* at 2868-76). While Dr. Bernet's testimony offered no apparent benefit to Ms. Pike's defense, it was highly prejudicial and represented a wasted opportunity. Dr. Bernet's testimony was prejudicial because it opened the door to a lengthy discussion of Satanism and the various details of Ms. Slemmer's killing that bore satanic overtones, such as the carving of a pentagram in her chest. (*Id.* at 2897-99). Dr. Bernet's testimony represented a wasted opportunity because he might have provided meaningful testimony regarding Ms. Pike's state of

---

[12] Moreover, if Dr. Engum had known of Christa's social history he likely would have diagnosed her with bipolar disorder as opposed to borderline personality disorder.

mind at the time of the offense. Dr. Bernet, however, never met or evaluated Ms. Pike. (R.8-8, Add.2, Doc.23, Dr. Bernet, TT, Page ID # 2854). In defense counsel's direct examination of Dr. Bernet, Mr. Talman asked if Dr. Bernet could testify to a reasonable degree of medical certainty as to Ms. Pike's mental state. (R.8-9, Add.2, Doc.24, Dr. Bernet, Page ID # 2880). Dr. Bernet was forced to respond that he could not, "not having interviewed her, and with the limited information I have, I . . . do not have an opinion with that degree of certainty." (*Id.*). Due to counsel's ineffectiveness, Dr. Bernet was unable to offer any evidence that could be of assistance in Ms. Pike's case.

Counsel had a duty to fully investigate and develop evidence that Christa Pike had not formed the required *mens rea* for first degree murder due to mental illness and brain damage. Counsel's failure to do so constituted deficient performance. Because this evidence was compelling, there is a reasonable probability that its presentation would have resulted in a different outcome. *See Strickland*, 466 U.S. at 694-96.

Petitioner Pike raised this claim during post-conviction and it was addressed on the merits in the Tennessee Court of Criminal Appeals. *Pike*, 2011 WL 1544207, at *60-61. That court's decision was an unreasonable application of federal constitutional law and was furthermore, based on unreasonable findings of fact in light of the state court record. This Court must issue the writ.

## GROUND FOUR

**The imposition of the death sentence on Christa Pike, an immature, mentally ill, and brain-damaged eighteen-year-old violates the Eighth Amendment prohibition against Cruel and Unusual Punishment. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Clearly established case law from the United States Supreme Court supports a categorical bar to execution of older adolescents suffering from serious mental illness or brain defect. A reasonable application of the rationale underpinning *Roper v. Simmons*, 543 U.S. 551 (2005) and *Atkins v. Virginia*, 536 U.S. 304 (2002) compels the finding that the Tennessee state courts should have recognized that a brain damaged and mentally-ill eighteen year-old such as Christa Pike is exempt from capital punishment under the Eighth Amendment to the United States Constitution.

In *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court held that a capital punishment statute would be held constitutional so long as it: (1) reflected contemporary public values, as evidenced by objective indicia; (2) satisfied the proportionality requirement that the punishment fit the crime; and (3) entailed no unnecessary infliction of pain. *Id.* at 173. Use of this three-factor analysis has expanded since *Gregg*. Although initially developed to test the facial constitutionality of a given statute, the Gregg analysis has since been used to determine whether particular groups merit categorical exception from capital statutes as applied. This practice began with groups defined by their alleged crimes. *Coker v. Georgia*, 433 U.S. 584 (1977) (death penalty for rape of adult woman unconstitutional); *Enmund v. Florida*, 458 U.S. 782 (1982) (death penalty for felony murder unconstitutional where defendant did not kill,

attempt to kill, or intend death or use of force). In *Ford v. Wainwright*, the Supreme Court proceeded to analyze groups defined by the characteristics of the members themselves, but only in relation to the effects of those characteristics after the fact of conviction. *Ford v. Wainwright*, 477 U.S. 399 (1986) (death penalty for insane person at time of execution, unconstitutional). In the past 20 years, the Supreme Court has taken the next logical step, considering the propriety of execution for groups whose defining characteristics suggest a lesser degree of culpability for capital crimes. *See Thompson v. Oklahoma*, 487 U.S. 815 (1988), overruled by *Roper*, 543 U.S. 551; *Penry v. Lynaugh*, 492 U.S. 302 (1989), overruled by *Atkins*, 536 U.S. 304.

