**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 1:12-cv-35** |
| **v.** | ) | **Mattice/Lee** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON,** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

# RESPONDENT'S ANSWER TO PETITION

---

## I. INTRODUCTION AND PROCEDURAL HISTORY

A Knox County jury convicted the Petitioner of one count of first degree murder and one count of conspiracy to commit first degree murder, and sentenced her to death. *State v. Christa Gail Pike*, C.C.A. No. 03C01-9611-CR-00408, 1997 Tenn. Crim. App. LEXIS 1186, at *1 (Tenn. Crim. App. Nov. 26, 1997). The Tennessee Court of Criminal Appeals ("TCCA") upheld her convictions and sentence. *Id.* at *3. The Tennessee Supreme Court ("TSC") also upheld her convictions and sentence. *State v. Pike*, 978 S.W.2d 904, 907 (Tenn. 1998).

On June 3, 1999, the Petitioner filed a timely petition for state post-conviction relief. *Christa Gail Pike v. State*, No. E2002-00766-CCA-R3-PD, Tenn. Crim. App. LEXIS 635, at *4-5 (July 15, 2004). Later, the Petitioner later waived her right to post-conviction. *Id*. at *28-29. Changing her mind, however, the Petitioner subsequently filed a motion to reinstate her post-conviction petition; the motion was denied, and the TCCA affirmed this denial. *Id*. at *2. The TSC reversed, ordering that the petition be reinstated and an evidentiary hearing conducted. *Pike v. State*, 164 S.W.3d 257, 259 (Tenn. May 12, 2005).



Case 1:12-cv-00035-HSM-SKL Document 23 Filed 12/28/12 Page 1 of 90 PageID #: 10306

Following the Petitioner's post-conviction proceedings, the post-conviction court denied relief, and the TCCA affirmed this denial. *Christa Gail Pike v. State*, E2009-00016-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 285, at *3 (Tenn. Crim. App. Apr. 25, 2011). The TSC denied the Petitioner permission to appeal. *Christa Gail Pike v. State of Tennessee*, No. E2009-00016-SC-R11-PD, 2011 Tenn. LEXIS 1110 (Tenn. Nov. 15, 2011).

This Answer is filed in opposition to the Petitioner's timely federal habeas corpus petition. (R.19, Petition).

## II. INTRODUCTION

Preliminarily, the Respondent notes that one of the Petitioner's central claims in this case alleges that lead counsel was conflicted due to an overbilling investigation taking place contemporaneous with her trial. The TCCA's analysis of this legal issue is presented in Section V.B.1, *infra*. The Petitioner also, however, refers to this issue in a general attempt to cast doubt on the reliability of the factual findings made by both the TCCA and the TSC in her appellate proceedings, arguing that because lead counsel's self-reported BPR complaint was still pending during those proceedings, "the [TSC] itself was a party to proceedings that affected the outcome of the state court litigation, [and] its findings of fact are inherently suspect." (R.19 at 69, Petition, Page ID # 9663).

This argument is unconvincing for three reasons. First, the TSC denied the Petitioner permission to appeal her denial of post-conviction relief, meaning that all factual findings relating to lead counsel's trial and appellate performance were made by the TCCA, not the TSC. The record, of course, contains no factual basis for the proposition that lead counsel's BPR proceeding was in some way related to the TSC's decision to deny the Petitioner permission to appeal. Second, even if there were evidence of relatedness, it is not at all clear why the TSC's

knowledge of an investigation into lead counsel's billing practices would lead the TSC to look *unfavorably* on the Petitioner's claims that lead counsel was thereby conflicted or ineffective.[1] Finally, as the TCCA concluded, there is no evidence that the overbilling investigation was anything other than a nonissue during lead counsel's representation of the Petitioner. When that representation started, lead counsel was free of any threat of criminal charges (R.9-19 at 66, PCH, Page ID # 5917), had paid a civil settlement, and had resumed taking appointments. (R.9-21 at 59-65, PCH, Page ID # 6117-23).

Ultimately, this case involves a horrific murder about which the facts, as well as the Petitioner's guilt, were never seriously in dispute. Trial counsel provided competent if inevitably imperfect representation in an effort to obtain a non-capital sentence, but was unable to do so given the uncontestable facts of the murder, the nature of the Petitioner, and the State's overwhelming establishment of two capital aggravators. Tennessee's appellate courts then reasonably applied federal law to an equally reasonable interpretation of the facts of this case. The Petitioner is not entitled to federal habeas corpus relief.

## III. PRELIMINARY STATEMENT

### A. Exhaustion of State Remedies

The Petitioner is deemed to have exhausted her state remedies under 28 U.S.C. § 2254(b), since there is no procedure available under Tennessee law for the Petitioner to present any remaining claim in the Tennessee state courts challenging the convictions and sentence at issue in this case. Although the Petitioner has alleged one ground for relief that has not been fairly or adequately presented to the state courts in satisfactions of § 2254(b)'s exhaustion requirement, this claim is now barred from presentation to the state courts by the statute of limitations under

[1] The Petitioner's argument relating to the trial court is equally unpersuasive. It is similarly unclear how the Petitioner could have been harmed by a trial and post-conviction court with *more* knowledge of lead counsel's overbilling issues.

Tenn. Code Ann. § 40-30-102(a) and the "one petition" limitation of § 40-30-102(c) and, thus, are procedurally defaulted in this proceeding, as alleged more specifically in the Respondent's response to Ground One D.

### B. Transcripts

Transcripts of all of the Petitioner's proceedings are believed to be available and included as addenda to the Respondent's Notice of Filing Documents. (R.7-1 through 7-18, Criminal Trial Record); (R.9-1 through 12-6, Post-Conviction Hearing Record).

### C. Briefs and Opinions

The Petitioner's briefs on appeal from her direct appeal and post-conviction proceedings, as well as related documents, have been filed with this Court as addenda to the Respondent's Notice of Filing Documents. (R.8-16 through 8-26, Briefs and Documents on Direct Appeal); (R.13-1 through 13-7, Briefs and Documents on Post-Conviction Appeal).

### D. Compliance with Rule 2(c)

The petition for writ of habeas corpus is substantially in compliance with Rule 2(c), Rules Governing Section 2254 Cases.

## IV. STATEMENT OF THE EVIDENCE

On direct appeal, the TSC offered the following summary of the evidence presented at the Petitioner's trial:

> The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the defendant, Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed Pike, along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, Pike's boyfriend, walking away from the Job Corps center toward 17th Street. At approximately 10:15 p.m., Iloilo observed Pike, Peterson, and Shipp return to the Center. Slemmer was not with them.

Later that night, Pike went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. Pike showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. Pike told Iloilo that the victim had begged "them" to stop cutting and beating her, but Pike did not stop because the victim continued to talk. Pike told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she had thrown those at the victim as well. Pike told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, Pike said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that Pike was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw Pike at breakfast the next morning she asked Pike what she had done with the piece of the victim's skull. Pike replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."

During a class later that morning, Pike made a similar statement to Stephanie Wilson, another Job Corps student. Pike pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." Pike then pulled a napkin from her pocket and showed Wilson a piece of bone which Pike said was a piece of Slemmer's skull. Pike also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. Pike told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

Though neither Iloilo nor Wilson immediately reported Pike's statements to police, on the day after the murder, January 13, at approximately 8:05 a.m., an employee of the University of Tennessee Grounds Department, discovered Slemmer's semi-nude, slashed, and badly beaten body near the greenhouses on the agricultural campus. He testified that the body was so badly beaten that he had first mistaken it for the corpse of an animal. Upon closer inspection, he saw the victim's clothes and her nude breast and realized it was the body of a human female. He immediately notified law enforcement officials.

Officers from the Knoxville Police Department and the U.T. Police Department were summoned to the scene. Officer John Terry Johnson testified at trial that the body he found was lying on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing. The victim's head had been bludgeoned. Multiple cuts and slashes appeared on her torso. Officer Johnson stated that he thought he was looking at the victim's face but he could not be sure because it was extremely mutilated. Johnson removed all civilians from the area and secured the scene surrounding the body.

As other officers arrived, they began securing the crime area. As officers discovered other areas of blood, articles of clothing, footprints, and broken

foliage, the crime scene tripled in size, eventually encompassing an area 100 feet long by 60 feet wide. The crime scene was wet and muddy, and there was evidence of a scuffle, with trampled bushes, hand and knee prints in the mud, and drag marks. A large pool of blood was found about 30 feet from the victim's body.

The victim's body was actually lying face down on a pile of debris. When officers turned the body over, they discovered that the victim's throat had been slashed. A bloody rag was around her neck. Detective Donald R. Cook, of the U.T. Police Department, accompanied the body to the morgue. He observed the body after it had been cleaned and noticed that a five pointed star in a circle, commonly known as a pentagram, had been carved onto the victim's chest.

Randy York, a criminal investigator with the Knoxville Police Department, began investigating this case on January 13, the day the victim's body was discovered. York separately interviewed the defendant and Shipp at the Knoxville Police Department on January 14th. Investigator York advised defendant Pike of her Miranda rights, but she chose to waive them and make a statement. Pike explained in detail how the killing had occurred. Pike's statement was tape-recorded and transcribed in some forty-six pages. Copies of the transcription were given to the jury, and the jurors were allowed to listen to the tape through individual headphones.

In her statement, Pike said that she and Slemmer had been having problems for some time. Pike claimed to have awakened one night to find Slemmer standing over her with a box cutter. Pike told Investigator York that Slemmer had been "trying to get [her] boyfriend" and had been "running her mouth" everywhere. Pike said that Slemmer had deliberately provoked her because Slemmer realized that Pike would be terminated from the Job Corps program the next time she became involved in a fight or similar incident.

Pike claimed that she had not planned to kill Slemmer, but she had instead planned only to fight Slemmer and let her know "to leave me the hell alone." However, Pike admitted that she had taken a box cutter and a miniature meat cleaver with her when she and the victim left the Job Corps Center. Pike said she had borrowed the miniature meat cleaver, but refused to identify the person who had loaned it to her.

According to Pike, she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, Pike told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though Pike refused to name the other parties involved in the incident, she said the group began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, Pike and Slemmer exchanged words. Pike then began hitting Slemmer and banging Slemmer's head on her knee. Pike threw Slemmer to the ground and kicked her repeatedly. According to Pike, as she slammed Slemmer's head against

the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report Pike so she would be terminated from the Job Corps program, Pike again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with Pike caught Slemmer and pushed her to the ground.

Pike and the other person, who Pike referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where Pike cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," Pike recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point Pike said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, Pike cut Slemmer's back, "the big long cut on her back." Pike said Slemmer repeatedly tried to get up and run. Pike recounted how Slemmer bargained for her life, begging Pike to talk to her and telling Pike that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. Pike told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." Pike said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked Pike what she was going to do to her, at which point Pike thought she heard a noise. Pike left the scene to check out the surrounding area to make sure no one was around. When she returned, Pike began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, Pike cut Slemmer's throat several other times. Pike said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that Pike and the other person would push her back on the ground.

Slemmer attempted to run away again, and Pike threw a rock which hit Slemmer in the back of the head. Pike stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, Pike continued to hit her. Eventually Pike said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but Pike "kept hitting her and hitting her and hitting her." Pike eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, Pike said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. Pike said the episode lasted "for about thirty minutes to an hour." Pike admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. Pike also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. Pike denied carving a pentagram in the victim's

chest, but said that the other person had cut the victim on her chest.

After disposing of Slemmer's body, Pike and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and Pike returned the miniature meat cleaver to the person at Job Corps from whom she had borrowed it. Pike never identified that individual. Pike told Investigator York that the blood-stained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. Pike also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. Pike gave Investigator York consent to search her room and then accompanied him to the Job Corps Center. From there Pike retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that Pike eventually directed him to the exact location where the victim's body was found.

After Pike's statement was played for the jury, the State introduced pictures of Pike and Shipp taken at the Knoxville Police Department on the day the statement was given, January 14, 1995, two days after the murder. In the pictures, both Pike and Shipp were wearing pentagram necklaces.

Mark A. Waggoner, an officer with the Knoxville Police Department, testified that he had retrieved a pair of black gloves and two of Slemmer's I.D. cards from the Texaco station on Cumberland Avenue. These items were also made exhibits. Another officer, Lanny Janeway, used a chart to illustrate each of the locations where blood or evidence was found. Photographs of bloody chunks of asphalt, blood drippings on leaves, and pools of blood were introduced into evidence. The bloody piece of asphalt and the victim's bloody clothing were also introduced into evidence.

Special Agent Raymond A. DePriest, a forensic scientist employed by the Tennessee Bureau of Investigation, testified that he had received blood samples taken from the shoes and clothing of Pike and Shipp. Those items that he determined had human blood on them were sent to the DNA unit. Margaret Bush, an employee of the Tennessee Bureau of Investigation assigned to the DNA unit, testified that she had been unable to perform a DNA analysis on the blood taken from the shoes of Pike and Shipp, but she had determined that the blood samples taken from the clothing of both Pike and Shipp matched the DNA profile of the victim.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsy on the victim, who was later identified by dental records as Colleen Slemmer, a nineteen-year-old Job Corps student. Dr. Elkins described the victim's body as covered with dirt and twigs. Slemmer was nude from the waist up clothed only with jeans, socks, and shoes. After removing the victim's clothing and

cleaning the body, Dr. Elkins had attempted to catalog the slash and stab wounds on the victim's torso by assigning a letter of the alphabet. There were so many wounds that eventually Dr. Elkins decided to catalog only the most serious and major wounds. Dr. Elkins explained that to catalog every wound she would have been required to go through the alphabet again, and stay in the morgue for "three days." Eventually, Dr. Elkins said she "basically threw up [her] hands and just said, enumerable [sic] more superficial slash wounds on the back, arms and chest." In addition, Dr. Elkins said the victim had purple contusions on her knees, indicating fresh bruising consistent with crawling, and defensive wounds on her right arm.

Dr. Elkins described the major slash and stab wounds she had cataloged on the victim's back, arms, abdomen, and chest. She found a six inch gaping wound across the middle of the victim's neck which had penetrated the fat and muscles of the neck. In addition, Dr. Elkins had found ten other slash wounds on the victim's throat. Other slash wounds were on the victim's face, and Dr. Elkins observed what appeared to be a pentagram carved onto the victim's chest. Because the area around each wound was red in appearance, Dr. Elkins concluded that the victim's heart had been beating when the wounds were inflicted and she said the victim would not have been rendered unconscious by any of the stab or slash wounds.

Dr. Elkins determined that the victim's death was caused by blunt force injuries to the head. The victim had suffered multiple and extensive skull fractures. From the autopsy, Dr. Elkins determined that the victim had sustained a minimum of four blows to her head; two to the left side of the head, one over the right eye, and one in the nose area. The right frontal area of the victim's skull had been fractured as had the bridge of her nose. However, the major wound, labeled as injury "W", involved most of the left side of the victim's head. Dr. Elkins said that this injury, caused by blunt force to the left side of the victim's head while the right side of the victim's head was against a firm surface, also had fractured the right side of the skull and imbedded a portion of the skull into the victim's brain. Dr. Elkins found small divots in the victim's skull containing black particles from an asphalt chunk which was later determined to have been used to administer the blows. Finally, Dr. Elkins testified that blood in the victim's sinus cavity indicated she had been alive and probably conscious when the injuries were inflicted.

During her testimony, Dr. Elkins utilized the victim's skull to describe the injuries. She testified that in order to determine the cause of death, it was necessary to remove the head of the victim and have the skull prepared by Dr. Murray Marks, a forensic anthropologist at the University of Tennessee. She explained that she had removed the top of the victim's skull in order to remove the brain. Embedded inside the victim's brain as a result of the blunt force were portions of the victim's skull. Dr. Elkins removed those embedded pieces and forwarded them to Dr. Marks. Dr. Marks reconstructed the skull, fitting those

loose portions into the left side area of the skull. However, those pieces had not completely filled one area on the left side of the victim's skull. Dr. Elkins then showed the jury a piece of skull that had been given to her shortly before the trial and demonstrated that it fit perfectly into the remaining area of the victim's skull. The piece of skull utilized by Dr. Elkins had been taken from the pocket of a jacket which witnesses identified as belonging to Pike.

Pike's jacket had been turned over to law enforcement officials by Job Corps employees. Robert A. Pollock, orientation specialist at Knoxville Job Corps, testified that he had spoken with Pike on January 13, 1995, concerning a misplaced I.D. card. After Pike left his office, Pollock noticed a black leather jacket hanging on the chair where she had sat. The jacket had been hanging on the chair when Pollock locked the room at approximately 4:00 p.m. on January 13th, and it was still there when he returned at 7:30 a.m. on January 17th. Because he had heard over the weekend that Pike was a suspect in this murder investigation, Pollock immediately turned the jacket over to the Job Corps' Safety and Security Captain, William Hudson. Hudson called the Knoxville Police Department and turned the jacket over to Officer Arthur Bohanan when he arrived a short time later.

Officer Bohanan identified the jacket, and it was introduced into evidence. He testified that he had discovered a small piece of bone in the inside pocket of the jacket and had immediately taken it to Dr. Marks at the University of Tennessee. Dr. Marks testified concerning the process by which [**19] the victim's skull had been prepared and again demonstrated that the bone fragment given to him by Officer Bohanan fit perfectly into the bone reconstruction of the skull of the victim.

Following the introduction into evidence of the victim's skull, numerous photographs, and items of the victim's clothing, the State rested its case-in-chief.

Dr. Eric Engum, a clinical psychologist, testified for the defense and stated that he had conducted a clinical interview and had administered a battery of tests to the defendant. Dr. Engum described Pike as an "extremely bright young woman." Dr. Engum explained that Pike "is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustains concentration, can sequence, ah, has excellent receptive and expressive language skills." Pike had a full scale IQ score of 111 which is in the 77th percentile and which was characterized as "remarkable" by Dr. Engum since she had only completed the ninth grade. According to Dr. Engum, the tests unequivocally showed that Pike had no symptoms of brain damage and that she was not insane. However, Dr. Engum concluded that the defendant suffers from a very severe borderline personality disorder and exhibits signs of cannabis (marijuana) dependence and inhalant abuse. He testified that the defendant is not so dysfunctional that she needs to be institutionalized, but instead opined that she has a multiplicity of problems in interpersonal relationships, in controlling her behavior, and in achieving

vocational and academic goals.

During direct examination, Dr. Engum opined that the defendant had not acted with deliberation or premeditation in killing Slemmer. Instead Dr. Engum said she had acted in a manner consistent with his diagnosis of borderline personality disorder; she had lost control. He explained that she had danced around when relating the murder to Iloilo because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her relationship with Shipp. When questioned about the piece of skull found in the defendant's coat, Dr. Engum explained that the Defendant actually has no identity and the action of taking and displaying a piece of Slemmer's skull to her friends was the defendant's way of getting recognition, "no matter how distorted" the recognition.

On cross-examination, Dr. Engum stated that there was no question that the defendant had killed Slemmer. He reiterated that his opinion that once the attack began, Pike had literally lost control. However, Dr. Engum admitted that Pike had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that Pike's act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that Pike had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statements of the defendant and Kimberly Iloilo and the reports of Dr Engum, Dr. Elkins, and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the defendant nor any of the other witnesses. Dr. Bernet admitted that he did not have enough information to offer an expert opinion as to whether Pike acted with intent or premeditation in killing the victim.

Based on this evidence offered during the guilt phase of the trial, the jury found Pike, guilty of first degree murder and conspiracy to commit first degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called Carrie Ross, Pike's aunt as a witness. Ross testified that the defendant had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross said that Pike's family has a history of substance abuse and that Pike's maternal

grandmother was an alcoholic who was verbally abusive to Pike. Following the death of Pike's paternal grandmother, Pike was shuffled between her mother and father. According to Ross, Pike's mother's home was very dirty. Pike's mother set no rules for her, and on the occasions that Pike had visited Ross, the defendant had behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin.

On cross-examination, Ross admitted that she had previously described Pike as a pathological liar and that she had been afraid to allow Pike to associate with her own children. Ross also admitted that Pike had been out of control since she was twelve years old.

Glenn Pike, the defendant's father, testified that he had kicked the defendant out of his house twice, the last time in 1989. He admitted that he had signed adoption papers for the defendant prior to her eighteenth birthday. On cross-examination, he admitted that he had forced Pike to leave his home in 1989 because there had been an allegation that the defendant had sexually abused his two-year-old daughter from his second marriage. According to her father, Pike had been disobedient, dishonest, and manipulative when she had lived with him.

The defendant's mother, Carissa Hansen, a licensed practical nurse, testified that Pike had lived with her 95 percent of the time since her paternal grandmother's death. Hansen admitted that she had smoked marijuana with the defendant in order to "establish a friendship." Hansen related that the defendant had attempted suicide by taking an overdose shortly after the death of her paternal grandmother. Hansen also testified that one of her boyfriends had whipped Pike with a belt. Hansen had the boyfriend arrested.

On cross-examination, Hansen admitted that Pike's behavior had been problematic for years. The defendant had begun growing marijuana in pots in her home at age nine. After threatening to run away from home and live on the street, Pike had been allowed to have a live-in boyfriend at age fourteen. Hansen admitted that Pike had wielded a "butcher-knife" against the boyfriend, who had been arrested for whipping her. Hansen also said Pike had lied to her and stolen from her on numerous occasions and had quit high school. Hansen conceded that Pike had been out of control since she was eight years old. Following Hansen's testimony, the defense rested its case.

In rebuttal, the State presented the testimony of Harold James Underwood, Jr., a University of Tennessee police officer who was assigned to secure the crime scene on January 13, 1995. Underwood testified that the defendant came to the scene with three to five other females between four and five p.m. that day. Pike asked Underwood why the area had been marked off and questioned him concerning the identity of the victim and whether or not the police had any suspects. None of the other females spoke during the fifteen minutes the group was there. Underwood said Pike appeared amused and giggled and moved around.



Case 1:12-cv-00035-HSM-SKL Document 23 Filed 12/28/12 Page 12 of 90
PageID #: 10317

> Underwood noticed that Pike was wearing an unusual necklace in the shape of a pentagram. After learning at roll call on January 14, 1995, that the victim of the murder had a pentagram carved on her chest, he reported Pike's strange behavior and unusual necklace to his superior officers.
>
> Based on the proof submitted at the sentencing hearing, the jury found the existence of the following two aggravating circumstances beyond a reasonable doubt: (1) "the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(5) and (6) (1997 Repl.). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the Court of Criminal Appeals.

*Pike*, 978 S.W.2d 904, 907-14 (Tenn. 1998).