In tandem with the expanding use of the *Gregg* analysis, the Supreme Court has arrived at a more precise understanding of each of the three *Gregg* factors. Under the first factor, which calls for an assessment of public values, the courts look to legislation, polls, juror surveys, jury verdicts, positions taken by professional and advocacy organizations, and any other objective data to determine whether public sentiment disfavors execution of the group in question. *See Atkins*, 536 U.S. at 313-17. The second factor--proportionality analysis--entails judicial scrutiny of prevailing scientific and social science literature with an eye towards evidence that the group in question may be physiologically incapable of full culpability. *See Roper*, 543 U.S. at 569-71. Third, and finally, in determining whether execution would result in the unnecessary infliction of pain or suffering, the courts ask whether execution of group members is likely to further either of the purposes of capital punishment in retribution and deterrence. *See id*. at 571-72.

In arriving at the decision that certain groups must be categorically barred from capital punishment, the Supreme Court explicitly found insufficient the prospect of group members defending against execution on a case-by-case basis. This was for the reason that existing means

of fighting a death sentence--an insanity defense, or presentation of sentencing phase mitigation--provided insufficient protection. In *Roper*, the Court elaborated on the shortcomings of mitigation evidence in the particular circumstances of adolescent defenders who commit violent crimes:

> The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime could overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective maturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him.

*Roper*, 543 U.S. at 572-73.

Only categorical exceptions to the death penalty can insure the protection against cruel and unusual punishment for certain groups of less culpable individuals.

Under the factors outlined in *Gregg*, older adolescents who suffer from brain damage or mental illness must not be subject to the death penalty. First, adolescents lack sufficient cognitive capacities to achieve the requisite degree of culpability for imposition of the death penalty. For this reason, individuals under the age of eighteen are immune from capital prosecution under federal law. *Roper*, 543 U.S. at 575. The evidence presented at Petitioner Pike's trial shows that she, along with other older adolescents, suffers from the same lack of cognitive development. Healthy individuals raised in stable environments may reach cognitive maturity in their early twenties. When the variables of mental illness or environmental abuse and neglect are factored in, cognitive development, and therefore moral reasoning, may take place even later.

In addition, a national consensus is building against the execution of older adolescents as evidenced in the *Roper* decision. At the same time, the diminished culpability of older adolescents may not be adequately protected through the presentation of mitigating evidence. The reasons that full culpability is lacking are often the very same reasons that youthful offenders are capable of particularly offensive crimes: maturity, defenses to peer pressure, and impulse control are not fully formed. That phenomenon was prominently manifested in Ms. Pike's case.

Just as the Supreme Court found youth to justify a categorical exemption from the death penalty in *Roper*, it also found that cognitive impairment justified such an exemption in *Atkins*. Even earlier, the Court had recognized the importance of mental illness and impairment when it held that individuals must be mentally competent at the time of execution in *Ford v. Wainwright*, 477 U.S. 399 (1986). That same reasoning from *Ford* and *Atkins* now justifies an exemption for brain damaged individuals, particularly those suffering from severe mental illness.

A ban on the execution of mentally-ill, cognitively-impaired adolescents would satisfy constitutional requirements of proportionality, due process. It would also be in accord with evolving standards of decency. *See Trop v. Dulles*, 356 U.S. 86, 101 (1958).

The state court record in this case shows that Christa Pike was indeed a mentally-ill, cognitively-impaired, immature adolescent at the time of the offense. She was only eighteen years old. Her frontal lobe has been damaged since she was a developing fetus. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4770-75). In addition, due to the abuse she suffered as a young child, the development of her brain was affected. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID # 6830-35). She also suffers from a severe mental illness, bipolar disorder, that is dominated by long periods of hypomania in which she becomes increasingly irritable. (R.9-8,

Add.5, Doc.3, Dr. Pincus, PCT, Page ID # 4774; R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID# 6778-79). All of these elements match or surpass the reasons for exempting juveniles and the mentally retarded from the death penalty. She is less able to control her emotions and actions due to mental illness and brain damage. Her frontal lobe, as an eighteen year old at the time of the offense, was not just incompletely developed, but was also damaged. The conditions surrounding Ms. Pike's case are thus indistinguishable from those of juveniles or the mentally retarded. Under these circumstances, Ms. Pike's death sentence violates the Eighth and Fourteenth Amendments to the U.S. Constitution.