The TCCA offered the following summary of the evidence eventually presented at the Petitioner's post-conviction hearing:

> At the post-conviction hearing, the Petitioner presented numerous witnesses in support of her case. First, Carissa Henson, the mother of the Petitioner, testified that, at the time of the Petitioner's arrest, Ms. Henson had been living in Cedar Grove, North Carolina. She stated that lead counsel represented the Petitioner and that she had spoken with him on the telephone and had met with him in Knoxville. Ms. Henson recalled meeting with lead counsel on only two occasions prior to trial, having one meeting in Knoxville and one meeting in Raleigh, North Carolina. However, Ms. Henson testified that she also spoke with Dr. Diana McCoy and Barry Rice, members of the defense team. Further, she explained that she had lunch with lead counsel and the other members of the defense team during the trial.
>
> Ms. Henson testified that, during the guilt phase of the trial, she was the only family member present. However, during the penalty phase, Ms. Henson's husband, Gerard Hensen; the Petitioner's biological father, Glenn Pike; and the Petitioner's aunt, Carrie Ross, were also present. Ms. Henson, Glenn Pike, and Carrie Ross testified during the penalty phase. Ms. Henson testified that she did not learn that she was going to testify until the second week of the trial. She stated that she was advised that "they were going to make the family look bad because that would help [the Petitioner's] case." Ms. Henson explained, "[Lead counsel and co-counsel] told us to make it look as bad as we could, to exaggerate anything

bad that was wrong with our family because the jury would — the jury would look at [the Petitioner] and think, 'The poor girl, she grew up in a family like this; no wonder she turned out the way she did.' So that's what we did."

Ms. Henson testified that she married Glenn Pike in 1975, and that the Petitioner was born in March 1976. Ms. Henson stated that the Petitioner had an older half-sister, Alicia. She testified she and Glenn Pike were married for two years, were divorced for a year, and then were remarried for two more years. The family lived in Beckley, West Virginia.

Ms. Henson, a licensed practical nurse, explained that, while pregnant with the Petitioner, she worked the evening shift on a psychiatric unit. One evening, an alcoholic was admitted with delirium tremens. The patient "threw [Ms. Henson] through some double swinging doors and [she] landed on a supply cart. . . ." Ms. Henson began leaking amniotic fluid after this incident and was not permitted to work. Ms. Henson testified that the Petitioner was born prematurely via Caesarean section. She was born with a condition known as hyaline membrane disease where the lungs are not fully developed and had bilateral hip dysplasias, which occurs when the hip sockets are not fully formed. The Petitioner was taken to Charleston Area Medical Center neonatal intensive care unit where she remained hospitalized for two weeks.

In 1982, Ms. Henson moved to North Carolina but returned to West Virginia for two years to assist her ailing mother. After Ms. Henson's mother died in 1985, she moved back to North Carolina. Ms. Henson explained that her move was due to her marriage to Danny Thompson.

Ms. Henson testified that "during their growing-up years," the Petitioner and her half-sister, Alicia, spent a lot of time with their grandmother. She explained that when they moved to North Carolina, both girls were "really unhappy" and that both girls "ended up going back to West Virginia." The Petitioner moved back to North Carolina when she was in the fourth or fifth grade.

Ms. Henson testified that her oldest daughter, Alicia, got pregnant when she was fifteen years old. After the baby was born, Alicia and her fiance, Bryan Hammond, moved to North Carolina and lived with Ms. Henson. Alicia, her baby, and Hammond lived in Ms. Henson's home for two years. Ms. Henson testified that she was separated from Danny Thompson during this time period.

Ms. Henson testified that she had a relationship with Steve Kyaw when the Petitioner was twelve years old. She stated that the Petitioner never got along with Steve Kyaw. On one occasion, they went to court because Steve Kyaw "punched" the Petitioner. Ms. Henson denied knowledge of any other incidents of abuse by any of the Petitioner's other stepfathers.

Ms. Henson later married Gerard Henson. After this marriage, Ms. Henson learned that the Petitioner was pregnant. Ms. Henson testified that she also learned that the Petitioner was using cocaine. Ms. Henson told the Petitioner that, if she had the baby, she would have to get a job. Ms. Henson testified that the Petitioner had an abortion. She stated that did not know the identity of the baby's father. Ms. Henson also testified that she had smoked marijuana with the Petitioner and her friends on occasion when the Petitioner was seventeen years old. Ms. Henson denied that the Petitioner was pregnant at this time and denied that she encouraged the use of marijuana to develop the Petitioner's appetite.

Ms. Henson testified that, when the Petitioner was in the third grade, the Petitioner took an overdose of Tylenol. The Petitioner was placed in outpatient psychiatric treatment, and Ms. Henson was advised that the Petitioner was "depressed." The psychiatrist prescribed medicine that "made [the Petitioner] feel worse instead of better so she didn't take them." The therapist agreed to allow the Petitioner to discontinue the medication and eventually discharged her from treatment. However, Ms. Henson added that "over the course of the years, we saw therapists, psychologists after that."

Ms. Henson testified that the Petitioner reported being raped after school one day. This incident occurred during the same time period as the Petitioner's suicide attempt. Ms. Henson stated that, after being informed by the school about this incident, she did not observe anything unusual about the Petitioner. Ms. Henson recalled that Claude Davis was arrested for the incident, but the Petitioner was not able to identify him in the lineup so he was not charged. Ms. Henson also testified that the Petitioner reported being sexually molested when she sixteen years old. Ms. Henson stated that the Petitioner said she was walking to the store when a man grabbed her, pulled her into the woods, and sexually molested her. Ms. Henson could not recall whether this incident involved penetration.

Ms. Henson testified that the Petitioner held various jobs, including positions at Waffle House and a steak house. She stated that the Petitioner dated a homeless young man, Brian Wilson, who lived at the Henson residence for a period of time. Ms. Henson stated that Brian Wilson did not live with them long because he was unable to obtain employment and was very sloppy. Ms. Henson and her husband made him leave. When Brian Wilson moved out of their home, the Petitioner moved out as well. The Petitioner and Brian Wilson rented a trailer together.

Ms. Henson testified that the Petitioner repeatedly ran away from school and home and that the Petitioner skipped school habitually. Ms. Henson testified that the Petitioner lived in a group facility on two different occasions. When the Petitioner was in the tenth grade, she was sent to Swannoa, a juvenile facility, for "about a year." After her return from Swannoa, the Petitioner became interested in the Job Corp Program. The Petitioner advised her mother and stepfather that the Job Corp Program would enable her to get her GED and would train her to be a

nursing assistant. Ms. Henson and her husband decided to allow the Petitioner to participate in the Job Corp Program, and the Petitioner arrived there during the fall of 1994.

Ms. Henson testified that she visited the Petitioner at the Job Corp Program, meeting several of the Petitioner's friends and touring the school and the dormitory. Ms. Henson described the dormitories as "dirty."

> There was graffiti painted on the walls. There was blood on the walls, and [the Petitioner] told me that there had been a boy stabbed in the bathroom like the weekend before, I think, and the blood was still there. And that's when we tried to talk [the Petitioner] into coming home with us, but she wanted to stay.

Ms. Henson reported that, when the Petitioner was home for Christmas, she told her that a girl had been threatening her. The Petitioner told Ms. Henson that this girl would be "hovering over her bed at night with a knife or something threatening her." The Petitioner also told Ms. Henson that Tadaryl Shipp was her friend and would protect her. Ms. Henson testified that the Petitioner was not afraid to go back to the Job Corp Program.

On cross-examination, Ms. Henson did not deny that the Petitioner's life had been traumatic. She did deny, however, that there was an incident in which the Petitioner alleged that she had been sexually abused and that Ms. Henson had observed the blood on the Petitioner's person. Ms. Henson testified that her father, Chris Fotos, owned a meat packing plant and that the petitioner would have seen animals being slaughtered and processed.

Ms. Henson related an incident during which a man named Kenny Clyde telephoned her and told her that he was going to rape her. Ms. Henson's husband searched for him but could not find him. The Petitioner and a friend found him in the McDonald's parking lot and "beat him up with a stick." Ms. Henson did not dispute that the Petitioner was "always in some sort of trouble." She also characterized the Petitioner as "having had a bad temper." Ms. Henson described their home as a "continuous battle zone." She added that the Petitioner was notorious for lying. Regarding the incident with Steve Kyaw, Ms. Henson admitted that the Petitioner had chased Steve Kyaw with a butter knife. Ms. Henson related that the Petitioner's friend, Breanna, moved in with them for a period of time. Ms. Henson stated that Breanna, who came from an abusive home, and the Petitioner argued about something and that the Petitioner "beat Breanna up and pushed her down the stairs." After this altercation, Breanna moved out of their home.

Ms. Henson reported that the Petitioner brought some crystals home with her on her Christmas break from the Job Corp Program. The Petitioner told her that Tadaryl Shipp "could make the clouds move and make the sky open up" with

the crystals. Ms. Henson could not recall making a previous statement affirming that the Petitioner had told her that she was involved in a WICCA group. Ms. Henson admitted that she was aware that the Petitioner had a tattoo of the devil on her chest; however, she described the tattoo as a "cute little cartoon" and not as a wicked devil.

Gerard Henson, the Petitioner's stepfather, testified that he married Carissa Henson in 1992. Mr. Henson testified that entering the Job Corp Program was the Petitioner's idea. Mr. Henson and his wife visited the Petitioner at the Job Corp, but he was not permitted to enter the dormitory because he was a male. Mr. Henson described the Petitioner as "open and friendly." Mr. Henson stated that he did not testify at the Petitioner's trial.

Mr. Henson denied making statements that the Petitioner was out of control or that the Petitioner had pushed her friend Breanna down the stairs. He admitted that he made a statement that the Petitioner liked the attention she received as a result of her behavior.

Carrie Ross, the Petitioner's aunt, stated that she testified at the Petitioner's 1996 trial. At that time, Ms. Ross was employed as an intensive care unit nurse. She was currently certified in neonatal intensive care.

Ms. Ross testified that, at the time of the Petitioner's birth, she worked in the pathology department as a histology technician and had not yet attended nursing school. In 1990, Ms. Ross earned her bachelor of science degree in nursing. When questioned about the circumstances of the Petitioner's birth, Ms. Ross stated that the Petitioner was born via caesarean section and had respiratory arrest. The Petitioner was moved to a neonatal intensive care unit at a different hospital where she was placed on a ventilator for three to four days.

Ms. Ross testified that lead counsel visited her at work to ask her for background information on the Petitioner. Ms. Ross also met with Dr. McCoy a few months before trial. Ms. Ross stated that she was not subpoenaed as a witness but that "[lead counsel and co-counsel] suggested sort of that I be here."

Ms. Ross stated that she grew up in Beckley, West Virginia, and confirmed that her parents were Chris and Zola Fotos. She further confirmed that she had an aunt named Norma Privett. Ms. Ross stated that Norma Privett had often babysat her and her sister, Carissa Henson. Ms. Ross described Norma Privett as "abusive." She explained:

> She was always very nice to us when my mother was around. But as soon as she was left to babysit us, she would do things that . . . she would pull me around by the hair . . . literally, drag me through the house by my hair and very abusive personality, yes.

Ms. Ross testified that Norma Privett also babysat the Petitioner and her sister, Alicia. Eventually, Norma Privett stopped babysitting the Petitioner because Privett "was very abusive" and because Ms. Ross informed her sister of the abuse she suffered as a child.

Chris Fotos, the father of Ms. Ross and Ms. Henson, owned a butcher shop and slaughter house. Ms. Ross and her sister spent a lot of time at their father's business, and this was not considered unusual. Ms. Ross testified that her father was addicted to Talwin for a long period of time. She stated that, while on the Talwin, her father "had no concept of who he was, where he was. He was just out of touch with reality." Ms. Ross related that he once pulled a gun on her. She related that, if someone "crossed" her father, "he would sort of bluster and threaten to kill them." Ms. Ross also related that her father was investigated by the Internal Revenue Service. Related to that investigation, her father took a gun into a federal courtroom and told the judge that he had the gun "to unseat him."

Ms. Ross testified that her mother was an alcoholic. She explained that her mother was very loving and nurturing toward Alicia. However, her mother resented having the Petitioner at her home. Ms. Ross explained that Alicia was the first grandchild and that, when the Petitioner was born, her mother's alcoholism was getting worse and she was drinking more. She explained that her mother was angry at Carissa for becoming pregnant with the Petitioner.

Ms. Ross testified that her sister, Carissa Henson, also threatened to harm people. She related that her sister would tell others that "she was going to whip their — butt." Ms. Ross explained that it was the accepted "cultural thing" that violence would solve "everything," "[t]he Hatfields and McCoys." Ms. Ross related that, when they were teenagers, she and her sister would sneak into bars, smoke marijuana, skip school, and "do whatever we could find to do, drugs, alcohol, whatever." Ms. Ross stated that she would now describe her sister as an alcoholic. She also described her sister as "very immature and irresponsible." Ms. Ross testified that she raised Alicia during the time that her sister was married to Danny Thompson because he did not like children. However, Ms. Ross stated that she could not afford to raise both Alicia and the Petitioner. Ms. Ross commented that "[Carissa's] children were never [Carissa's] first priority." She explained that her sister put "men" first and that Carissa Henson had been married five times.

Ms. Ross testified that "there was always a problem with [the Petitioner], because [the Petitioner] didn't seem to understand when you would tell her things." Ms. Ross stated that the Petitioner was a very difficult child to watch. She stated that the Petitioner "never could understand what the word 'no' meant." Ms. Ross testified that the Petitioner "had a very flat affect," explaining that "she showed little or no emotion." Ms. Ross recalled an incident when the Petitioner was in the first grade and drew a picture of a penis. Ms. Ross related that the Petitioner's teacher reported that the Petitioner had been drawing pornographic pictures in class and that there was a recommendation that the Petitioner see a



Case 1:12-cv-00035-HSM-SKL Document 23 Filed 12/28/12 Page 18 of 90
PageID #: 10323

counselor.

Ms. Ross testified that the entire family thought that the Petitioner's joining the Job Corp Program was a good way for her to straighten out her life. However, Ms. Ross stated that, during the Petitioner's trip home for Christmas, the Petitioner indicated to her that she was afraid to return to the Job Corp Program. The Petitioner remarked, "Well, I want everybody to be proud of me, but people get hurt there." Ms. Ross stated that the Petitioner's family would not have approved of the Petitioner's relationship with Tadaryl Shipp because he was African-American.

Dr. Jonathan Henry Pincus, an expert in neurology, testified that he was retained to examine the Petitioner in March 2001. Dr. Pincus reviewed her history and data, which was given to him. Dr. Pincus identified the components of his examination as: (1) the Petitioner's history; (2) a physical neurological examination; (3) neuropsychological testing; (4) tests of brain functions including an EEG; and (5) tests of the brain's structure, including an MRI. Dr. Pincus also conducted a physical examination of the Petitioner. Dr. Pincus reported that the physical examination was normal, "but there were certain abnormalities that I think can only be characterized as minor." Specifically, Dr. Pincus stated that "there was generalized hyperreflexia, that is to say her deep tendon reflexes were too active." He also noted that "[t]here was spooning of her outstretched hands," explaining that "her fingers extended at the metacarpal phalangeal joint in that manner." He noted that this was a "sign that there is something not quite right about the basal ganglia . . . which are gray matter masses at the center of the brain that influence movement and to some degree thinking." The Petitioner also could not hold her fingers still. Dr. Pincus remarked that this also signaled that the basal ganglia were not working properly. Dr. Pincus testified that "there was a positive nuchocephalic reflex." He explained that this meant that "there is an interruption of fibers that are coming from the motor area — supplementary motor areas of the brain stem, possibly at the level of the basal ganglia. . . ." Based on these observations, Dr. Pincus concluded that "there was subcortical dysfunction involving the basal ganglia and possibly the thalamus." Dr. Pincus further noted that the MRI "showed an abnormality that was just lateral to the ventricle in the frontal lobe." Dr. Pincus stated that "my physical examination with its minor abnormalities, the MRI, and the EEG are all pointing to the same place."

Dr. Pincus testified that the MRI revealed a small heterotopia. He explained that the brain is formed during fetal development. A heterotopia is caused by clumps of gray matter being located in the wrong part of the brain. He attributed the heterotopia to "some maternal factor. The mother was exposed to radiation or she was ill." He stated that the most common cause of the heterotopia was a mother's exposure to alcohol. Dr. Pincus testified that mental retardation and epilepsy are associated with a heterotopia. Dr. Pincus related that this affected the frontal lobes and explained that a person could have an IQ of 120 or 130 and be a "social imbecile" due to frontal lobe disease. He stated that the Petitioner's

"frontal lobes [are not] put together properly." Dr. Pincus related that it was significant that the Petitioner's heterotopia was visible on the MRI because most are invisible. He stated that an important feature of the frontal lobes is "moral and ethical standards." He explained that "human beings are not born with an ethical and moral sense." "[You are] born with a capacity to develop one, but they must be exposed to the right influences in order for that to happen."

Dr. Pincus stated that the Petitioner had previously been diagnosed with epilepsy but that she no longer had epilepsy. He added that "people outgrow epilepsy." He explained that, at birth, the brain is almost completely unmyelinated. Myelin is a fatty substance that insulates nerves. He stated that the last part of the brain to become myelinated is the frontal lobe and that does not happen fully until a person's early twenties. Dr. Pincus related that an MRI was done on April 2, 2001, and the EEG was done when the Petitioner was fourteen months old. He stated that based on his assessment, the Petitioner had a damaged brain. Dr. Pincus testified that the fact that Dr. Engum had previously found that there was no brain damage did not negate or contradict his findings. He explained that the area in which the Petitioner's heretopia was located was "notoriously difficult to test."

Dr. Pincus stated that a common finding in his examination of convicted murderers is the "big triumvirate of brain damage, history of abuse, and presence of mental illness." Dr. Pincus stated that the Petitioner had a history of abuse. He explained that the Petitioner self-reported abuse, that there were scars present on her body, and that verification was made through interviews with the Petitioner's family members. Dr. Pincus also reported that the Petitioner had been raped by a neighbor. The incident involved the neighbor inserting sticks into her vagina and having his dog lick her genitals. The Petitioner reported the incident to her sister and mother, but neither believed her. Dr. Pincus stated that the Petitioner reported "boxes of pornography, sadistic pornography" in the home. She reported incidents of "wrestling" with her mother's boyfriend when she was thirteen or fourteen years old. Dr. Pincus stated that the Petitioner's mother acknowledged that there were pornographic videotapes but explained that "[a]ll men have those." The Petitioner reported an incident where her mother's boyfriend "twist[ed] her nipples painfully," and, in response, the Petitioner "twist[ed] his scrotum. . . ." The Petitioner's mother denied that this happened. According to the Petitioner, this same boyfriend "slugged [the Petitioner] in full view of her neighbor." Criminal charges were filed as a result of this incident but were later dropped as a result of a negotiation that the boyfriend would move out of the home. Dr. Pincus stated that the Petitioner reported yet another rape when she was seventeen. The Petitioner reported that Kenny Clyde began stalking her and later sexually assaulted her. The Petitioner searched for Kenny Clyde and beat him with a stick. Dr. Pincus noted that this incident should have been a red flag that the Petitioner could not control herself. Dr. Pincus related that this incident was a sign that the Petitioner's frontal lobes were not working.

Dr. Pincus stated that he found evidence to confirm Dr. Kenner's diagnosis of bipolar disorder. Specifically, he stated:

> [T]here's spending. She was working at one point two full-time jobs and a part-time job, and what did she spend money on? Candles, trinkets, shoes. She didn't have food! She would go days without eating. She would see other people eating. Sometimes the mother's boyfriend would come in with food and eat it with the mother and not give it to her. She had no appetite. That's what happens during periods of mania.
>
> She would go for two or three or four days without sleeping or sleeping [ninety] minutes here and [ninety] minutes there, sleeping on the ground, sleeping on the street. And it didn't bother her. Didn't wash . . . she used drugs; she used alcohol. Those are signs of bipolar. She had periods of lots of sexual activity, and then long periods when she would be depressed of none, where she couldn't get out of bed for [fourteen to eighteen] hours a day and just would sit there.
>
> She lost a lot of school time because of depression. . . . Her weight fluctuated. She's been from 92 to 170. . . . That kind of weight fluctuation occurs in people with bipolar disorder.
>
> . . . .
>
> And she has periods when she can't get out of bed, and she can't move, and she's [fourteen to eighteen] hours a day in bed. And she's feeling crying, and she wants — is suicidal, two suicide attempts by over dosage. And a family history . . . it is a hereditary disease, bipolar illness.
>
> Oh my God, that family history on the mother's side is spectacular! Maternal grandfather . . . was addicted to Talwin by injection. . . . The [grand]mother . . . was no great shakes either. She was an alcoholic who grew marijuana, died of cirrhosis of the liver.
>
> And there's a maternal great aunt, Norma, who attempted murder. . . . [A]nd there was a great aunt, Geraldine, who God spoke to. Maternal great . . . great aunt, Nola, who went to a mental hospital.

Dr. Pincus stated that the Petitioner's sister, Alicia, was not brain damaged, although she suffered through the abuse. He stated that one of the components was not enough to be dangerous. He explained that if you put these

things together, i.e., the abuse, the brain damage, and the mental illness, you have a dangerous person.

Next, Dr. Pincus discussed the events preceding January 12, 1995. He explained that the Petitioner had not slept well for the three days prior to the 12th. The Petitioner was in an "excited period" and was very irritable and angry. The victim had reportedly been calling the Petitioner and saying that the Petitioner was a whore and a slut. Dr. Pincus stated that it was intolerable for the Petitioner to hear these words. Dr. Pincus opined that the Petitioner did not start out wanting to kill the victim. In his view, the Petitioner "lost control of herself and she did want to kill her and did do it." Dr. Pincus concluded that:

> [the Petitioner] was . . . under the influence of a mental disease and defect that prevented her from being able to consider what she was doing, and to prevent herself from giving in to this impulse of killing.

He stated that the origin of the mental disease occurred in utero and that the bipolar illness was hereditary. Finally, he stated that the Petitioner could not control the abuse. Dr. Pincus stated that evidence of all three of these factors: abuse, mental illness, and brain damage, were present in 1995.

On cross-examination, Dr. Pincus conceded that Dr. Eric Engum testified at the Petitioner's trial that there was no brain damage to the Petitioner. Dr. Engum had been retained by trial counsel. Dr. Pincus stated that Dr. Engum's diagnosis was wrong and that he had failed to obtain an MRI. Dr. Pincus stated that the trial attorneys may have been incompetent but that Dr. Engum was "just wrong."

Alicia Wills, the Petitioner's half-sister, testified that she and the Petitioner have the same mother but different fathers. When the Petitioner was born, Ms. Wills began spending more time with her grandmother and grandfather. She explained that she was raised by her maternal grandmother, Zola Fotos. Ms. Wills loved her grandmother and knew that her grandmother loved her. She explained, however, that her grandmother physically disciplined the Petitioner. Ms. Wills also testified that her grandmother "drank every day," stating that she would start the day with whiskey in the morning. However, Ms. Wills explained that she was never aware that her grandmother was drunk. Ms. Wills stated that her grandmother's death impacted her tremendously. Ms. Wills explained that she felt that no one else cared for her the way her grandmother did. Ms. Wills stated that, at this point in her life, she started getting into fights and started using drugs. Ms. Wills testified that she was twelve or thirteen years old when her grandmother died.