Ms. Pike presented this issue in her post-conviction appeal to the Tennessee Court of Criminal Appeals. The Court of Criminal Appeals addressed these issues on the merits. *Pike*, 2011 WL 1544207, at *62-68. The state court decision to deny relief was contrary to or an unreasonable application of clearly established federal law. This Court must grant habeas relief.

## GROUND FIVE

> **The death sentence in this case violates Christa Pike's rights to a fair jury and due process of law because the trial court dismissed for cause a juror who was qualified to serve. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d)**.

As presented in Ground One above (p.63-64), defense counsel failed to object when the trial court improperly struck prospective juror Rutherford for cause because he had expressed his reluctance to vote for the death penalty for someone as young as Christa Pike. In this Ground for Relief, Petitioner relies on the same facts to argue that it was structural error for the trial court to excuse prospective juror Rutherford.

Petitioner Pike presented this claim for relief during her post-conviction proceedings. The Tennessee Court of Criminal Appeals addressed this issue at the same time it addressed the issue of ineffective assistance of counsel and found the underlying excusal of this juror to be appropriate. *Pike*, 2011 WL 1544207, at *58. However, a careful review of Mr. Rutherford's colloquy shows that the state court's conclusion is based on an unreasonable characterization of the facts and resulted in an unreasonable application of clearly established federal law.

Mr. Rutherford's excusal violated Ms. Pike's constitutional rights to a fair trial and impartial jury. In *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968), the Supreme Court held that striking a juror who had conscientious scruples against the death penalty but who, nevertheless, could consider it, violated the defendant's right to an impartial jury under the Sixth and Fourteenth Amendments. In *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the Court clarified the *Witherspoon* standard, proclaiming the critical issue to be "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Later, in *Morgan v. Illinois*, 504 U.S. 719, 731 (1992), the Court held that *Witherspoon* "was in reality a limitation of a State's making unlimited challenges for cause to exclude those jurors who 'might hesitate' to return a verdict imposing death." *Morgan*, at 731 citing *Witherspoon*, 391 U.S. at 512-13.

After prospective juror Mr. Rutherford had been initially determined to be death-qualified under *Witherspoon* and *Witt*, he told the court that he was having difficulty with the idea of imposing the death penalty due to Ms. Pike's youth. This exchange followed:

> Trial Court: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I, I need you to tell me how you feel.

> Mr. Rutherford: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.
>
> . . .
>
> General Crabtree: And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.
>
> Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?
>
> Mr. Rutherford: I have problems just because of the death penalty.
>
> . . .
>
> General Crabtree: . . . So let's see if we can make it clear–as far as her, the sole factor of her age, that would be something that you could not do?
>
> Mr. Rutherford: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem–
>
> . . .
>
> General Crabtree: . . . I understand you to be saying that because of her age that one factor would keep you from returning the death penalty, is that correct?
>
> Mr. Rutherford: I think so.

(R.8-1, Add.2, Doc.16, TT, Page ID # 2048; 2050-52). Thereafter, the court excused Mr. Rutherford for cause. (*Id*. at 2053).

In affirming the dismissal of prospective juror Rutherford, the Court of Criminal Appeals applied federal law unreasonably. Mr. Rutherford never said that he would be unable to follow instructions and conscientiously follow the law.

The trial court never told Mr. Rutherford that Ms. Pike's youth was a statutory mitigating factor. *See* Tenn. Code. Ann. § 39-13-204(j)(7). Nor did anyone inform Mr. Rutherford that he could accord that factor great weight if he found that Ms. Pike was emotionally immature for someone her age. Nor, conversely, was he told that he could accord this factor less weight if he

found that she was more mature or if he simply found that her actions were premeditated and not mitigated by youth. In fact, Mr. Rutherford expressed his belief that it was not age, *per se*, that made him hesitate about the death penalty, but rather the immaturity that generally goes with it: "you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem." (*Id*. at 2051). Consideration of age and maturity as a mitigating factor was not only permissible in this case, it was required. *See Eddings v. Oklahoma*, 455 U.S. 104, 115-17 (1982). Mr. Rutherford's recognition of this was not a reason to strike him from jury service.