Ms. Wills described her Grandfather Fotos as "fun." She stated that he would give the Petitioner and her candy and that he spoiled them. She denied any

allegation that Grandfather Fotos mistreated the Petitioner. She conceded that he was a butcher and owned a slaughter house and that they visited the slaughter house. Ms. Willis stated that she did not feel that she had any emotional scars from witnessing the animal processing.

Ms. Wills testified that her mother announced one day that she was marrying Danny Thompson and that they were all moving to North Carolina. Ms. Willis stated that her new stepfather was "mean to us." She denied that he ever physically harmed her but stated that he would get fast food and eat it in front of them without offering them any. Ms. Wills stated that she was angry at her mother for "shack[ing] up with" this man and for pushing her own children to the side. Ms. Wills was also angry about the move to North Carolina, where she felt that she did not fit in. Ms. Wills testified that she "became completely depressed and extremely angry." Ms. Wills stated that her mother placed her own pleasures and happiness before that of her children.

Ms. Wills also testified regarding her parents' marriage. She stated that, during the marriage, her father would lose his temper and hit her mother. However, she explained that "[her mother] was running around having affairs with men while she was supposed to be at church. . . ." Ms. Wills also described her mother as an alcoholic. She stated that "parties were a big part of our life" and that her mother let her take "sips of her beer." On one occasion when Ms. Wills was in the second grade, her mother packed her lunch for school and included a beer. She stated that she could not recall ever sitting on her mother's lap or getting a hug from her mother. Ms. Wills testified that her mother's treatment of the Petitioner was probably similar, although she described their relationship as closer than her own with her mother. She described the relationship between the Petitioner and her mother as more of a friendship than a mother-daughter relationship. She added that she "always felt like [she] was the mother. . . ." Ms. Wills testified that she never saw the Petitioner's father, Glenn Pike, physically discipline her.

Ms. Wills testified that, when she was in the fifth grade, she and the Petitioner went to the mall and spent all of the child support money Glenn Pike had given to the Petitioner to give to her mother. She stated that, during the shopping spree, she had shoplifted one pair of earrings. Ms. Wills stated that the Petitioner, who was approximately six years old, had shoplifted at least twenty pieces of jewelry. Ms. Wills further testified that the Petitioner read horror stories, like Stephen King, when she was very young.

Ms. Wills stated that she liked to watch her mother and her friends get ready to go out to parties. She stated that this appealed to her because she looked forward to living a similar lifestyle. Ms. Wills admitted that she started smoking marijuana when she was twelve years old. Ms. Wills became pregnant at age fifteen and stopped smoking marijuana until she was seventeen.

Ms. Wills described the Petitioner as having a big heart and stated that the Petitioner "loves people." She added that the Petitioner had dreams of becoming a nurse. Ms. Wills testified that the Petitioner was "very messy" and would sometimes have a "blank look." Ms. Wills stated that, in retrospect, she could see that "there were things that were not normal about [the Petitioner]." Specifically, she acknowledged that the Petitioner would have episodes of sudden rage. Ms. Wills testified that the Petitioner loved Ms. Wills' son Keith and would act like his mother. Ms. Wills was unaware of any allegations that the Petitioner had abused her son. Ms. Wills stated that the Petitioner always wanted to give Keith a bath but that she was not comfortable with the Petitioner giving her son a bath. Ms. Wills testified that any statement that Dr. McCoy had made regarding allegations of the Petitioner's sexual abuse of Keith were untrue and unfounded.

Ms. Wills testified that she was aware that the Petitioner was "drawing dirty pictures at school at a very young age." However, she stated that she had no knowledge as to whether the Petitioner had been sexually abused. Ms. Wills stated that she did not believe the Petitioner's accusations that a man had raped her.

Ms. Wills denied any allegation that she had abused the Petitioner. Ms. Wills specifically denied that she intentionally burned her sister with a curling iron. She explained that the girls were playing beauty shop when she accidentally burned the Petitioner with the curling iron. She further explained that the curling iron incident occurred when the Petitioner was three or four years old. Ms. Wills also denied slamming the Petitioner's fingers in a door. Ms. Wills denied holding the Petitioner down and scraping the bottom of her foot with an electric plug.

Ms. Wills testified that she was not subpoenaed by either the State or the defense team for the Petitioner's trial. She indicated that she had anticipated being called as a witness because the Petitioner was her sister. Ms. Wills testified that, in her opinion, the Petitioner "never had a [fair] shake from the day she was born." Ms. Wills stated that, at the time of the trial, she was living in Dallas, Texas, and that she currently had "a great life." She owned her own business and had been married for twelve years. She stated that she had "peace inside."

Emil Glenn Pike, the Petitioner's father, stated that he testified during the 1996 penalty phase of the Petitioner's trial. He testified that he had been interviewed by Dr. Diana McCoy prior to his testimony. Mr. Pike stated that he was born and raised in Beckley, West Virginia. He related that his father had worked as coal miner and a plumber and that his mother was a housewife. He testified that his parents disciplined him by using a switch or a belt. As a result of this discipline, Mr. Pike "swore to never . . . put a switch to my children." Mr. Pike testified that his father died when he was thirteen years old. After his father's death, the family moved to Indiana to find work. Mr. Pike testified that, in 1966, he was drafted and sent to Vietnam, where he contracted hepatitis and was wounded. Mr. Pike re-enlisted in the service in 1973, because he could not find a

job in West Virginia. Mr. Pike testified that, during his time in Vietnam, he was exposed to agent orange. He was provided information that his exposure may cause birth defects in children, specifically, spina bifida.

Mr. Pike testified that in 1974, he married Joanne Lily. After their divorce, he married the Petitioner's mother in 1975. He stated that his social life with the Petitioner's mother involved drinking alcohol. Mr. Pike testified that the Petitioner's mother got pregnant soon after their marriage. After his discharge from the service, he returned to Beckley, West Virginia, and opened a motorcross race track on the family farm. Mr. Pike recalled the day the Petitioner was born. He stated that the Petitioner's mother had a caesarean section and that the Petitioner had hyaline membrane disease and was taken to a hospital in Charleston.

Mr. Pike reported that he began working road construction and was often away from home. When he learned that the Petitioner's mother was seeing other men during this time, the couple divorced. However, after the Petitioner's mother attempted suicide, the couple remarried. Afterward, the Petitioner's mother resumed her previous ways of partying, and the couple grew apart.

Mr. Pike related that his mother would often babysit the Petitioner. According to Mr. Pike, his mother loved the Petitioner and spent a lot of time with her. He testified, however, that his wife's mother did not appear to like either him or the Petitioner. He presumed that his mother-in-law felt that he was of a lower social class.

Mr. Pike stated that he would use either his hand or a belt to discipline the Petitioner. At most, he struck her with the belt three or four times in the same day. Mr. Pike denied that he ever made the Petitioner remove her clothing for the spankings and stated that any scars on the Petitioner's back were not the result of any spankings he gave her. He recalled that, after the Petitioner's mother married Danny Thompson, she contacted him regarding the Petitioner's behavior. The Petitioner's mother informed Mr. Pike that she was having disciplinary problems with the Petitioner and asked that he try to take care of her. He stated that the Petitioner would come live with him for a while, but then he would start having problems with the Petitioner and she would be returned to her mother.

Mr. Pike testified that he later married Kathleen Almond and that they had two children together. He confirmed that there had been an allegation that the Petitioner had sexually abused his younger daughter. Mr. Pike stated that his wife had told the therapist she was seeing that his younger daughter had reported that the Petitioner had "licked her" and had pointed "towards her belly or towards her genitals and said, 'There?'." The therapist told Mr. Pike's wife that the Petitioner was not to be around the younger daughter. The Petitioner denied any wrongdoing, and Mr. Pike stated that he had never observed any inappropriate behavior between the Petitioner and his other children. He stated that he did not

believe the Petitioner had molested his younger daughter.

Mr. Pike stated that he was aware that the Petitioner spent time at a juvenile facility in North Carolina. He further stated that he did not visit her during her time at that facility. Mr. Pike testified that he was not aware that the Petitioner was entering the Job Corp Program until after she had already entered the program.

Mr. Pike denied that he had previously described the Petitioner as a manipulator but conceded that he had described her as a liar. He also admitted that on one occasion, the Petitioner had forged her teacher's name.

Faye Johnson Guy testified that she was a neighbor of the Petitioner's family and that she also worked with the Petitioner's mother. Ms. Guy testified that she frequently spent time with the Petitioner and her family on a social basis and observed that the Petitioner's mother, Carissa, abused alcohol. Ms. Guy related that Carissa was married to Danny Thompson when they first met. She stated that she met Danny Thompson only once or twice and that he was drunk and appeared violent on those occasions. After Carissa left Danny Thompson, she moved close to Ms. Guy. Ms. Guy stated that Carissa began seeing other men shortly after she separated from Danny Thompson. She stated that Carissa was involved with a married man. Ms. Guy also confirmed that Carissa dated a man named Steve Kyaw and that shortly after she began seeing him, Kyaw moved into her home.

Ms. Guy testified that she often included the Petitioner in her family's outings because the Petitioner was often left home alone. She stated that the Petitioner told her that she had access to pornographic movies that belonged to either her mother or to Steve Kyaw. Ms. Guy had also observed the Petitioner watch horror movies with her mother, Carissa. Ms. Guy stated that she had told Carissa that she felt that it was inappropriate for the Petitioner to be watching these horror movies. Ms. Guy recalled that Carissa just laughed and stated that the Petitioner enjoyed these movies and had been watching them since she was two or three years old. Ms. Guy testified that the Petitioner and Carissa had more of a friend relationship than a mother-daughter relationship. She stated that Carissa would discuss inappropriate things with the Petitioner, e.g., sex with her boyfriends.

Ms. Guy testified that both the Petitioner and Carissa participated in her wedding. She recalled that, at the rehearsal dinner, Carissa was caught having sexual intercourse in the bathroom with Ms. Guy's future brother-in-law. Ms. Guy testified that, later that same evening, she again caught Carissa having sexual intercourse with her future brother-in-law, who was married. Ms. Guy stated that she and Carissa were friends with Ann Marie Hansen and her husband, Gerard. Ann Marie Hansen worked with Ms. Guy and Carissa. Carissa had an affair with Gerard Hansen. He eventually left his wife and moved in with Carissa. They later

married. After this event, Ms. Guy began to sever her relationship with Carissa.

Ms. Guy testified that the Petitioner had mood swings. The Petitioner would be happy and cheerful and could quickly become sad and depressed. Ms. Guy initially thought that the mood swings were due to hormones. Ms. Guy later recognized the signs of bipolar disorder. She explained that her mother was bipolar and that the Petitioner's symptoms reminded her of her mother. Ms. Guy also testified that, in her opinion, the Petitioner's sister, Alicia, seemed to pick on the Petitioner.

Ms. Guy testified that she had met Carissa's father, Chris Fotos. She stated that Chris Fotos "scared me a bit," was very prejudiced against African-Americans, and often talked about violence.

Orlando Powell testified that he was formerly the manager of a Pizza Hut in Durham, North Carolina, where the Petitioner would come with her friends. He explained that "she grew towards me and the more she grew towards me, I just grew towards her." Mr. Powell explained that their relationship eventually became a romantic one. He stated that the Petitioner was with him most of the time. Mr. Powell met the Petitioner's mother, and he stated that he could tell there was not much of a relationship between the Petitioner and her mother.

Mr. Powell described the Petitioner as "a little fire ball." He stated that she had a temper. Mr. Powell testified that the Petitioner's temper would just erupt and that he "want[ed] to save [the Petitioner] because jail is not a place for her at this time." He also described her as being "wired" or full of energy. Mr. Powell stated that he knew the Petitioner smoked marijuana and drank alcohol. Mr. Powell stated that their relationship lasted a year to a year and a half. Mr. Powell stated that they were still dating when she made the decision to enter the Job Corp Program. He explained that, during her Christmas break from Job Corp, he tried to make her stay in North Carolina. Mr. Powell stated the Petitioner was never violent toward him; however, he did observe the Petitioner become violent toward others. Mr. Powell stated that no one from the Petitioner's defense team contacted him prior to her trial and that no one contacted him until 2000.

Carol Goehring testified that she first met the Petitioner when they were in the seventh grade. Ms. Goehring stated that she and the Petitioner became friends and that she had occasion to visit the Petitioner in her home. Ms. Goehring stated that Steve Kyaw was living with the Petitioner's mother at the time. During one visit, Steve Kyaw began yelling at the Petitioner. The Petitioner told Ms. Goehring to "go out back. . . ." Ms. Goehring saw Steve Kyaw "nudge [the Petitioner] to the room." She then saw the Petitioner running from the room. Ms. Goehring heard bumping and yelling, and she then saw the Petitioner with "a knife in her hand and her face was all red and she was trying to adjust her pants." Ms. Goehring described the Petitioner as "very panicked." Ms. Goehring called her mother to come get her and the Petitioner. After this incident, Ms. Goehring

was no longer permitted to visit the Petitioner's home. Ms. Goehring stated that, a month later, the Petitioner's mother moved and that she left Steve Kyaw. Ms. Goehring described the Petitioner as a very loyal person. She stated that the Petitioner was "very happy," "very energetic."

Jamie Robinson testified that the Petitioner's ex-boyfriend, Brian Wilson, and her ex-boyfriend, Jeffrey Crank, were best friends. Ms. Robinson stated that the four of them ended up living on the streets for a while. Ms. Robinson explained that, in her situation, her parents did not approve of Jeffrey Crank and gave her an ultimatum. Ms. Robinson stated that the four of them would sleep in hospitals and hotels and would run the streets a lot of nights, just walking. She explained that Brian Wilson and Jeffrey Crank would often sell their plasma to get money for a hotel room. She recalled that there were times when they had nothing to eat except ketchup and hot sauce from packets.

Ms. Robinson stated that she spent the night at the Petitioner's home on one occasion, but she could not recall meeting the Petitioner's mother. She stated that, in her opinion, the Petitioner and her stepfather did not get along. Ms. Robinson observed that the Petitioner's parents had no food in the house. She also observed that the Petitioner did not have sheets on her bed. This same evening, the Petitioner and Ms. Robinson snuck Jeffrey Crank into the home, and the Petitioner's parents never knew he was there.

Ms. Robinson recalled an incident where she and the Petitioner shoplifted some shirts for Jeff Crank and Brian Wilson. The Petitioner told Ms. Robinson to run and took off running herself. Ms. Robinson stated that she did not run. Ms. Robinson was not arrested, but the Petitioner was arrested and placed in a police car. Ms. Robinson recalled that the Petitioner was laughing after she was caught. Ms. Robinson also recalled an incident where the security officers at the mall called their parents because they had been at the mall "a very long time." Ms. Robinson stated that the officers were on the telephone with her mother for a very long time. She stated that her mother asked the officers about Ms. Robinson's condition. Ms. Robinson related that the officers were only on the telephone with the Petitioner's mother for "two seconds."

Ms. Robinson related that the Petitioner "seemed to be okay with the way things were for her. . . ." Ms. Robinson stated that she could not have dealt with the situation the way the Petitioner did. Ms. Robinson learned that the Petitioner had been raped. Ms. Robinson stated that the Petitioner "never showed any emotion." She did, however, acknowledge that the Petitioner and Brian Wilson fought a lot. Ms. Robinson recalled an incident where the Petitioner and a new boyfriend "beat Brian up pretty badly, and I remember [the Petitioner] throwing a beer bottle at him." This incident occurred after the Petitioner and Brian Wilson had ended their relationship and the four of them were no longer hanging around one another. Ms. Robinson stated that she was never contacted by the Petitioner's defense team.

Kerry Sherrill testified that she was a treatment worker for the Child Protective Services Unit of Orange County, North Carolina and that she was assigned the Petitioner's case following an allegation of child abuse and neglect. Ms. Sherrill testified that she observed that the Petitioner, who was in middle school at the time, was a "bright and warm young woman, easy to get along with, [and] enjoyed the attention of adults." Ms. Sherrill related that the initial allegation involved the Petitioner's mother's boyfriend, Steve Kyaw, and a report of inappropriate discipline. She reported that "the plan was to keep [the Petitioner] safe when she was in the home and if Steve [was] going to be present in the home." Ms. Sherrill reported that the Petitioner was eventually placed at Shaeffer House, due to the Petitioner's truancy and running away. She also reported that it appeared that the Petitioner's mother was "not doing what she needed to meet [the Petitioner's] needs." Ms. Sherrill testified that, while at Shaeffer House, the Petitioner wrote a letter to her friend, Brandy, expressing that "she was very unhappy with her life and had made a plan to commit suicide. . . ." The Petitioner enumerated her reasons for wanting to kill herself, including the assertion that she had been raped by Claude Davis. Ms. Sherrill stated that the Petitioner's case was closed after Steve Kyaw moved out of the family home.

Peggy Hamlett testified that she is a counselor with the North Carolina Department of Juvenile Justice. Ms. Hamlett testified that the Petitioner was initially charged with a felony breaking and entering and larceny of a community center during which the Petitioner stole some candy. As a result of this incident, the Petitioner was adjudicated delinquent and was placed under Ms. Hamlett's supervision. Ms. Hamlett stated that the Petitioner's probation was later revoked and that she was sent to a juvenile detention center. Ms. Hamlett explained that the Petitioner's initial term in the facility would have been six months. However, the Petitioner was at the facility for more than a year because she kept receiving infractions. Ms. Hamlett testified that the Petitioner's juvenile records would have been destroyed when she reached the age of eighteen.

Ms. Hamlett described the Petitioner as a "smart girl" with "a lot of potential." She also stated that the Petitioner was "out of control." Ms. Hamlett stated that the Petitioner was drinking and "huffing" and, perhaps, doing other drugs. Ms. Hamlett described "huffing" as when one would "huff the fumes that come from an aerosol can . . . and get high." She stated that huffing was very dangerous. Ms. Hamlett also stated that the Petitioner was not an aggressive person.

Ms. Hamlett testified that she was contacted by the Petitioner's counsel and by Dr. McCoy prior to the Petitioner's trial. However, she stated that she was not asked to attend the Petitioner's trial.

Debby Howell Burchfield was employed at the Juvenile Evaluation Center in Swannoa in the 1990s. Ms. Burchfield explained that the Juvenile Evaluation

Center was a state training school for youths who had been committed by the courts due to delinquent behavior. She stated that she was the Petitioner's social worker. Ms. Burchfield explained that her office was in the living quarters for the girls, so she had direct contact with them every day. Ms. Burchfield testified that the Petitioner remained confined at Swannoa from November 1991 until March 1993. She stated that this was a longer period of time than usual but was because the Petitioner was unable to maintain or achieve the level of points necessary to be released. Ms. Burchfield described the Petitioner's actions as "sabotaging" herself.

Ms. Burchfield testified that, while at Swannoa, a juvenile could have one visit per week. She stated that the Petitioner was at Swannoa for about fifteen months; thus, she was eligible for sixty visits during that time period. The Petitioner received only eight visits during this time.

Ms. Burchfield testified that the Petitioner related that she never felt close to either of her parents. She stated that the Petitioner felt that she had been emotionally abused by her father and that her mother was not a real parent to her. Ms. Burchfield testified that there were incidents in which the Petitioner engaged in self-mutilation and tattooing of her body. She stated that the Petitioner had also reported being a victim of abuse by her older sister. She admitted that she had previously indicated to post-conviction counsel's investigator that the Petitioner "was known to have dabbled with devil worship. She would draw pictures and talk about that, and she also dressed in gothic." Ms. Burchfield also admitted that it was important for the Petitioner to get her way but explained that this was common in adolescents. Ms. Burchfield testified that, upon her release from Swannoa, the Petitioner planned to enroll at Almance Technical College to study nursing. The staff at Swannoa attempted to assist the Petitioner in reaching her goals. Ms. Burchfield noted that the Petitioner had completed the GED program and that the staff assisted in preparing her application to the Job Corp Program.

Ms. Burchfield testified that, in 1996, she was contacted by a psychiatrist involved in the Petitioner's case. She stated that records were sent to the psychiatrist by her office.

Kristina Hargis, a social worker with the North Carolina Department of Juvenile Justice, testified that she was assigned to the Swannoa Youth Development Center as a house parent and counselor. She stated that she was with the juveniles eight hours a day. She added that she spent one hour a week with the Petitioner individually, talking about her feelings and problems. Ms. Hargis stated that she was not contacted by the Petitioner's trial attorneys.

Ms. Hargis described the Petitioner as "struggling" and "depressed." She stated that the Petitioner was upset that she got into trouble. She opined that the Petitioner could not understand why she was doing the things to get herself in trouble. Ms. Hargis confirmed that the Petitioner was at Swannoa longer than she

needed to be because she continued to get into trouble. She surmised that the Petitioner was intentionally sabotaging herself in order not to be released.

Ms. Hargis explained that Swannoa's student body was both male and female. She stated that there were 180 males and 45 females. Ms. Hargis stated that the juveniles had to do chores and attend school and treatment programs. The juveniles also had structured recreation programs. Ms. Hargis opined that there was little free time.

Frederic Marshall Muse testified that he was employed as a teacher at Swannoa during the 1990s and that the Petitioner was assigned to his class. Mr. Muse testified that the Petitioner was initially defiant in his class. However, when she learned who was in charge, her attitude changed, and she began to work. Mr. Muse recommended the Petitioner for various teacher aid positions. He stated that the Petitioner became a teacher's aide and remained in that position for the duration of her stay. He explained that the Petitioner had the "run of the campus" when she was running errands for the teacher. He described the Petitioner as being respectful. Mr. Muse remarked that he and the Petitioner developed a respectful relationship, and he described the Petitioner as having "a delightful sense of humor."

Mr. Muse stated that he could not recall telling the post-conviction investigator that the Petitioner "seemed to have two faces." He explained that the Petitioner had one of the higher intellects at Swannoa. He explained that the Petitioner could feign getting along and being happy when, in reality, she was not. Mr. Muse stated that he was not contacted by the Petitioner's trial team.

Andrew Drace was in the Job Corp with the Petitioner. He arrived at the center in October 1994, and was enrolled in the certified nursing assistant program. He stated that Swannoa was small and that "everyone knew everybody." Mr. Drace described the Job Corp Program as a "pretty rough, violent place." He stated that there were gangs and people who picked on other people. He stated that gang members would come into students' rooms, place sheets over them, and beat them up, mainly because they were white. There were less than ten white male students at the center. He stated that Tadaryl Shipp was one of the gang members and that he was "in fear of him on a daily basis." He stated that, on one occasion, Tadaryl Shipp attempted to throw him from a bridge near the center. Mr. Drace explained that, out of fear for their own safety, many students hid in their rooms.