Mr. Rutherford's views, according great weight to immaturity due to age, are not at all unlike the views expressed by the Supreme Court when it held that the death penalty was unconstitutional for defendants who were under eighteen at the time of their offense. In *Roper v. Simmons*, the Court held that immaturity due to youth was such a strong factor in mitigation that the death penalty was excluded no matter how strong the aggravation. *Roper*, 543 U.S. at 570-71. Mr. Rutherford's belief, that Ms. Pike's youth would be a strong mitigating factor because she was only eighteen at the time of the offense, and therefore only barely eligible for the death penalty, is hardly surprising and should not have disqualified him from service.

The Tennessee court's decision on this issue represents an unreasonable application of federal law. It is also based on unreasonable factual findings in light of the record. For these reasons, this Court must issue the writ.

## GROUND SIX

**The appointment of counsel with an active conflict of interest known to the trial court constitutes a violation of Christa Pike's Sixth Amendment right to counsel and this Court must issue the writ of habeas corpus due to this structural error.**

As set out in the Statement of Facts, trial counsel Bill Talman was appointed to defend Christa Pike who was on trial for her life and being prosecuted by the same prosecutors who could potentially bring charges against him for fraudulent billing. *See* generally, infra, p.3-5. Mr. Talman carried out this appointment beyond trial to eventually argue Ms. Pike's case before the Tennessee Supreme Court, the same court that was considering what sanctions to impose against him for his earlier unethical conduct. The trial court was aware of all of these facts. The trial court admitted, "I knew; we all knew that Mr. Talman had his own problems." (R.10-7, Add.5, Doc.27, Judge Leibowitz, PCT, Page ID # 7083). Mr. Talman's own fate was in the hands of his adversary in this adversarial process and his credibility and ethics were being judged at the same time he was supposed to be arguing to save his client's life. This situation was more than just unseemly. It had an influence on Mr. Talman in ways that may be difficult to quantify and represents the type of error that the Supreme Court has found to be structural error for that very difficulty.

During the state post-conviction process, Petitioner Pike argued "that the appointment of counsel who the court knew had a high risk of conflict constitutes a structural error requiring that her conviction and sentence be set aside." (R.13-1, Add.7, Doc.1, PC Appellant's Brief, Page ID # 9027). Petitioner cited to Supreme Court cases that hold that "the assistance of counsel is among those 'constitutional rights so basic to a fair trial' that their infraction can never be treated

as harmless error;" *Holloway v. Arkansas*, 435 U.S. 475, 489 (1979) quoting *Chapman v. California*, 386 U.S. 18, 23 (1967); and that, "[w]hen a defendant is deprived of the presence and assistance of this attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) quoting *Holloway*, 435 U.S. at 489 (Where a Petitioner shows structural error, no showing of prejudice or effect is necessary.).

This claim was presented to the Court of Criminal Appeals during the post-conviction process. Although that court found that no conflict of interest existed because of Petitioner's alleged failure to show prejudicial impact, that court never specifically addressed the structural error aspect of this claim. *Pike*, 2011 WL 1544207, at *46, *48. The court made no finding of procedural default. Because there is no state court decision to defer to, this Court must address this issue *de novo*. To the extent that the state court addressed issues of conflict of interest, its decision was based on an unreasonable application of clearly established federal case law and was based on unreasonable factual findings in light of the record before it. This Court must issue the writ of habeas corpus.

## GROUND SEVEN

> **The trial court erred in violation of Petitioner Pike's rights to due process guaranteed by the Fourteenth Amendment to the United States Constitution by allowing television and photographic coverage of the pretrial proceedings. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

The present case had extensive media coverage. The constitutional fairness of the trial was implicated by extensive pretrial publicity, and that extensive publicity continued throughout

the trial. This was due to television and photographic media coverage in the courtroom that occurred both during the pretrial stages as well as the trial itself. The Petitioner objected to the presence of television and newspaper photographers during pretrial proceedings. (R.7-1, Add.1, Doc.1, T. Tech. Rec., Page ID # 88-89). Her motion was made in order to limit the public's exposure to the specific details of the case so as not to taint potential jurors. However, the trial court overruled Petitioner's objections and the media coverage continued denying Petitioner Pike a fair trial by an unbiased jury. (R.7-1, Add.1, Doc.1, T. Tech. Rec., Page ID # 124).