Mr. Drace testified that on the morning of January 12, 1995, he saw Colleen Slimmer, and she asked whether he had seen Tadaryl Shipp. This was the last time that Mr. Drace saw Ms. Slemmer. The next day, Mr. Drace and his friend Anthony purchased some liquor and were walking along Cumberland Avenue when they ran into the Petitioner. Mr. Drace stated that the Petitioner started drinking with them. He stated that the Petitioner drank two plastic fountain

cups of Mad Dog 20/20. He stated that the Petitioner was definitely intoxicated when she left but had indicated that she wanted to drink some more.

After the murder of Ms. Slemmer, the center was placed on lockdown, and no one was permitted to leave. The students stopped going to their classes. Mr. Drace reported that he lost his job at Wendy's. He stated that they were all questioned. Mr. Drace later contacted the Petitioner's attorneys but observed that the Petitioner's attorney "didn't seem to care."

Mr. Drace testified that after the murder, the Job Corp Center closed and the students were "shipped" to Gulfport, Mississippi. He stated that he did not complete the program in Mississippi. He explained that he left because he was told that he would have to restart the entire program. He added that the group from Knoxville had the stigma of being "evil, terrible people."

Onas Perry was employed at the Juvenile Evaluation Center in Swannoa, North Carolina, in the 1990s. She stated that she supervised sixteen girls, including the Petitioner. Ms. Perry testified that the Petitioner would stay up at night and help clean. The Petitioner would also want to talk about her family problems. The Petitioner related that she wanted a better relationship with her mother and wished that her mother loved her more. Ms. Perry testified that the Petitioner reported verbal, physical, and sexual abuse. Ms. Perry stated that she believed the Petitioner's reports. Ms. Perry related that, in her opinion, the Petitioner sabotaged herself to be able to stay at Swannoa.

Ms. Perry testified that she had observed the Petitioner "in the hobby room doing some Satanic stuff I guess" with some of the other girls. Ms. Perry related that she noticed the light go off in the hobby room and that when she went to see what was going on, she observed the girls sitting down, holding hands, and chanting. She did not understand what they were chanting. Ms. Perry also observed a pentagram on a piece of paper. Ms. Perry stated that she believed that the Petitioner "was just searching, experimenting or trying to find out who she was. . . ." Ms. Perry stated that the Petitioner had different moods that were not normal. She explained that "[s]ometimes [the Petitioner] would be calm, and sometimes she would just be like just kind of out of control. . . ."

William Joseph Mode testified that, in the fall of 1994, he was employed as an instructor at Job Corp on Rutledge Pike. Mr. Mode taught cultural awareness, reading, AODA (a class on drugs and alcohol), and parenting. Mr. Mode recalled that Colleen Slemmer was "a very sweet young lady." Mr. Mode testified that, although he was under the impression that the Job Corp students did not have violent criminal backgrounds, this impression was contradicted by the actions of the students. He described incidents of being slapped and hit by students. He also recalled an incident where a student threatened to kill him.

Mr. Mode testified that Tadaryl Shipp often came to class high, hung over,

or drunk, when he came at all. He described Tadaryl Shipp as disrespectful. He stated that there was little discipline by the Job Corp supervisors. He stated that, from what he had heard from the students, the Job Corp dormitories were unsafe. Mr. Mode stated that he knew Shadolla Peterson and the Petitioner and that he knew about the "devil worshiping business."

Jacqueline Olebe was employed at Knoxville Job Corp as a health instructor in 1994 and 1995. She described the Petitioner as a non-violent student who completed her course requirements. She noted that the Petitioner often slept in her classes but that she participated when she was awake. Ms. Olebe stated that the Petitioner was smart and wanted to be a nurse. She also testified that she came into contact with the Petitioner through her position on the Drug Abuse Panel and was aware that the Petitioner used marijuana and alcohol. She also acknowledged a conversation she had with the Petitioner regarding voodoo in which the petitioner told her that it worked.

Ms. Olebe testified that Mr. Shipp rarely attended her classes but when he did he was loud and disrespectful. She described the victim as very respectful and skilled. Finally, she stated that she was not contacted by anyone regarding the Petitioner until after the conviction.

Next to testify was Kim Rhodes, a fellow student in the Job Corp Program, who testified for the State at trial. Ms. Rhodes described the environment at the Job Corp as "scary," with a great deal of animosity between different groups. She also related that there was a lot of drug use at the Center.

Ms. Rhodes testified that she had a great relationship with the Petitioner and that she felt safe with her. She stated that both felt like they did not fit in with others. She specifically testified that she never saw the Petitioner act violent. She testified that she was shocked when the Petitioner made the statement to her that the victim had been killed. She also stated that after giving her statement in the case, she was informed by the State's attorney that she would not be allowed to see the Petitioner. She said that she missed her friend.

The next witness to testify was Judge Matthew Martin from North Carolina. Prior to becoming a judge, he represented the Petitioner, who was a juvenile at the time, on multiple occasions. Judge Martin testified that he felt that sending the Petitioner to training school was a mistake and that he had, in fact, found an alternative which he recommended to the sentencing judge. He felt that the Petitioner would have benefitted more from another type of service. Judge Martin testified that he believed the Petitioner was an abused child and that he was not surprised to learn that she was diagnosed with bipolar disorder. Finally, Judge Martin testified that after the Petitioner was charged in this case, he contacted trial counsel and supplied them with his file.

Next, Tadaryl Shipp, the Petitioner's co-defendant and former boyfriend,

was called to testify. He began his testimony by acknowledging his membership in the Gangster Disciples, as well as the membership of the third co-defendant Peterson. He testified that the Petitioner was not a member of the gang. Shipp also acknowledged his romantic involvement with the Petitioner and described her as his best friend. He stated that the Petitioner was a caring person but that she was "edgy" and had mood swings. Shipp testified that during her moods, she often hit him for no apparent reason. He testified that the Petitioner was like two different people depending on whether she was agitated or calm. He estimated that the mood swings could last from two to three minutes up to an hour. During these periods, the Petitioner just went into a rage. Shipp further indicated that the Petitioner was particularly agitated just prior to the murder.

Shipp testified that the Petitioner took the relationship more seriously than he did, and he acknowledged that he was seeing other girls at the time. He stated that he did not believe the Petitioner had been aware of that fact. He also testified that the Petitioner continued to write him three to four letters per week after the offense occurred.

Shipp acknowledged that he was the one who carved the pentagram on the victim's chest and stated that he did so because he felt like it. He acknowledged that this varied from his original statement to police that the Petitioner brought the weapons and helped carve the pentagram. Shipp further testified that he was unable to recall whose idea it had been to take the victim to the scene, although he acknowledged that he had previously indicated in a statement to police that it was the Petitioner's idea. Shipp stated, however, that he was intoxicated when he gave the statement and that the police were harassing him. Finally, Shipp testified that he would have testified for the Petitioner at trial if he had been asked, even if it conflicted with his own attorney's advice.

Tyrone Comfort also testified and stated he was at the Job Corp Center with the Petitioner and that she was one of his best friends. He indicated that the Petitioner would sometimes be "overly happy" and then suddenly very sad. He described one incident when he observed her in the hall crying, screaming, and pulling out her hair. Mr. Comfort indicated that he did not know Shipp well, but he did not like the way that Shipp treated the Petitioner. He testified that he heard the Petitioner and Shipp argue on multiple occasions, and he recalled seeing bruises and marks on the Petitioner at times. He indicated that Shipp was the one controlling the relationship, even going so far as to threaten Mr. Comfort.

The next two witnesses to testify, DeAndrea Gates and Amanda Robertson, were both former girlfriends of Shipp. Both indicated that he was abusive to them, as well as manipulative and controlling. Ms. Gates indicated that she believed that Shipp preyed on women he could control. She further indicated that she was not contacted by the Petitioner's defense team. Ms. Robertson said that she was not contacted until 1995 or 1996.

Jermaine Bishop, another former student at the Job Corp, indicated that, at the time of the hearing, he was incarcerated for especially aggravated kidnapping and especially aggravated robbery. He testified that met Shipp in the program and described him as "weird." Mr. Bishop testified that he was aware that the Petitioner and Shipp were dating, and he felt that Shipp was in control of the relationship. He further testified that the Petitioner and Shipp fought often.

Co-counsel was the next witness, and she stated that she had been licensed to practice law since 1992, and that she had been appointed to the Petitioner's case on January 23, 1996. At the time, her practice consisted primarily of criminal cases. She also indicated that she had previously served as an assistance public defender and had handled felony and misdemeanor trials. Co-counsel acknowledged that the Petitioner's case was her first murder case. She indicated that her primary role in the case was research and the drafting of motions. She also stated that she was responsible for preparing voir dire, conducting some cross-examination in the guilt phase, and handling the family witnesses in the penalty phase.

Co-counsel testified that she was appointed to replace prior co-counsel and that much of the groundwork had already been done when she was appointed. She indicated that her initial thoughts upon reviewing the case were that it might be possible to prove second degree murder based upon "the frenzy" at the murder scene combined with the Petitioner's mental health issues. However, she noted that she saw sentencing as the critical phase and, from the beginning, began analyzing what proof would be needed.

Co-counsel stated that Dr. McCoy had been retained as the mitigation expert prior to co-counsel's own appointment. She met with Dr. McCoy and lead counsel in March and reviewed the materials which had been prepared by Dr. McCoy. Co-counsel further indicated that she presumed these materials were also shared with Dr. Engum, who had produced a diagnosis of severe borderline personality disorder.

Co-counsel testified that, in the penalty phase, the goal was to establish that the Petitioner came from a dysfunctional family with a history of drug and alcohol abuse. In hope of establishing this, the initial strategy was to call Dr. McCoy and to introduce her report. However, at the "ninth hour," a decision was made against having Dr. McCoy testify in the penalty phase. Co-counsel indicated that this decision was made because of several problems which arose with Dr. McCoy, namely her relationship with the prosecutor in the case and her statement that she was not in agreement with Dr. Engum's report. Despite the decision against calling Dr. McCoy, the defense team unsuccessfully attempted to get her report admitted into evidence, as well as the charts which had been prepared. Co-counsel acknowledged that only three witnesses were called to testify and stated that it might have been more helpful to the case to call other lay witnesses. However, by the time the decision was made not to use Dr. McCoy, it was too

late. Co-counsel said that she attempted to present their mitigation theme as well as she could using the lay witnesses but acknowledged that they had no expert "to connect the dots." However, she stated that she attempted to do so in her closing argument.

Co-counsel testified that she was aware that much of the material contained in the report by Dr. McCoy, including the incidents of the Petitioner's prior violence, were a "two-edged sword." She stated that they felt the defense had to be careful about the type of mitigation evidence which was presented because some of the proof "could hurt them as much as it helped." She stated that they were faced with "a horrible case with horrible facts and someone that confessed ad nauseam and kept confessing over and over and over in letters that she was passing out."

Co-counsel acknowledged that they had filed a "don't ask/don't tell" motion regarding the death penalty issue with the jury. According to her, the strategy was to get one person on the jury who was totally opposed to the death penalty. She acknowledged that this decision involved the risk of getting twelve jurors who were all in favor of the death penalty. She also acknowledged that Dr. McCoy's entire report was given to the prosecution despite the fact that it contained information which would have been privileged, especially in light of the decision not to call Dr. McCoy to the stand. She further acknowledged that the prosecution's cross-examination of the witnesses, utilizing information contained in the report, was damaging to their case. However, she also testified that the decision not to call Dr. McCoy resulted in the State not being able to use many other damaging facts which were contained in the report. Co-counsel also testified that she could not recall why there was no objection made to the inconsistent theories utilized by the State based upon the charge of conspiracy and then the application of the aggravating factor that the killing was done, in part, to avoid arrest.

On cross-examination, co-counsel stated that she was aware of lead counsel's overbilling issues but did not discuss it with him. She testified that she did not think the issue affected lead-counsel's representation of the Petitioner and described him as very zealous. Co-counsel acknowledged that she and lead counsel had the Petitioner sign a release which would allow them to profit from the Petitioner's story. However, she explained that the document only referred to public aspects, not information protected by the attorney/client privilege. She testified that the main purpose of the document was to protect the Petitioner's rights and eliminate any ethical concerns. Co-counsel specifically testified that the release in no way affected any trial strategy or decision.

Co-counsel reiterated that the goal in the guilt phase was to try to convince the jury to convict the Petitioner of second degree murder based upon the frenzy of the scene and the controlling nature of the Petitioner's relationship with Shipp. However, she acknowledged that some witnesses, as well as the Petitioner's own

statement, undercut the theory that Shipp had committed most of the acts during the murder. In addition, co-counsel stated that some aspects of Dr. McCoy's report also undermined this theory.

Co-counsel testified that she had met with the Post-Conviction Defender's Office on one occasion in 1999 and had given them her entire file. She indicated that, despite requests to do so, she had not met with them again as she believed that everything had been covered.

Next, the Petitioner called William Crabtree to testify. General Crabtree testified that he had been employed as a District Attorney General for more than thirty years and had been the lead prosecutor in the Petitioner's trial. He also indicated that knew Dr. Diana McCoy, the mitigation expert employed by the defense team, and had dated her for a period of time. General Crabtree indicated that the relationship had occurred prior to the Petitioner's trial and that he and Dr. McCoy were not involved at all during the trial. Further, General Crabtree testified that he was not aware that Dr. McCoy was employed in the Petitioner's case until he received her notebooks and report during the penalty phase of the Petitioner's trial. He also indicated that he was not happy to get the large report so late in the proceeding. He was unable to recall what information was contained in the report or if he found specific information in it that he used to cross-examine the Petitioner's witnesses.

General Crabtree testified that he saw no reason to withdraw as the prosecutor because of his previous relationship with Dr. McCoy. He indicated that he did not see that a conflict of interest was created. He testified that he had prosecuted several other cases in which Dr. McCoy was involved. He indicated that only in one instance did he withdraw and that was because he had generally discussed the facts of that case with her prior to learning of her involvement.

Next, the Petitioner's lead counsel at trial testified that he had been practicing law in Knoxville since 1986. He indicated that his practice was exclusively criminal defense at the time and that, prior to his appointment in the Petitioner's case, he had handled several murders cases but had not previously handled a capital case.

In 1993 or 1994, lead counsel learned from an article in the newspaper that the Comptroller's Office was conducting an audit of the indigent defense system and that he would likely be one of the attorneys involved in the audit. As a result, he conducted a "self-audit" and discovered that, in certain instances, he had billed more than twenty-four hours in a day. He self-reported to the Board of Professional Responsibility on the advice of counsel. In April of 1995, one month prior to his appointment in the Petitioner's case, he had to repay approximately $67,000 to the fund. Prior to repayment, he had refrained from taking any appointments and withdrew from some cases to avoid an appearance of impropriety.

Lead counsel testified that he was not concerned that the investigation would affect his representation of the Petitioner because he had been "cleared to practice law" at the time of the appointment. Despite the fact that his name had been in the newspaper, he was not concerned about the issue affecting potential jurors during voir dire. At the time of the appointment, the only complaint pending was the disciplinary complaint, which he had self-reported. That issue was not resolved until 1998, and lead counsel never received an active suspension nor was his practice interrupted. Lead counsel testified that he had several murder cases prior to his involvement in the Petitioner's case. He estimated he had taken a dozen or more felony cases to jury trial. He could not recall whether he had called an expert witness to testify in those trials, but he did indicate that he often used investigators, pathologists, and psychologists. He also stated that, at some point prior to trial, he contacted the Capital Case Resource Center.

Lead counsel testified that early in his representation, he engaged Dr. Engum to do psychological testing on the Petitioner. He met with Dr. Engum on several occasions to discuss the findings. In the late summer or early fall of 1995, lead counsel also engaged the services of Dr. Diana McCoy as a mitigation specialist and indicated that he communicated with Dr. McCoy frequently. According to lead counsel, his strategy was that he and Dr. Engum would concentrate on the guilt phase where he knew they would "take a beating" and then Dr. McCoy would "come out and save the day" in the penalty phase. Lead counsel indicated that he looked at the social history as a tool to be used in the penalty phase because he wanted Dr. McCoy to take the social history and tie it back to Dr. Engum's report. However, he specifically recalled at least one meeting during trial preparation when both doctors were present.

Lead counsel also employed the services of Dr. Bernet, a psychiatrist, in the case, but he was not a "member of the team." He was hired solely for the purpose of giving background on the Satanic aspect of the case. He was to testify that the murder was not a ritualistic killing and that the Petitioner had just been a "kid dabbling in Satanism." Mr. Talman did not ask Dr. Bernet to conduct an evaluation.

Lead counsel indicated that co-counsel was appointed after previous co-counsel requested to withdraw. Lead counsel had not previously worked with co-counsel, but he was aware that she had previously handled criminal cases while with the Public Defender's Office. He indicated that he was aware that co-counsel had never been involved in a capital case, but he stated that he was not aware that she had never been involved in a murder case. Lead counsel testified that co-counsel handled the penalty phase of the case because he thought it might be better with a female attorney. Nonetheless, he stated that he was lead counsel and was involved personally in both phases of the trial.

Lead counsel indicated that he was aware that the case was complex.

While the Petitioner was very cooperative, it was not a "who done it." The Petitioner had confessed to a "grizzly murder," and lead counsel indicated that going into trial, he was fairly certain that there would be a penalty phase. Therefore, in his mind, sentencing issues were the most important, and he would have considered it a victory if the Petitioner did not receive death. Lead counsel acknowledged that, in hindsight, there were things he wished he had done differently. While not specifically recalling a discussion with Dr. McCoy of which witnesses to call, he assumed that he did discuss this with her. Lead counsel also indicated that he was not dissatisfied with Dr. McCoy's work.

Lead counsel testified that during the guilt phase of the proceeding, he tried to attack the elements of intent and premeditation. The defense team attempted to "soften [the Petitioner] as best we could, make her a person." Lead counsel indicated that he spent a great deal of time investigating the case, even traveling to North Carolina to interview family and friends of the Petitioner.

According to lead counsel, the strategy of using Dr. McCoy during the penalty phase to give an overview of the Petitioner's life remained in place throughout the trial. He also indicated that he had planned to call the Petitioner's parents and aunt as witnesses. At the time, he believed that was a sufficient number of witnesses. Despite his intent to use Dr. McCoy as a witness, lead counsel made clear that there were certain things contained in her report that he had concerns about being admitted into evidence. According to lead counsel, the decision not to call Dr. McCoy was based on multiple reasons, with the primary reason being that she would not corroborate Dr. Engum's report because she did not personally conduct an evaluation of the Petitioner. He testified that, until that moment after the penalty phase when he spoke with Dr. McCoy about this, he had believed that the two doctors were in agreement.

Lead counsel also indicated that he was uncomfortable with Dr. McCoy's relationship with General Crabtree, although he did not doubt Dr. McCoy's integrity. Lead counsel testified that he had been aware of the relationship which, according to Dr. McCoy, had involved some anger and jealousy. The final decision not to use Dr. McCoy was a last minute decision, which lead counsel acknowledged "could" have been wrong. He testified that he wished that he had called additional witness, but he did not know if it would have made a difference in the outcome. Lead counsel could not recall exactly when the decision was made to proceed with only three witnesses.

Lead counsel was unable to recall when he received a copy of Dr. McCoy's final report, although Dr. McCoy's billing records indicate that the report was bound on March 20, after jury selection in the trial. Lead counsel testified that he did not recall reviewing the entire report before trial, but he stated that he had seen prior drafts. Lead counsel did recall an in-camera hearing during which he gave Dr. McCoy's report to the State. He recalled that General Crabtree was unhappy with the timing as it only gave the State one night to review the

report prior to the opening of the penalty phase. He acknowledged that he turned over the final report, as well as the notes of interviews and other information contained in Dr. McCoy's folder, because he was still planned to use Dr. McCoy at that point. Lead counsel stated that, in retrospect, he probably should have just given the report only, as he did not plan to use the other supporting documents. At the time, he believed they were not protected under the privilege.

Lead counsel testified that he made no challenge to the State using inconsistent theories with regard to the conspiracy conviction as opposed to the aggravator that the murder was done to avoid arrest. While at the time he did not see those as inconsistent theories, he now does.

Lead counsel further testified that, during voir dire, the publicity of the case was extensive and that almost all of the potential jurors had heard something about the case. Lead counsel acknowledged that his line of questioning may have reinforced the information the jurors had seen in the news. He also acknowledged the risk in pursuing the strategy of the "don't ask don't tell" with regard to death qualifying the jury. Lead counsel could not recall if he asked questions to "life qualify" the jury.

Lead counsel also testified that, after the case, he talked with the Petitioner's aunt, Carrie Ross, about the possibility of writing a book. However, nothing ever became of the idea. He specifically testified that he never profited from the Petitioner's story, although he acknowledged that a document had been signed by the Petitioner which would have allowed him to do so.

Lead counsel indicated that the State had offered the Petitioner a guilty plea deal to life without the possibility of parole. The Petitioner did not accept the offer because "she did not want to grow old in jail." During his testimony, lead counsel indicated that he probably should have pushed the Petitioner harder to accept the deal. Lead counsel testified that he did not recall asking Dr. McCoy to lie. He did recall receiving an angry letter from her after trial alleging that he was responsible for her not being hired to work on another capital case.

Lead counsel acknowledged that the Petitioner did not receive a "perfect defense." He said that, in retrospect, there were things which could have been done differently. However, given the sheer brutality of case, he was unable to say that doing anything different would have resulted in a different outcome.

On cross-examination, lead counsel again addressed the overbilling issue and stated that he had considered the matter closed prior to his appointment in the Petitioner's case. A settlement had been reached, and he had paid it. The State was again paying him for appointments, and the Tennessee Supreme Court had appointed him in another case prior to his taking the Petitioner's case. There was no issue of criminal liability pending at the time. Furthermore, lead counsel testified that he had discussed the matter with the Petitioner, and she was not

bothered by it. Lead counsel stated that the billing issue had no affect on his performance or zealousness in his representation of the Petitioner.

Lead counsel also testified to the reasoning behind the decision not to seek a continuance because of the short time that co-counsel had been on the case. He stated that a great deal of work had been done prior to her appointment and that co-counsel worked hard and felt prepared. Moreover, the decision was affected by their hope that the State would be unable to locate key witnesses against the Petitioner. Lead counsel also testified that he saw no specific legal reason to file a motion to suppress the statement given by the Petitioner. He also reiterated that the timing of Dr. McCoy's report had no bearing on the decision not to call her as a witness. Lead counsel stated that he felt that the damaging information in Dr. McCoy's report was too prejudicial to present to the jury if Dr. McCoy was not going to support Dr. Engum's diagnosis. Lead counsel acknowledged that the decision to give the State the report did allow some damaging information to be used on cross-examination; however, by not calling Dr. McCoy, other damaging evidence was kept out.

Lead counsel indicated that neither Dr. Engum nor Dr. McCoy suggested involving another mental health professional in the case. Lead counsel acknowledged that, looking back, retaining the services of a psychiatrist might have been beneficial.

Following lead counsel's testimony, Carrie Ross, the Petitioner's aunt, was recalled to the stand. She indicated that, while she was in Knoxville for the trial, lead counsel had discussed with her the possibility of a book deal about the case. According to Ms. Ross, lead counsel also made the statement to her that there was no way the Petitioner would avoid receiving the death penalty but that he was leaving room for appeal or "leaving holes in the case."