The basis for allowing cameras in the courtroom was the then-experimental rule promulgated by the Tennessee Supreme Court, which was testing the feasibility of allowing cameras in the courtroom during proceedings. On direct appeal, the Tennessee Supreme Court affirmed the trial court's application of this rule to Ms. Pike's case finding that Ms. Pike "ha[d] failed to demonstrate that the media coverage of the pretrial and trial proceedings in this case impinged upon her right to a fair trial." *Pike*, 978 S.W.2d at 917. That decision is contrary to or is an unreasonable application of federal constitutional law and is furthermore based on an unreasonable assessment of the facts in light of the trial record.

The only federal case law cited by the Tennessee Supreme Court in support of its affirmance was *Chandler v. Florida*, 449 U.S. 560 (1981). However, the Supreme Court in that case expressly limited its holding to "the limited question of the Florida Supreme Court's authority to promulgate" the rule allowing electronic media and still photography coverage of public judicial proceedings. *Id.* at 570. That case did not examine whether the application of such a rule to a specific set of facts might cause a trial to be fundamentally unfair. *Id.* Such an application shows that an unfair trial was the result of a similar rule in Petitioner Pike's case.

Many of the jurors and potential jurors in the present case were aware of the inordinate media attention this case had received. Furthermore, and more importantly, many potential jurors were exposed to media coverage during *voir dire* and pretrial hearings that immediately preceded their reporting for jury service. For one thing, potential jurors discussed the fact that there had been a confession while they were waiting to be questioned on *voir dire*. (R.7-12, Add.2, Doc.9, Potential Juror Strickler, TT, Page ID # 1318). In addition, Juror Green admitted that he had been exposed to media coverage of the *voir dire* process. (R.7-16, Add.2, Doc.13, Juror Green, TT, Page ID # 1791). Other potential jurors were exposed to media coverage of the *voir dire* process. Potential jurors Hayner and Qualls were both exposed to media coverage about the jury selection. (R.7-5, Add.2, Doc.2, Potential Juror Hayner, TT, Page ID # 622-23; R.7-8, Add. 2, Doc.5, Potential Juror Qualls, TT, Page ID # 930-31). Media coverage in this case made jury selection extremely difficult and the result was a jury panel that was already familiar with the alleged facts of this case as reported by the news media.

The opinion of the Tennessee Supreme Court failed to engage in a fact-specific analysis of the effect of continuing media coverage in this case. *See State v. Pike*, 978 S.W.2d 904, 916-17 (Tenn. 1998). To the extent that it did address Petitioner Pike's fair trial concerns, it represents an unreasonable application of clearly established law. This Court must issue the writ of habeas corpus.

## GROUND EIGHT

**Petitioner Pike's Sixth Amendment right to a fair and impartial jury was violated by the trial court's refusal to grant her motion for a change of venue. The Tennessee courts' denial of this claim was contrary to, or an unreasonable application of, clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

The pretrial publicity generated in this case was very extensive with the media portraying Ms. Pike as being guilty before her trial ever took place. Due to the nature and extent of the media coverage, Ms. Pike filed a motion for change of venue from Knox County where the offense had occurred. (R.7-1, Add.1, Doc.1, T. Tech. Rec., Page ID # 93-94). The trial court denied this motion. Through questioning during *voir dire*, Ms. Pike was able to demonstrate that an overwhelming majority of the prospective jurors had heard detailed information about this case. While some jurors remembered general facts about the case (R.7-5, Add.2, Doc.2, TT, Page ID # 614-16), many others remembered specific details. (R.7-9, Add.2, Doc.6, TT, Page ID # 1011-23; 1033-38). Furthermore, some of the prospective jurors admitted that they had been discussing the media details of the case in the hallway during jury selection. (R.7-9, Add.2, Doc.6, TT, Page ID # 1021; R.7-11, Add.2, Doc.8, TT, Page ID # 1310; R.7-12, Add.2, Doc.9, Page ID # 1315-20). As a result of this questioning, defense counsel renewed the motion for change of venue. (R.7-12, Add.2, Doc.9, Bill Talman, TT, Page ID # 1321). The trial court reaffirmed its denial and the trial proceeded before a jury composed of residents of Knox County, Tennessee. (*Id.*).