Ms. Ross again reiterated the violent nature and various abuses of the Petitioner's parents and grandparents. She testified again as to the environment in which the Petitioner had grown up in, indicating violence was a way of life. She also indicated that in her opinion, the questions she was asked during the penalty phase of the trial did not allow her to convey the person the Petitioner really was.

The next witness to take the stand was Dr. Diana McCoy, the mitigation expert employed to handle the Petitioner's case at trial. She testified that her role in the case was to collect information by interviewing people and reviewing records and to analyze that information in order to develop themes for the attorneys to present in the penalty phase. She also testified that it was her responsibility to assist in choosing additional lay witnesses who would show the jury the Petitioner's human side during the penalty phase. However, she testified that, in this case, her job did not involve forming a diagnosis for any conditions from which the Petitioner might suffer. She indicated that she was retained by lead counsel in this case.



Case 1:12-cv-00035-HSM-SKL Document 23 Filed 12/28/12 Page 41 of 90 PageID #: 10346

Dr. McCoy indicated that she recalled only one meeting between the entire defense team. She stated that most of her interaction was with lead counsel, with the record indicating at least fourteen face-to-face meetings and more than forty telephone conversations. She testified that they worked together a great deal and had good interaction. She indicated that she was specifically told to prepare a report, not an opinion, in the case. She testified that she provided the final bound version of her report to the attorneys on March 24, 1996, although she had previously gone over the material contained in the report with the attorneys. She stated that lead counsel was as familiar with the materials as she.

Dr. McCoy testified that she met with the Petitioner on nine occasions prior to trial in order to build a rapport with the Petitioner so that she might gain the entire truth of the Petitioner's life. She indicated that she was aware of Dr. Engum's diagnosis of borderline personality disorder and that she was in agreement with that diagnosis. Dr. McCoy testified that she reviewed her report with lead counsel and co-counsel on March 15, and that they had previously discussed who should be called to testify as lay witnesses. At this meeting, Dr. McCoy indicated to them that the final report would soon be done. According to Dr. McCoy, lead counsel indicated that there was no hurry, as he planned to wait till the last possible minute to give the report to the prosecution.

She went on to note that, in her opinion, family members alone would not be able to sufficiently explain who the Petitioner was and why she had committed the crime. Dr. McCoy indicated that although she was not specifically informed, she assumed that these witnesses had been subpoenaed or that arrangements had been made for them to be at the trial. She testified that several of the professionals from Swannoa and Shaeffer, who had worked with the Petitioner and liked her, would have been greatly beneficial to call as witnesses. She also testified that Matthew Martin and the Petitioner's aunt would be good witnesses, but the Petitioner's mother would not make a positive witness for the defense. Dr. McCoy testified that, as of March 14, she was under the impression that several lay witnesses would be called to testify and that she would then testify in order to tie the diagnosis together.

Dr. McCoy indicated that her work developed into a three-volume social history. She testified that she was in agreement with the diagnosis of borderline personality disorder and never told either attorney that she disagreed with the diagnosis. As part of her testimony, Dr. McCoy explained some of the characteristics of borderline personality disorder, such as fear of abandonment, unstable relationships, mood swings, unstable self-image, and impulsivity. Dr. McCoy had prepared various charts to show such things as substance abuse in the Petitioner's family, a family chart showing the large number of people in and out of the Petitioner's life, and the Petitioner's education history. She testified that all of these influences tied into the development of the Petitioner's borderline personality disorder, indicating that the Petitioner's fear of abandonment was the

overriding concern. She also testified regarding the "tough girl image" which the Petitioner presented and opined that this was cultivated in order for the Petitioner to appear fearless when, in fact, she was just a "scared kid." Dr. McCoy also referenced the Petitioner's tendencies toward self-destruction, testifying with regard to specific instances in her history of self-sabotage and suicide attempts. She further testified regarding the unstable relationships experienced by the Petitioner and her drastic mood swings. Dr. McCoy discussed the Petitioner's acknowledged lying, which was usually done to make herself look better. She said this was an indication that the Petitioner was starved for attention, and she referenced the multiple witnesses who had indicated that if the Petitioner was ever shown attention, she would "talk and talk." Finally, Dr. McCoy discussed the poor parental role models which the Petitioner had while growing up. She indicated that the Petitioner grew up in an environment where drugs and alcohol were used, where sex was glamorized, where violence was seen as a solution to problems, and where no limits were set.

Next, Dr. McCoy discussed a March 24th meeting in which she was informed that she would be the only witness to testify during the penalty phase. She believed that the decision to rely strictly on her testimony was a bad one. Dr. McCoy testified that, in her opinion, the mitigation evidence which she had gathered was relatively strong, but she felt that she could not convey that alone. According to her, it would take a number of people to "paint the whole picture." She also opined that it was important to show the early physical and emotional abuse with the true depth of the problems. She indicated that it was important to include the negative aspects of the Petitioner's life and that the jury would not be expecting her to be a "girl scout" if she had already been convicted of first degree murder.

Dr. McCoy also discussed the Petitioner's relationship with Shipp. She described the Petitioner as hungry for attention and very intense about the relationship, stating that it made her feel like somebody. She stated that the Petitioner basked in the glow of Shipp's attention. Dr. McCoy also opined that the Petitioner's prior rejections had led her to Shipp.

Dr. McCoy testified that she recommended that Dr. Bernet be used as an expert in regard to the Satanism aspect of the case. She testified that lead counsel had expressed some concern because of the reference to Satanism in the report from Swannoa. However, Dr. McCoy testified that she felt that it was fairly normal under the circumstances and that she saw the Petitioner as struggling with spirituality.

Dr. McCoy testified that she learned on Friday following the guilty verdict that she would not be called to testify. According to her, lead counsel, who was very upset, telephoned her after an in-camera conference with the trial court and the State. He informed her that the prosecutor had gone "ballastic" about receiving the mitigation report so late and that the prosecutor believed it was all



Case 1:12-cv-00035-HSM-SKL Document 23 Filed 12/28/12 Page 43 of 90
PageID #: 10348

hearsay. Dr. McCoy testified that lead counsel then asked her to lie and say she had just given him the report the previous day, but she refused. Dr. McCoy testified that she asked lead counsel if he would like her to call Herb Moncier, a local attorney, to ask his opinion. When Dr. McCoy was unable to reach Mr. Moncier, lead counsel informed her that he would not have her testify in the case.

Despite being informed that she would not be called to testify, she met with lead counsel later that evening to discuss the options. Dr. McCoy stated that they talked for several hours and that lead counsel was upset, saying they will "probably post-convict me on this." After their discussion, the decision was made to call three witnesses to testify, those being the Petitioner's parents and her aunt. Dr. McCoy met with the witnesses the next morning to prepare them to testify. Dr. McCoy stated that it was extremely important to show the reasons the Petitioner had turned out the way she had. She stated that it was impossible to do so by calling only three family members. She described the mitigation presented as "punnie and pathetic."

Dr. McCoy also testified regarding a situation which arose post-trial. She indicated that she was contacted by the victim's attorneys, who were asking for a copy of her report. She telephoned lead counsel for advice, and he advised her against disclosing the report. He later sent her a letter in which he questioned her ethics, and Dr. McCoy sought the advice of counsel. In order to set the record straight, her attorney helped her draft a letter in response to lead counsel. Lead counsel then telephoned her and stated that he just wanted to drop the issue, as they had previously gotten along.

Dr. McCoy also testified that she had engaged in a brief dating relationship with General Crabtree. She stated, however, that the relationship was over prior to her beginning to work on the Petitioner's case. She indicated that, early on in the case, she informed lead counsel of this fact, and he said he had no problem with it. When Dr. McCoy heard rumors that lead counsel and co-counsel were indicating she had withheld this information, leading to their decision not to call her as a witness, she contacted Herb Moncier. He advised her to let it go, as it would come out on post-conviction.

Although Dr. McCoy was not asked to prepare an opinion for the trial, she did prepare one for the post-conviction hearing. She used charts and graphs to support the borderline personality diagnosis. Her general conclusions were:

> (1) The Petitioner came from a highly dysfunctional family and that many of her subsequent developmental issues stemmed from this;
>
> (2) The Petitioner experienced multiple traumatic events during her childhood and adolescence, including rapes and physical abuse by multiple parties, which also contributed to the exacerbation of her

psychiatric problems;

(3) The Petitioner's parents did not sufficiently address and handle her emotional and psychological problems;

(4) The Petitioner had multiple psychological problems including:

(a) attachment issues which significantly contributed to her dysfunctional relationships;

(b) an inability to maintain emotional control, particularly during periods of stress, and a reliance on others to help her maintain control;

(c) a constant need for attention;

(d) an assumption of a tough-girl image to compensate for her lack of self-esteem and self-respect; and

(e) a need to please others and a willingness to be influenced by others, regardless of the cost to herself.

(5) The Petitioner was experiencing great stress at the time of the homicide, which contributed to her participation.

Dr. McCoy stated that, at the time of the murder, the Petitioner felt that her identity, which she felt centered around Shipp, was slipping away. She also opined that because of the Petitioner's problems at the Job Corp and her problems with the victim, the Petitioner felt that she was losing her sense of self-esteem and identity. Because of the Petitioner's borderline personality disorder, she felt frantic and experienced irrational anger. Dr. McCoy referenced and discussed prior times in the Petitioner's life when she became extremely angry and stated that the Petitioner simply did not have the control of a normal person.

On cross-examination, Dr. McCoy acknowledged that, although she had previous capital case experience as a mitigation specialist, she had never testified in any of those trials. She reiterated that she was comfortable with Dr. Engum's diagnosis and again stated that it was not her responsibility to reach a diagnosis in this case. She acknowledged that she did not necessarily look for things which would contradict Dr. Engum's conclusions. She also testified that because Dr. Engum was a neuropsychologist, she assumed that if a neurologist was needed, he would have made that suggestion.

Herb Moncier, a Knoxville attorney, testified that he spoke with Dr. McCoy about her relationship with General Crabtree after she sought his advice on whether it created a problem with her working on the Petitioner's case. He

informed her that it should not be a problem but that she should inform lead counsel. Mr. Moncier also testified that sometime after the trial began, Dr. McCoy called him, upset, and informed him that Mr. Talman had asked her to say something that was untrue. Mr. Moncier advised her not to lie and that the issue would be raised in post-conviction. Mr. Moncier also testified that Knoxville had an excellent bar and that any number of attorneys would have happily assisted lead counsel if he had asked.

Gregory Isaacs, another local attorney, testified next. He stated that he had been involved in two capital cases and a number of homicide cases and that he had occasionally used Dr. McCoy. He testified that she was very competent and made a good witness. Mr. Isaacs also testified that he dealt with Dr. McCoy in a representative capacity following the Petitioner's trial. He testified that he assisted her in drafting a response to lead counsel's letter to Dr. McCoy questioning her ethics.

The final witness to testify was Dr. William Kenner, an expert in forensic psychiatry. He testified that he was appointed by the court in 2001 to conduct a competency evaluation of the Petitioner in order to see if she could waive her post-conviction appeals. In performing his evaluation for the court, Dr. Kenner met with the Petitioner on five occasions and, afterward, an additional two times. He testified that he also reviewed extensive records, including medical records of some of the Petitioner's family members. He ultimately diagnosed the Petitioner as suffering from:

> Axis I (active diagnosis) Bipolar Disorder hypomanic recurrent
>
> Axis II (personality disorder) Borderline Personality Disorder Antisocial Personality Disorder
>
> Axis III (active medical condition) von Willibrand Disease
>
> Alix IV (psychosocial stressors) Problems with primary support group, social environment, incarceration
>
> Axis V (global assessment) 15

Dr. Kenner testified that in his first meeting with the Petitioner, there were some suggestions of bipolar disorder, but it "didn't sort of knock me over" that way. He opined that the diagnosis requires multiple observations over time because people with bipolar disorder cycle. Dr. Kenner indicated that his second meeting with the Petitioner was completely different and that it became clear that sleep deprivation affected her. In prison, it showed up as irritability. The Petitioner told Dr. Kenner that she did "stupid" stuff when she was not in prison.

In 2002, the Petitioner was prescribed Lithium, and her reaction to the

drug was dramatic. According to Dr. Kenner, her major improvement after taking the drug is what would be expected from someone with bipolar disorder. Following another evaluation in 2002, he re-diagnosed the Petitioner and concluded that she did not suffer from borderline personality disorder as he had previously concluded but rather it was part of her bipolar spectrum disorder. He acknowledged that bipolar disorder is an illness which "doesn't have terribly clear borders." Dr. Kenner also concluded that the Petitioner was not antisocial. Dr. Kenner further acknowledged an ongoing debate in the mental health community as to whether borderline personality disorder is misdiagnosed bipolar disorder or whether there is, in fact, borderline personality disorder. He also indicated that new diagnoses are constantly emerging in this field.

According to Dr. Kenner, he felt that there was data available at the time of trial which could have been discovered if a competent physician had conducted an examination of the Petitioner. He specifically noted that there was significant data to suggest early onset bipolar disorder, based upon the Petitioner's history. He indicated that it was critical to explain this to the jury, tying it back into the Petitioner's personal history. He explained that this was so important because, at the time of the murder, the Petitioner was experiencing a two-to-four day cycle of sleep deprivation with increasing irritability, which peaked at the time of the murder.

Dr. Kenner further testified that there were records available for raising the medical question of whether the Petitioner had brain damage, based upon her seizures, her abnormal test results, and the head injury she suffered as an adolescent. He suggested that medical testing, such as an MRI, should have been done on the Petitioner prior to a final diagnosis. Dr. Kenner acknowledged that, given the information the defense team possessed, borderline personality disorder was a reasonable diagnosis when the trial was held.

Dr. Kenner said that, in his opinion, the structure of the defense team was odd. He asserted that the lines of communication all went to lead counsel and that there appeared to be little expert information shared. He noted that Dr. Bernet never saw the Petitioner and that, from what he learned, Dr. Engum never reviewed Dr. McCoy's work. Dr. Kenner also noted that the fact that Mr. Talman attempted to solicit a medical opinion from Dr. Bernet, who had to then answer that he had not examined the Petitioner, made Dr. Bernet's entire theory seem more suspect to the jury.

*Christa Gail Pike v. State of Tennessee*, No. E2009-00016-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 285, *27-112 (Tenn. Crim. App. Apr. 25, 2011).

## V. ARGUMENT

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Section 2254(d) provides the standard for addressing claims that have been adjudicated in the state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The petitioner carries the burden of proof for this "difficult standard to meet" and "highly deferential [AEDPA] standard" which "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (U.S. 2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (U.S. 2011), and *Woodford v. Viscotti*, 537 U.S. 19 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has

"on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A rule applied by a state court contradicts established Supreme Court precedent if it is "diametrically different," "opposite in character or nature," or "mutually opposed" to it. *Williams*, 529 U.S. at 405. An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 412-13. The state court's application of clearly established federal law must be "objectively unreasonable." *Id*. at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 130 S. Ct. 1855, 1862 (U.S. 2010) (citing *Williams*, 529 U.S. at 411).

There is less case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 130 S. Ct. 841, 849 (U.S. 2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).

Where there is no state-court decision articulating its reasons for rejecting a petitioner's claim, a federal court's review nevertheless remains deferential; it should focus on the result of the state court's decision to determine whether it is "in keeping with the strictures of the

AEDPA," i.e., whether it is contrary to or involves an unreasonable application of federal law. *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000), cert. denied, 532 U.S. 947 (2001). Alternatively, where there is a state-court decision that articulates the reasons for the court's denial of relief, but that decision does not address the relevant federal constitutional claim, the question for the federal court is limited to whether the state court's decision is "contrary to" clearly established Supreme Court precedent as of the time of its decision. *See Doan v. Brigano*, 237 F.3d 722, 731 (6th Cir. 2001). A state court need not even be aware of the applicable precedent, so long as neither the reasoning nor the result of the state-court decision contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002).

**A. Grounds One and Five: The TCCA correctly determined that the Petitioner did not receive ineffective assistance of counsel at the penalty phase.**

In Ground One, the Petitioner claims that trial counsel were ineffective during the penalty phase of her trial because they: (A) failed to present mitigating evidence that their investigation had uncovered (R.19 at 73-81, Petition, Page ID # 9667-75); (B) failed to contact certain witnesses or otherwise discover certain mitigating evidence of organic brain damage, bipolar disorder and post-traumatic stress disorder (R.19 at 81-86, Petition, Page ID # 9675-80); (C) disclosed protected work product to the State (R.19 at 86-87, Petition, Page ID # 9680-81); (D) failed to make effective penalty phase arguments (R.19 at 87-88, Petition, Page ID # 9681-82), and; (E) failed to conduct a meaningful voir dire of jurors (R.19 at 88-89, Petition, Page ID # 9682-83). In Ground Five, which the TCCA addressed along with the Petitioner's claims in Ground One E, the Petitioner claims her right to a jury trial and due process was violated by a qualified juror's dismissal. (R.19 at 105-08, Petition, Page ID # 9699-702).

The Petitioner's claims rest largely upon the proposition that the TCCA unreasonably applied *Strickland v. Washinton*, 466 U.S. 668 (1984), by "fail[ing] to consider the cumulative

impact of all aspects of counsel's ineffectiveness in the penalty phase" and "appl[ying] an outcome-determinative test to the prejudice prong." (R.19 at 73, Petition, Page ID # 9667). This implies that the TCCA found multiple instances of deficiency but that, considering each separately from the others, it held that there was no prejudice.

This is not so, however; in no instance did the TCCA hold that trial counsel were deficient during the penalty phase of the Petitioner's trial. In Ground One A, the TCCA reasonably disagrees with the interpretation of the facts that the Petitioner asserts supports a finding of deficiency. In Grounds One B, One C, and One E, the TCCA simply concluded that trial counsel were not deficient.[2] Because there was no deficiency, the Petitioner cannot argue she was affected by cumulative prejudice.

**1. Ground One A: The TCCA correctly determined that trial counsel were not ineffective in failing to present certain mitigating evidence they had uncovered.**

In considering Ground One A, The TCCA stated the following in concluding that trial counsel was not ineffective:

> At the post-conviction hearing, trial counsel conceded that he should have called many of the individuals interviewed by Dr. McCoy, including the juvenile detention workers and the Petitioner's friends from Job Corps. Trial counsel further acknowledged that he did not, in fact, subpoena any lay witnesses to testify, planning instead to use Dr. McCoy as the only witness, presenting the social history of the Petitioner and utilizing the charts and materials she had prepared to support her testimony. The Petitioner first contends that trial counsel's strategy to use Dr. McCoy as the sole witness to present the Petitioner's social history was ineffective assistance of counsel because a social history is more properly presented through multiple lay witnesses. She further argues, however, that the decision not to utilize the testimony of Dr. McCoy compounded the problem and was separately ineffective.
>
> The Petitioner acknowledges that trial counsel provided four alternative reasons for the decision not to have Dr. McCoy testify, but she asserts that each justification is implausible. With regard to counsel's asserted reason not to have Dr. McCoy testify because she could not corroborate Dr. Engum's diagnosis, the

[2] The TCCA held that Ground One D was waived.

Petitioner asserts the reason is simply untrue as Dr. McCoy testified otherwise and her prepared report supported the diagnosis. With regard to the asserted reason that Dr. McCoy's materials contained "double-edged" information, the Petitioner contends that: trial counsel should have already been aware of this information from discussions with Dr. McCoy; the negative information could have been presented in a way to strengthen the mental illness diagnosis; and the decision to turn the materials over to the State allowed the information in anyway. With regard to trial counsel's third explanation for not calling Dr. McCoy, her relationship with General Crabtree, the Petitioner contends that trial counsel undermined his own justification by admitting his knowledge of the relationship months in advance. Finally, the Petitioner argues that the explanation that the decision was based in part on the fact that General Crabtree showed up that morning with the report covered in "yellow stickies" and appeared "loaded for bear" was not rational, as it was undisputed that the decision not to call Dr. McCoy was made the prior evening. The Petitioner argues that "[b]ecause each of counsel's proffered explanations fall flat, there is no reasonable strategic basis on which counsel could have decided to pull Dr. McCoy's testimony from the penalty phase."

When analyzing a claim of ineffective assistance as a result of failing to present mitigating evidence, the courts apply the three-pronged test set forth by our supreme court in *Goad v. State*, 938 S.W.2d 363, 371 (Tenn. 1996): (1) the reviewing court must first analyze the nature and extent of the mitigating evidence that was available and not presented; (2) the court must then determine whether substantially similar mitigating evidence was presented to the jury during either the guilt phase or the sentencing phase of the proceedings; and (3) the court must consider whether there was such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination. *Id*. at 371. In denying the Petitioner post-conviction relief on this issue, the post-conviction court properly analyzed the issue and supported its reasoning on the record.

First, the post-conviction court analyzed the mitigating evidence known to the defense team at the time of trial, specifically, Dr. McCoy's report. Afterward, the court found that the first *Goad* factor had not been satisfied. In reaching its decision, the court recognized that:

> Dr. McCoy testified concerning various themes of mitigation that she thought should have been presented to the jury during . . . the trial. While this court finds that there may have been mitigating evidence that was not presented to the jury, this court has previously discussed counsel's decision to limit some mitigation and the negative aspect of some of that evidence.

Review of the record reveals that the court had indeed earlier discussed, and found reasonable, lead counsel's decisions regarding the available evidence in

light of the negative aspects. Next, the court looked to the evidence and found that the information in Dr. McCoy's report was substantially similar to mitigation evidence which was presented during the guilt and penalty phases of the trial. Specifically, the court stated:

> Much of the evidence presented by the petitioner here was presented to the jury in one of the phases of trial, but this court notes that it was not to the extent that the petitioner now asserts that she thinks it should have been. Some of the witnesses would have been redundant while others would have included some very negative information about the petitioner.

Finally, the post-conviction court determined that there was "such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination." *See Goad*, 938 S.W.2d at 371. Additionally, the court made the following comments on the record.

> Considering all the circumstances and evidence, this court cannot fault counsel for having chosen not to use Dr. McCoy as a witness at the penalty phase of the petitioner's trial. [Lead counsel] was understandably uncomfortable with Dr. McCoy's statements and materials and while a different decision may seem best in hindsight, this court cannot judge counsel's decision with the situation with 20-20 hindsight and find fault merely because another choice may seem to be preferable today. Counsel's decision was not unreasonable.

The post-conviction court also noted in its order the problematic information that lay witnesses called to testify could put before the jury and noted that:

> With the potential for much of this plus other information to harm the petitioner's case in mitigation, counsel made a reasonable choice to try to limit what came before the jury and from whom. Counsel's original choice to have the information explained by an expert rather than lay witnesses who could not explain the petitioner's behavior was understandable. Once the exigent decision was made that Dr. McCoy would not testify, counsel strategically decided to have the petitioner's parents and aunt testify to bring out the petitioner's life history to be considered in combination with the information that had already been provided to the jury regarding her Borderline Personality Disorder.