Ms. Pike raised this issue during the direct appeals process. Although the Tennessee Supreme Court did not address the issue, it attached the merits review from the Court of Criminal

Appeals to its Opinion as an Appendix. *Pike*, 978 S.W.2d at 923-28. The opinion from the Court of Criminal Appeals was an unreasonable application of federal constitutional law as interpreted by the Supreme Court in *Irvin v. Dowd*, 366 U.S. 717 (1961).

In *Dowd*, two-thirds of the jurors actually seated had been exposed to a barrage of pretrial publicity right up until the time of trial, had already formed an opinion that the defendant was guilty, and acknowledged familiarity with material facts and circumstances of the case. 366 U.S. at 725-28. In addition, even the headlines of one of the local newspapers reported during jury selection that "impartial jurors are hard to find." *Id.* at 727. Although each of the jurors said that he could be impartial, the U.S. Supreme Court concluded that, "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." *Id.* at 728.

The circumstances in the present case were similar to the circumstances in the *Dowd* case. Here, almost every prospective juror indicated that they had heard about the case and could recall details of the case. The Tennessee Supreme Court itself recognized that "jury selection was lengthy, in part, due to the media coverage of the crime[.]" *Pike*, 978 S.W.2d at 917. While the jury actually seated consisted of people who stated that they could be impartial, the *Dowd* rule would compel that with her life at stake, Pike should have been tried in "an atmosphere undisturbed by so huge a wave of public passion." *Dowd*, 366 U.S. at 728.

Although the Court of Criminal Appeals correctly cited to the *Dowd* opinion, it applied it summarily and unreasonably. The court dismissed Ms. Pike's appeal because "every juror who said that he or she was familiar with the case said that he or she could disregard the reports and

render an impartial decision." *State v. Pike*, No. 03C01-96119CR-408, 1997 WL 732511, at *12 (Tenn. Crim. App. Nov. 26, 1997). Furthermore, the court failed to conduct any analysis of the evidence of pretrial publicity or the impact of the continuing publicity during the trial, including television coverage of the actual proceedings. *See* Ground Seven, p.85-87. For these reasons, the decision represents an unreasonable application of clearly established federal law and habeas relief is warranted.

## GROUND NINE

**Petitioner Pike's Sixth Amendment rights to a fair and impartial jury as well as her right to equal protection were violated when the trial court applied a new rule in violation of the *ex post facto* clause that gave the State the same number of peremptory challenges as the Defendant. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Petitioner Pike's constitutional rights were violated when the trial court applied a new law on how to go about selecting a fair and impartial jury that was not in effect at the time the offense was committed. The application of this law during the trial for an offense that took place before its enactment violated the *ex post facto* rule of the United States Constitution and merits habeas relief.

At the time the offense was committed in this case, January 12, 1995, the Tennessee statute on jury selection that was in effect gave a greater number of peremptory challenges to the Defendant (fifteen) than it did to the State (eight). *See* Tenn. R. Crim. P. 24(d) (West 1995). By the time the trial took place, the state legislature enacted a new law that gave the State the same number of peremptory challenges as the Defendant. *See* Tenn. R. Crim. P. 24(d) (West 1996). The trial court applied the new law to jury selection in Christa Pike's case and allowed the State

to exercise as many peremptory challenges as the Defendant. (R.7-4, Add.2, Doc.1, Judge Leibowitz, TT, Page ID # 502). Ms. Pike objected and raised this issue during the direct appeal process. (R.8-16, Add.3, Doc.1, Pike Direct Appeal Brief, Page ID # 3489-90). Although the Tennessee Supreme Court did not address the issue, it attached the merits review from the Court of Criminal Appeals to its Opinion as an Appendix. *Pike*, 978 S.W.2d at 925. That opinion from the Court of Criminal Appeals is an unreasonable application of federal constitutional law.