Following review of the record, we cannot conclude that the Petitioner has put forth sufficient evidence to preponderate against the trial court's findings. The court made clear its findings on the record after applying the appropriate analysis,

> and we agree with the post-conviction court.
>
> The post-conviction court, again specifically accrediting lead counsel's testimony, stated that he did not call Dr. McCoy because she told him that she could not corroborate Dr. Engum's report. As previously noted, it is not the province of this court to reweigh such determinations. Lead counsel also testified that he had never been completely comfortable with the use of Dr. McCoy's materials as they contained a lot of material which he did not want the jury to hear. He explained that the decision was made to have Dr. McCoy testify, but some discomfort still remained with the decision. According to lead counsel, when he learned that Dr. McCoy would not corroborate the diagnosis, this was the final straw, and, when considered in combination with his original discomfort and other minor concerns, the decision was made. The court noted that while Dr. McCoy's testimony contradicted these statements, this could easily be explained as a misunderstanding between the two. With regard to lay witnesses who could possibly have been called, the court again, based on the testimony which was given, stated that the decision was a tactical one based on the negative nature of some of the statements. The Petitioner has failed to carry her burden for relief.
>
> Based upon the clear finding by the trial court that the mitigation evidence which was omitted would not have outweighed the aggravating factors, the Petitioner is essentially precluded from establishing prejudice. Even trial counsel himself, while admitting that in hind sight he wished he had called more mitigation witnesses, stated that he was not sure it would have made a difference based upon the horrible facts of the case. However, as noted by the post-conviction court, these decisions cannot be judged in hindsight.

*Pike,* 2011 Tenn. Crim. App. LEXIS 285, at *139-46.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**2. Ground One B: The TCCA correctly determined that trial counsel were not ineffective in failing to discover certain mitigating evidence.**

In considering the claims presented in Ground One B, the TCCA stated the following:

> The Petitioner also finds fault with trial counsel for failing to discover critical mitigation evidence in this case. Specifically, she asserts that trial counsel failed to discover evidence of the Petitioner's brain damage and Bipolar Disorder. Additionally, she asserts that trial counsel failed to discover numerous lay

witnesses who could have testified in her defense. She contends that trial counsel was in possession of numerous "red flags" that should have alerted counsel of the need to discover and present evidence of the alleged brain damage.

The Petitioner bases her argument with regard to brain damage and mental illness on the testimony of Drs. Pincus and Kenner. Dr. Pincus testified that the most significant indication of the Petitioner's brain damage was her history of seizures dating from infancy. Dr. Kenner testified that because of the abnormal EEG done when the Petitioner was fourteen months old, the history of seizures, and the traumatic head injury at age fourteen, "ample evidence existed at the time of [the Petitioner's] trial to suggest the need for a neurological examination." Additionally, trial counsel was aware of lay witness testimony regarding the Petitioner's mother's alcoholism and the Petitioner's exposure in-utero, which can result in neurological impairment. The Petitioner asserts that, despite all this evidence which suggested brain damage, the defense team conducted no neurological investigation. As such, counsel failed to discover the Petitioner's neurological disabilities, namely, an abnormality in the brain that impairs her impulse control.

The Petitioner contends that the psychological evaluation conducted by Dr. Engum was not sufficient for two reasons. First, she contends it is insufficient because Dr. Engum is a neuropsychologist, and the type of brain damage suffered by the Petitioner does not show up in neuropsychological testing. Dr. Pincus testified that no evidence of brain damage could have been discovered by Dr. Engum because of the type of testing he utilized. The Petitioner does not contend that trial counsel should be held to a standard of neurological knowledge on par with Dr. Pincus, but argues that counsel should have known that: (1) the available evidence suggests physiological damage; and (2) Dr. Engum was not a medical doctor. "Competent counsel would have known that different areas of expertise are needed to conclude that there is no brain damage." The second reason the Petitioner contends that it was unreasonable for trial counsel to rely on Dr. Engum's opinion is that Dr. Engum provided no explanation for the myriad indications of brain damage. "Minimal diligence required a second opinion from a medical professional with a different specialty."

The Petitioner further asserts that the trial diagnosis of borderline personality disorder was incorrect. Rather, the proper diagnosis, as testified to at the post-conviction hearing, was bipolar disorder, as confirmed by her positive response to mood-stabilizing drugs. Additionally, she asserts that counsel failed to discover her post-traumatic stress disorder. The Petitioner contends this failure to discover the proper diagnosis was ineffective assistance because the diagnosis was readily discoverable at the time of trial. Dr. Kenner testified that reports of the Petitioner's family and friends of her behavior, the Petitioner's three suicide attempts, the Petitioner's belief that she was invincible, and her EEG at fourteen months of age were all indicators of bipolar disorder. Dr. Kenner acknowledged that there is a danger of misdiagnosing bipolar individuals as someone who has

borderline personality disorder, and to achieve the correct diagnosis, repeated clinical interviews are necessary. He opined that Dr. Engum reached the wrong diagnosis because he met with the Petitioner only four times. The Petitioner further contends that Dr. Engum's diagnosis was wrong because he knew little about the Petitioner's life, a fact directly attributable to trial counsel because their team was structured so that their experts worked in isolation with respect to the others.

As a third assertion of failure to discover mitigation evidence, the Petitioner also asserts that trial counsel was in possession of numerous "red flags in the form of information obtained from prospective lay witnesses" that should have alerted counsel for the need to discover and present evidence of the alleged brain damage. She also faults counsel for failing to investigate witnesses who could testify to the Petitioner's family relationships and the institutions in which the Petitioner spent a great portion of her life.

In denying relief on this issue, the post-conviction court made the following findings:

> Counsel relied upon the experience of Dr. Engum to perform the appropriate testing. When Dr. Engum indicated that there were no signs of brain damage, counsel relied on this information. Dr. Engum did not testify here and there is no indication that he advised that other experts were needed. [Lead counsel] testified that he did not recall either Dr. Engum or Dr. McCoy suggesting that a psychiatrist needed to evaluate the petitioner. Dr. McCoy also testified that because Dr. Engum was a neurophsychologist that she would have assumed he would have been the person to make the call if a neurologist was needed. This court finds no deficiency in counsel for not instructing the defense experts in how to do their jobs in areas to which they are supposed to be experts or for not having questioned their opinions.
>
> The experts at all the proceedings opined that the petitioner acted without premeditation. Drs. Engum, Pincus, and Kenner all testified that the petitioner lost control. Dr. Pincus specifically testified, as did Dr. Engum, to the petitioner's premeditation and deliberation in planning the beating, taking weapons, getting to the park, carving a pentagram, and delivering blows to the victim. They both opined that the petitioner had not, however, premeditatedly and deliberately murder the victim. They opined, as did Dr. Kenner, that once the beating began, she lost control and could not stop. Drs. Pincus and Engum also agreed that while they did not think a cooling off period had occurred, there had been time for that to occur. Dr. Pincus also admitted that the fact that the petitioner had told someone the day before the murder that she was

> going to kill the victim and then did in fact kill the victim makes it appear premeditated. This court will not fault counsel because the specific diagnosis by different experts differed. Counsel appropriately relied upon the retained expert's opinion. As made clear by Dr. Kenner's own testimony, the area of mental health is constantly changing. Dr. Kenner even had included borderline personality disorder in his diagnoses and stated that it was a reasonable diagnosis at the time with what the defense had.

Following a thorough review, we must agree with the post-conviction court. Trial counsel was not an expert in the field of psychology or neurology, and, as conceded by the Petitioner, such expertise is not required. Lead counsel retained multiple experts to examine the Petitioner, and a diagnosis was reached. A defense attorney is not required to question a diagnosis put forth by a professional expert in the field. Lead counsel was asked at the post-conviction hearing if any of the retained experts had recommended additional testing, and he answered in the negative. Lead counsel specifically stated that if such recommendation had been made, he would have pursued it. Moreover, the court concluded that "no relief is warranted based on the fact that the opinions of Drs. Pincus and Kenner differed somewhat from that of Dr. Engum." While the actual diagnosis is somewhat varied, the essential facts, i.e., the concession to premeditation, are very similar. And, as further noted, the Petitioner's own expert conceded that the diagnosis reached by Dr. Engum was reasonable at the time. This issue was properly denied by the post-conviction court, and the Petitioner has failed to demonstrate that the evidence preponderates against the court's findings.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *146-53.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**3. Ground One C: The TCCA correctly determined that trial counsel were not ineffective in disclosing certain materials to the State.**

In considering the claims presented in Ground One C, the TCCA stated the following:

The Petitioner next asserts that counsel's representation was ineffective because lead counsel turned three volumes of Dr. McCoy's work product over to the prosecutor immediately prior to the penalty phase. The Petitioner's argument first centers around whether counsel was ordered by the trial court to produce

these documents. She asserts that because the record does not support the existence of a court order, then trial counsel was ineffective because he was not required to turn the documents over pursuant to Rules 16(b) and 26.2 of the Tennessee Rules of Criminal Procedure and Rule 705 of the Tennessee Rules of Evidence.

As noted by the State, the Petitioner's argument appears to rest solely on whether lead counsel was ordered by the court to turn over the documents. She notes the testimony of lead counsel during which he stated that he turned over the materials because "the Court said we had to give them to him." However, the Petitioner states that later statements by lead counsel cast doubt upon the existence of such an order. Namely, she noted that lead counsel later stated that he "could be mistaken as to whether it was actually a ruling" by the court. She also references a statement in which lead counsel stated, "in retrospect, I probably would not have given the entire thing and made the Court specifically order me to do that." Moreover, the Petitioner points out that no written order appears in the record ordering production of Dr. McCoy's work.

We must agree with the State and conclude that the Petitioner has failed to carry her burden of establishing either deficient performance or prejudice. The Petitioner is not asserting that lead counsel is duty bound to comply with the orders of a court. The Petitioner's argument is merely that the record does not establish that such an order existed. We disagree, however, with the Petitioner's interpretation of the evidence presented. In fact, the only evidence presented is basically the testimony of lead counsel, which appears to indicate that he would have turned the material over only upon order of the court. While lead counsel did not specifically recall such an order, the record still seems to indicate that the court, during the in-camera hearing, did, in fact, order production. Nothing in the testimony of General Crabtree, the only other person present during the meeting other than the trial court, contradicts the testimony of lead counsel. On this record, we cannot conclude that the Petitioner has carried her burden of showing that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *See Baxter v. Rose*, 523 S.W.2d at 936.

Additionally, the Petitioner has failed to prove that she was prejudiced by anything in the mitigation report that was turned over to the State. While some testimony was elicited at the post-conviction hearing with regard to the State utilizing some of the information contained therein in cross-examination of three witnesses who testified at the sentencing hearing, the Petitioner has not established that this affected the outcome of the trial or that a different result would have been reached absent the information. When questioned at the post-conviction hearing, General Crabtree was unable to recall what, if any, of the information he learned for the first time by reading the report, rather than it being information he was already in possession of from other sources. The Petitioner has simply failed to put forth any evidence which preponderates against the findings of the post-conviction court.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *153-56.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**4. Ground One D: The TCCA correctly determined that the Petitioner waived her claim that trial counsel were ineffective in failing to present certain penalty phase arguments to the jury; accordingly, this ground is procedurally defaulted.**

In considering the claims presented in Ground One D, the TCCA stated the following:

> Next, the Petitioner contends that trial counsels' penalty phase arguments highlighted and compounded counsels' poor preparation. With regard to the opening statement, the Petitioner asserts that lead counsel failed to highlight the Petitioner's age at the time of the crime and that counsel neglected to explain that the Petitioner had acted in concert with two violent gang members who shared significant culpability for the crime. Moreover, he failed to discuss any of the evidence discovered by Drs. Engum and McCoy or to even mention the Petitioner's mental illness or history of abuse and neglect. With regard to the co-counsel's penalty phase closing argument, the Petitioner contends that she, likewise, was "equally fault worthy" because she failed to allude to any of the mitigation themes of mental illness, lack of significant prior criminal activity, that the murder was committed under extreme mental or emotional disturbance, or the Petitioner's youth at the time. The State contends that this issue is being raised for the first time on appeal and is, therefore, waived.
>
> Like the State, we can find nothing in the record to support that these arguments have been previously presented as the argument was not raised in either the Petitioner's post-conviction petition or argued before the post-conviction court. While some questions were asked of lead counsel and co-counsel with regard to their strategy and thinking during closing, no argument was made before the post-conviction court. Moreover, we can find nowhere in the post-conviction court's order of denial addressing the issue. As such, we must agree with the State that these claims are waived for the purposes of appellate review. *See* T.C.A. § 40-30-106(g) (a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"; *see also Workman v. State*, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993).

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *156-57.

The TCCA is correct that the Petitioner failed to present this claim to the post-conviction court. (R.19-2 at 133-157, Consolidated PC Petition, Page ID # 4057-81); (R.9-3 at 3-25, Consolidated PC Petition, Page ID # 4084-106). The Petitioner raised the claim for the first time on post-conviction appeal, and the TCCA held that she had waived the issue based upon her failure to raise it at her post-conviction hearing, citing Tenn. Code Ann. § 40-30-106(g). In Tennessee, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g). Waiver supplies an adequate and independent state law ground which will bar habeas review, unless a petitioner demonstrates cause and prejudice. *Cone v. Bell*, 492 F.3d 743, 758 (2007). Here, the Petitioner has not shown cause and prejudice to excuse her procedural default in state court.

### 5. Grounds One E and Five: The TCCA correctly determined that trial counsel did not fail to conduct a meaningful *voir dire* of jurors, and that the trial court did not err in dismissing a certain juror for cause.

In considering the claims presented in Ground One E and Ground Five, the TCCA stated the following:

> The Petitioner next contends that trial counsel was ineffective in failing to conduct meaningful voir dire. Specifically, she contends that counsel was ineffective for failing to object to the striking of a juror who indicated that he could not return a death sentence solely based on the Petitioner's age at the time of trial. The Petitioner also argues that counsel was ineffective for failing to adequately voir dire prospective jurors regarding racial biases or "fears or prejudices involving Satanism."
>
> The United States Supreme Court has examined the issue of capital juror selection in great detail and has refined it through several opinions. Tennessee courts have followed the Supreme Court's analysis. *See State v. Alley*, 776 S.W.2d 506, 518 (Tenn. 1989), cert. denied, 493 U.S. 1036, 110 S. Ct. 758, 107 L. Ed. 2d 775 (1989). The issue was first discussed at length in *Witherspoon v.*

*Illinois*, 391 U.S 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). At the time of trial in *Witherspoon*, Illinois juries had complete discretion as to when to impose the death penalty, and the jury assessed punishment at the same time it rendered its verdict as to guilt. *Adams v. Texas*, 448 U.S. 38, 43-44, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980). By statute, Illinois allowed unlimited challenges for cause by the State to any juror who stated that he had conscientious scruples against capital punishment or that he was opposed to capital punishment. *Witherspoon*, 391 U.S. at 513. In the trial at issue in *Witherspoon*, forty-seven members of the venire were successfully challenged for cause under the statute. *Id*. at 514. The court held that the selection process violated the defendant's Sixth Amendment right to a fair and impartial jury because the jury eventually selected was not representative of the community. *Id*. at 518. The Court found that much of the constitutional harm occurred because many of the jurors were excluded without knowing whether they could put their beliefs aside and still follow the law. *Id*. at 519-20. The Court held that by its statute providing for such challenges, Illinois had crossed the line of neutrality; the State could not entrust the determination of whether a man should live or die to a "tribunal organized to determine a verdict of death." *Id*. at 521.

Later, the Court in *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), clarified some of the confusion that had arisen from *Witherspoon* and some of its other prior decisions on the matter. *Wainwright* involved a Florida capital case where one juror expressed personal opposition to the death penalty and further stated that she felt her view would influence her decision on guilt or innocence. That juror had been dismissed for cause on the basis of *Witherspoon*. The United State Supreme Court reversed the Eleventh Circuit, finding that the juror had been properly dismissed for cause. *Id*. In correcting some of the misapprehensions of the Eleventh Circuit, the Court lamented that, despite *Witherspoon*'s limited holding, courts had applied it too broadly. *Id*. at 420-21.

The Court explained that *Witherspoon* had to be understood within the context of the issues presented. Much had changed in the field of capital litigation since the time of *Witherspoon*. Juries no longer had unlimited discretion in imposing capital punishment. Furthermore, *Witherspoon* dealt with circumstances under which jurors could not be excluded, but did not explain when jurors could properly be excluded. *Id*. at 422. The Court explained that *Witherspoon* had to be understood in accordance with the traditional reasons for excluding jurors. As Justice Rehnquist noted, there is nothing talismanic about juror exclusions under *Witherspoon* merely because it involves capital sentencing juries. *Id*. at 423. *Witherspoon* was not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment's right to a fair and impartial jury. Id. The key to the analysis is not what a juror believes about the death penalty, but whether, because of those beliefs, a potential juror lacks impartiality. *Id*. at 423-24. Based on this understanding of its prior opinions, the Court announced that the standards for determining whether a juror could be

properly excluded was whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Id*. at 424.

The *Wainwright* standard does not require that a juror's bias be proven with "unmistakable clarity" because determinations of juror bias cannot be reduced to question and answer sessions that obtain results in the manner of a catechism. *Id*. Accordingly, the parties attempting to select the jury, as well as the trial judge, must be intently attuned to the jurors' responses to determine potential bias. As the *Wainwright* court noted, even when the printed record may not be particularly clear, there will be situations where the trial judge is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law. *Id*. at 425-26. For that reason, the Supreme Court demanded that deference be paid to the trial judge who sees and hears the potential jurors. *Id*. at 426. Thereafter, in *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), the Court reiterated the standard: "[I]t is clear from Witt and Adams, the progeny of Witherspoon, that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."

Applying these standards to the facts of this case, we must conclude that the trial court was acting entirely within its discretion when removing Prospective juror Mr. Rutherford for cause. The following exchange occurred on the record:

> Trial Court: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I need you to tell me how you feel.
>
> Mr. Rutherford: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.
>
> . . .
>
> General Crabtree: . . . And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.
>
> Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?
>
> Mr. Rutherford: I have problems just because of the death penalty.
>
> General Crabtree: That's what we are talking about. I'm not talking about anything else now. I'm talking about the death penalty. Are you saying because of this individual's age you could

> not return a death penalty?
>
> Mr. Rutherford: I, I don't think I could.
>
> General Crabtree: . . . So let's see if we can make it clear — as far as her, the sole factor of her age, that would be something that you could not do?
>
> Mr. Rutherford: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem - -
>
> General Crabtree: I understand you are saying that because of her age that one factor would keep you from returning the death penalty, is that correct?
>
> Mr. Rutherford: I think so.

The Petitioner argues that this colloquy indicates only that "Mr. Rutherford made clear that he could consider the death penalty for a mature defendant, but that he had reservations in light of [the Petitioner's] youth." We disagree with the Petitioner's analysis and her reliance on the statement made in *Morgan v. Illinois*. As previously stated, the Supreme Court in Morgan stated that "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan v. Illinois*, 504 U.S. at 728 (emphasis added). According to the Petitioner, that statement stands for the proposition that if a potential juror could possibly impose the death penalty in some case, just not the instant case, then he should not be stricken for cause an impartial juror. We clearly disagree with that interpretation entirely and conclude that the statement should only be taken as a reiteration of the standard previously stated in *Wainwright* and *Adams* that a potential juror must have impartiality in the case he or she is presently involved with.

A reading of the colloquy which occurred with Mr. Rutherford made clear that he could not impose the death penalty under any circumstances because of the Petitioner's age in this case. As such, the statements made by Mr. Rutherford indicate that his views would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and his oath. As such, we agree that he was appropriately struck for cause, and no objection by trial counsel was warranted. While we do agree that the statements do not necessarily indicate an unconditional bias against capital punishment entirely, as noted, that is not the required standard.

The Petitioner also challenges Mr. Rutherford being struck for cause on grounds that a "juror is entitled to find that any one mitigating factor outweighs all aggravating evidence, and thus a juror could not have been disqualified" for

> stating he could not apply the death penalty because of age, i.e. the mitigating factor at issue. We agree with the State that this argument does not comport with the rationale in *Wainwright* that the focus of voir dire is to determine potential bias. Mr. Rutherford's remarks again clearly indicate that he was giving a definitive refusal in this case to impose the death penalty.
>
> With regard to voir dire, the Petitioner further asserts that trial counsel were ineffective because they failed to tell the jury that the Petitioner's youth was a statutory mitigating factor; discuss and question the prospective jurors on the mitigation themes of mental illness, psychology, and mental health experts; and failed to question the prospective jurors with regard to their beliefs on interracial dating and Satanism. The Petitioner also contests counsels' failure to question the pool to ascertain their knowledge of the lead counsel's overbilling problem. However, we again must agree with the State, that the Petitioner has failed to put forth any evidence to show that any prospective juror harbored any bias or prejudice on these grounds or that anyone was improperly excluded in this regard. As such, the Petitioner has simply failed to meet her burden of establishing ineffective assistance of counsel for the aforementioned lack of discussion during voir dire. As noted by the post-conviction court:
>
> > The length and scope of voir dire is an individual decision made by counsel on a case by case basis. The attorneys voiced no dissatisfaction with the jury ultimately selected. Petitioner also failed any proof that any particular juror was . . . not qualified.
>
> The Petitioner has failed to put forth evidence which preponderates against the findings of the post-conviction court.

*Pike,* 2011 Tenn. Crim. App. LEXIS 285, at *157-66.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**B. Ground Two and Six: The TCCA correctly determined that the Petitioner was not deprived of the right to unconflicted counsel.**

In Ground Two, the Petitioner claims that she was deprived of the right to unconflicted counsel because: (A) the State was investigating lead counsel for overbilling (R.19 at 90-94, Petition, Page ID # 9684-88); and (B) trial counsel procured media rights to the Petitioner's story

(R.19 at 94-96, Petition, Page ID # 9688-90). In an extension of Ground Two A, the Petitioner also claims, as Ground Six, that the TCCA failed to address her argument that trial counsel's alleged overbilling conflict constituted structural error. (R.19 at 109-10, Petition, Page ID # 9703-04).