The Court of Criminal Appeals unreasonably applied *Miller v. Florida*, 482 U.S. 423 (1987) and *Dobbert v. Florida*, 432 U.S. 282 (1977) to the facts in this case. Under *Miller*, the court recognized that in order to show a violation of the *ex post facto* clause, Petitioner Pike had to show that the enactment of a new law was applied to events occurring before its enactment and that it must disadvantage the offender. *Pike*, 978 S.W.2d at 925, quoting *Miller*, 482 U.S. at 430. Since the trial court applied a new law not in effect at the time the offense in this case occurred, the Court of Criminal Appeals recognized that the trial court applied a new law affecting Pike's rights during jury selection. *Id*. However, the court unreasonably concluded that there was no *ex post facto* violation because the change in law only affected "rules of procedure" that "do not affect any substantial right of a defendant . . . ." *Id*. at 926.

Because this change in law disadvantaged Petitioner Pike in her exercise of a substantial right, the Sixth Amendment right to a fair and impartial jury, the Court of Criminal Appeals' decision was unreasonable. By adding peremptory strikes for the prosecution, the new law unquestionably disadvantaged Pike from where she would have stood under the old law. Nothing in the Supreme Court precedents cited required that she bear the further burden of showing that she was denied a fair trial. Yet, this was the standard imposed by the Court of

Criminal Appeals. The imposition of this requirement was therefore unreasonable. Where the application of clearly established law is unreasonable, this Court must grant the writ of habeas corpus.

## GROUND TEN

**Christa Pike's death sentence must be set aside because the Tennessee death penalty scheme is unconstitutional; its protocol for lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment.**

The Tennessee death penalty statute and its application as interpreted by the Tennessee courts violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### A. Tennessee's death scheme fails to meaningfully narrow the class of death eligible defendants.

The scheme of a capital sentencing must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring). Several of the aggravating circumstances set forth in Tenn. Code Ann. § 39-13-204(i) have been so broadly and disparately interpreted that they fail to provide a meaningful basis for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. These include:

1. The Tenn. Code Ann. § 39-13-204(i)(2) aggravating circumstance has been construed and applied in an overbroad manner;[13]

[13] While this aggravating circumstance and other aspects of the Tennessee death penalty statute may not have been an issue in Christa Pike's case, the application of these aspects of the statute contributes to the unconstitutional application of the death penalty as a punishment in the state of Tennessee.

2. The Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance has been construed and applied in such a manner as to be duplicative of the (i)(7) aggravating circumstance and is overbroad;

3. The Tenn. Code Ann. § 39-13-204(i)(5) aggravating circumstance is vague and overbroad;

4. In combination, subsections (i)(5), (i)(6), and (i)(7) encompass most homicides committed in Tennessee.

Furthermore, Tennessee's appellate review process in death penalty cases is constitutionally inadequate because it is not meaningful and because the statutorily-mandated proportionality review is conducted in violation of due process and equal protection. The appellate review process is not meaningful for the following reasons:

1. The Tennessee Supreme Court cannot reweigh proof due to the absence of written findings concerning mitigating circumstances;

2. The information relied upon by the Tennessee Supreme Court for comparative review is inadequate and incomplete; and

3. The Tennessee Supreme Court's methodology is flawed.

By creating a statutory requirement that the appellate courts conduct proportionality review, there is a constitutional right that the proportionality review be conducted consistent with the elements of due process. *See, e.g.*, *Olim v. Wakinkona*, 461 U.S. 238 (1983). Tennessee's proportionality review process is not conducted in a manner sufficient to satisfy due process.

**B. The death penalty is imposed capriciously and arbitrarily under the Tennessee statute.**

"The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute

renunciation of all that is embodied in our concept of humanity." *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring). "Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976).

Provisions of the Tennessee death penalty statute and other provisions of the State's criminal law have resulted in the arbitrary and capricious infliction of the death penalty. Death sentences are imposed not because the defendant has been found to be one of the most blameworthy or culpable of offenders, but for other improper, illegal and unconstitutional reasons. These are:

1. Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty;

2. The death penalty is imposed in a discriminatory manner depending on the defendant's race, gender, and the location where the crime occurs;

3. There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter;

4. The death qualification process skews the make-up of the jury and results in a jury more prone to be prosecution oriented and more prone to find guilt.