**1. Grounds Two A and Six: The TCCA correctly determined that lead counsel was not conflicted by the State's investigation into his billing practices.**

The TCCA stated the following in rejecting this claim:

> The Petitioner's first contention of a conflict is based upon the Comptroller's investigation into lead counsel's prior billings to the indigent defense fund. There is no dispute in the facts that lead counsel was investigated for overbilling the Indigent Defense Fund and repaid more than $60,000 to the fund. Nor is it disputed that lead counsel self-reported to the Board of Professional Responsibility and that the claim remained unresolved at the time of trial. Eventually, as a result, the Tennessee Supreme Court suspended lead counsel's license for eleven months, twenty-nine days. The sanction, however, was not entered until November 24, 1998, one day after the supreme court affirmed the Petitioner's conviction and sentence. Neither lead counsel nor any other attorney involved in the fraudulent billing was prosecuted criminally for their actions.
>
> The Petitioner's claim on appeal, although somewhat unclear, appears to be that lead counsel was conflicted between his representation of the Petitioner and his own fear of being prosecuted by the State. The argument centers around the in-camera meeting in which lead counsel turned over Dr. McCoy's report and, at least according to the testimony of Dr. McCoy, later asked her to lie about when the report was delivered to him because the State was "furious" at receiving the materials at the late date. The Petitioner contends this resulted in lead counsel not calling Dr. McCoy, the key mitigation witness, allegedly because of his own fear of angering the court or the State. The Petitioner also contends that any testimony by lead counsel regarding other possible reasons as to why Dr. McCoy was not called was not credible and not supported by the testimony of other witnesses. The Petitioner asserts that "given this understanding of the facts, [lead counsel's] penalty phase decisions must be considered as products of a conflict of interest."
>
> A conflict of interest does not, in and of itself, constitute ineffective assistance of counsel. In order to establish a violation of the Sixth Amendment, a [petitioner] who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) (holding

that the mere possibility of a conflict of interest is not enough to establish ineffective assistance of counsel where the defendant raised no objection to multiple representation at trial.) However, unless the petitioner establishes that counsel was burdened by an actual conflict of interest, he must prove both deficient performance and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Prejudice is presumed only if the petitioner demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350. Until a petitioner shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim. *Id*.

Where an attorney is placed in a position of divided loyalties between himself and his client, an actual conflict is created. *State v. Culbreath*, 30 S.W.3d 309. 315 (Tenn. 2000). Among the class of potentially conflicting interests are the personal interests of defense counsel. *McCullough v. State*, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003). Yet another recognized conflicting interest is preoccupation with fear of instigating prosecution for one's own misdeeds. *U.S. v. Montana*, 199 F.3d 947, 949 (7th Cir. 1992).

First, as an aside, the Petitioner contends that the post-conviction court erred in finding the conflict claims waived. The court found that "[lead counsel] testified that he had informed [the Petitioner] of the issue and that she actually liked him more because of it. No issue was raised either pretrial or at trial." As such, the court found the issue waived but, nonetheless, ruled on the issue and found it to be without merit. Likewise, we also elect to review the issue, so it is not necessary to rule on the issue of waiver.

In denying relief on this claim, the post-conviction court found that the proof did not establish an actual conflict of interest which adversely affected lead counsel's performance. The court entered multiple findings of fact, upon which it based this conclusion. Prior to the lead counsel's appointment to the Petitioner's case, the trial court inquired into the status of the investigation and discovered that the reimbursement had been paid in full. The actual investigation had concluded prior to lead counsel's appointment as the Petitioner's attorney. Lead counsel had been appointed by the Tennessee Supreme Court in another matter in March 1995, two months prior to his appointment in this case. Lead counsel remained a licensed attorney, in good standing, throughout the entire investigation. Lead counsel stated that he had deemed the matter concluded prior to his appointment in the Petitioner's case. Lead counsel further testified that he informed the Petitioner of the investigation and that she "seemed to like him more because of it."

The Petitioner has failed to provide any proof which preponderates against these findings. *See Henley v. State*, 960 S.W.2d at 579. The record simply fails to offer anything more than supposition that the overbilling issue affected lead

counsel's representation of the Petitioner. All the evidence presented appears to support lead counsel's own testimony that the investigation was concluded and the matter settled prior to his appointment in this case. Lead counsel consistently testified that he considered the matter concluded prior to appointment in the case and that he never spoke with anyone in the district attorney's office regarding the matter. He further indicated that he never would have settled the matter civilly if there were potential criminal charges pending.

> Moreover, the assertion that fear of prosecution led lead counsel to lie to the court at the in-camera meeting and then deciding not to call Dr. McCoy is mere supposition as the allegations rest on speculation and disputed testimony. Each witness who was present at the in-camera hearing testified that they were unable to recall what occurred in that meeting. Lead counsel testified that he had never asked Dr. McCoy to lie, and the court accredited this testimony. As noted, questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court. *Henley*, 960 S.W.2d st 579. This court does not reweigh such determinations. Lead counsel, along with co-counsel, testified that there were multiple reasons as to why the decision was made to not use Dr. McCoy as a witness, the primary one being that she could not corroborate the testimony of Dr. Engum. The post-conviction court also noted that the record did not support Dr. McCoy's testimony based upon a statement made on the record following the in-camera meeting in which lead counsel stated he had received the documentation from Dr. McCoy "earlier this week," not the day prior as Dr. McCoy indicated lead counsel wanted her to say.

> The Petitioner offers only speculation as the reason for "counsel's penalty phase collapse." This speculation as to what might have been the reason for the decisions made is not sufficient meet her burden of establishing that a conflict existed.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *127-33.

In Ground Six, the Petitioner presents as a separate claim the proposition that the TCCA failed to address her contention that lead counsel's situation presented an actual conflict of interest requiring no showing of prejudice. *See Cuyler v. Sullivan*, 446 U.S. 335 at 348-49 (1980). The Petitioner argues that the TCCA instead "found that no conflict of interest existed because of the alleged failure to show prejudicial impact." (R.19 at 110, Petition, Page ID # 9704). This is incorrect. The TCCA acknowledged that prejudice is presumed in the event of an actual conflict of interest. *Pike,* 2011 Tenn. Crim. App. LEXIS 285, at *130-31. Although the

first sentence of its factual analysis perhaps could have been more artfully drafted ("the post-conviction court found that the proof did not establish an actual conflict of interest which adversely affected lead counsel's performance"), the remainder of the TCCA's discussion makes clear its conclusion that no actual conflict of interest existed. *Id*. at 131. Among other things, it credited the post-conviction court's findings that lead counsel had reimbursed the indigent defense fund in full and considered the matter concluded before being appointed to represent the Petitioner. *Id*. The TCCA reasonably addressed both the legal and factual aspects of the Petitioner's claim of structural error.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**2. Ground Two B: The TCCA correctly determined that trial counsel were not conflicted by the procurement of media rights.**

The TCCA stated the following in rejecting this claim:

> Next, the Petitioner asserts that a conflict of interest existed based upon a release of media rights from the Petitioner to lead counsel and co-counsel regarding the Petitioner's story. It is not disputed that lead counsel spoke with the Petitioner's aunt, Carrie Ross, about authoring a book with her about the Petitioner's life and criminal prosecution. Moreover, on May 1, 1996, after the Petitioner was found guilty and sentenced to death but prior to direct appeal, she signed a release giving the attorneys permission to retell her story. The release was "limited to information which is public information, e.g., evidence at trial and in my court file, and their own personal experiences while working on [the Petitioner's] behalf." The release further acknowledged that the attorneys may "eventually gain a pecuniary benefit from the retelling on [the Petitioner's] story."
>
> Rule 1.8(a) of the Tennessee Rules of Professional Conduct, dictates that "[a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client" unless there is full disclosure, the client is given the opportunity to seek independent counsel, and the agreement is in writing and signed. Tenn. Sup. Ct.

R. 8, RPC 1.8(d). Generally, an agreement by which a lawyer acquires literary or media rights concerning the conduct of the representation creates a conflict of interest between the attorney and the client. (emphasis added). *See Id*. If such conflict is proven, it is still necessary "for [the] petitioner to establish that the conflict of interest adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. at 174.

On appeal, the Petitioner contends that "[lead counsel]'s discussions with Ms. Ross make evident his interest in profiting from [the Petitioner's] story from the earliest stages of his representation of [the Petitioner]. Because counsel handled [the Petitioner's] direct appeal, counsel's conduct in obtaining a waiver also occurred in the course of [the Petitioner's] trial. This conduct also casts a shadow backwards across [the Petitioner's] trial, suggesting that defense counsel were motivated by monetary gain throughout." The Petitioner further contends that because she established a conflict, the required showing again is adverse effect rather than prejudice. Finally, she asserts that the adverse effect is shown by the Petitioner's failure to seek a continuance when effective representation of the Petitioner mandated delay for two reasons. According to the Petitioner, trial counsel's failure to seek a continuance is consistent with their pecuniary interest in selling the story, which was generating a great deal of media attention at the time. Although contending that a showing of prejudice is not required, "the evidence of prejudice is immediately apparent; failure to gain a continuance resulted in poor preparation that undermined [the Petitioner's] defense in totality."

The State counters that trial counsel did not enter into such an agreement with the Petitioner prior to or during trial. The State acknowledges that lead counsel did, in fact, have a discussion with Ms. Ross regarding the writing of the Petitioner's story; however, Ms. Ross had no legal rights to the Petitioner's story. The State contends, and the post-conviction court found, that there is no evidence to indicate that trial counsels entered into any agreement with the Petitioner prior to or during the trial. The State further asserts that as the only release at issue in this case was signed by the Petitioner after she was found guilty and sentenced, although prior to the direct appeal, "it is irrational to suggest that the [Petitioner] was adversely affected by the conduct of the attorneys during trial as a result of this post-trial agreement." We agree with the State.

The Petitioner did not put on any evidence which preponderates against the post-conviction court's findings. A mere discussion of a book, which even Ms. Rose was somewhat unclear on the timing of, is not sufficient to establish the existence of a conflict of interest. As noted by the State, at the time the waiver was signed by the Petitioner, which is the only firm indication that trial counsel was considering pursuing a book deal, which as an aside never occurred, the trial and sentencing phases were completed. The Petitioner may not now rely on something which occurred after the trial to establish a conflict which affected counsel's performance during the trial.

> Though not specifically asserted by the Petitioner, with regard to counsel's representation of the Petitioner on appeal, we conclude that a possible conflict existed, as counsel continued the representation on direct appeal. However, contrary to the Petitioner's assertions, we conclude that a showing of prejudice is required in this case to establish ineffective assistance of counsel. Moreover, as did the post-conviction court, we conclude that no prejudice has been shown. Ms. Ross testified that the only reason presented to her for the book was so that others could see a different side of the Petitioner. Both attorneys denied any hopes of pecuniary gain. Co-counsel indicated that they had discussed doing a publication for a seminar on death penalty cases. Moreover, there is no indication from any party that anything was ever done to further the actual goal. After review, we conclude that the Petitioner has failed to show even adverse affect from these actions, let alone prejudice.

*Pike,* 2011 Tenn. Crim. App. LEXIS 285, at *133-38.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**C. Ground Three: The TCCA correctly determined that trial counsel were not ineffective for failing to present evidence that the Petitioner lacked the mens rea required for first degree murder.**

In Ground Three, the Petitioner contends that trial counsel were ineffective in failing to present evidence that her murder of the victim was neither premeditated or deliberate. (R.19 at 97-100, Petition, Page ID # 9691-94). The TCCA stated the following in rejecting this claim:

> The Petitioner initially contends that the "killing of Ms. Slemmer was neither deliberate or premeditated. As [the Petitioner] proved on post-conviction, . . . the facts establish that [the Petitioner] participated in Ms. Slemmer's killing in the midst of a hypomanic, psychotic break." The Petitioner asserts that counsel "failed to present an effective case to undermine the State's proof of deliberate and premeditated murder" The Petitioner contends that counsel failed to make appropriate use of expert witnesses and failed to discover relevant lay witness testimony, "the same fundamental errors that plagued [her] representation in the penalty phase."
>
> Specifically, the Petitioner contends that trial counsel presented "scant expert testimony with regard to [her] mental state surrounding the killing of Ms.

Slemmer." The only expert proof presented was that of Dr. Engum, who testified that "she basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, Borderline Personality Disorder, which meant that she basically went out of control." The Petitioner asserts that Dr. Engum's testimony was "sufficiently on point," but was "insufficiently substantiated," as it was dependent solely upon self-reports of the Petitioner. The State, therefore, was able to diminish the weight of Dr. Engum's testimony considerably on cross-examination by pointing out that the factual basis for his opinion was limited to statements made by the Petitioner herself.

The Petitioner also asserts that had trial counsel introduced the testimony of lay witnesses to substantiate Dr. Engum's conclusion, Dr. Engum's opinion would have carried more weight. Additionally, the Petitioner argues that trial counsel was ineffective for presenting the testimony of Dr. Bernet. Dr. Bernet was called on to testify that Ms. Slemmer's killing was not a satanic ritual, but, rather, was consistent with a phenomenon called "collective aggression." The Petitioner asserts that Dr. Bernet's testimony offered no apparent benefit to the defense and was highly prejudicial in that it opened the door to a lengthy discussion of Satanism and the various details of the killing that bore satanic overtones.

Citing to no legal authority, the Petitioner has made the above contentions. Like the State and post-conviction court, we must conclude that she has failed to carry her burden of establishing her entitlement to relief. The Petitioner's main complaint with Dr. Engum's testimony, which she concedes was "sufficiently on point," was that it was not substantiated by lay witness testimony, which the Petitioner contends would have given it more weight before a jury. This is mere supposition. The Petitioner argues that lay witnesses interviewed by Dr. McCoy, as well as others, could have testified that the Petitioner had lost complete control in the past, nearly killing a man before she was held back. The Petitioner also asserts lay witnesses could have testified that the Petitioner was incapable of calming down on her own. Initially, we are somewhat unclear as to how these statements would have bolstered her defense, but, regardless, this argument is not sufficient to substantiate a claim for post-conviction relief. The Petitioner has failed to argue how any specific lay witness would have sufficiently substantiated the testimony in order to improve its weight before the jury, as much of the information was introduced through Dr. Engum. Absent such a showing, prejudice is not established.

We must also reject the Petitioner's complaint that calling Dr. Bernet to the stand was "a wasted opportunity." Both lead counsel and Dr. McCoy stated that Dr. Bernet was not part of the defense team and was utilized in the case for one specific purpose. As previously noted, neither of the experts who were employed by the defense team recommended that another expert be retained. As such, we have previously concluded that trial counsel was not deficient for not having Dr. Bernet examine the Petitioner.

*Pike,* 2011 Tenn. Crim. App. LEXIS 285, at *170-73.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**D. Ground Four: The TCCA correctly held that execution of the Petitioner does not violate the Eighth Amendment to the United States Constitution.**

In Ground Four, the Petitioner contends that her execution would violate the Eighth Amendment. (R.19 at 101-05, Petition, Page ID # 9695-99). The TCCA stated the following in rejecting this claim:

> The Petitioner asserts that, under the constitutional understanding of the requirements for a categorical bar to execution established by *Atkins v. Virginia* and *Roper v. Simmons*, an immature, mentally ill, brain damaged eighteen-year-old is not eligible for the death penalty. The Petitioner's support of her argument relies upon the general consensus that the death penalty must be reserved for "the worst of the worst." *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006) (Souter, J., dissenting) (citation omitted).
>
> "Death is different." The penalty of death is qualitatively different from every other sentence, however long. *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). Because of the qualitative difference, there exists the corresponding need in capital cases for reliability in the determination that death is the appropriate punishment in a specific case. *Id*. at 305. In *Furman v. Georgia*, Justice Stewart expressed what has come to be the longstanding view of the United States Supreme Court:
>
>> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejections of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
>
> *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (Stewart, J., concurring). Justice Stewart concluded that "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly

imposed." *Id*.

The "death is different" principle led to the Court's cases condemning the mandatory imposition of the death penalty. *See, e.g.*, *Roberts v. Louisiana*, 431 U.S. 633, 97 S. Ct. 1993, 52 L. Ed. 2d 637 (1977) (per curiam); *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion). The "death is different" principle also led to the recognition that the arbitrary imposition of the death penalty violates the Eighth Amendment. *See, e.g.*, *Zant v. Stephens*, 462 U.S. 862, 874, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). The "death is different" principle established the guarantee of full consideration of mitigating evidence. *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586 , 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (plurality opinion). *Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. That is, the sentence imposed "should reflect a reasoned moral response to the [petitioner's] background, character, and crime rather than mere sympathy or emotion." *California v. Brown*, 479 U.S. 538, 545-46, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring).

The "death is different" principle also led the Court to carve out exemptions from eligibility for capital punishment. In this regard, a national consensus may develop which holds that an immutable characteristic of the defendant so affects his individual responsibility and moral guilt that it precludes finding his "consciousness [is] materially more 'depraved' than that of any person guilty of murder," as is required for capital punishment to be lawful. *See Godfrey v. Georgia*, 446 U.S. 420, 433, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). A group of offenders may be excluded from capital punishment under the Eighth Amendment only if a national consensus barring the execution of such offenders exists. The United States Supreme Court set out four indicia to consider in determining the existence of such a consensus: (1) legislation enacted by the country's legislatures, including whether there is a pattern of movement towards precluding the execution of members of a particular group; (2) the decisions of sentencing juries, appellate courts, and governors about whether to execute defendants in that group; (3) where appropriate, other indicia of national and international opinion; and (4) the court's own judgment. *See Roper v. Simmons*, 543 U.S. 543 U.S. 551, 563-65, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). The United States Supreme Court has carved out exempted classes of persons from execution. *See*, *e.g.*, *Roper*, 543 U.S. at 551 (2005) (execution of prisoners who were under eighteen years of age at time of crime barred by Eighth Amendment); *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (execution of mentally retarded persons unconstitutional); *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986) (Eighth Amendment prohibits execution of insane persons). Because the "national consensus" is temporally situated, the list of exempted classes is not stagnant and must be revisited under standards that currently prevail.



Case 1:12-cv-00035-HSM-SKL Document 23 Filed 12/28/12 Page 73 of 90
PageID #: 10378

The Petitioner now asks this Court to "carve out" another excepted class of persons exempted from the death penalty, i.e., immature, mentally ill, brain damaged eighteen-year-olds. In support of her position, the Petitioner cites language in both opinions of the United States Supreme Court and the Tennessee Supreme Court to conclude that "only categorical exception to the death penalty can insure the protection against cruel and unusual punishment for certain groups of less culpable individuals." Appellant's brief at 113 (citing *Roper*, 543 U.S. at 572-73 (noting the shortcomings of mitigation evidence in circumstances of adolescent defendants); *Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001) ("jury's consideration of mental retardation as a mitigating factor is by itself insufficient to address the concerns protected under the Eighth Amendment or article I, § 16.")). The Petitioner further asserts that "[a]dolescents lack sufficient cognitive capacities to achieve the requisite degree of culpability for imposition of the death penalty." The Petitioner states that "[eighteen] is an arbitrary number." In support of her assertion, the Petitioner relies upon evidence that development of the frontal lobe of the brain continues into the early twenties.

The State responds that the Petitioner's issue is waived as a result of the failure to raise the issue on direct appeal. Alternatively, the State asserts that the arguments are without merit. The State contends that the United States Supreme Court rejected her argument that "execution of older adolescents must be categorically barred." The State further avers that, to the extent that the Petitioner asserts that she is incompetent to be executed, the claim is not yet ripe.

A. Execution of Older Adolescents

The Petitioner argues that "[t]here is . . . a significant portion of individuals who lack the requisite brain development to be fully culpable for their crimes, and yet currently fall outside of the absolute bar to execution imposed by Tennessee and federal law." She maintains that "[t]hese older adolescents may have brains that are developmentally identical to or even less developed than individuals who are shielded because of a difference in birth date of a few years, months, or even days."

The Petitioner asserts that Tennessee has long recognized the special status of young people with regard to the death penalty. Specifically, the Petitioner cites to Tennessee's recognition of youth as a statutory mitigating factor, Tennessee Code Annotated section 39- 13-204(j)(7), and to Tennessee's statutory exemption of the death penalty to persons under the age of eighteen, Tennessee Code Annotated section 37-1-134(a)(1). Additionally, the Petitioner makes the following statements:

> • Tennessee has not executed anyone who was younger than twenty-three at the time of the offense (Coe, age 23; Alley, age 29; Workman, age 28; Holton, age 36; and Henley, age 31).

• Only 7.7 % of Tennessee's present death-sentenced inmates were nineteen or under at the time of the crime.

• Twenty-nine of thirty-seven states with the death penalty made youth a statutory mitigating factor by 1989.

• In *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988), the United States Supreme Court concluded that it would violate the Eighth Amendment to execute an offender under the age of sixteen at the time of the offense.

• Capital Juror Project's South Carolina jury study suggests that jurors consider the youthfulness of a capital defendant to be "significantly mitigating." Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Colum. L. Rev. 1538, 1564 (1988).

• Science suggests that individuals lack the brain capacity of full culpability until they are in their early 20s.

In March 2005, the United States Supreme Court ruled that the death penalty for those who had committed their crimes at under eighteen years of age was cruel and unusual punishment and, hence, barred by the United States Constitution. *See Roper v. Simmons,* 543 U.S. at 551. Prior to this 2005 decision, the nation's highest court had previously determined that "our standards of decency do not permit the execution of any offender under the age of [sixteen] at the time of the crime." *Id*. at 561 (citing *Thompson*, 487 U.S. at 815 (1988)). In *Thompson*, the Court stressed that "[t]he reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." *Id*. at 835.

In 1989, the nation's highest court again addressed the issue of the execution of minors. In *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989), the Court referred to contemporary standards of decency in this country and concluded that the Eighth and Fourteenth Amendments did not proscribe the execution of juvenile offenders over fifteen but under eighteen. In so holding, the Court noted that twenty-two of the thirty-seven death penalty states permitted the death penalty for sixteen-year-old offenders, and, among these thirty-seven states, twenty-five permitted it for seventeen-year-old offenders. The Court concluded that there was no national consensus "sufficient to label a particular punishment cruel and unusual." *Id*. at 370-71.

At the time the Supreme Court was again presented with the issue of whether juveniles are exempt from the death penalty, thirty states had prohibited

the juvenile death penalty, comprised of twelve that have rejected the death penalty altogether and eighteen that maintained it but, by express provision or judicial interpretation, excluded juveniles from its reach. *Roper*, 543 U.S. at 564. The Court further acknowledged the declining use of the death penalty from crimes committed by juveniles. *Id*. at 565. The Court held that "[a] majority of States have rejected the imposition of the death penalty on juvenile offenders under [eighteen], and we now hold this is required by the Eighth Amendment." Id. at 567. In so holding, the Court recognized:

> Three general differences between juveniles under [eighteen] and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to conform, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." . . . It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior." . . . In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under [eighteen] years of age from voting, serving on juries, or marrying without parental consent. . . .
>
> The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. Eddings, . . . at 115 . . . ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."). This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. . . .
>
> The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. . . .

*Roper*, 543 U.S. at 570 (internal citations omitted). The Court concluded that these three differences "render suspect any conclusion that a juvenile falls among the worst offenders." *Id*. The Court further determines that "neither retribution nor deterrence provide[d] adequate justification for imposing the death penalty on juvenile offenders." *Id*.