**C. Execution by Tennessee's protocol for lethal injection would violate Christa Pike's rights under the Eighth and Fourteenth Amendments to the United States Constitution.**

Tennessee's protocol for lethal injection is unconstitutional, and creates a substantial risk of needless pain and suffering because of the protocol's use of pancuronium bromide and potassium chloride and the failure of sodium thiopental to induce an adequate level of anesthesia.

**D. The death sentence is unconstitutional because it infringes on Christa Pike's fundamental right to life, and imposition of the death penalty is not necessary to promote any compelling state interest.**

Under the Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, the death sentence must be set aside because it unconstitutionally impinges upon Petitioner Pike's fundamental right to life. Convicted murderers retain a fundamental right to life under the Eighth and Fourteenth Amendments to the United States Constitution. *Ford v. Wainwright*, 477 U.S. 399, 409 (1986). The constitution explicitly recognizes the right to life as fundamental in both the due process clause of both the Fifth and the Fourteenth Amendments.

**E. The indictment returned by the Grand Jury in this case was unconstitutional.**

The State of Tennessee denied Ms. Pike's rights under the Fifth and Eighth Amendments to the United States Constitution because the aggravating factor making her eligible for the death sentence was neither in the indictment nor returned by the Grand Jury. *See Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Therefore, this Court must set aside the death sentence in this case.

Ms. Pike presented these issues to the state courts in post-conviction and they were rejected on the merits. *Pike v. State*, 2011 WL 1544207, at *70. As to the issue of standards for jury selection, those issues were presented to the Tennessee Supreme Court on direct appeal. *Pike*, 978 S.W.2d at 924-25. Because the state court's failure to grant relief represents a decision that is contrary to, or an unreasonable application of, federal law, habeas relief is merited.

## GROUND ELEVEN

**In violation of the Fifth, Sixth and Fourteenth Amendment, the cumulative effect of the errors addressed above deprived Christa Pike of due process and a fair trial.**

"That the reliability of a state criminal trial can be substantially undermined by a series of events, none of which individually amounts to a constitutional violation, is an idea that has been accepted by nearly every federal court to have addressed the issue." *Pursell v. Horn*, 187 F. Supp. 2d 260, 374 (W.D. Pa. 2002) citing *Taylor v. Kentucky*, 436 U.S. 478, 487-88 (1978) (other citations omitted).

Even if this Court were to find that Ms. Pike failed to show prejudice from any one of the claims for relief enumerated in this petition, the Court must still grant relief because the combined effect of those errors acted to deprive her of a fair trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

The prejudice that flowed from the many errors at her trial demonstrates a fundamental denial of due process of law such that Ms. Pike is entitled to a new trial on guilt and punishment. "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990); *see also United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993). Cumulative error analysis "focus[es] on the underlying fairness of the trial." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Cumulative error has also led to a grant of habeas relief in an AEDPA case. *See Thomas v. Hubbard*, 273 F.3d 1164 (9th Cir. 2002). As in *Thomas v. Hubbard*, the cumulative error occurring in Ms. Pike's case dictates that her trial was fundamentally unfair and relief is warranted. *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974);

*Kyles v. Whitley*, 514 U.S. 419 (1995); *United States v. Bagley*, 473 U.S. 667 (1985); *Brady v. Maryland*, 373 U.S. 83 (1963).

**RELIEF REQUESTED**

- That a writ of habeas corpus issue to have Petitioner brought before this Court to the end that she may be discharged from her unconstitutional confinement and restraint and relieved of her unconstitutional convictions and sentence of death;
- That the Respondent be required to answer the allegations of this petition;
- That Petitioner be granted discovery, an opportunity to amend, and an evidentiary hearing on the allegations of this petition;
- That after such a hearing relief be granted from the unconstitutional convictions and sentence;
- For such other relief as may be appropriate under the facts and circumstances as developed in this proceeding.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY: /s/Stephen A. Ferrell
Stephen A. Ferrell
Asst. Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2012, notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/Stephen A. Ferrell
Stephen A. Ferrell