Next, the Court was faced with the determination of where to draw the line regarding the age at which a person remains a juvenile. Essentially, the same question is posed to this Court today. In this regard, the *Roper* Court wrote:

> Drawing the line at [eighteen] years of age is subject . . . to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns [eighteen]. By the same token, some under [eighteen] have already attained a level of maturity some adults will never reach . . . . [H]owever, a line must be drawn. The plurality opinion in Thompson drew the line at [sixteen]. In the intervening years, the Thompson plurality's conclusion . . . has not been challenged. The logic of Thompson extends to those who are under [eighteen]. The age of [eighteen] is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

*Roper*, 543 U.S. at 574.

The Petitioner has failed to persuade this court that a new national consensus exists to extend the holding of *Roper* to persons over the age of [eighteen]. Furthermore, this court has not been able to discern that there is a national consensus to show that evolving standards of decency require a constitutional ban, under either the United States Constitution or the Constitution of the State of Tennessee, on executing persons who were between the ages of eighteen and the early twentys at the time of the offense. We decline to extend the holding of Roper to include such.

B. Execution of Mentally Ill

Both the federal courts and state courts have recognized that the mentally impaired require special protections in the capital arena. Mental illness may be raised to claim incompetency to stand trial and as an affirmative defense to guilt. Under *Ford v. Wainwright*, an individual must be mentally competent at the time of the execution. Moreover, the mentally retarded are systematically shielded from capital prosecution under *Atkins* and *Van Tran*. The Petitioner asserts that "[t]his patchwork provides incomplete protection for the cognitively impaired."

In *Atkins*, the Supreme Court found that mentally retarded individuals suffer significant disadvantages during legal proceedings, which increase their risk of wrongful execution. The Court found that mentally retarded defendants are more susceptible to situations generating false confessions, are unable to provide meaningful assistance to their counsel, have difficulty testifying on their own behalf, and create an unwarranted impression of lack of remorse for their crimes. The Petitioner asserts that the cognitively impaired exhibit the same disadvantages exhibited by the mentally retarded and that they are slipping through the cracks. The Petitioner makes the following statements in support of extending an exemption against the death penalty to persons with mental illness:

• Twelve U.S. states are abolitionist, and a thirteenth, New York, has a de facto moratorium on the death penalty. These states are not using the death penalty against anyone, let alone people with mental illness.

• Twenty-five of the thirty-seven death penalty states, as well as the federal government, have as statutory mitigating factors for consideration by capital juries at sentencing either of: (1) the defendant's capacity to appreciate the wrongfulness of his or her conduct or to conform that conduct to the requirements of the law was impaired; or (2) the defendant was acting under extreme mental or emotional disturbance.

• In at least five states — Arizona, Florida, Mississippi, Ohio and Nevada — a number of inmates suffering from mental illness have been removed from death row under proportionality review.

• Of the death penalty states which permit defendants to plead "guilty but mentally ill," only four have passed death sentences in GBMI cases.

• Two states have explicitly considered abolishing the death penalty for the severely mentally ill. Bills were presented in Illinois and North Carolina, but neither bill has been passed into law.

• Congress passed the Mentally Ill Offender Treatment and Crime Reduction Reauthorization and Improvement Act of 2008.

• The Capital Juror Project singled out a defendant's history of mental illness as the most powerful type of mitigation evidence after evidence of mental retardation.

• The ABA passed Resolution 122A rejecting capital punishment for the severely mentally ill and those with similar symptoms resulting from serious brain injury.

We do not dispute the concerns that deficiencies and limitations inherent in those who are mentally retarded may also be found in those who, while not mentally retarded, are considered mentally ill or cognitively impaired. The majority of states with capital statutes permit the jury to consider the [petitioner's] capacity to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of the law. However, there is no consensus in state legislation supporting a categorical exclusion for the mentally ill. In fact, federal and state courts have consistently declined to extend *Atkins* to the mentally

> ill. *See, e.g.*, *Joshua v. Adams*, 231 Fed. Appx. 592, 593 (9th Cir. 2007); In re: Neville, 440 F.3d 220, 221 (5th Cir. 2006); *Lawrence v. State*, 969 So.2d 294 (Fla. 2007); *State v. Ketterer*, 111 Ohio St. 3d 70, 2006 Ohio 5283, 855 N.E.2d 48 (Ohio 2006); *Matheney v. State*, 833 N.E.2d 454 (Ind. 2005). Accordingly, we decline to extend the *Atkins* bar to the death penalty to persons who are cognitively impaired or suffering from mental illness. Additionally, we acknowledge, as does the State, that should the Petitioner seek exemption from execution based upon a condition of insanity, such claim is not yet ripe for review.
>
> C. Execution of Older Adolescents Who Are Cognitively Impaired
>
> The Petitioner asserts that an exception to the death penalty should be created for older adolescents who suffer from mental illness. The Petitioner asserts that the combination of these factors rendered the Petitioner unable to control her emotions and actions due to mental illness and brain damage. While this court appreciates the unique circumstances of this Petitioner, this court declines to create a categorical bar to execution specifically for persons exhibiting these specific traits. Such factors are of the nature of those envisioned as mitigating factors. The Petitioner's request to create a categorical exemption is merely an attempt to gain a second chance at proportionality review. While this court appreciates the novelty of the Petitioner's argument, practicality precludes its acceptance. The court can envision a multitude of specifically created exemptions based upon the unique circumstances of an individual capital defendant. These particular circumstances were not what was envisioned as being encompassed within a categorical bar. Rather, this specific grouping of traits is captured within the individualized sentencing mandate of the capital sentencing scheme. This is the purpose of the weighing of the mitigating and aggravating circumstances by the jury and by proportionality review by the courts of this state. Accordingly, we decline to create a specifically carved out exception for older adolescents who are cognitively impaired. The Petitioner is not entitled to relief on this ground.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *175-91.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**E. Ground Seven: The TSC correctly held that the Petitioner's right to due process was not violated by the trial court's decision to allow television coverage of her pretrial proceedings.**

In Ground Seven, the Petitioner contends her due process rights were violated by television coverage of her pretrial proceedings. (R.19 at 110-12, Petition, Page ID # 9704-06). The TSC stated the following in rejecting this claim:

> The defendant next asserts that the trial court erred by refusing to grant her motion to deny television coverage of the pretrial proceedings in this case. She asserts that media coverage in this case made jury selection difficult, "arguably affected the witness testimony and was generally disruptive of the proceedings." While recognizing that this Court has promulgated a rule which permits media coverage, FN3 Pike nonetheless contends that "the record of jury selection demonstrates intense media coverage made it impossible to get a fair trial.
>
> FN3. Tennessee Supreme Court Rule 30.
>
> This Court in December of 1995, adopted Supreme Court Rule 30 as a one-year pilot project to govern media coverage of judicial proceedings in Tennessee. The experimental rule was effective from January 1, 1996, until December 31, 1996. During this experimental period, this Court solicited and considered comments both from members of the general public and from participants in judicial proceedings which had been covered by the media pursuant to the terms of Rule 30. After considering the comments and adopting appropriate amendments, on December 30, 1996, this Court entered an order making Rule 30 permanent. FN4.
>
> > FN4. "To ensure that Rule 30 continues to operate in a manner that is in the best interest of the public and compatible with the administration of justice," on August 31, 1998, this Court entered an order again soliciting comments from interested members of the public. The comments must be filed with the Appellate Court Clerk's Office in Nashville by December 29, 1998.
>
> Section (A)(1) of Rule 30 authorizes "media coverage of public judicial proceedings in the appellate and trial courts of this State . . . ." However, the media coverage is "subject, at all times, to the authority of the presiding judge to (i) control the conduct of the proceedings before the court; (ii) maintain decorum and prevent distractions; (iii) guarantee the safety of any party, witness, or juror; and (iv) ensure the fair and impartial administration of justice in the pending cause." Further, Section (D)(2) of Rule 30 specifically grants to the presiding judge at a judicial proceeding the discretion to "refuse, limit, terminate or temporarily suspend" media coverage of all or part of a case if necessary to accommodate any of these important interests.
>
> Although the defendant in this case contends that the media coverage

> "arguably affected the witness testimony and was generally disruptive of the proceedings," she does not cite to any specific portion of the record, nor offer specific reasons as to the ways in which the testimony was affected or the proceedings disrupted. Also, the defendant does not explain how media coverage of the crime would have been less intense had cameras been excluded from the courtroom during the proceedings. Although jury selection was lengthy, in part, due to the media coverage of the crime, there is no assertion, nor proof, that any particular juror was biased because of the media coverage. In addition, there is no indication from reading the transcript that the media coverage itself was disruptive or that any disruptive event occurred during the proceedings. Clearly, a presiding judge's decision to deny a motion to preclude or limit media coverage is not error in the absence of proof that media coverage will compromise one of the important interests set forth in Sections (A)(1) and (D)(2) of Rule 30. The defendant in this case presented no such proof. Therefore, the trial judge did not abuse her discretion under Rule 30 by denying the defendant's motion.
>
> Moreover, the defendant has failed to demonstrate that the media coverage of the pretrial and trial proceedings in this case impinged upon her right to a fair trial. In *State v. Harries*, 657 S.W.2d 414 (Tenn. 1983), the defendant alleged that the presence of cameras had deprived him of his right to a fair trial. In rejecting this claim, we first stated that Harries had agreed to the media coverage and could not object on appeal. However, we also stated that had a proper objection been interposed Harries' claim would have failed because he had not demonstrated either that the presence of cameras impaired the jurors' ability to decide the case on the evidence alone, or that the trial was adversely affected by the impact of the media coverage on one or more of the participants. *See also Chandler v. Florida*, 449 U.S. 560, 581-82, 101 S. Ct. 802, 813, 66 L. Ed. 2d 740 (1981).
>
> Likewise, the defendant in this case has failed to show either that media coverage of the pretrial and trial proceedings impaired the jurors' ability to decide the case on the evidence alone or adversely impacted one or more of the trial participants. To the contrary, the record is devoid of such proof. Accordingly, this issue is without merit.

*Pike*, 978 S.W.2d at 916-17.

Although the Petitioner argues that the TSC failed to "engage in a fact-specific analysis of the effect of the continuing media coverage in this case," it is clear above that the TSC simply viewed the Petitioner as failing to meet her burden of showing that the media coverage prejudiced her. (R.19 at 112, Petition, Page ID # 9706). Indeed, the instant petition discusses facts supporting the Petitioner's general claim that media coverage affected the jury, not the

specific claim that television coverage of pretrial proceedings did so. *Id*. The TSC's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

### F. Ground Eight: The TCCA correctly held that the Petitioner's right to a jury trial was not violated by the trial court's denial of her motion for a change of venue.

In Ground Eight, the Petitioner contends the trial court's denial of a motion for a change of venue violated her right to an impartial jury. (R.19 at 113-15, Petition, Page ID # 9707-09). The TCCA stated the following in rejecting this claim:

> The Defendant argues that the trial court erred by failing to grant her motion for a change of venue. She maintains that a majority of prospective jurors admitted that they had heard detailed information about the case. The Defendant cites the United States Supreme Court decision in *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), in support of the proposition that a change of venue should be granted if extensive pretrial publicity was such that the court should presume the jury is tainted even if prospective jurors stated that they would be able to set aside what they had seen or heard.
>
> However, in *Dowd*, jury selection lasted more than four weeks. Also the Supreme Court specifically stated that due to "swift, widespread and diverse methods of communication," it is not required that jurors be totally ignorant of the facts and issues involved. 366 U.S. at 722, 81 S. Ct. at 1642. The court also stated that "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 723, 81 S. Ct. at 1643. In *Dowd*, the panel consisted of 430 persons. The court itself excused 268 of those persons due to their fixed opinions of guilt, and 103 were excused because of their conscientious objection to the death penalty. 366 U.S. at 727, 81 S. Ct. at 1645. The voir dire record indicated that 370 of the prospective jurors entertained some opinion as to guilt, ranging from mere suspicion to absolute certainty. Of the twelve jurors selected, eight thought the Defendant was guilty. *Id*.
>
> In the present case, although many potential jurors had indicated that they had heard something about the case in the media, every juror who said he or she was familiar with the case said that he or she could disregard the reports and render an impartial decision. All potential jurors who said they could not

disregard the reports were excused for cause. The Defendant has cited no specific response from any seated juror that was troublesome.

*Pike*, 1997 Tenn. Crim. App. LEXIS 1186, at *30-32.

The TCCA correctly concluded that the Petitioner's case did not run afoul of *Dowd*. The Dowd court noted that "'[t]he affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside . . . . If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed.'" *Dowd*, 366 U.S. at 723 (quoting Lisenba v. California , 314 U.S. 219, 236 (1941)). Dowd prohibits the seating of jurors with a preconception of a defendant's guilt or innocence. Here, it was established in voir dire that each seated juror had formed no opinion about the ultimate issues in this case.

The TCCA correctly identified the controlling federal precedent. TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

### G. Ground Nine: The TCCA correctly held that the Petitioner's constitutional rights were not violated by the number of peremptory challenges afforded to the State.

In Ground Nine, the Petitioner contends that the State was afforded a constitutionally impermissible number of peremptory challenges. (R.19 at 115-17, Petition, Page ID # 9709-11). The TCCA stated the following in rejecting this claim:

> The Defendant contends that at the time of the offense, the rules in effect gave the Defendant fifteen (15) peremptory challenges compared to the State's eight. *See* Rule 24(d), Tenn. R. Crim. P. (1995). However, at the time of trial, the rules had been changed to give an equal number of peremptory challenges to both

the Defendant and the State. *See* Rule 24(d), Tenn. R. Crim. P. (1996). The Defendant argues that application of the new rule violated the ex post facto provision of the Tennessee Constitution which requires that rules not be applied to events which occurred prior to their enactment.

The term "ex post facto" as used in Article I, § 10, cl. 1, of the U.S. Constitution, provides that "no state shall … pass any … ex post facto law." The Tennessee Constitution's ex post facto prohibition found in Article I, § 11, provides:

> That laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made.

Two critical elements must be present for a law to fall within the prohibition. First, it "must be retrospective, that is, it must apply to events occurring before its enactment"; and second, "it must disadvantage the offender affected by it." *Miller v. Florida*, 482 U.S. 423, 430, 107 S. Ct. 2446, 2451, 96 L. Ed. 2d 351 (1987) (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 101 S. Ct. 960, 964, 67 L. Ed. 2d 17 (1981)); *State v. Ricci*, 914 S.W.2d 475, 480 (Tenn. 1996). Furthermore, Tennessee Code Annotated section 39-11-112 provides that:

> whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force an effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.

Yet, the United States Supreme Court has held that laws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute ex post facto laws. *State v. Bragan*, 920 S.W.2d 227, 241 (Tenn. Crim. App. 1995) (citations omitted). In *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977), the Supreme Court held that the prohibition of ex post facto laws does not extend to every change of law that "may work to the disadvantage of a defendant." Instead, it is intended to secure "substantive personal rights" from retroactive deprivation and does not "limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Id*. Thus laws which change rules of procedure but which do not affect any substantial right of a defendant are not ex post facto laws.

Here, it is apparent that the trial court applied a procedural rule that had

> been amended after the commission of the crimes in question. The Defendant also claims that the right to a fair and impartial jury was impaired by the increase in peremptory challenges for the State. However, the Defendant has not proffered any evidence that the jury, as it was composed by the State's using the additional peremptory challenges, prevented her from receiving a fair trial. Absent proof that the Defendant was disadvantaged or that a substantive right was impaired by the amended procedural rule, we cannot conclude that an ex post facto violation occurred. This issue is without merit.

*Pike*, 1997 Tenn. Crim. App. LEXIS 1186, at *37-39.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

### H. Ground Ten: The TCCA correctly held that Tennessee's death penalty scheme is constitutional.

In Ground Ten, the Petitioner claims that the Tennessee death penalty scheme is unconstitutional because it: (A) fails to meaningfully narrow the class of death-eligible defendants (R.19 at 117-18, Petition, Page ID # 9711-12); (B) is imposed arbitrarily and capriciously (R.19 at 118-19, Petition, Page ID # 9712-13); (C) employs lethal injection, which the Petitioner claims constitutes cruel and unusual punishment (R.19 at 119, Petition, Page ID # 9713); (D) infringes on the Petitioner's fundamental right to life (R.19 at 120, Petition, Page ID # 9714); (E) its imposition in this case rested on an aggravator not included in the indictment (R.19 at 120, Petition, Page ID # 9714).

#### 1. Grounds Ten A and B:

On post-conviction appeal, these two claims were included within a more general claim challenging the constitutionality of Tennessee's death penalty statute. (Pet. PC Brief Bates No. 8987-88). That claim contained contended that Tennessee's death penalty statute is

unconstitutional because it allegedly fails to meaningfully narrow the class of death-eligible defendants, is imposed arbitrarily and capriciously, and is not subjected to meaningful proportionality review. The TCCA stated the following in rejecting this claim:

> The Petitioner asserts that Tennessee fails to ensure a meaningful proportionality review as required by state and federal law. Our supreme court has repeatedly upheld the comparative proportionality review undertaken by the appellate courts in this state as meeting state constitutional standards. *State v. Kiser*, 284 S.W.3d 227, 294 (Tenn. 2009); *State v. Vann*, 976 S.W.2d 93, 118 (Tenn.1998) (appendix); *State v. Keen*, 926 S.W.2d 727, 743-44 (Tenn.1994); *State v. Barber*, 753 S.W.2d 659, 663-68 (Tenn.1988); *State v. Coleman*, 619 S.W.2d 112, 115-16 (Tenn.1981).
>
> The Petitioner also contends that unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has also been rejected. *State v. Hines*, 919 S.W.2d 573, 582 (Tenn. 1995). The Petitioner contends that the unlimited discretion of the thirty-one elected District Attorneys General violates principles set out in *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000). This Court has previously considered and rejected this claim. *Tyrone Chalmers v. State*, No. W2006-00424-CCA-R3-PD, 2008 Tenn. Crim. App. LEXIS 464 (Tenn. Crim. App., at Jackson, June 25, 2008), perm. app. denied (Tenn. Dec. 22, 2008); *David Keen v. State*, No. W2004-02159-CCA-R3-PD, 2006 Tenn. Crim. App. LEXIS 442 (Tenn. Crim. App., at Jackson, June 5, 2006), perm. app. denied 2006 Tenn. LEXIS 1032 (Tenn. Oct. 30, 2006).

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *192-93.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**2. Ground Ten C: The TCCA correctly concluded that lethal injection is not a cruel and unusual punishment under the Eighth Amendment to the United States Constitution.**

The TCCA stated the following in rejecting this claim:

> The Tennessee Supreme Court has considered this claim and determined that Tennessee's lethal injection protocol is consistent with contemporary standards of decency and with the overwhelming majority of lethal injection

> protocols used by other states and the federal government. *Abdur' Rahman v. Bredesen*, 181 S.W.3d 292, 306-07 (Tenn. 2005). On April 16, 2008, the United States Supreme Court affirmed the use of the three-drug protocol used in Kentucky's lethal injection procedure. *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008). Tennessee uses the same protocol as Kentucky. Id. (citing *Workman v. Bredesen*, 486 F.3d 896, 902 (6th Cir. 2007)); *see also Harbison v. Little*, 571 F.3d 531 (6th Cir. 2009), cert. denied, U.S. , 130 S. Ct. 1689, 176 L. Ed. 2d 187 (2010). The Petitioner is not entitled to relief on this issue.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *193-94.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**4. Ground Ten D: The TCCA correctly held that the death penalty is not unconstitutionally infringe on a fundamental right to life.**

The TCCA stated the following in rejecting this claim:

> The Petitioner argues that the death sentence is unconstitutional because it infringes upon her fundamental right to life and because the death penalty is not necessary to promote any compelling Tennessee state interest. This complaint, that her death sentence must be reversed because it violates his fundamental right to life, is contrary to settled precedent as reflected in *Cauthern v. State*, 145 S.W.3d 571, 629 (Tenn. Crim. App. 2004) (citing *Nichols*, 90 S.W.3d at 604; *State v. Mann*, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix); *State v. Bush*, 942 S.W.2d 489, 523 (Tenn. 1997)). Accordingly, the Petitioner is not entitled to relief on this issue.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *194.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

**5. Ground Ten E: The TCCA correctly held that the Petitioner's death sentence**

**is not unconstitutional due to the absence of an aggravating factor in her indictment.**

The TCCA stated the following in rejecting this claim:

> The Petitioner asserts that the imposition of the death penalty violates due process of law because the indictment failed to set forth the aggravating circumstance. The courts of this state have rejected the Petitioner's argument. Our supreme court has held that "[n]either the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." *State v. Dellinger*, 79 S.W.3d 458, 467 (Tenn. 2002); *see also State v. Rice*, 184 S.W.3d 646, 686 (Tenn. 2006); *State v. Holton*, 126 S.W.3d 845, 862- 63 (Tenn. 2004). In *Dellinger*, the court explained that the capital sentencing scheme in Tennessee is consistent with *Apprendi* because: (1) the holding in *Apprendi* applies only to enhancement factors used to impose a sentence above the statutory maximum; (2) the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly; and (3) Tennessee's capital sentencing procedure requires both that a jury find statutory aggravating circumstances based upon proof beyond a reasonable doubt and that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. *Dellinger*, 79 S.W.3d at 466-67. In *Holton*, the court addressed whether the holding in *Dellinger* was correct in light of the United States Supreme Court's decision in *Ring*. The Tennessee Supreme Court held that "*Ring* does not stand for the broad proposition that aggravating circumstances must be charged in the indictment to satisfy constitutional standards. . . . Therefore, *Ring* provides no relief to the defendant and does not invalidate this Court's holding in *Dellinger*." *Holton*, 126 S.W.3d at 863 (citing *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002); *Porter v. Crosby*, 840 So.2d 981, 986 (Fla. 2003); *Terrell v. State*, 276 Ga. 34, 572 S.E.2d 595, 602 (Ga. 2002)); *see also State v. Carter*, 114 S.W.3d 895, 910 n.4 (Tenn. 2003) (applying *Dellinger* to reject a claim that *Ring* requires aggravating circumstances be included in the indictment). Accordingly, the Petitioner is not entitled to relief on this issue.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *194-96.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim should be dismissed. *See Bell*, 535 U.S. at 693-94.

## I. Ground Eleven: The Petitioner is not entitled to relief based on the cumulative effect of alleged errors.

Because the TCCA and TSC held that the trial and post-conviction courts committed no reversible error, the Petitioner is not entitled to relief based on the cumulative effect of any alleged errors.

## V. CONCLUSION

For the foregoing reasons, the Respondent respectfully asks that this Court dismiss the petition.

Respectfully submitted,

**ROBERT E. COOPER, JR.**,
Tennessee Attorney General & Reporter

/s/ Aaron E. Winter
AARON E. WINTER
Assistant Attorney General
Criminal Justice Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8093
B.P.R. No. 27636

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2012, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

Stephen A. Ferrell
Federal Defender Services of Eastern Tennessee, Inc. (Knox)
800 South Gay Street
Suite 2400
Knoxville, TN 37929-9714

/s/ Aaron E. Winter________
AARON E. WINTER
Assistant Attorney General