**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA PIKE**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-35 |
| | ) | Judge Mattice/Lee |
| **VICKIE FREEMAN**, Warden, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

---

# MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---


FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

Stephen A. Ferrell
Asst. Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {1}

CONTROLLING FEDERAL LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {1}

I. The structure and function of 28 U.S.C. § 2254 (a) and (d) provide the opportunity for this Court to grant relief where the petitioner's constitutional rights have been violated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {2}

II. The state court's obligations when adjudicating a federal claim. . . . . . . . . . . . . . {5}
 A. Where state court procedures are not reasonable, the federal claim may not have been properly resolved.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {6}
 B. Where the state court adjudication of the claim does not comport with federal law on the issue, the federal claim was not properly resolved.. . {6}
 C. A state-court determination of a federal question that is not based on reasonable factual conclusions does not properly resolve a federal constitutional claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {7}

III. Summary Judgment is available to habeas petitioners seeking relief where there is no dispute of material fact and the state-court record demonstrates their right to relief as a matter of law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {9}

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {10}

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {11}

I. Christa Pike's death sentence was the result of a series of mis-steps by lead counsel, an attorney who "had his own problems.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {11}
 A. Inexperienced attorneys, one of whom was dealing with serious legal and ethical issues of his own, were appointed to this high-profile capital case. . . . . . . . . . {11}
 B. Christa Pike was found guilty of first-degree murder. . . . . . . . . . . . . . . . . . . . {14}
 C. Defense counsel abandoned their plans for the penalty phase at the last minute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {16}

II. Evidence presented during the post-conviction gave a complete picture of Christa's life of abuse and neglect, her organic brain damage and severe mental illness as well as how these factors accounted for her behavior throughout her young life, including at the time of the offense in this case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {22}
 A. Defense counsel's last-minute decision not to call Dr. McCoy deprived the jury of any explanation as to how family members' testimony could be given mitigating effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {23}

B. In post-conviction, Christa Pike presented evidence that she suffers from organic brain damage that probably resulted from her mother's drinking alcohol during pregnancy. This brain damage affected her ability to regulate her behavior. . {26}

C. Christa Pike's early life was characterized by instability, neglect and physical abuse. Furthermore, she was exposed to violence in an environment that condoned that violence. . . . . . {29}

D. During Christa's adolescence, as the neglect and abuse continued, she was repeatedly sexually assaulted and began to be "out of control.". . . . . {34}

E. Knoxville's Job Corps was a violent, unsafe environment where Christa's psychological make-up made her vulnerable to the influence of her new boyfriend, Tadaryl Shipp. Her background, along with the new dangers from the Job Corps, led post-conviction expert, Dr. Kenner, to diagnose her with Post-Traumatic Stress Disorder (PTSD). . . . . . {38}

F. The evidence demonstrates that Christa Pike suffers from bipolar disorder. . . {40}

G. Despite her tragic background and despite the facts surrounding the offense in this case, many witnesses were willing to come forward to testify about Christa Pike's positive characteristics. . . . . . {43}

H. Conclusion. . . . . . {46}

PETITIONER PIKE'S CONSTITUTIONAL CLAIMS FOR RELIEF. . . . . . {47}

GROUND ONE. . . . . . {47}

Christa Pike's attorneys were constitutionally ineffective during the penalty phase of her capital trial and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . {47}

A. Trial counsel's last-minute decision to change their mitigation presentation constituted ineffective assistance of counsel. . . . . . {48}

1. The state courts' conclusion that counsel's performance in the penalty phase was not deficient was unreasonable.. . . . . {48}

2. The Tennessee courts' decision that Petitioner Pike was not prejudiced by counsel's failure to present the mitigation evidence Dr. McCoy had gathered is unreasonable. . . . . . {59}

B. Counsel were ineffective due their failure to discover compelling mitigating evidence. . . . . . {66}

1. Counsel failed to uncover and present evidence that Christa Pike suffers from organic brain damage. . . . . . {67}

2. Counsel failed to discover and present evidence that Christa Pike suffers from bipolar disorder and post-traumatic stress disorder.. . . . . {71}

3. Counsel failed to contact and present lay witnesses who could have presented mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {73}
C. Counsel were ineffective when they disclosed protected work product to the prosecutor without objection to any court order. . . . . . . . . . . . . . . . . . . . . . . {75}
D. Counsel failed to present effective penalty phase arguments to the jury in this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {81}
E. Counsel were ineffective when they failed to conduct a meaningful *voir dire* of potential jurors in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {82}
F. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {83}

GROUND TWO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {84}

Christa Pike's attorneys labored under a conflict of interest in violation of her Sixth and Fourteenth Amendments to the United States Constitution. The Tennessee courts' denials of this claim were contrary to or an unreasonable application of clearly established federal law or were based on the state court's unreasonable determination of the facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {84}

GROUND THREE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {85}

Christa Pike's attorneys were constitutionally ineffective during the guilt/innocence phase of her capital trial for their failure to present available evidence that Christa Pike did not form the required *mens rea* to be guilty of first degree premeditated murder and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {85}
A. Because counsel failed to effectively challenge the State's case for premeditation by effectively using the necessary experts supported by lay-witness testimony, counsel's performance fell below constitutional standards. . . . . . . . . . . . . . . . . {86}
B. Evidence presented in post-conviction demonstrates that Petitioner Pike was prejudiced by her counsel's failure to ensure that their experts' opinions were adequately supported. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {89}

GROUND FOUR.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {92}

The imposition of the death sentence on Christa Pike, an immature, mentally ill, and brain-damaged eighteen-year-old violates the Eighth Amendment prohibition against Cruel and Unusual Punishment. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).. . . . . . . . {92}

GROUND FIVE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {97}

The death sentence in this case violates Christa Pike's rights to a fair jury and due process of law because the trial court dismissed for cause a juror who was qualified to serve. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {97}

GROUND SIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {101}

The appointment of counsel with an active conflict of interest known to the trial court constitutes a violation of Christa Pike's Sixth Amendment right to counsel and this Court must issue the writ of habeas corpus due to this structural error. . . . . . . . . . . . . . . . . . {101}

GROUND SEVEN.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {103}

The trial court erred in violation of Christa Pike's rights to due process guaranteed by the Fourteenth Amendment to the United States Constitution by allowing television and photographic coverage of the pretrial proceedings. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {103}

GROUND EIGHT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {106}

Christa Pike's Sixth Amendment right to a fair and impartial jury was violated by the trial court's refusal to grant her motion for a change of venue. The Tennessee courts' denial of this claim was contrary to, or an unreasonable application of, clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {106}

GROUND NINE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {109}

Christa Pike's Sixth Amendment rights to a fair and impartial jury as well as her right to equal protection were violated when the trial court applied a new rule in violation of the *ex post facto* clause that gave the State the same number of peremptory challenges as the Defendant. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . {109}

GROUND TEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {111}

Christa Pike's death sentence must be set aside because the Tennessee death penalty scheme is unconstitutional; its protocol for lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment. . . . . . . . . . . . . . . . . {111}

A. Tennessee's death scheme fails to meaningfully narrow the class of death eligible defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {111}

B. The death penalty is imposed capriciously and arbitrarily under the Tennessee statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {113}

C. Execution by Tennessee's protocol for lethal injection would violate Christa Pike's rights under the Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {114}

D. The death sentence is unconstitutional because it infringes on Christa Pike's fundamental right to life, and imposition of the death penalty is not necessary to promote any compelling state interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {114}

E. The indictment returned by the Grand Jury in this case was unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {115}

GROUND ELEVEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {115}

In violation of the Fifth, Sixth and Fourteenth Amendment, the cumulative effect of the errors addressed above deprived Christa Pike of due process and a fair trial. . . . . . . {115}

RELIEF REQUESTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {117}

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {118}

## INTRODUCTION

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law. Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources." *Harrington v. Richter*, 131 S. Ct. 770, 780 (2011); *see also Murray v. Carrier*, 477 U.S. 478, 500 (1986) ("The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.") (quoting *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969)).

Christa Pike is an inmate on Tennessee's death row, convicted and sentenced to death for the murder of Colleen Slemmer. She challenged her conviction and death sentence on direct appeal and through the state post-conviction process. The Tennessee courts denied relief.

These habeas proceedings are Ms. Pike's only opportunity to seek federal review of her capital conviction and death sentence. She respectfully asks this court to independently review her claims and find that the numerous constitutional violations merit relief. This is especially crucial in a case, like Ms. Pike's, where her trial counsel was woefully ineffective at protecting her constitutional rights in the first instance. The writ must issue.

## CONTROLLING FEDERAL LAW

Petitioner, Christa Pike, respectfully requests the federal courts give plenary and meaningful review to her petition for writ of habeas corpus in which she alleges that the State of Tennessee tried and sentenced her to death in violation of her federal constitutional rights.

Federal review of constitutional claims is a "central part of the review process for prisoners sentenced to death." *Murray v. Giarratano*, 492 U.S. 1, 14 (1989) (Kennedy, J., concurring). Because habeas corpus review is designed to assure that state courts have provided

due process and that the guilt and sentencing decisions of these courts are reliable, it is especially critical in capital cases. *See, e.g., Barefoot v. Estelle*, 463 U.S. 880, 888 (1983) (admonishing federal habeas corpus courts "to give non-frivolous claims of constitutional error the careful attention they deserve"). In particular, because Pike's attorneys were inexperienced in capital cases and her lead counsel was under a cloud of suspicion due to fraudulent billing practices, close federal review is essential to protect federal constitutional rights.

The purpose of this section is to set forth an accurate description of federal law that controls this Court's disposition of this case. Petitioner Pike will discuss the structure and function of 28 U.S.C. § 2254(a) and (d), the state court's obligations when adjudicating a federal claim and when summary relief may be granted pursuant to Fed. R. Civ. P. 56. In the body of this memorandum, Pike will discuss how this law applies to the particular claims where she is seeking summary judgment.

## I. The structure and function of 28 U.S.C. § 2254 (a) and (d) provide the opportunity for this Court to grant relief where the petitioner's constitutional rights have been violated.

Sections 2254(a) and (d) provide as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> . . .
>
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(a) confers jurisdiction on this Court for the purpose of determining whether the petitioner is in custody in violation of the Constitution. When Congress enacted AEDPA, it made no changes to this section, which directs this Court to first determine the existence of constitutional error.

Taken together, sections 2254(a) and (d) form a framework in which federal courts are obligated, first, to determine whether a constitutional violation exists and, second, to determine whether subsection (d) permits the grant of relief. *See Danforth v. Minnesota*, 552 U.S. 264, 270 (2008) (discussing distinction between violations of constitutional rights and the granting of relief for those violations); *Gonzalez v. Crosby*, 545 U.S. 524, 532 n.4 (2005) (defining a "merits" decision in a habeas case as a "determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. § 2254(a) and (d)").

While section (a) concerns the existence of constitutional error, section (d) speaks to the existence of a remedy. Section (d), by its terms, limits the grant of relief unless certain conditions are met. It does not address how this Court is to analyze the antecedent constitutional claim. The first requirement of subsection (d) is to determine whether the claim was "adjudicated on the merits in State court proceedings." If the state court to which the claim was presented failed to address the merits, or failed to address any component of the standard prescribed for the claim by federal law, then § 2254(d) is inapplicable to the federal court's

analysis. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of [ ] *Strickland*"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element . . . *de novo*") (citing *Wiggins*, 539 U.S. at 534) (internal citation omitted).

For claims that were adjudicated on the merits, the function of 2254(d)(1) and (2) is straightforward. Subsection (1) authorizes a federal court to remedy a constitutional violation where the state court's adjudication of the claim was contrary to or involved an unreasonable application of clearly established Federal law. Subsection (2) authorizes a grant of relief where the state court's review of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. "Objective reasonableness" is the touchstone of this review under subsection (d). *(Terry) Williams v. Taylor*, 529 U.S. 362, 410 (2000).[1]

By conditioning the availability of the writ not only upon a finding of a constitutional violation, but also upon the state court's failure to remedy the error being attributable to a

---

[1] *Harrington v. Richter*, 131 S. Ct. 770 (2011) does not alter this well-settled law. It simply holds that § 2254(d)'s limitations on relief apply even where the state court denial is a "summary disposition." *Id*. at 784. In such cases, the "habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with" clearly established law. *Id.* at 786. *Richter's* use of the term "fair-minded jurists" is not a departure from the "objective reasonableness" standard that has been in place at least since *Williams v. Taylor*, 529 U.S. at 410. The Supreme Court also used that phrase in, and quoted it in *Richter* from *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), where the Supreme Court stated it reviewed the state court's decision from the perspective of the "fair-minded jurist" and ultimately concluded relief was prohibited because the state court opinion was not "objectively unreasonable." *Id.* at 665.

material defect in the state court's adjudication, § 2254(d) strikes a balance between insulating state court decisions from undue federal interference and maintaining the availability of federal habeas relief where the state court's ruling was demonstrably flawed.

In short, federal habeas review of claims previously adjudicated on the merits in state court involves this two-tiered approach. First, the federal court must determine whether a constitutional violation occurred. 28 U.S.C. § 2254(a). Second, the court must determine whether the claim was reviewed on the merits. 28 U.S.C. § 2254(d). Next, the court must engage in an analysis of whether the state court opinion reviewing the claim was contrary to or involved an unreasonable application of federal law or was based on an unreasonable factual determination. 28 U.S.C. § 2254(d)(1), (2). *See Williams*, 529 U.S. at 390-398 (review of petitioner's constitutional claim followed by a detailed analysis of the ways the state court's analysis was contrary to or involved an unreasonable application of federal law); *Rompilla*, 545 U.S. at 381-87 (same); *Wiggins*, 539 U.S. at 527-34 (same). This approach is also exemplified in *Miller-El v. Dretke*, 545 U.S. 231 (2005) and *Porter v. McCullom*, 558 U.S. 30 (2009). In these cases, the Supreme Court first reviewed the constitutional issue and only *then* turned to § 2254(d) to permit the grant of relief.

**II. The state court's obligations when adjudicating a federal claim.**

AEDPA rests upon the presumption that state court is the first arbiter of federal rights. However, the AEDPA recognizes that this presumption does not always hold true and that there may be defects in the state court proceedings. The requirement that a federal claim be adjudicated substantively and procedurally in accordance with federal law, regardless of whether the claim is heard in state court or federal court, is not a concept exclusive to AEDPA. Where a

state court entertains a federal cause of action, local or state practices cannot defeat the federal right. *Felder v. Casey*, 487 U.S. 131, 138 (1988). *See also Free v. Bland*, 369 U.S. 663, 666 (1962 ). Federal rights may not be frustrated, burdened, limited or precluded by state procedural rules. There are several ways in which the state court process may not competently resolve a federal claim.

### A. Where state court procedures are not reasonable, the federal claim may not have been properly resolved.

First, allegations in a well-pleaded complaint in state court must be taken as true. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011); *Smith v. O'Grady*, 312 U.S. 329, 331 (1941); *Coleman v. Alabama*, 377 U.S. 129 (1964). Next, disputed facts must be resolved through a hearing. *See Panetti v. Quarterman*, 551 U.S. 930, 952-54 (2007) (due to gross deficiencies in the state court's "fact finding" procedures, review was *de novo* and petitioner could proceed in federal court with an evidentiary hearing); *Smith*, 312 U.S. at 334. A court is obligated to facilitate fact development when the petitioner has shown "reason to believe" such development could lead to proof of a constitutional violation. *Harris*, 394 U.S. at 300. "Federal courts not only may grant evidentiary hearings to applicants, but must do so upon an appropriate showing." *Id*. at 291 (citing *Townsend v. Sain*, 372 U.S. 293, 313 (1963)).

### B. Where the state court adjudication of the claim does not comport with federal law on the issue, the federal claim was not properly resolved.

The state court decision may "be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405. For example, the state court might identify the wrong precedent, identify the correct precedent but misstate the rule of that precedent, misunderstand the rule

established by the governing precedent, incorrectly determine that the governing precedent had been modified, or make some other mistake in selecting or stating the governing federal rule. *See generally Williams*, 529 U.S. at 391-97. *See also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007) (a state court opinion is unreasonable under 2254(d) where the state court "ignore[d] [an] entire line" of controlling Supreme Court case law).

Occasionally, the federal habeas claim will be so factually similar to a case already decided by the Supreme Court that the question will simply be whether the state court resolved the claim in the same manner as the Supreme Court did. *Williams*, 529 U.S. at 404-07 ("A state-court decision will . . . be contrary to . . . clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.")

It is also unreasonable where the state court fails to recognize or appreciate the impact of legal principles. *See Williams*, 529 at 398 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."). *See also Rompilla v. Beard*, 545 U.S. 387-88 (where the state court opinion failed to address key "considerations," it may be "unreasonable"); *Porter v. McCollum*, 558 U.S. at 41-43 (where the state court discounted the value of mitigation evidence, its opinion was unreasonable).

### C. A state-court determination of a federal question that is not based on reasonable factual conclusions does not properly resolve a federal constitutional claim.

The state court can also unreasonably resolve a federal claim by rendering a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

state court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has directed habeas courts to look at the record as a whole to determine if factual determinations are "unreasonable." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Although the federal court is required to give substantial deference to state-court fact-finding, such "deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Id.* A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence. *Id.*

In *Miller-El v. Dretke*, 545 U.S. 231 (2005), the Court set aside state court fact-finding on the petitioner's *Batson* claim where the record did not support the conclusions reached by the state court. The Court engaged in a very detailed and fact-specific analysis of the record to test the state court's factual conclusions. *See id.* at 240-52. Thus, while the Court accorded deference as required by the habeas statute, *id.* at 240, the Court nonetheless required support for the state court's factual conclusions before accepting them. When the Court found such support lacking, it disregarded the state's findings as unreasonable. *Id.* at 266.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court found that state court findings would not be entitled to deference where the state courts relied on a "clear factual error." *Id.* at 528. Again, as in *Miller-El*, the Court made a painstakingly close examination of the record to determine whether the state court conclusions were supported by the record. *See Wiggins*, 539 U.S. 528-33. The *Wiggins* court determined that the state courts had relied on an assumption that was proven untrue by a close examination of the record. *Id.* at 528. It also found that portions of trial counsel's testimony relied upon by the state courts were rebutted by other portions of the

record and concluded that counsel's testimony "may simply reflect a mistaken memory shaped by the passage of time." *Id*. at 533. A similar analysis in Petitioner Pike's case will lead to a similar conclusion: Many of the state court's factual findings are unreasonable because they lack support in the record.

### III. Summary Judgment is available to habeas petitioners seeking relief where there is no dispute of material fact and the state-court record demonstrates their right to relief as a matter of law.

"The [Supreme] Court stated in *Walker v. Johnston* that there could be situations where 'on the facts admitted, it may appear that, as a matter of law, the prisoner is entitled to the writ and to a discharge.'" *Browder v. Director*, 434 U.S. 257, 266 n.10 (1978) (quoting *Walker v. Johnston*, 312 U.S. 275, 284 (1941)). In *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977), the Supreme Court explained that a motion for summary judgment may be sustained in the habeas context where the allegations are sufficient to establish relief as a matter of law. Petitioner-initiated summary judgment proceedings may be appropriate if:

1. The state court fact-finding creates a right to relief under controlling federal law, *Browder*, 434 U.S. at 260, 266 (summary judgment based on facts found by the state court);

2. The answer admits petitioner's version of controlling facts, *Walker v. Johnson*, 312 U.S. 275, 284 (1941); or

3. There is no issue of fact to be resolved. *Browder, supra.*

Petitioner Pike moves for summary judgment on seven of her eleven claims because the material facts supporting those claims are not disputed and the evidence presented in state court demonstrates her right to relief. Even though some factual issues may still be in dispute, those issues need not be resolved in order to grant habeas relief on most of Pike's claims. She will

discuss her entitlement to summary judgment within the discussion of each claim. However, should the State rely on state court factual findings that are not fairly supported by the state court record, and if those factual findings are material to this Court's decision, Petitioner will respond by asking this Court to conduct a federal evidentiary hearing.

**STATEMENT OF THE CASE**

On April 12, 1995, Christa Pike, Shadolla Peterson and Tadaryl Shipp were indicted for the premeditated murder and conspiracy to commit the premeditated murder of Colleen Slemmer. (R.7-1, Add.1, Doc.1, T. Tech. Rec., PageID# 34).[2] Ms. Pike was the first to be tried. She was convicted of both charges and sentenced to death for the murder and to a consecutive 25 years for conspiracy. (*Id*. at 430-31; 445-46). Ms. Pike's convictions and sentences were affirmed on appeal. *State v. Pike*, 978 S.W.2d 904 (1998), *cert. denied*, 526 U.S. 1147 (1999).

On June 3, 1999, Ms. Pike filed a pro se Petition for Relief from Conviction and Sentence. (R.9-1, Add.4, Doc.1, PC Tech. Rec., PageID# 3781-92). Evidentiary hearings were conducted in the post-conviction court in January 2007, July 2007 and April 2008. On September 22, 2008, Ms. Pike filed her closing brief. (R.9-4, Add.4, Doc.4, PC Tech. Rec., PageID# 4237-4337). The State filed a responsive brief on November 14, 2008. (*Id*. at 4340-76). Ms. Pike filed a brief in reply on December 8, 2008. (*Id*. at 4377-84). On December 10, 2008, the post-conviction trial court entered its Findings of Fact and Conclusions of Law denying

[2] Citations to the record contain the district court record number (R.__), the Addenda and Document number assigned by the State (Add.___, Doc.___) and the PageID#. The abbreviations are as follows: "T. Tech. Rec." is Trial Technical Record; "PC Tech. Rec." is Post-Conviction Technical Record; "TT" is Trial Transcript; "PCT" is Post-Conviction Transcript; "T. Exh." is Trial Exhibit and "PC Exh." is Post-Conviction Exhibit. All transcript citations identify the name of the person testifying.

Ms. Pike's petition for post-conviction relief. (R.9-5, Add.4, Doc.5, PC Tech. Rec., PageID# 4387-4489). On April 25, 2011, the Tennessee Court of Criminal Appeals affirmed the post-conviction court's denial of relief. *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. Apr. 25, 2011), *perm. appeal denied* (Nov.15, 2011).

Having exhausted her state court remedies, Ms. Pike filed her Petition for Writ of Habeas Corpus in this Court. (R.19, PageID# 9595-9717). This Court granted limited discovery which has been completed. (R.32, PageID# 10452-60). Ms. Pike now files this Motion for Partial Summary Judgment. Should Respondent file a Motion for Summary Judgment that relies on disputed issues of material fact, Petitioner Pike may ask for a federal evidentiary hearing in response.

## STATEMENT OF FACTS

### I. Christa Pike's death sentence was the result of a series of mis-steps by lead counsel, an attorney who "had his own problems."

#### A. Inexperienced attorneys, one of whom was dealing with serious legal and ethical issues of his own, were appointed to this high-profile capital case.

The trial court appointed Bill Talman to serve as Ms. Pike's lead counsel, even though the court knew he "had his own problems," namely that he was under investigation and his law license was in jeopardy. The TBI, the District Attorneys' Conference and the State Attorney General were among numerous agencies investigating Talman for fraudulently billing the Indigent Defense Fund for working numerically-impossible amounts of hours.[3] He frequently

[3] *See* correspondence between Randy Nichols, Attorney General for the 6th Judicial District, who prosecuted Ms. Pike's case, and the District Attorney for the 20th Judicial District, referencing TBI's investigation into Talman. The correspondence indicates involvement by the TBI, the Tennessee Administrative Office of the Courts, the State Attorney General's Office, the Comptroller of the Treasury, and the Tennessee District Attorneys General Conference. (R.11-2,

billed the Fund for providing more than 24 hours of legal services in a single day. An audit uncovered this numeric impossibility and a highly publicized investigation into the over-billing scandal was launched. The final Comptroller's Report found Talman in egregious violation of proper billing practices. Talman was represented by counsel who was eventually able to persuade prosecutors not to seek a criminal conviction against him, but he was required to repay $67,027 to the Defense Fund. The same prosecutor's office who prosecuted Pike's case accepted the settlement negotiated with Talman. (R.12-3, Add.6, Doc.8, Supp. PC Exh.2A, BPR Report, PageID# 8471-72). Talman was never officially released of criminal liability and criminal prosecution for theft over $60,000, a Class B felony with a minimum sentencing range of eight to twelve years.

The end result of this investigation was that one day after denying rehearing in Ms. Pike's capital case (wherein she was represented by Talman), the Tennessee Supreme Court stripped Talman of his law licence for eleven months and twenty-nine days. This sanction was suspended upon Talman's compliance with numerous conditions, including that his practice be monitored by a court-appointed representative. (*Id.*).

Literally days after reimbursing $70,000 in illegally gained fees as part of a settlement with the Knox County District Attorney General's Office, and just as the Board of Professional Responsibility was beginning its own investigation into Talman's improprieties, Talman was appointed as lead counsel in Ms. Pike's capital case.

At the time of his appointment, Mr. Talman had never handled a death penalty case. (R.9-19, Add.5, Doc.14, Bill Talman, PCT, PageID# 5909). Given the gravity of the case against

---

Add.6, Doc.2, PC Exh.1, Comptroller's Report, PageID# 7256-77).

Ms. Pike, the trial court's appointment of Talman, whose law license was literally still in jeopardy, was inexplicable and should give this Court pause. The trial court admitted, "I knew; we all knew that Mr. Talman had his own problems." (R.10-7, Add.5, Doc.27, Judge Leibowitz, PCT, PageID# 7083).

On January 23, 1996, just 55 days before the trial started, the trial court appointed Julie (Martin) Rice (hereinafter "Rice") as second counsel to represent Pike. Rice was appointed upon her agreement that she would not to seek a continuance to prepare for trial. (R.11-2, Add.6, Doc.2, PC Exh.3, Excerpt Pretrial Motions, PageID# 7325-26). At the time of her appointment, Rice had at least one other trial scheduled prior to Ms. Pike's capital trial. (*Id*. at 7326).

Rice had been licensed for approximately three-and-a half years at the time of Ms. Pike's trial. (R.9-17, Add.5, Doc.12, Julie Rice, PCT, PageID# 5677-78). She had never handled a murder case or any prosecution more serious than a Class B felony. (*Id*. at 5679-81). She had little or no experience working with expert witnesses or investigators and no particular knowledge of psychological issues. (*Id*. at 5681-84). Because she had no death penalty experience, she obviously had never handled a capital mitigation presentation.

Rice did not remember how she and Talman divided the work on Pike's case, but she recalled that she was responsible for the family witnesses in the penalty phase. (*Id*. at 5696). Talman said he assigned the penalty phase to Rice. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5979). He thought that a female attorney would provide a "softer appearance to the jury and – that's why we divided the functions . . . and let her handle the mitigation." (*Id.*).

Nonetheless, at the time of Rice's appointment, and more significantly, at the time of her pledge to the trial court that she would not seek a continuance though trial was only eight weeks

off, she had not reviewed the Social History prepared by the mitigation specialist, Dr. McCoy. Nor had she met with the defense team's psychologist, Dr. Engum. (R.9-17, Add.5, Doc.12, Julie Rice, PCT, PageID# 5690, 5692-93). In fact, even though Rice handled the direct examination of the only three of the witnesses who actually testified during the penalty phase, she just had one meeting with Dr. McCoy. (R.9-24, Add.5, Doc.19, McCoy, PCT, PageID# 6292, 6303-05). That meeting took place a mere three days before *voir dire* began. (*Id*. at 6303).

**B. Christa Pike was found guilty of first-degree murder.**

Eighteen-year-old Christa Pike, seventeen-year-old Tadaryl Shipp and nineteen-year-old Shadolla Peterson were accused of killing Colleen Slemmer on January 12, 1995. Ms. Pike had given a detailed statement admitting her involvement in this murder. (R.8-15, Add.2, Doc.30, T. Exh.28, KPD Statement, PageID# 3375-3420). The case was highly publicized in the local media and media coverage was extensive during the trial. (R.7-1, Add.1, Doc.1, T. Tech. Rec., PageID# 135-80; R.7-2, Add.1, Doc.2, T. Tech Rec., PageID# 183-267).

The testimony generally established that Christa Pike, co-defendants Tadaryl Shipp and Shadolla Peterson, and the victim, Colleen Slemmer, were all students at Job Corps, a residential program designed to help troubled teens gain job skills. Pike was romantically involved with co-defendant Shipp, when she began to suspect that Slemmer was interested in him and a rivalry developed. (R.8-8, Add.2, Doc.23, Dr. Engum, TT, PageID# 2761). Pike and her co-defendants enticed Slemmer to join them in a secluded area near Job Corps and then attacked her. Slemmer's skull was bashed in by a large piece of asphalt, her throat was slit multiple times, and a pentagram was carved in her chest. (R.8-2, Add.2, Doc.17, Dr. Elkins, TT, PageID# 2232-33, 2236; R.8-3, Add.2, Doc.18, Dr. Elkins, TT, PageID# 2288-91, 2321). The prosecution generally

established its case through the testimony of the medical examiner and admission of Pike's confession.

The defense theory at trial was that Pike was guilty of reckless homicide, not first-degree murder. The defense offered the testimony of clinical psychologist, Dr. Eric Engum, to testify about Pike's mental state "along [the] line[s]" of diminished capacity. (R.8-7, Add.2, Doc.22, Dr. Engum, TT, PageID# 2708-10). Dr. Engum told the jury Pike suffers from borderline personality disorder. He reached this conclusion based on his meetings with Pike and her performance on a battery of psychological tests. (*Id.* at 2732-35, 2739). Dr. Engum never discussed Pike's social history to explain the possible origins of this disorder.

Dr. Engum told the jury Pike was not legally insane but that she did not act with deliberation or premeditation. Instead, she basically "went out of control." (*Id.* at 2753). On cross-examination, Dr. Engum acknowledged his opinion was based entirely upon Pike's self-report of the homicide and his testing. (R.8-8, Add.2, Doc.23, Dr. Engum, TT, PageID# 2764). He also conceded she could be aggressive and impulsive. (*Id.* at 2771-72).

The defense also offered the testimony of William Bernet, Medical Director of the Psychiatric Hospital at Vanderbilt University, an expert in analyzing satanic rituals. He testified that due to the "mutilation of [the] body," there are "satanic elements in this crime." (*Id.*, Dr. Bernet, TT, PageID# 2841). But he did not think that the "whole picture fits the pattern of a satanic ceremony, or a satanic sacrifice, or a planned satanic sacrifice." (*Id.* at 2842). Despite this opinion, he added to the jury's consideration of a possible satanic angle by discussing a copy of *The Satanic Bible* by Anton Lavey. (R.8-8, Add.2, Doc.23, Dr. Bernet, TT, PageID# 2839; R.8-6, Add.2, Doc.21, T. Exh.76, PageID# 2636). When defense counsel asked Dr. Bernet if he

had an opinion as to whether the crime was premeditated, Dr. Bernet stated he had no such opinion because he never examined Ms. Pike. (R.8-9, Add.2, Doc.24, Dr. Bernet, TT, PageID# 2880).

At the conclusion of Dr. Bernet's direct examination, the trial court admonished defense counsel for failing to disclose Dr. Bernet's report as Tenn. R. Crim. P. 26.2 required. (*Id*. at 2884). Dr. Bernet testified that in discussing the matter with Talman, he "came to understand that it was not necessary . . . to do a report." (*Id*.). The trial court explained to defense counsel that he was not in compliance with the rule and defense counsel apologized. (*Id.*).

In closing argument, defense counsel argued the testimony of Drs. Engum and Bernet established Ms. Pike was guilty of reckless homicide. (*Id.* at 2956). The jury disagreed and convicted Ms. Pike of first degree, premeditated murder.

**C. Defense counsel abandoned their plans for the penalty phase at the last minute.**

Prior to and during the trial, forensic psychologist, Dr. Diana McCoy acted as mitigation specialist and investigator. The substance of Dr. McCoy's work was contained in three volumes consisting of a 60-page Social History, numerous records she had collected and her memoranda of all of the interviews she had conducted with Pike, her family, friends, and a small number of juvenile court employees who had worked with Pike. Talman planned on presenting the case for a life sentence through the testimony of Dr. McCoy. (*See* R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5986-87; R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6388, 6414).

At the close of the guilt phase of the trial, after the jury had returned a conviction of murder in the first degree, the trial court called an *in camera* meeting with both parties. Defense

counsel failed to request that this meeting be recorded, and because it took place out of the presence of the court reporter, there is no definitive record of what was said. However, during this *in camera* meeting, Talman provided the prosecutor with Dr. McCoy's three-volume Mitigation Materials and Social History, possibly by court order.[4] (R.8-10, Add.2, Doc.25, TT, PageID# 3030). However, the record reflects no such order, no objection by the defense nor any request that the disclosure be limited.

After the meeting, once again in court and on the record, the prosecutor expressed agitation at having received voluminous materials pertinent to Dr. McCoy's testimony immediately before she was to take the stand. (*Id.* at 3030-34). The trial court then continued the start of the penalty phase until the following morning to allow the prosecutor time to review Dr. McCoy's Mitigation Materials and Social History. (*Id.* at 3030). Neither the prosecutor nor the trial court could locate Dr. McCoy's report or opinion within the materials and Mr. Talman was unsure as to whether Dr. McCoy had prepared one.[5] (*Id.* at 3033-34).

In post-conviction, Dr. McCoy testified that Talman contacted her that afternoon in a panic. She testified that he told her he had lied to the trial court and prosecutor by saying he had only received the materials himself the prior evening, March 28, 1996. (R.9-25, Add.5, Doc.20,

---

[4] The Tennessee Court of Criminal Appeals determined that the trial court must have ordered Talman to turn over the materials. *Pike*, 2011 WL 1544207, at *55.

[5] If the attorneys and the court were unsure about whether Dr. McCoy's materials contained opinion testimony to be offered in court, it is unclear under what theory the trial court would have ordered disclosure. Tennessee Rules of Evidence Rule 705, only contemplates the disclosure of reports and opinions. ("The expert may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.") (adopted effective Jan. 1, 1990). Since the conference with counsel was not recorded, the basis for the court's ruling (if any) is unknown.

Dr. McCoy, PCT, PageID# 6413). Dr. McCoy had given the three volumes of work to Talman on Sunday, March 24. (*Id.*). She said that Talman had told her that he planned to provide any discoverable materials to the State only at the last possible instant. (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, PageID# 6346-47). Talman was also panicking because the prosecutor had complained it was all hearsay. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6413). Dr. McCoy offered to call other attorneys regarding the potential hearsay issue. (*Id.*). When she could not reach them, Talman told her that she would not be called to testify, and in fact, she was not. (*Id.* at 6413-14).

After making the rash, last-minute decision to abandon the previously-planned mitigation case, on the eve of the penalty phase of Pike's trial, counsel was left with only a few hours to concoct an alternative strategy. No potential witnesses were under subpoena to appear. (R.9-18, Add.5, Doc.18, Julie Rice, PCT, PageID# 5752-55). Counsel did not seek a continuance. Talman ultimately called the three witnesses who had been present throughout the trial and were available on short notice: Pike's maternal aunt, father, and mother. However, the prosecution had access to these witnesses' numerous prior statements included in Dr. McCoy's materials and used them in cross-examination.

Christa Pike's aunt, Carrie Ross, was the first witness to testify in mitigation. She told of how Christa was born prematurely and was immediately taken to a regional medical center. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, PageID# 3050-51). Shortly thereafter, her mother went back to work, leaving Christa in the care of her paternal grandmother, Delpha Pike. (*Id.* at 3051). Christa spent much of her time with Delpha Pike and "was totally and absolutely devoted to [her.]" (R.8-11, Add.2, Doc.26, Carrie Ross, TT, PageID# 3070). Delpha Pike died when

Christa was about twelve years old. Christa was devastated and hysterical at her grandmother's funeral. (*Id*. at 3072).

Ms. Ross also related an incident that she thought took place when Christa was three or four years old. Christa suffered a seizure and her mother did not want to take Christa to the hospital. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, PageID# 3063-64). She further testified that Christa grew up in a number of different homes, staying sometimes with her mother, her father, and both sets of grandparents.

On cross-examination (using the material turned over by the defense) the prosecutor elicited testimony that Ms. Ross took in Christa's half-sister Alicia, but refused to do so with Christa because Ms. Ross was afraid to leave Christa alone with her own children. (R.8-11, Add.2, Doc.26, Carrie Ross, TT, PageID# 3074). Ms. Ross also admitted that she had called Christa a pathological liar. (*Id*.)

Glenn Pike, Christa's father, testified and described himself as a strict disciplinarian. When Christa did something wrong, he spanked her. (*Id*., Glenn Pike, TT, PageID# 3083). He testified that he and Christa's mother married and divorced twice. After the second divorce, Mr. Pike married Kathleen Allman, who ultimately insisted that he not spend time with Christa. Mr. Pike stated that his relationship with Christa deteriorated completely when Christa told him that she no longer wanted his name and wanted to be adopted by someone else. Mr. Pike signed the necessary papers to voluntarily relinquish all parental rights. (*Id*. at 3083-84).

On cross-examination, again through use of materials disclosed by defense counsel, the prosecutor elicited testimony that Christa was dishonest and manipulative (*id*. at 3085-86) and that she allegedly abused her younger half-sister. (*Id*. at 3088).[6]

Christa's mother, Carissa Hansen, was the third and final witness during the penalty phase. (R.8-11, Add.2, Doc.26, Carissa Hansen, TT, PageID# 3091). She admitted kicking her daughter out of the house at the request of one of her husbands who said he did not like children. (*Id*. at 3093). She recalled that Christa was close to her Grandmother Pike. (*Id*. at 3096). Christa wanted to stay in West Virginia to care for her grandmother and believed that her grandmother died because she was not there to care for her. (*Id*.). Christa cried for days after the funeral, did not go to school, and not long afterward, attempted suicide. (*Id*.). After Grandmother Pike died, Christa was frequently shuffled back and forth between her parents but later spent more time with her mother. (*Id*. at 3094). Carissa admitted that while Christa was being cared for by her either of her two grandmothers, Carissa drank heavily, smoked marijuana, and used other drugs. (*Id*. at 3095). She admitted smoking marijuana with Christa in an attempt to be closer to her. (*Id*.).

She also admitted never getting regular medical treatment for Christa. Carissa testified that she took Christa to see a psychiatrist the day of her suicide attempt following her grandmother's death and for a couple of outpatient visits. (*Id*. at 3098).

---

[6] The trial court found that "[t]here is no proof in the record that Ms. Pike was in any way abusive to any children in her family, or otherwise." (R.9-5, Add.4, Doc.5, PC Tech. Rec., Findings of Fact and Conclusions of Law, PageID# 4413). The trial court's finding stands in stark contrast to the impression Pike's jury must have had after hearing the State's cross-examination of the first two mitigation witnesses.

Christa repeatedly ran away and lived on the streets for short periods. Carissa took no action to bring Christa home in such circumstances. Instead, Carissa testified, she usually responded by drinking and feeling sorry for herself. (R.8-11, Add.2, Doc.26, Carissa Hansen, TT, PageID# 3100).

On cross-examination, using Dr. McCoy's materials, the prosecutor brought out that when Christa was twelve years old she threatened Carissa's then-boyfriend, with a butcher knife, was found with a knife on another occasion, was uncontrollable since the age of eight, had a live-in boyfriend when she was fourteen, grew marijuana in the house, was not allowed around her father's young children, and was a liar who had many second chances and blew them all. (*Id.* at 3102-10). All of this information was derived from the material turned over in the mitigation materials.[7] General Crabtree explicitly referred to statements given to Dr. McCoy. (*Id.* at 3110).

Testimony from these three witnesses covers less than sixty pages of transcript. (R.8-10, Add.2, Doc.25, PageID# 3049-65 through R.8-11, Add.2, Doc.26, PageID# 3069-3111). Opening statements began after 9:30 and all testimony in mitigation had been given before 11:45. (R.8-11, Add.2, Doc.26, PageID# 3035, 3112). Information was elicited in a chaotic manner with the prosecutor and trial court instructing counsel on how to lay a proper foundation. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, PageID# 3052-53, 3057-58; R.8-11, Add.2, Doc.26, Glen Pike, TT, PageID# 3081-82). At one point, counsel attempted to elicit testimony about Christa's family history of substance abuse using a chart prepared by Dr. McCoy, but the trial court would

---

[7] *See* R.11-3, Add.6, Doc.3, PC Exh.1A, Dr. McCoy's Social History, PageID# 7485; *Id.*, Mitigation Materials, PageID# 7569, 7573; R.11-5, Add.6, Doc.5, PC Exh.1C, Mitigation Materials, PageID# 8096-97.

not allow it because "[n]one of you are experts as to substance abuse." (R.8-10, Add.2, Doc.25, Judge Leibowitz, TT, PageID# 3058).

Trial counsel's sentencing phase argument was brief. Attorney Rice never mentioned Christa's borderline personality disorder, history of physical and sexual abuse, abandonment and neglect or even told the jury that Christa's youth was a statutory mitigating factor. Rather, counsel emphasized the prosecution argument that their client enjoyed the attention this case brought. Because she enjoyed attention, the defense proposed a life sentence as a more severe punishment, reasoning to the jury that Christa would receive less attention than if the jury imposed death. (*Id.*, Talman Penalty Phase Opening, TT, PageID# 3046). Counsel was actually arguing that the jury should inflict what they characterized as the harshest punishment. The jury responded by imposing the harshest punishment under the law.

The jury imposed death.

## II. Evidence presented during the post-conviction gave a complete picture of Christa's life of abuse and neglect, her organic brain damage and severe mental illness as well as how these factors accounted for her behavior throughout her young life, including at the time of the offense in this case.

In post-conviction, Ms. Pike presented the case for mitigation that her sentencing jury was never given the chance to hear. This included Dr. McCoy's testimony, as well as evidence to show that her participation in the murder of Colleen Slemmer was the product of brain damage, mental illness, and a history of severe abuse and neglect. Moreover, all of the evidence presented by Ms. Pike in post-conviction would have been available to diligent counsel. Much of the evidence was in trial counsel's immediate possession but was simply not presented. Even more mitigating evidence could have been easily discovered if counsel had made even minimally

diligent efforts to investigate potential issues and incorporate the opinions of experts into their trial presentation.

Ms. Pike put on expert testimony that individuals exhibiting three characteristics in particular: (1) brain damage, (2) mental illness, and (3) a history of abuse are predisposed to commit acts of violence. Ms. Pike then made the case that she suffers from all three characteristics. She has: (1) brain damage in the form of a heterotopia of the frontal lobe, (2) bipolar disorder, and (3) post-traumatic stress disorder resulting from a history of physical and sexual abuse. Additionally, Ms. Pike demonstrated that she was raised in an environment that condoned, normalized, and even glorified extreme levels of violence. Ms. Pike also demonstrated that in the months leading up to the murder in this case she was under mounting stress and exposure to violence while a student at Job Corps, both because of the generalized level of danger and violence at the Job Corps facilities, and more specifically because of her relationship with co-defendant Tadaryl Shipp. Had the jury been able to consider this evidence that gave a completely different view of the defendant and that gave some explanation for her actions, there is a reasonable probability that at least one juror would have voted for a life sentence.

### A. Defense counsel's last-minute decision not to call Dr. McCoy deprived the jury of any explanation as to how family members' testimony could be given mitigating effect.

One of the mitigating themes trial counsel had planned to present during the sentencing phase was that Christa suffered from borderline personality disorder. (R.11-2. Add.6, Doc.2, PC Exh.6, Suggested Mitigation Themes, PageID# 7340). However, counsel failed to present background evidence to tie into this theory. Counsel had originally planned to present the

mitigating evidence through their mitigation specialist, Dr. McCoy. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5986-87; R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6414). The "plan was to try and have Dr. McCoy bring all this stuff in . . . about her background and tie it in with Dr. Engum's report." (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5987). However, once counsel decided not to call Dr. McCoy, this plan was never implemented and the jury never heard Dr. McCoy's testimony and never heard any tie-in to Dr. Engum's testimony.

Dr. McCoy was called in post-conviction to give the mitigation testimony she would have presented at trial. She would have testified that borderline personality disorder is defined as a "pervasive pattern of instability of interpersonal relationships, self-image and affect, and marked by impulsivity. . . ." (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, PageID# 6365). It is characterized by "efforts to avoid real or imagined abandonment." (*Id.* at 6366). As a result, people with borderline personality disorder "often have very inappropriate anger that they express, way out of proportion to the incident." (*Id.*) Typically there are a number of recurrent suicide gestures or threats and self-mutilating behavior. (*Id.* at 6367). In addition, a borderline individual will have mood swings during which they may be really happy one minute, then irritable and, then anxious. (*Id.* at 6368). The intense anger and stress can cause transient psychotic episodes. (*Id.*) That individual will also experience extremes and instability in relationships. (*Id.* at 6358).

Dr. McCoy would also have informed the jury that the origins of Christa's disorder were instability, abuse and neglect seen in Christa's early life. (*Id*. at 6358-59). Dr. McCoy would have described Christa's dysfunctional family, its lack of stability causing her to move back and forth between parents and other caretakers, along with the volatility of the mother's relationships

with a series of men. (R.9-25, Add.5, Doc.20, McCoy, PCT, PageID# 6443). Such a background contributed to Christa's frantic efforts to avoid real or imagined abandonment. (*Id.* at 6438). Dr. McCoy would also have testified that Christa's mental difficulties were caused by multiple traumatic events in her childhood and adolescence, including two rapes and physical abuse by a number of care givers. (*Id.* at 6447, 6466).

Dr. McCoy could have explained that many of the negative behaviors exposed by the trial prosecutor's cross-examination of Christa's family members could be attributed to her borderline diagnosis. Christa's continual childhood efforts to run away, her dishonesty, her being described as "out of control," were all manifestations of the borderline personality disorder which was a product of her unfortunate childhood circumstances. (*Id.* at 6392, 6468-69). Her self-destructiveness, including her suicide attempts, and her failure to take advantage of the "chances" she was given, were also symptoms of her disorder. (*Id.* at 6377-78).

Dr. McCoy also provided the link between Christa's borderline personality disorder and her relationship with her co-defendant, Tadaryl Shipp. Christa's friends, Brandi and Mandy, both told Dr. McCoy that Ms. Pike was so hungry for attention that she would do anything to impress a boy. Dr. McCoy opined that this intense need for a romantic relationship was consistent with Christa's disorder. When Christa arrived at Job Corps and Shipp showed interest in her, it played into her borderline issues of unstable identity and low self-esteem. Because Shipp was feared by other Job Corps students, Christa also saw him as her protector. (*Id.* at 6395-96). All of these facts played an important role in the tragic events that underlie this case. Yet, none of it was presented to the jury in mitigation. Because counsel presented no expert

testimony at the penalty phase, none of this information was available to the jury that decided whether Christa would live or die.

### B. In post-conviction, Christa Pike presented evidence that she suffers from organic brain damage that probably resulted from her mother's drinking alcohol during pregnancy. This brain damage affected her ability to regulate her behavior.

Also in post-conviction, Ms. Pike presented extensive evidence that she suffers from organic brain damage. She presented the expert neurological testimony of Dr. Pincus and the expert psychiatric testimony of Dr. Kenner. She also presented lay witnesses who testified to their observations of her behavior that corroborated the effects and manifestations of that brain damage.

Dr. Jonathan Pincus, Chief of Neurology at the Veterans Administration Hospital in Washington, D.C., board-certified in Psychiatry and Neurology, and a Professor of Neurology at Georgetown University School of Medicine, concluded that Christa Pike's brain was seriously damaged during fetal development. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4738, 4770-71). Dr. Pincus explained that the frontal lobe is the region of the brain where moral teaching is encoded. Later in life, this same region functions to regulate conduct in accordance with learned ethical standards. (*Id.* at 4773). Damage to an individual's frontal lobe thus obstructs moral learning. (*Id.*). Mental illness compounds this problem (*Id.* at 4774). So does abuse, and when all three of these factors are present, the individual is at a high risk for committing violent crimes. (*Id.* at 4751).

Dr. Pincus testified Ms. Pike was born with brain damage. (*Id.* at 4770-72). Abnormality in Ms. Pike's *basil ganglia* was clear to Dr. Pincus from consistent indications across a variety of

tests, including in the physical examination he performed on Ms. Pike, and in the electroencephalography (EEG) that had been conducted in 1977 when she was fourteen months old, and in a small heterotopia, visible to the naked eye, on a magnetic resonance imaging (MRI) scan performed on Ms. Pike at Dr. Pincus's request. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4764-71; R.12-5, Add.6, Doc.10, PC Exh.7, Christa Pike Birth Records, PageID# 8778). The EEG results were abnormal, "showing frequent high voltage sharp spikes and biphasic sharp waves . . . mostly from the right frontal temporal site focal." (R.12-5, Add.6, Doc.10, PC Exh.7, Christa Pike Birth Records, PageID# 8786). This was the first evidence of Christa's brain damage. Dr. Pincus explained that heterotopia is a phenomenon that occurs in a fetus as brain cells are developing and gray matter grows where gray matter does not belong. This happens because of some problem the mother is having, or perhaps, because she is drinking alcohol. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4771-72). A heterotopia is normally visible on an MRI only with the aid of a microscope, making Ms. Pike's heterotopia significant because when you can see it with the naked eye, you can be "certain that there's plenty more heterotopic areas and nests that exist that you can't see on MRI." (*Id.* at 4774-75). According to Dr. Pincus, this heterotopia found in Christa was consistent with her childhood seizures.

Dr. Pincus believed that Christa's brain damage is most likely the result of her mother's drinking while pregnant with her. (*Id.* at 4771-72). The record is replete with evidence that Christa's mother was an alcoholic and drank throughout her pregnancy with her. Christa's father, Glenn Pike, testified that he did not remember Carissa slowing her drinking anytime during their marriage, a period which included her pregnancy with Christa. (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4975). Furthermore, Christa's half-sister, Alicia Wills,

testified that her mother always drank a lot and that she often attended parties where there was drinking when her children were small. (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, PageID# 4912).

Dr. Pincus testified that Christa's brain damage diminished her capacity for moral reasoning because it was significant enough to interfere with her frontal lobe function. Consequently, Dr. Pincus concluded, Christa was likely born with a faulty system for incorporating morality from the world around her, and was likewise unable to place effective moral constraints on her conduct. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4776).

William Kenner, M.D., confirmed Dr. Pincus's findings. Dr. Kenner stated that Christa's EEG at 14 months suggested that her brain was not wired properly and the location of the damage was in the area that controls executive functioning and behavior regulation. Dr. Kenner agreed with Dr. Pincus that Christa's frontal lobe was significantly impaired. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, PageID# 6788-93).

Lay testimony shows that Christa exhibited symptoms of this brain damage from a very early age. Christa's aunt, Carrie Ross, testified that Christa did not seem to understand instructions, she would go right back to playing with something someone had told her not to touch. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4705-06). Christa's sister, Alicia Wills, testified similarly, recalling that Christa's Grandmother Fotos did not like to keep Christa because she was frustrated by Christa's failure to understand when she was being told what to do, she would just "blank out." (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, PageID# 4901-02). Thus, from the very beginning, Christa's brain damage caused her problems.

### C. Christa Pike's early life was characterized by instability, neglect and physical abuse. Furthermore, she was exposed to violence in an environment that condoned that violence.

After suffering prenatal brain damage, Christa's life outside the womb began traumatically. She was born prematurely in Beckley, West Virginia, and rushed to the intensive neonatal care unit of a hospital in Charleston, West Virginia. She suffered respiratory failure after birth and again in the ambulance on the way to the hospital. Christa was afflicted with hyaline membrane disease, which occurs when immature lungs prevent an infant from holding sufficient oxygen. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, PageID# 4575; R.12-5, Add.6, Doc.10, PC Exh.7, Christa Pike Birth Records, PageID# 8795, 8800).

Because Christa was in the neonatal unit for the first week of her life, she had no bonding experience with her parents. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6848). This first experience constituted early attachment abandonment trauma. This deficit might have been overcome by reasonable stability after Christa was sent home, but that did not happen, which resulted in lasting emotional and psychological damage. (*Id.*).

The evidence is overwhelming that from birth Christa's parents were disinterested in her well-being and treated her as an unwelcome nuisance. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4702-03; R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4785; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4978-80, 4985-90). This is best substantiated by the fact that when she was fourteen months old, during the aforementioned seizures, Christa's mother was out drinking and had to be chided into checking on her daughter. (R.8-10, Add.2, Doc.25, Carrie Ross, TT, PageID# 3063-64).

Christa's parents had a tendency to leave her with abusive caretakers. Among these was her maternal grandmother, Zola Fotos, an alcoholic who resented having to care for Carissa's second daughter. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4698, 4709-10). While Christa's grandmother Fotos was loving and nurturing to Carissa's first daughter, Alicia, she was not the same with Christa. (*Id.* at 4709-10). Grandmother Fotos showed her resentment of Christa. (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, PageID# 4901).

Christa was also left in the care of an abusive great-aunt, Norma Privett. Carrie Ross testified about Aunt Norma's abuse from having known it as a child. While caring for Ms. Ross, Aunt Norma was very abusive and would drag Ms. Ross around by the hair. Ms. Ross did not allow Aunt Norma to babysit any of her children. However, Aunt Norma did babysit Christa and Alicia until Ms. Ross persuaded Christa's mother against it. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4686-88).

The one bright spot in Ms. Pike's life was her Grandmother Pike. Shortly after Christa's birth, Grandmother Pike became her most consistent caretaker and appeared to be the only person in the world who loved her. Unfortunately, Grandmother Pike died when Christa was twelve. Christa felt she no longer had anyone who cared about her after Grandmother Pike's passing, and was devastated by the loss. (R.8-11, Add.2, Doc.26, Carrie Ross, TT, PageID# 3070-72; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4994).

Although Christa's Grandmother Pike brought a singularly positive dimension to Christa's childhood, even this relationship was not without its harmful side. When Grandmother Pike's boyfriend, Ernest, spent the night, Christa would sleep between him and her grandmother. Christa's aunt, Carrie Ross noticed that Christa stroked Grandmother Pike's breasts in an

inappropriate, sexual manner when she was two or two-and-half-years old. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History PageID# 7481; R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4712-13). Furthermore, when Christa was in the first grade, her teacher reported that she had been drawing pornographic pictures in class, suggesting some exposure to sex. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4715).

Neither of Christa's parents played a consistent role in raising her. While her parents were married, her primary care was delegated to Grandmother Pike. Once they were divorced, Christa was passed back and forth between them haphazardly, each reluctantly taking her in for a brief period before tiring of her and sending her to the other. (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4990-91). When Christa was eight or nine years old, her mother sent her to live with her father because her latest husband, Danny Thompson, told her that he did not like children and that Christa and her sister had to go. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4696-98). Christa's father initially took her in, but he later forbade her from entering his home after his wife alleged that Christa sexually abused their infant daughter even though he stated he never believed the allegations.[8] (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4992-93, 4997).

Christa's schooling was greatly disrupted because she was sent back and forth between her parents. She changed schools often (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, PageID# 6325), and never spent more than two years in the same school. (*Id.* at 6360). Despite her

[8] The post-conviction court found that "[t]here is no proof in the record that Ms. Pike was in any way abusive to any children in her family, or otherwise." (R.9-5, Add.4, Doc.5, PC Tech. Rec., Findings of Fact and Conclusions of Law, PageID# 4413).

above-average intelligence, she failed the seventh grade because she changed schools so many times that year. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6462).

When Christa's father was not neglecting his daughter, he was "disciplining" her in a physically abusive manner. Glenn Pike admitted during his post-conviction testimony that he whipped Christa with a belt when she disobeyed him. (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4985). He would beat her when she did not complete her homework. (*Id.* at 4986-87). On at least one occasion, he beat her five or six times on the same day because she did not complete her homework to his satisfaction. (*Id.* at 4988-89). While Mr. Pike downplayed these beatings as routine discipline, Mr. Pike grossly understated the violent nature of these whippings. Christa's back bears scars from these beatings that were most likely caused by a belt or switch. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4782).

During the times that Christa spent in her mother's house, she was left to fend for herself. Christa's aunt testified that Christa's mother placed her own appearance, clothing, drinking and the whims of her various husbands and boyfriends before the interests of her children. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4702). Christa's sister recalled one boyfriend in particular who frequently brought fast food and candy into the house and ate it in front of the girls, offering them nothing, though there was no food in the house. (R.9-9, Add.5, Doc.4, Alicia Wills, PCT, PageID# 4913-14).

Christa was also allowed to spend time in places where she was exposed to things that were inappropriate for her age. Christa was first exposed to pornography at five or six, when she played with her father's pornographic playing cards. She took these cards to school in either

kindergarten or first grade to show her classmates. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6868).

From the time that Christa was a toddler, she frequently spent days with her Grandfather Fotos in the slaughterhouse he owned. According to the testimony of Carrie Ross, Christa would first play with the cows in the holding pen. (R.9-23, Add.5, Doc.18, Carrie Ross, PCT, PageID# 6251-52; R.9-24, Add.5, Doc.19, Carrie Ross, PCT, PageID# 6278). Then, Christa would go into the slaughterhouse and watch as her grandfather knocked a cow unconscious, hoisted it by its hind leg, cut its throat, drained its blood, removed the guts, then bisected the cow down the spine using a meat saw. (R.9-23, Add.5, Doc.18, Carrie Ross, PCT, PageID# 6253-57). Dr. Kenner explained this overstimulation removes the natural inhibition to escalating violence that is inherent in individuals not similarly exposed. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6857).

Christa was raised with an extended family that condoned and revered violence as a means of problem solving. This value system was firmly entrenched. Christa's mother would commonly threaten physical violence whenever she was angry. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4692-93). Ms. Ross testified that the family was taught that the appropriate response to verbal or physical attack was physical violence. (*Id.*). On one occasion, Ms. Ross was ridiculed by her mother, Zola Fotos, for walking away when another woman tried to pick a fight with her. Ms. Fotos challenged her daughter to go back and finish the altercation, asking, "what are you going to kill her with?" and calling her a "coward." (R.9-23, Add.5, Doc.18, Carrie Ross, PCT, PageID# 6239-40).

This same message was delivered to Christa. Her Grandfather Fotos repeatedly told the grandchildren that if someone started a fight with them and they did not finish it, then he would "kick [their] ass" when they got home. (*Id.* at 6244). Grandmother Fotos echoed this message and family violence was the subject of many proud stories. Stories of murder and violence were passed down with pride and often told with humor. (*Id.* at 6236-44).

### D. During Christa's adolescence, as the neglect and abuse continued, she was repeatedly sexually assaulted and began to be "out of control."

When Christa was in fourth or fifth grade, her mother moved to North Carolina as a result of her latest marriage. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, PageID# 4578). About this time, Christa was sexually assaulted for the first time.

A man named Claude Davis, who lived in Christa's neighborhood, sexually assaulted her when she was 11 years old, violating her vaginally with sticks and allowing his dog to lick her genitalia. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4787; R.12-5, Add.6, Doc.10, PC Exh.5, Court Records from S. Carolina, PageID# 8735-40). Criminal charges against Davis were later reduced. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, PageID# 4589). Christa attempted suicide in response to her mother not believing she had been raped. (R.12-2, Add.6, Doc.7, PC Exh.1E, Mitigation Materials, PageID# 8315).

Christa was also subject to physical and sexual abuse from another of her mother's boyfriends. Steve Kyaw had boxes of pornographic pictures that Christa had access to, and would wrestle with Christa and twist her nipples. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4793-95; R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6855). When she was alone, Christa would occupy herself by watching the stacks of porno flicks until her mother came

home from work. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6868). Kyaw was eventually charged with assaulting Christa when he punched her in the nose. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, PageID# 4586). Carol Goehring, a childhood friend of Christa's, testified that she witnessed Kyaw assault Christa after she locked him out of her room. (R.9-11, Add.5, Doc.6, Carol Goehring, PCT, PageID# 5076-77). According to Goehring, Christa tried to defend herself with a knife and had to adjust her pants after getting away from Kyaw. (*Id.*). This is the "butcher-knife" incident that the prosecutor used in cross-examination of Christa's mother to show she was "out of control." (R.8-11, Add.2, Doc.26, Carissa Hansen, TT, PageID# 3103-04).

After Kyaw was charged with assault, Children Services became involved in Christa's life. Kerry Clement Sherrill testified that she met Christa while employed as a social worker for the Child Protective Services Unit of Orange County, North Carolina. (R.9-11, Add.5, Doc.6, Kerry Sherrill, PCT, PageID# 5107). Christa's case was assigned to Ms. Sherrill as a case of child abuse and neglect. Christa was in middle school at the time. (*Id.*). Ms. Sherrill devised a treatment plan that entailed Christa not being left alone with Kyaw, parental counseling for Christa's mother, and development of a better relationship between Christa and her mother, beginning with the two spending more time together. (*Id.* at 5108).

Through Ms. Sherrill's intervention, Christa was removed from her home and temporarily placed in the Scheaffer House boarding facility. (*Id.* at 5109). Ms. Sherrill testified that she had recommended that Christa's mother take parenting classes while finding a job that would allow her to be home more. According to Sherrill, Christa's mother did not take any of the steps

prescribed in the treatment plan and she seemed disinterested in assuring Christa's return home. (*Id.* at 5115-16).

However, Christa did eventually return home where her mother's parenting skills had not improved. Christa's mother's friend, Faye Guy, testified that Christa was inappropriately exposed to graphic images of gore and violence when Christa and her mother watched horror movies together. (R.9-10, Add.5, Doc.5, Faye Guy, PCT, PageID# 5033-34). Ms. Guy described these particular movies as "horrible, horrible bloody gory movies" that were simply not age-appropriate for Christa at the time. (*Id.*). She once told Christa's mother that these movies were inappropriate, but her mother laughed it off, saying, "[w]ell, she loves them. She's been watching those movies since she was two or three years old." (*Id.* at 5034-35). Christa's aunt, Carrie Ross, corroborated Christa's exposure to graphic violence in movies from a young age. (R.9-8, Add.5, Doc.3, Carrie Ross, PCT, PageID# 4733). Counter-intuitively, these movies had pleasant connotations for Christa because watching them was virtually the only way she was able to spend time with her mother as a child.

As a result of this chaotic childhood, Christa began acting out and suffered more abuse for it. Her sister's boyfriend, Brian Hammond, was dispatched to check on Christa while Christa's mother was out of town with a husband, and was angered to find that Christa was having a party at the house. He gave Christa a bloody nose. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, PageID# 4583-84).

Eventually, Christa, was put on probation for larceny and running away. When she did not comply with the conditions of her probation, she was sent to juvenile detention at a facility named Swannanoa. (R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, PageID# 5134-35). While she

was there, Christa's mother rarely visited and her father never did. (R.9-12, Add.5, Doc.7, Peggy Hamlett, PCT, PageID# 5179; R.12-1, Add.6, Doc.6, PC Exh.1D, McCoy Mitigation Materials, PageID# 8121; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4995). Employees at Swannanoa testified that Christa stayed there longer than most children placed in such facilities. Each believed that when Christa was doing well, she sabotaged herself to avoid being sent home. (R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, PageID# 5136-37; R.9-13, Add.5, Doc.8, Onas Perry, PCT, PageID# 5279).

Onas Perry, a cottage technician at Swannanoa, testified that on many occasions Christa sought her out late at night to talk one-on-one. On these occasions, Christa spoke about wanting a better relationship with her mother. Christa said that her mother was unavailable, and that she wished her mother loved and cared for her more. (R.9-13, Add.5, Doc.8, Onas Perry, PCT, PageID# 5266, 5270-71). Ms. Perry thought that Christa had a bad family situation (*id*. at 5279); she believed that the reason Christa was at the Juvenile Evaluation Center for fifteen or sixteen months was that it was a safe haven for her. (*Id.* at 5274).

At age seventeen, after leaving Swannanoa, Christa was living on the streets. (R.9-11, Add.5, Doc.6, Jamie Robinson, PCT, PageID# 5088-89, 5100). Her friend, Jamie Robinson, who spent much of this time with her, recalled once spending the night at Christa's house and noted that there was not much communication between Christa and her mother. (*Id.* at 5093). She also remembered an incident in which she and Christa were stopped by security officers at a mall and the officers called their parents. Jamie recalled that her own mother spent a long time on the phone with them, asking about her condition and asking to speak with her. Christa's

mother, in contrast spent "two seconds" on the phone. (*Id.* at 5096-97). Jamie felt that Christa's mother did not seem to care about what was happening to her. (*Id.*)

Around this same time, when Christa was seventeen, she was raped by a man who grabbed her when she was going to the store. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, PageID# 4590-91). Hospital records confirmed the rape. (R.12-5, Add.6, Doc.10, PC Exh.6, UNC Hospital Records, PageID# 8759-70).

Despite all of these difficulties, Christa decided that she still wanted to make something of herself. She wanted to help others and wanted a career. She decided she would go to the Job Corps in Knoxville. (R.9-6, Add.5, Doc.1, Carrisa Hansen, PCT, PageID# 4594-95).

### E. Knoxville's Job Corps was a violent, unsafe environment where Christa's psychological make-up made her vulnerable to the influence of her new boyfriend, Tadaryl Shipp. Her background, along with the new dangers from the Job Corps, led post-conviction expert, Dr. Kenner, to diagnose her with Post-Traumatic Stress Disorder (PTSD).

William Joseph Mode, an instructor at the Job Corps, testified that the Job Corps facility was dangerous for both students and faculty. (R.9-13, Add.5, Doc.8, William Mode, PCT, PageID# 5306, 5309-13). Many students were armed with either knives or guns, and Tadaryl Shipp, Christa's boyfriend was widely known to carry a gun. (*Id.* at 5313).

Andrew Scott Drace attended Job Corps at the same time as Christa and testified that Job Corps was a very violent place due to the presence of gangs and predatory students who picked on others. (R.9-12, Add.5, Doc.7, Andrew Drace, PCT, PageID# 5219). He indicated that because he was white, the gang members would come into his room and put a towel or sheet over him and beat him up. (*Id.* at 5221). Tadaryl Shipp was one of these gang members. (*Id.*).

Drace stated that on one occasion, Shipp tried to pick him up and throw him off of a bridge onto a railroad track some 200 feet below. (*Id.* at 5225). Drace managed to get away when several cars crossing over the bridge stopped to investigate and Shipp was distracted. (*Id.* at 5226).

Kimberly Iloilo Rhodes was a student at Job Corps and a friend of Christa's. (R.9-13, Add.5, Doc.8, Kimberly Rhodes, PCT, PageID# 5336). Rhodes testified for the State at Christa's 1996 trial. (*Id.* at 5336-37). She said that Job Corps was scary at times, and that she was afraid for her personal safety. She elaborated that there was a lot of animosity between different groups, and that this sometimes led to violence. (*Id.* at 5339-40).

Tyrone Comfort testified that he was a friend of Christa's at the Job Corps where they were both students. According to Comfort, Shipp was very controlling of Christa and was physically abusive. On one occasion Comfort heard Shipp and Christa arguing loudly in Shipp's room and the next morning he observed a bruise under her eye that wasn't there the day before. On another occasion, he witnessed Shipp "back hand[] her in the mouth" causing her lip to bleed. (R.9-15, Add.5, Doc.10, Tyrone Comfort, PCT, PageID# 5533, 5535-37, 5545).

Dr. Kenner explained how Christa's psychological state and all of these factors around the Job Corps affected her relationship with co-defendant Shipp, with whom she was infatuated. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6911). Shipp was violent and dangerous. He had been involved in gang-related violence before coming to Job Corps and he, "was flirting with voodoo, and black magic [and] devil worship. . . ." (*Id.* at 6912). His appreciation of violence and satanic worship exerted a strong influence on Christa. Christa was willing to adopt his interests in an effort to please him just as she had once shared her mother's interest in horror

movies in order to spend time with her. Around the time of the offense in this case, Shipp was sexually involved with other women besides Christa. Shipp had a history of both manipulating and abusing adolescent girls, he also had a history of threatening the girls he dated if he did not get his way. (R.9-15, Add.5, Doc.10, DeAndrea Gates, PCT, PageID# 5559-61; R.9-16, Add.5, Doc.11, Amanda Robertson, PCT, PageID# 5597-5605).

Christa's young life was marred by neglect, abuse, overstimulation and glorification of violence, which affected the development of her brain. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6885-88, 6891). The danger and violence of the Job Corps affected it further. Dr. Kenner explained how various stress hormones–produced in response to near-perpetual fear of something bad happening–lead to development of post-traumatic stress disorder ("PTSD"). (*Id.* at 6882, 6885-88). After reviewing the criteria for PTSD, Dr. Kenner indicated to a reasonable degree of medical certainty that Christa suffers from PTSD. (*Id.* at 6891-95).

Christa's PTSD is evident in looking at the events that led up to the offense in this case. In the months leading up to it, Christa was surrounded by circumstances that greatly amplified her potential for violent behavior.

**F. The evidence demonstrates that Christa Pike suffers from bipolar disorder.**

In addition to evidence of brain damage and PTSD, Christa Pike presented extensive evidence that she suffers from another significant mental illness, bipolar disorder. This evidence, like that in support of her brain damage, was presented through both expert and lay witnesses. Dr. Kenner testified that he had reached an expert opinion that Christa suffers from bipolar disorder based on a review of her entire social history as well as evaluations from other mental health professionals. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, PageID# 6774). In addition, Dr.

Kenner interviewed Christa eight times and conducted a collateral interview with Christa's mother. (*Id.* at 6765, 6775).

Dr. Kenner explained that individuals with bipolar type II disorder, which was his diagnosis for Ms. Pike, will have racing thoughts and be highly impulsive. (*Id.* at 6778). Dr. Kenner described this as akin to driving with the cruise control on and set between 95 and 120 miles per hour. (*Id.*) As a result, when confronted with problems, hypomaniacs like Christa are certain to make rash, poor decisions. (*Id.*) Dr. Kenner further explained that bipolar disorder creates in Ms. Pike a sense of omnipotence and grandiosity, making her feel invulnerable to danger. (*Id.* at 6778-79). A person with bipolar type II disorder will also have periods of depression, which Dr. Kenner noted, explains Christa's suicide attempts. (*Id.*)

Dr. Kenner also found ample evidence of bipolar disorder in Ms. Pike's life history. For instance, Ms. Pike had long exhibited the extended periods of manic energy that are symptomatic of bipolar disorder and that are characterized by lack of sleep. (*Id.* at 6775-76). Dr. Kenner testified that another feature of Christa's bipolar disorder is periodic bouts of mounting irritability. Dr. Kenner saw evidence of this symptomatic irritability in Christa's conduct in the course of killing Ms. Slemmer. He testified that just prior to this incident, Christa was experiencing long cycles of sleep deprivation with increasing irritability. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, PageID# 6783-84). At the time of Ms. Slemmer's killing, Christa had been awake for four days and her irritability was at its apex. (*Id.* at 6784).

Lay witness testimony supports the diagnosis of bipolar disorder. Kristina Hargis, a social worker at the Swannanoa facility, testified when she knew Christa when she was about fifteen and Christa was depressed and struggling. (R.9-12, Add.5, Doc.7, Kristina Hargis, PCT,

PageID# 5192). Ms. Hargis reported that Christa exhibited drastic mood changes, alternating between being up, full of life, and mischievous on the one hand, and depressed, upset, and crying on the other. (*Id*. at 5197).

Orlando Powell, a former boyfriend of Christa's, testified that he spent a lot of time talking with Christa while she was a teenager and recalled that she was not happy. He also recalled that she had a temper and could go from "zero to 100" very quickly. However, whenever her tempered flared up, if he was around, he was able to get her to calm down and regain control. (R.9-11, Add.5, Doc.6, Orlando Powell, PCT, PageID# 5055-56). Powell also recalled that Christa had a very high energy level. (*Id.*).

Peggy Hamlett, the Chief Court Counselor for Orange and Chatham Counties, North Carolina Department of Juvenile Justice, testified that as a young teenager, Christa was "really out of control" and exhibited impulsive behavior by skipping school, running away from home, and not keeping appointments while she was on probation. (*Id.*, Peggy Hamlett, PCT, PageID# 5139; R.9-12, Add.5, Doc.7, Peggy Hamlett, PCT, PageID# 5143). Similarly, Debby Howell Burchfield, the Director of the Buncombe Juvenile Detention Center in Asheville, North Carolina, testified that her records indicate that Christa was depressed and often cried in her room and that she was written up for self-mutilation which Ms. Burchfield explained is typically perceived as indicative of deeper psychological issues requiring further evaluation. (*Id.*, Debby Burchfield, PCT, PageID# 5169-71). Ms. Burchfield also reported that Christa usually exhibited a higher energy level than most teenagers, but that Christa would very quickly go from happy to depressed. (*Id.* at 5174-75).

Onas Perry testified that she worked at the Swannanoa Juvenile Evaluation Center while Christa was there. (R.9-13, Add.5, Doc.8, Onas Perry, PCT, PageID# 5266). Ms. Perry worked the 2:00 to 10:00 p.m. shift at Swannanoa and was with the students from after school until they went to sleep at night. (*Id*. at 5267). She explained that part of her job entailed checking on the girls every 15 minutes while they slept. (*Id*. at 5273). She noted that Christa would be asleep and then would wake up in her sleep as though having a nightmare. (*Id.*). Ms. Perry noted that Christa's moods were different from those of the other girls: sometimes she was calm, others she was rambunctious, out of control, and overly energetic, and still others she was depressed and would stay in her room, crying. (*Id.* at 5278).

### G. Despite her tragic background and despite the facts surrounding the offense in this case, many witnesses were willing to come forward to testify about Christa Pike's positive characteristics.

Many witnesses came forward in post-conviction to testify about Christa's intelligence, good humor, and humanity. Christa was able to exhibit these characteristics despite her troubled background and the devastating effects it had on her. Such testimony would have been essential to humanize Christa and show the jury that Christa's life has value and a life sentence was warranted.

Kerry Sherrill, the social worker for Child Protective Services assigned to Christa's case, kept a picture of Christa, and explained that she kept pictures of the children who touched her most. (R.9-11, Add.5, Doc.6, Kerry Sherrill, PCT, PageID# 5117-18). She recalled that she met Christa as a middle school student and described her as a bright, respectful, and warm young woman, easy to get along with, who enjoyed the attention of adults. (*Id.* at 5107). She was also

loyal to her friends. (*Id.* at 5117). Although Christa sometimes acted out, it was out of need for attention. (*Id.*)

Peggy Hamlett testified that Christa was clearly very bright and that her teachers reported that she had great potential. (R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, PageID# 5139).

Carol Goehring, a one-time close friend of Christa's, testified that Christa held friendship in very high regard and was very loyal. Christa seemed happy and was very energetic, always wanting to do something fun. (*Id.*, Carol Goehring, PCT, PageID# 5082-83). She recalled a time when a new girl in town named Brandy was put out of her home and had nowhere to go. Christa was concerned for Brandy's safety and stayed with her on the streets. (*Id.*).

Debby Burchfield, who worked with Christa while she was housed at the Swannanoa juvenile detention facility, described Christa as "bright" and "very personable." (R.9-12, Add.5, Doc.7, Debby Burchfield, PCT, PageID# 5163). She recalled that Christa planned to enroll in technical college to study nursing with a long term goal of becoming a physician's assistant. (*Id.*). Ms. Burchfield testified that she considered Christa's goals attainable. (*Id.*). She pointed out that, while at Swannanoa, Christa completed her GED and applied to Job Corps. (*Id.* at 5165).

Marshall Muse was Christa's teacher at Swannanoa's training school. (*Id.*, Marshall Muse, PCT, PageID# 5205). At first, he said, Christa was defiant in his class and he wrote her up for misbehavior numerous times. But after Christa understood that Mr. Muse was in charge, she began to work in his class and he saw "flashes that there's something special, something different, something that set her apart from the other students." (*Id.* at 5206-07).

Mr. Muse then made Christa a teacher's aide. (*Id.*). In that capacity, she performed tasks for him in the afternoon, and he could always count on her to do what she was assigned. (*Id.* at 5207). She was trusted not only by Mr. Muse, but also by other faculty members. Consequently, she was given many assignments and had the run of the campus to perform various errands. Mr. Muse also indicated that he and Christa had a healthy respect for each other and that she had a delightful sense of humor. (*Id.* at 5208). Christa loved to be challenged intellectually and rose to the occasion each time. (*Id.* at 5211). According to Mr. Muse, Christa did well, whether she was working with under-achieving students or doing menial chores, like cleaning up the classroom. She respected the other students, and Mr. Muse even had her substitute for him when he was absent. (*Id.* at 5212-13).

Mr. Muse recalled that in response to one particular Thanksgiving writing assignment, Christa included him in her story as the "mean Muse" pitted against a pumpkin, the story's protagonist. Mr. Muse noted that the story was in good humor and he published it for the whole campus to enjoy. (*Id*. at 5209).

On a different writing assignment, however, he recalled writing Christa up for not doing the assignment satisfactorily. He had asked the students to write about heroes and observed that Christa had waited until the last seven minutes of the period to write anything and then simply scrawled a "smart-alec" response. (R.12-2, Add.6, Doc.7, PC Exh.1E, Mitigation Materials, Page ID 8368). However, he was impressed when she wrote a lengthy appeal in which she explained why she had trouble writing about "heros." (R.9-12, Add.5, Doc.7, Marshall Muse, PCT, PageID# 5210-11).

Onas Perry, Christa's cottage technician at Swannanoa, testified that Christa generally got along with the other girls in the cottage. She noted that on one occasion, Christa comforted another girl who was upset, telling her that everything was going to be okay. (R.9-13, Add.5, Doc.8, Onas Perry, PCT, PageID# 5282). She also recalled that each time a new girl arrived, Christa would take the lead in trying to make the girl feel welcome. (*Id.*).

Kimberly Iloilo Rhodes met Christa on Kim's first day at Job Corps. After she finished orientation, Kim sat with Christa and they talked for four or five hours, immediately becoming close friends. (*Id.*, Kim Rhodes, PCT, PageID# 5341). Kim and Christa had a "really good relationship" and shared with each other whatever they had. Kim thought that she felt close to Christa because neither of them felt like they fit in with their family. (*Id.* at 5341-42). They confided in one another. (*Id.*).

**H. Conclusion**

In sum, the facts of this case add up to a case in mitigation that is very different from the one presented at trial. Whether because of trial counsel's incompetent abandonment of the evidence uncovered in Dr. McCoy's investigation or due to their incompetent investigation, trial counsel failed to present mitigation evidence that would have made a difference. Instead of advocating for a life sentence because that would punish Christa by depriving her of notoriety, counsel could have argued for a life sentence because Christa suffered from brain damage, serious mental illness as well as a tragic history of abuse and neglect. They could have further shown that she had positive characteristics and was worthy of being spared.

## PETITIONER PIKE'S CONSTITUTIONAL CLAIMS FOR RELIEF

## GROUND ONE

**Christa Pike's attorneys were constitutionally ineffective during the penalty phase of her capital trial and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Even though Christa Pike's trial counsel recognized that the penalty phase was where her case would be won or lost, their mitigation presentation was short, limited in scope, and disjointed. Furthermore, it painted a very negative image of Christa. Counsel failed to present important aspects of her background and failed to make any attempt to connect that background to the limited mental health testimony presented in the guilt phase. Rather than proceeding according to plan, counsel made abrupt, last-minute decisions about who to call and what to present. Because counsel failed to understand or comply with disclosure rules, they were further having to face devastating cross-examination from the State after turning over the entirety of their mitigation investigation work product. The result was predictable: Christa Pike was sentenced to death.

This outcome was not inevitable. A wealth of mitigating evidence was available that could have been presented to the jury: some that counsel had uncovered in their investigation, as well as a great deal of evidence that counsel could have found if their investigation had been adequately thorough. If this evidence had been presented to the jury by competent counsel, there is a reasonable probability that at least one juror would have voted for a life sentence. The Tennessee's courts' decision to the contrary was unreasonable.

Petitioner Pike presented the issue of counsel's ineffective assistance in the penalty phase to the Tennessee courts during post-conviction and the Tennessee courts addressed this issue on the merits. *Pike,* 2011 WL 1544207, at *51-52, *55-59. However, while the Tennessee courts correctly recognized that this issue was governed by *Strickland v. Washington*, 466 U.S. 668 (1984), the courts' resolution of this issue was an unreasonable application of *Strickland*. For one thing, in its final analysis the Tennessee Court of Criminal Appeals applied an outcome-determinative test to the prejudice prong that was unreasonable. *Pike*, 2011 WL 1544207, at *52. More importantly, the court's application of *Strickland*'s two prongs was unreasonable both by finding that trial counsel's decisions were reasonable and that their failure to present evidence was not prejudicial. Here, a careful analysis of the record demonstrates Petitioner Pike's right to habeas relief. This Court must grant summary judgment in her favor.

### A. Trial counsel's last-minute decision to change their mitigation presentation constituted ineffective assistance of counsel.

#### 1. The state courts' conclusion that counsel's performance in the penalty phase was not deficient was unreasonable.

It is undisputed that a last-minute change of plans led to a very limited mitigation presentation during the penalty phase of Ms. Pike's capital trial. Such a limited presentation was not based on any researched, reasoned or legitimate legal strategy on the part of counsel. Rather, counsel abandoned plans to use compelling mitigating evidence that had already been discovered in a panicked, last-minute decision. This happened despite the fact that according to Pike's lead trial attorney, "I don't think there was any question it was a penalty phase case." (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5982). Because counsel fully anticipated that the case would proceed to the penalty phase and because much investigation and research had been done

in the six months preceding trial, there was no legitimate reason for competent counsel would have to make a sudden, last-minute decision to entirely abandon the plan that had been formulated, as well as abandon most of the evidence that had been gathered. The result was a very incomplete and inadequate presentation. The decision to settle for such a presentation was constitutionally deficient.

William Talman was appointed lead counsel in Ms. Pike's case on May 25, 1995. (R.9-19, Add.5, Doc.14, Bill Talman, PCT, PageID# 5915). He brought on Dr. Diana McCoy to serve as mitigation specialist several months later. (*Id.* at 5935). For the penalty phase, Mr. Talman recalled that, "our plan was to try and have Dr. McCoy bring all this stuff in, you know, about [Ms. Pike's] background and tie it in with Dr. Engum's report." (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5987). Dr. McCoy spent six months interviewing Ms. Pike, her family, and friends, and assembling three volumes of notes ("Mitigation Materials") and a 60-page summation ("Social History"). Dr. McCoy remembered that Talman planned to call her as the only witness in mitigation. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6388). Using Dr. McCoy as a witness was counsel's plan up through the day the jury returned a guilty verdict and the day the penalty phase was set to begin. (*Id.* at 5995-96, 6009).

On that Friday afternoon immediately after the jury announced its guilty verdict, the trial court called a meeting *in camera* to discuss the parties' plans for the penalty phase. The *in camera* proceedings were not transcribed, and on post-conviction, no party to the meeting could recall precisely what transpired there. (R.10-7, Add.5, Doc.27, Judge Leibowitz, PC Motions Hrg., PageID# 7087-89). The only fact that is clear today is that defense counsel handed over the entirety of Dr. McCoy's investigation and work product in the form of her Mitigation Materials

and Social History to the prosecutor. (R.8-10, Add.2, Doc.25, Bill Crabtree, TT, PageID# 3030). Prior to this meeting, counsel had not disclosed any report from Dr. McCoy.[9] Immediately after the *in camera* meeting, the parties returned to the courtroom where, on the record, the trial court recessed the penalty phase until the following morning to allow the State time to review Dr. McCoy's materials. (*Id.*, Judge Leibowitz, PageID# 3031; R.10-7, Add.5, Doc.27, Judge Leibowitz, PCT, PageID# 7089).

There appears to be no justification for trial counsel's actions regardless of what the trial court may have ordered. *See* Ground One (C) *infra* at pp.75-81. A large part of Dr. McCoy's materials were indisputably work-product: these materials contained her interviews with prospective witnesses and her impressions of whether they would make good witnesses as well as how counsel might choose to present them. Such material is not discoverable since they do not constitute "results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case." Tenn. R. Crim. P. 16(b)(1)(B). While a report from a testifying expert offering expert opinion following testing is discoverable, *see* Tenn. R. Crim. P. 16(b)(1)(B), this was not the substance of Dr. McCoy's investigation materials. *See* Dr. McCoy's testimony that she was not an expert. (R.10-1, Add.5, Doc.21, Dr. McCoy, PCT, PageID# 6501-04). Dr. McCoy's "Social History" does not offer an expert opinion.

After turning all of the materials over to the State, Mr. Talman was unable to point to a "conclusory report." (R.8-10, Add.2, Doc.25, Bill Talman, TT, PageID# 3033-34). Thus, the

---

[9] *See* Tenn. R. Crim. P. 16(b) Disclosure of Evidence by the Defendant, and Tenn. R. Crim. P. 26.2, Production of Statements of Witnesses.

trial court was unaware of whether there was opinion testimony even though it appears she ordered disclosure:

> MR. CRABTREE: Your Honor, in the brief time that we have had to review the three volume report that we were provided, being the report of Dr. McCoy, we have been unable to find a conclusion, or a summary, or an opinion rendered by Dr. McCoy.
>
> And we need to know if there is anything else, any other report, an addendum to this report--
>
> THE COURT: Is there a conclusory report that you know of?
>
> MR. CRABTREE: --something that will show us what, in fact, her opinion is, rather than just this gross material.
>
> THE COURT: I understand.
>
> MR. TALMAN: Your Honor, as I explained in chambers, I had just received this documentation earlier this week myself.
>
> THE COURT: And I might add, it is a three volume document.
>
> MR. TALMAN: Yes, Your Honor.
> And it is my belief this is everything, but if we, after adjourning Court, I will contact Dr. McCoy and immediately convey to Counsel--
>
> THE COURT: I would appreciate it if you would do that as soon as I have adjourned--
>
> . . .
>
> MR. CRABTREE: . . . If Counsel will make a request of Dr. McCoy as to whether or not there is a report that concludes her findings.
>
> THE COURT: I did not see one in my very quick perusal, also.

(R.8-10, Add.2, Doc.25, TT, PageID# 3033-34).

Even after Talman had turned over the entirety of Dr. McCoy's materials, the record demonstrates that neither the attorneys nor the trial court knew whether it contained any expert opinion. In fact, the Social History does not contain such opinion testimony, and was therefore, not subject to disclosure under the rule.

Talman's strategy was to rely on Dr. McCoy to present an overview of Christa's life to the jury. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5986-87; R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6388, 6414). However, a competent attorney would know that Dr. McCoy could only testify to expert opinions that she had reached and that any background testimony she offered would have to be in support of that diagnosis. *See State v. Howard*, No. E2007-00178-CCA-R3-PC, 2008 WL 1805758 (Tenn. Crim. App. Apr. 22, 2008) (Court "emphasized that Rules 702, 703, 704 and 705 of the Tennessee Rules of Evidence do not contain exceptions to the hearsay rule. *See* Tenn. R. Evid. 803. However, an expert witness may base his or her opinions, at least in part, on "facts" ascertained from statements which would be inadmissible hearsay. *See* Tenn. R. Evid. 703.") She could not simply get up and tell Christa's life history unless that information was used by her to reach an expert opinion. Therefore, if she was not offering an opinion, her testimony was inadmissible. If however, she was offering an opinion, competent counsel would have known that.

There was no legitimate reason for the trial court to order Talman to turn over Dr. McCoy's materials, or for Talman to turn them over without objection. If Dr. McCoy was not offering expert opinion or the results of testing or of mental or physical examinations, then there would also be no justification for the disclosure of her materials. And, if she were offering an opinion, then it was incumbent upon counsel to ask her to prepare a report containing that

opinion so that they would be in compliance with the Tennessee rules for discovery. Tenn. R. Crim. P. 16(b). If Dr. McCoy were acting as an investigator, then under the rule, there would appear to be no need to disclose her investigatory work-product. Finally, it is obvious that the only discoverable reports are those that come from a person "the defendant intends to call as a witness at trial." Tenn. R. Crim. P. 16(b)(1)(B)(iii). This discovery obligation mandates that counsel be aware of exactly who they are going to call as witnesses in order to comply. The Pike team made that decision only after they had turned over all of the materials.

If Talman was asking Dr. McCoy to prepare opinions in order to make her a competent witness at the penalty phase, then it was his duty to communicate that to her. The state court found that there may have been a "misunderstanding" between Talman and McCoy. *Pike*, 2011 WL 1544207, at *52. However, any such "misunderstanding" would cripple the presentation of the penalty phase. Counsel had a duty to be informed a to what their expert was doing so that they could plan their presentation. *See Richey v. Bradshaw*, 498 F.3d 344, 363 (6th Cir. 2007) ("A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is.")

Both Dr. McCoy and Mr. Talman testified that Dr. McCoy did not conduct mental examinations or testing. (R.10-1, Add.5, Doc.21, Dr. McCoy, PCT, PageID# 6501-04; R.9-22, Add.5, Doc.17, Bill Talman, PCT, PageID# 6177). Therefore, unlike Dr. Engum, she was not offering an opinion on Christa's mental condition. Counsel had a duty to be well-aware of this, particularly on the eve of the start of the penalty phase.

Regardless of whether the trial court made a ruling on discovery and regardless of whether that ruling was right or wrong, counsel was deficient for failing to make any record of it, or to object (on the record) for any part of the decision that went beyond the applicable rules for discovery. Counsel had an absolute duty to protect their work-product from discovery or to make a record for appeal that they were ordered to turn over privileged materials over objection. To preserve issues on the record is one of the most basic duties of a trial lawyer, not to mention a criminal defense attorney. *See* ABA Standard 4-7.1(d) (1979) (stating that criminal defense attorney has a "duty to have the record reflect adverse rulings or judicial conduct which the lawyer considers prejudicial to his or her client's legitimate interests"). *Howard v. Bouchard*, 405 F.3d 459, 480 (6th Cir. 2005). Any *post hoc* argument that they had to limit their mitigation presentation out of the fear of disclosing negative facts must be considered in light of this first glaring failure. If a last-minute decision by the trial court caused them to alter their mitigation strategy, they had a duty to object and to make a record of their objection.

The Tennessee courts found that this last-minute decision to completely change plans did not amount to deficient performance:

> counsel made a reasonable choice to try to limit what came before the jury and from whom. Counsel's original choice to have the information explained by an expert rather than lay witnesses who could not explain the petitioner's behavior was understandable. Once the *exigent decision* was made that Dr. McCoy would not testify, counsel strategically decided to have the petitioner's parents and aunt testify to bring out the petitioner's life history to be considered[. ]

*Pike*, 2011 WL 1544207, at *51 (emphasis added). This opinion is unreasonable because it completely ignores the fact that there is no legitimate reason for counsel having to make this "exigent decision." Competent counsel would have avoided any such exigency.

There is no dispute that defense counsel turned over Dr. McCoy's materials right after the jury returned a verdict of guilt but that Dr. McCoy was not called to testify. With no witnesses under subpoena for the sentencing phase, counsel called the members of Ms. Pike's family who happened to be present: Ms. Pike's mother, father, and aunt.[10] (R.8-10, Add.2, Doc.25, Carrie Ross, TT, PageID# 3048-65; R.8-11, Add.2, Doc.26, Carrie Ross, Glenn Pike & Carissa Hansen, TT, PageID# 3069-3111). These witnesses were asked to testify just before the proceedings began, and their testimony was unprepared. (R.9-6, Add.5, Doc.1, Carissa Hansen, PCT, PageID# 4563-64; 4569-70; R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4682-84; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4961-62; R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6415-16). On cross-examination, the State made use of Dr. McCoy's Mitigation Materials to impeach these witnesses and emphasize negative facts about Ms. Pike. In this manner, Ms. Pike's planned mitigation case unraveled: the privileged information gathered by her mitigation specialist was presented by the State, and in the worst possible light.

This was the presentation allegedly necessitated by counsel's "exigent decision." But what brought on such a decision and can it be competent performance? Despite having worked with Dr. McCoy for more than six months, Mr. Talman testified that on the day before the penalty phase, or perhaps after it had begun, he learned what Dr. McCoy's testimony would be:

> [I]t was just one of these little huddles outside during a break or something, you know--we're going to start this phase, going to put this witness on, going to start with this, going to put you on. To Dr. McCoy, "I'm going to have you corroborate Dr. Engum's report and go through things." And she said, "I can't do that; I didn't conduct an evaluation of Miss Pike." And at that point is when I made the decision.

---

[10] According to the state court opinion, these are the "lay witnesses who could not explain the petitioner's behavior." *Pike*, 2011 WL 1544207, at *51.

(R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 6010).[11] This is inexcusable. Counsel had been working with Dr. McCoy for more than six months and should have known her position on this key aspect of the mitigation case. Furthermore, even if Dr. McCoy were not asked to corroborate Dr. Engum's diagnosis, she still could have provided valuable background information if she were properly qualified as an expert offering an opinion. The facts supporting her opinion would have been consistent with Dr. Engum's diagnosis. The exigent circumstances were created by defense counsel because they did not know their own case.

The state post-conviction court excused the discrepancy between Mr. Talman's and Dr. McCoy's testimony, finding that it "could easily be explained as a misunderstanding between the two." (R.9-5, Add.4, Doc.5, PC Tech Rec., Findings of Fact and Conclusions of Law, PageID# 4472). However, as the Sixth Circuit has pointed out in *Richey*, resolving any misunderstanding was counsel's constitutional responsibility and needed to be worked out well before the eve of the mitigation hearing.

Mr. Talman testified on post-conviction to other reasons for pulling Dr. McCoy's testimony. He explained that he was hesitant to put Dr. McCoy on the stand because there were things in her report that he did not want to come in. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 6006). However, Talman testified that he knew the facts in Dr. McCoy's Mitigation Materials long before the penalty phase began because the two were in regular contact throughout Dr. McCoy's investigation. (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, PageID# 6338). In fact,

[11] This explanation is contrary to Dr. McCoy's testimony as well as information in Dr. McCoy's materials that corroborate the theme of borderline personality disorder. (R.9-24, Add.5, Doc.19, Dr. McCoy, PCT, Page ID# 6308, 6319-20; R.11-2, Add.6, Doc.2, PC Exh.6, Suggested Mitigation Themes, PageID# 7340).

on the basis of Talman's understanding of Dr. McCoy's findings, he had planned to present the overview of Christa's life through Dr. McCoy up until the day before the penalty phase began. Talman's reasoning for suddenly jettisoning their case is still unjustifiable because once defense counsel had turned over the entire file, the State was able to use it to introduce much of the negative evidence that Mr. Talman was allegedly so fearful of. Calling Dr. McCoy as a witness could only serve to explain and mitigate any damaging use of the facts by the State.

Mr. Talman testified that another factor in his decision to pull Dr. McCoy's testimony was the fact that Dr. McCoy had dated William Crabtree, the State's lead prosecutor on the case. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 6010). Yet, although Mr. Talman claimed to have discovered this information shortly before trial, he did not discuss it with either Mr. Crabtree or the trial court, and he did not seek a continuance for the purpose of replacing Dr. McCoy. (*Id.* at 6011, 6013-14). Talman explained that, this was because, "I never doubted Dr. McCoy's work. I never doubted Dr. McCoy's integrity. She assured me she had never talked to Mr. Crabtree about this case. I have no reason to doubt Mr. Crabtree's integrity." (*Id.* at 6013). Again, if this factor troubled Mr. Talman, his words and actions suggested the contrary. And if it did trouble him, he had a duty to protect his client's case and raise the issue before the court.

The Court of Criminal Appeals' decision finding counsels' decision to be a competent one is unreasonable because it ignores the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, the Court warned review courts to look carefully at the "record of the actual sentencing proceedings" to determine counsel's decisions were based on "reasoned strategic judgment." *Id.* at 526. Where the actual sentencing record does not support a finding of a reasoned strategic decision, counsel's attempts to justify this decision "resemble[ ] more a *post*

*hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id.* at 526-27. Here the actual record shows that the decision to withdraw Dr. McCoy as a witness was made "exigent" by counsel's own conduct. Furthermore, counsel's explanation that he "wanted to limit what came before the jury" is clearly *post hoc* because he'd already given all of McCoy's information to the State. Just as in *Wiggins*, the Tennessee Court of Criminal Appeals often credits counsels' decisions as strategic but notes that "courts should defer to trial strategy or tactical choices if they are *informed* ones based upon *adequate preparation*." *Pike*, 2011 WL 1544207, at *45 (emphasis added). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Cauthern v. Colson*, 736 F.3d 465, 486 (6th Cir. 2013) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)). Defense counsels' rash, last-minute decision to completely abandon their plan for the presentation of mitigation cannot be reasonable because it was based on a lack of knowledge about their own case and a failure to protect their own work product.

Furthermore, counsels' original plan lacks any reasoned basis of admissibility since Dr. McCoy did not conduct testing or reach a diagnosis. (R.10-1, Add.5, Doc.21, Dr. McCoy, PCT, PageID# 6501-04; R.9-22, Add.5, Doc.17, Bill Talman, PCT, PageID# 6177). If counsel asked her to do this, her report contains no such information. Counsel's performance fell below competent standards because counsel had an obligation to plan and prepare for the penalty phase. *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005). This planning necessarily included anticipating discovery disclosure requirements as well as the hearsay rules, so that there would be no last-minute surprises. In addition, counsel had an obligation to place the trial court's order to disclose confidential work product on the record, to object and to appeal. *See Strickland*, 466 U.S. at 689

("Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."). Finally, counsel had an absolute obligation to know their case and the witnesses who could establish it, under the applicable rules, so that there would not be a last-minute "exigent decision" to change the entire plan that would necessarily leave out crucial mitigating evidence and arguments. All of the problems were caused by counsel's lack of preparation. Christa Pike's attorneys failed in all of these obligations and the state court conclusion that their performance was not deficient is unreasonable.

**2. The Tennessee courts' decision that Petitioner Pike was not prejudiced by counsel's failure to present the mitigation evidence Dr. McCoy had gathered is unreasonable.**

Petitioner Pike was prejudiced. Because of counsel's last-minute decisions, no witnesses were under subpoena and counsel had to make do with those people who were available. The witnesses presented were Ms. Pike's family members who happened to be present and who were unprepared to testify. These were the witnesses that Mr. Talman had earlier hesitated to call because they were "lay witnesses who could not explain the petitioner's behavior." *Pike*, 2011 WL 1544207, at *51. None of them could speak of Ms. Pike's diagnosis of borderline personality disorder and no explanation of this disorder or its mitigating value was presented. Dr. Engum was not recalled so there was no penalty phase testimony about Ms. Pike's mental health or how her tragic background may have caused or influenced this personality disorder. The actual presentation was short, disjointed and very incomplete. Many aspects of Christa Pike's history and her character were never presented to the jury. Therefore, the state courts' conclusion that "[m]uch of the evidence presented by the petitioner here was presented to the jury in one of the phases of the trial" is completely inaccurate and unreasonable considering that

state court record. Where evidence presented in post-conviction is "much more extensive, powerful and corroborated" than what was presented at trial, a habeas petitioner has shown prejudice. *Goodwin v. Johnson*, 632 F.3d 301, 328 (6th Cir. 2011).

Significant portions of Dr. McCoy's Social History, with context about how events in Ms. Pike's background shaped her into the adolescent she became, were never presented. Testimony from Dr. McCoy in post-conviction, along with the records she collected reveals a part of the mitigation case that could have been presented at trial and shows relevant aspects of Christa Pike's history that the jury never knew.

No testimony was presented at trial that would have shown that Christa's mother was married five times during Christa's childhood and that she had numerous affairs with other men as well as live-in boyfriends during that time. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7480, 7482-83, 7485).

While Christa's father testified at trial that he was a "strict disciplinarian," Christa told Dr. McCoy that he would beat her with a belt. (R.8-11, Add.2, Doc.26, Glen Pike, TT, PageID# 3083; R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7491). This was later confirmed by Dr. Pincus who was able to do a physical examination of Christa and identify the physical scars left by the beatings. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4782-83).

The sentencing jury never knew that Christa was shuffled back and forth between her parents to such an extent that she failed school in the third and seventh grades despite the fact that Dr. Engum testified that she was "very intelligent."[12] (R.8-7, Add.2, Doc.22, Dr. Engum,

---

[12] Early school records indicate that Christa did very well on standardized tests, scoring in the top 10% nationwide in academic achievement testing although her actual grades did not reflect her potential. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7509).

TT, PageID# 2738; R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7481, 7483-85). The number of schools she actually attended while moving back and forth is startling. *See* McCoy's Social History, "Educational Data." (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7508-09). She had to go to summer school to avoid repeating the sixth grade. From the testimony elicited at trial, the jury would not even have known that her mother left West Virginia to live in North Carolina after her parents divorced for the second time and her mother had met up with a trucker by CB radio. (*Id.* at 7483). After this, her parents shuffled Christa back and forth two to three times a year. (*Id.* at 7490). At one point, her father dropped Christa and her suitcases off on her mother's doorstep and left her even though her mother was not home. (*Id.* at 7485). Each parent would threaten the other by saying they would send Christa to live there. (*Id.*) At this point, both parents were saying that they could not handle her. (*Id.* at 7509).

Although the jury heard that Christa had threatened one of her mother's live-in boyfriends with a butcher knife, it never knew that the boyfriend in question, Steve Kyaw, pinched Christa's breasts and felt her up while wrestling with her when she was about twelve years old. At one point, he hit her in the face with a belt and she grabbed a butcher knife and began chasing him. Kyaw was arrested. (*Id.* at 7485). This was the actual story behind the "butcher knife" incident elicited by the prosecution during the trial. Furthermore, the jury never knew that social services became involved with Christa and her mother because of this incident. Far from viewing this incident as the child's fault, social services focused on the unstable environment in which the child was being raised and attempted to intervene. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7504). The jury had no way of knowing that her caseworker, Kerry Clement,

was willing to testify about her efforts to help Christa that were often hindered by Christa's mother. (*Id.*) This was potentially powerful mitigation evidence that the State was able to twist into harmful evidence to show Christa's violent nature.

The jury that sentenced her to death never knew that Christa had attempted suicide on at least two occasions, the first time being when she was in the sixth grade and then again in seventh grade. (*Id.* at 7508; R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4804). This was not a child who was simply "out of control" and "blowing chances" as the prosecution argued to her jury. This was a child who was having serious mental health issues at a very early age. These issues were being systematically ignored by her parents who were supposed to be taking care of her.

No evidence was presented to show that Christa was sexually assaulted and/or raped on at least two occasions. The first incident took place when she was around eleven and then again when she was seventeen. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4787; R.12-5, Add.6, Doc.10, PC Exh.6, UNC Hospital Records, PageID# 8759-70). The problems were compounded because her mother did not believe she had been assaulted. Around the time of the first sexual assault, she made her first suicide attempt. (R.12-2, Add.6, Doc.7, PC Exh.1E, Mitigation Materials, PageID# 8315). Christa's aunt had speculated that Christa may have been sexually abused by her grandmother's boyfriend because Christa slept between them and later was seen inappropriately stroking her grandmother's breasts. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History PageID# 7481; R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4712-13). She also drew sexually explicit pictures in kindergarten or first grade suggesting early exposure to

inappropriate conduct. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6452). Christa's jury never knew any of this.

Dr. McCoy documented the fact that Christa's immediate and extended family glorified violence including her mother always telling romantic rivals that she would "whup your ass." (R.11-2, Add.6, Doc.2, PC Exh.6, Suggested Mitigation Themes, PageID# 7340). Christa's own mother encouraged her to watch graphic horror movies with her. None of this was presented to Christa's jury who were nonetheless told that Christa had taken Colleen Slemmer to the woods to "teach her a lesson." (R.8-9, Add.2, Doc.24, Talman Closing, TT, PageID# 2953, 2955). In addition, Christa along with her sister and cousin would visit their grandfather's slaughterhouse to watch animals being butchered and drained of blood. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7498). Since she was only eighteen at the time of the crime in this case, that culture of violence would have had a strong influence on her and would have lessened her moral culpability for this crime.

The jury was never told that Christa spent time in a juvenile facility as a teenager and for the first time found some stability. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7503; R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, PageID# 5130-33, 5148). Although she did not like being there, she recognized that the stability was good for her and she sabotaged herself to avoid having to go home. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History, PageID# 7503; R.9-11, Add.5, Doc.6, Peggy Hamlett, PCT, PageID# 5136-37; R.9-12, Add.5, Doc.7, Debby Burchfield, PCT, PageID# 5157). The jury also never heard that staff at the facility grew to like Christa and recognized that she stayed in trouble to avoid being sent home. This same staff noticed that her mother rarely visited. (R.11-3, Add.6, Doc.3, PC Exh.1A, Social History,

PageID# 7503; R.9-12, Add.5, Doc.7, Debby Burchfield, PCT, PageID# 5179; *id.*, Kristina Hargis, PCT, PageID# 5200). They also knew that her father never visited. (R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4994-95; R.9-12, Add.5, Doc.7, Debby Burchfield, PCT, PageID# 5184). Christa's capital jury was never informed of this.

Despite all of her troubles, Dr. McCoy located a number of people who had been sufficiently impressed with Christa's positive attributes that they would have testified for her at her capital trial. A North Carolina attorney who represented her remembered her as "a sweet, bright and inquisitive girl." (R.12-1, Add.6, Doc.6, PC Exh.1D, Mitigation Materials, PageID# 8127). He was so struck by her that he went to visit her after she went to training school. (*Id.*). Dr. McCoy had recommended that he be called to testify at Christa's mitigation hearing but he was not and the jury never heard this positive testimony. Christa's jury never heard from other witnesses, such as Peggy Hamlett, Rose Wilson, and Kerry Clement who knew Christa during her later teens and who had much favorable testimony to impart to the jury. (R.11-2, Add.6, Doc.2, PC Exh.5, Suggested Mitigation Witnesses, PageID# 7336-37). These witnesses could have described a troubled teen who was starved for attention and who could be very loving, loyal and hardworking. Talman conceded on post-conviction that he should have called the majority of these individuals. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 6003-05). Yet, defense counsel had issued no subpoenas to any these potential witnesses so none of them were available to testify. (*Id.* at 6005). In fact, Christa's jury heard almost nothing positive or redeeming about her.

The Supreme Court has held that this type of troubled background information constitutes compelling mitigating evidence. *See Wiggins*, 539 U.S. at 535 (compelling mitigating evidence

included "absentee alcoholic mother" along with "sexual molestation and repeated rape."). *Sears v. Upton*, 130 S.Ct. 3259, 3262 (2010) (finding mitigating evidence in verbal and physical parental abuse, sexual abuse, inappropriate parental discipline, and behavioral disorders). Such evidence "might well have influenced the jury's appraisal of [Christa's] moral culpability." *Williams v. Taylor*, 529 U.S. at 398.

The fact that Dr. McCoy's materials also contained some negative information cannot be used to show a lack of prejudice. Much of this evidence came out anyway through the prosecution's cross-examination. Furthermore, the Tennessee courts' decision is unreasonable because it ignores Supreme Court rulings that hold "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive." *Sears*, 130 S.Ct. at 3264. *See also Williams v. Taylor*, 529 U.S. at 396 (Finding prejudice for failure to present mitigation despite the fact that "[o]f course, not all of the additional evidence was favorable to *Williams*.") Much of Christa's negative behavior could have been shown to be the result of her chaotic and abusive background. As the Supreme Court explained in *Sears*, "[t]his evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears and his horrendous acts." *Sears*, 130 S.Ct. at 3264. Given the facts of the crime in the present case, the lack of a thorough mitigation presentation was much more prejudicial than some negative facts that were in Dr. McCoy's Social History.

The evidence contained in Dr. McCoy's Social History provided an impressive volume of mitigating evidence. As shown by Dr. McCoy's "Mitigating Themes," a number of compelling themes could have explained the origins of Dr. Engum's diagnosis of borderline personality disorder, through such themes as Christa's poor role models and their lack of consistent, stable

parenting. Her violence and anger also had its origins in her own violent, abusive and chaotic upbringing that cause her to be so self-destructive. At age eighteen, even though she was technically an adult, this upbringing still exercised a profound influence on her, particularly given her parents' failure to seek proper treatment for her. Dr. McCoy's materials also recommended calling witnesses who would speak positively about Christa, something that is completely missing from the testimony presented to the jury. *See Williams*, 529 U.S. at 416 (finding prejudicial the omission of "friends, neighbors and family of [Williams] who would have testified that he had some redeeming qualities").

"This is not a case in which the [evidence not presented] 'would barely have altered the sentencing profile presented to [the sentencer].'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Strickland*, 466 U.S. at 700). Just as in *Porter*, Christa Pike's jury "heard almost nothing that would humanize [her] or allow them to accurately gauge [her] moral culpability." *Porter*, 558 U.S. at 41. Christa's jury heard many negative things about her, but got almost nothing positive. And, there was no cogent explanation for the negative. The case that could have been presented would have completely altered her sentencing profile. There is a reasonable probability that a competent mitigation presentation would have resulted in a different outcome in this case. *Strickland*, 46 U.S. at 694. The Tennessee court's decision denying relief is unreasonable because the record demonstrates prejudice and Petitioner's entitlement to relief.

**B. Counsel were ineffective due their failure to discover compelling mitigating evidence.**

Even though Dr. McCoy's investigation had uncovered a great deal of mitigating evidence, so much more was available. Christa Pike's trial counsel were constitutionally

ineffective for their failure to investigate, discover and present evidence of Ms. Pike's organic brain damage and its effects along with evidence that she suffers from bipolar disorder and post-traumatic stress disorder (PTSD). Trial counsel also failed to interview many witnesses from Christa's background, including witnesses who could have provided mitigating evidence of her positive traits as well as fellow participants in the Job Corps who could have testified to its dangerous and violent atmosphere. Counsel's failure and the resulting prejudice constitute ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments. The Tennessee courts' conclusion to the contrary is an unreasonable application of clearly established federal constitutional law.

**1. Counsel failed to uncover and present evidence that Christa Pike suffers from organic brain damage.**

Although trial counsel retained a psychologist to examine Christa, numerous red flags pointed to the distinct possibility that she suffered from organic brain damage. When Christa was fourteen months old, she was admitted to Appalachian Regional Hospital after being evaluated in the emergency room for two seizures she had at home. During this hospital admission, an EEG was performed which showed abnormality and the clinical diagnosis was: "seizure disorder." (R.12-5, Add.6, Doc.10, PC Exh.7, Birth Records, PageID# 8786). The abnormality and the diagnosis provided ample evidence to suggest the need for a neurological examination by a medical physician to competent counsel. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, PageID# 6774). Furthermore, the fact that she had survived a traumatic car accident where she went through the windshield also suggested the possibility of brain damage. (*Id.* at 6787). Finally, Dr. McCoy had documented Christa's extensive abuse of inhalants. (R.11-3, Add.6,

Doc.3, PC Exh.1A, Social History, PageID# 7502, 7539; R.11-5, Add.6, Doc.5, PC Exh.1C, Mitigation Materials, PageID#7855; R.12-1, Add.6, Doc.6, PC Exh.1D, Mitigation Materials, PageID# 8140). Counsel should have been aware of all of these facts that pointed to neurological damage. Yet counsel failed to seek a medical opinion.

Defense attorneys were alerted to other red flags of a medical mental illness and about the possibility of brain damage in the form of information obtained from prospective lay witnesses. Ms. Pike's maternal aunt told Dr. McCoy that Christa's mother, Carissa Hansen, was an alcoholic for much of her life. (R.11-5, Add.6, Doc.5, PC Exh.1-C, Mitigation Materials, PageID# 7879). Christa's father substantiated this information and further said that he could not recall Christa's mother ever abstaining from alcohol during pregnancy. (*Id*. at 7885). This was sufficient information to suggest that Ms. Pike had been exposed to alcohol *in-utero*, and that she may have suffered some resulting neurological impairment. Ms. Ross testified at trial that Ms. Pike was born prematurely (R.8-10, Add.2, Doc.25, Carrie Ross, TT, PageID# 3050) which would also suggest the possibility of neurological issues.

There was a body of evidence which readily suggested brain damage, yet the defense failed to conduct an adequate neurological investigation and thus, failed to discover Christa's neurological disabilities, namely, an abnormality in the brain that impairs Christa's impulse control. This failure of further investigation despite many indications of its necessity amounted to deficient performance. *See Rompilla*, 545 U.S. at 389-90 (failure to look at obvious source for information is not excused by the fact that counsel investigated other possible sources).

Dr. Engum's testing did not uncover this brain damage. However, as Dr. Pincus testified, brain damage, particularly the heterotopia afflicting Ms. Pike, does not show up on

neuropsychological testing. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4779-80). This is because this damage is physiological in nature. (*Id.* at 4780). Dr. Pincus thus agreed that no brain damage was discovered through Dr. Engum's testing, but he offered an important qualifier: none could have been discovered by using limited neuropsychological testing. (*Id.* at 4778, 4811-17). Because Dr. Engum was not an expert in neurology and could not perform the appropriate testing, he had no way of knowing for certain whether brain damage was present. At most, Dr. Pincus explained, Dr. Engum could have stated that he found no brain damage, but in going further to say none existed, he overstated his findings. (*Id.*).

Of course, Petitioner does not contend that defense counsel should be held to a standard of neurological knowledge on par with Dr. Pincus. However, counsel should have seen: (1) that the available evidence suggested physiological damage, and (2) that Dr. Engum was not a medical doctor and might not identify neurological damage. *See State v. Savage*, 577 A.2d 455, 465 (N.J. 1990) (citation omitted) (death penalty defense requires "an expertise regarding special considerations present in capital cases").

These standards represent the minimum level of knowledge for competent counsel in a capital case. Seizures, irregular EEG's, traumatic head injury, and prenatal alcohol ingestion--there can be no question that these things signal problems with the physical brain. As for the expertise of psychologists, a reasonably competent defense attorney, particularly in a capital case where issues of mental illness are abundant, is required to know the limitations of a psychologist, who is not a medical doctor. Competent counsel would have known that different areas of expertise are needed to make a definitive conclusion about neurological disorders where so much evidence has indicated its presence. As Dr. Pincus noted, you cannot rely on one set of testing to

find brain damage, because any one test showing an abnormality is definitive that the abnormality exists. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4753-54).

Defense counsel were unreasonable in relying solely on Dr. Engum's opinion because Dr. Engum provided no explanation for the myriad indications of brain damage. After Dr. Engum stated that there was no brain damage, counsel were in the same position as before, with a variety of indications that something was wrong with Ms. Pike, but with no overarching theory to explain them. It was unreasonable for counsel to abandon the investigation at this stage and leave an obvious mystery unsolved. Minimal diligence required an opinion from a medical professional with appropriate expertise.

The Court of Criminal Appeals' opinion on this issue is unreasonable for the same reasons. That court found "no deficiency in counsel for not instructing the defense experts in how to do their jobs in areas to which they are supposed to be experts or for not having questioned their opinions." *Pike*, 2011 WL 1544207, at *54. It was not a question of instructing experts in doing their job, but rather, in identifying and selecting the proper expert. The Court of Criminal Appeals' conclusion ignores the fact that Dr. Engum's opinion left so many critical questions about Christa unanswered. Counsel had a duty to seek out the answers to these questions. Where so much evidence pointed to the possibility of neurological damage, counsel has a duty to explore more than one hypothesis to explain it.

The foregoing is particularly true in a case where, by counsel's own admission, the critical phase of the trial was the penalty phase. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 5982). Furthermore, the facts of this case were so bizarre and gruesome that counsel should have known that the jury would need as much information as possible about their client's

mental state in order to return a life verdict. Counsel acknowledged as much. (*Id.* at 5930). Under these circumstances, counsel has a duty to consider all of the evidence and to get as much information as possible.

Counsel's failure to uncover and present compelling evidence that gave some explanation for the offense in this case prejudiced Ms. Pike because frontal lobe damage impairs moral reasoning and impulse control. The Supreme Court has found this mitigating. *See Sears v. Upton*, 130 S. Ct. 3259, 3263 (2010). Evidence presented in post-conviction demonstrates that Ms. Pike is indeed brain-damaged and that this impairment affected her at the time of the offense. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4778-79, 4808-09). The state court never made any factual findings to the contrary because its decision denying relief relied on its finding that counsels' performance was not deficient. *Pike*, 2011 WL 1544207, at *54. That evidence could have provided the jury with some insight into why the offense happened the way it did. It would have carried strong weight in mitigation and there is a reasonable probability that had it been presented, the verdict would have been different.

**2. Counsel failed to discover and present evidence that Christa Pike suffers from bipolar disorder and post-traumatic stress disorder.**

Trial counsel failed to conduct an adequate investigation in that they failed to discover that Ms. Pike suffers from bipolar disorder and post-traumatic stress disorder (PTSD). Ms. Pike's bipolar disorder and PTSD were readily discoverable at the time of trial. In his post-conviction testimony, Dr. Kenner noted several pieces of information from Ms. Pike's social history that immediately suggested bipolar disorder, including: (1) numerous reports from family and friends that Ms. Pike exhibited extremely high levels of energy and had trouble sleeping; (2)

Ms. Pike's suicide attempts; (3) Ms. Pike's displays of belief in her own invincibility; and, (4) Ms. Pike's EEG at fourteen months, because there is a significant correlation between brain damage and the development of bipolar disorder. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, PageID# 6774-79, 6781,6787-88). During post-conviction, Ms. Pike presented still other characteristics suggestive of bipolar disorder, including evidence of rapid and dramatic mood swings, or descriptions of Ms. Pike as "out of control," all of which were discoverable at the time of trial. (R.9-11, Add.5, Doc. 6, Orlando Powell, PCT PageID# 5055-56; *Id.*, Peggy Hamlett, PCT, PageID# 5139).

Dr. Kenner testified that there is a danger of misdiagnosing bipolar individuals as borderline. (R.10-5, Add.5, Doc. 25, Dr. Kenner, PCT, PageID# 6953-54). To achieve the correct diagnosis, he stated, a clinician has to acquire longitudinal information about the client, preferably through repeated clinical interviews. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, PageID# 6824-26). Dr. Kenner opined that Dr. Engum reached the wrong diagnosis because he had not met with Christa over a sufficient period of time and he lacked her complete social history. (R.10-4, Add.5, Doc.24, Dr. Kenner, PageID# 6769, 6826).

Regarding his diagnosis of PTSD, Dr. Kenner based his opinion on clinical interviews and Ms. Pike's history of abuse, neglect, and trauma. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6891-95). He also saw evidence of PTSD in her delusional paranoia, heightened fear of abandonment, and hyper-vigilance in the face of perceived threats. (*Id.* at 6896, 6898-6900).

As in Dr. Pincus's testimony, this is not a case of defense counsel "instructing the defense experts in how to do their jobs in areas to which they are supposed to be experts or for not questioning their opinions." *Pike*, 2011 WL 1544207, at *54. Trial counsel had an absolute duty

to select the appropriate experts and to question their opinions to the extent that these opinions gave adequate explanation to the evidence. Counsel's failure to obtain a correct diagnosis for their client's mental illness constitutes deficient performance and Ms. Pike was prejudiced. Her organic brain damage and her illness were both important contributing factors in the offense in this case and they are factors over which she had no control. Dr. Pincus's and Dr. Kenner's diagnosis are well-supported with background evidence and give explanation to Christa's actions. Their mitigating weight would have been significant and in tandem with the other mitigating evidence, would have likely led at least one juror to vote for a life sentence.

**3. Counsel failed to contact and present lay witnesses who could have presented mitigating evidence.**

Defense counsel failed to uncover many aspects of Ms. Pike's life history as it pertained to her experiences in various institutional facilities, including Child Protective Services, juvenile detention, and Job Corps. This was a significant oversight, considering that Christa had spent part of the last eight years of her life prior to trial, from age ten to eighteen, in various institutional settings. More pointedly, however, counsel was aware that Christa was rejected by her parents and maternal aunt. The evidence uncovered by Dr. McCoy revealed that the only family member who had cared for Christa, her paternal grandmother, was dead. (*See* R.9-9, Add.5, Doc.4, Alicia Wills, PCT, PageID# 4907-08; R.9-10, Add.5, Doc.5, Glenn Pike, PCT, PageID# 4994; R.8-11, Add.2, Doc. 26, Carrie Ross, TT, PageID# 3070). As a result, it was incumbent upon counsel to seek lay witnesses who could testify to caring for Christa and about her life after she was essentially abandoned by her family. Many of those witnesses who testified in post-conviction, such as: Faye Guy, Carol Goehring, Jamie Robinson, Orlando Powell, Debby

Burchfield, Kristina Hargis, Marshall Muse, Andrew Drace and Onas Perry were never contacted prior to trial. However, these same witnesses provided important mitigating testimony during post-conviction. Such proof would have both humanized Christa and helped lead jurors to vote for a life sentence.

The information that these witnesses could have given is described in the Statement of Facts (pp.35-46). Some of the most significant evidence comes in the form of anecdotes and personal recollections that these people had of Christa that would have given jurors a glimpse into the real person whose fate they were deciding. Significant among those recollections are those of Christa's teacher, Marshall Muse who talked about Christa's writing ability, her imagination, and her sense of humor. Onas Perry, who worked at Swannanoa when Christa was there, could have testified about the late-night talks she and Christa had in which Christa related her bad family situation. Debbie Burchfield, another employee at Swannanoa, would have described Christa as "bright" and "very personable." Such positive information was completely lacking at Christa's trial.

Trial counsel also failed to investigate and present information about the Job Corps in Knoxville, the setting for the crime in this case. Christa's teachers and fellow students described it as a dangerous place. Counsel further failed to investigate and present witnesses who could have testified about the controlling nature of her co-defendant, Tadaryl Shipp. These witnesses could have shown that Ms. Pike had been abused and was being influenced by Mr. Shipp at the time of the offense. Witnesses from the Job Corps program could also have testified about its violent atmosphere where threats of gang violence were constant. *See infra* Statement of Facts, pp.38-40. These circumstances greatly influenced Christa's relationship with Tadaryl Shipp and

Colleen Slemmer. Furthermore, they affected Christa's mental state and influenced her thinking at the time of the offense. The following witnesses from the Job Corps were never contacted: Joe Mode, Jacqueline Olebe, Tyrone Comfort, Deandrea Gates, Amanda Robertson, and Jermaine Bishop. Given the obvious relevance of this evidence, in both the guilt and the penalty phases, trial counsel's failure to contact these witnesses constitutes deficient performance. The fact that these witnesses could have contributed significant mitigating evidence as outlined in the Statement of Facts demonstrates prejudice.

Although Petitioner Pike presented this aspect of her ineffectiveness case to the Tennessee courts, the Court of Criminal Appeals opinion never specifically addressed it other than to note that it has been raised. No state court made findings that these law witnesses' testimony was unbelievable or unreliable, or even that it was not mitigating in nature.

There can be no dispute that these lay witnesses were not presented at trial. Nor is there any indication that Dr. McCoy or counsel ever contacted or interviewed them prior to trial. Yet, they provided a significant mitigating evidence that would have contributed towards obtaining a probably life verdict. No one testified as to any of Christa's positive aspects at trial and very little information was given about her chaotic upbringing. She was prejudiced by its omission.

**C. Counsel were ineffective when they disclosed protected work product to the prosecutor without objection to any court order.**

In the interval between the jury's verdict of guilt and the beginning of the penalty phase of Petitioner Pike's trial, defense counsel turned over all three volumes of Dr. McCoy's work product to the prosecutor. Mr. Talman and Ms. Rice could not remember whether they were ordered to turn over their work product and the trial record reflects no such order. However, the

Tennessee Court of Criminal Appeals held that "[w]hile lead counsel did not specifically recall such an order, the record still seems to indicate that the court, during the *in camera* hearing, did, in fact, order production." *Pike*, 2011 WL 1544207, at *55.

Although the record is not clear that an order was issued, it is clear that if the court had ordered counsel to turn over the entire file, trial counsel had an absolute duty to make sure that the record reflected the issuance of any such order and that it also reflected an objection from counsel. *Howard v. Bouchard*, 405 F.3d 459, 480 (6th Cir. 2005). This is because counsel had a duty to insure that what was turned over did not constitute privileged attorney work product. Counsel had a duty to limit any materials to only those that were properly discoverable, which would not include the attorney work product information contained in all of the interviews. Counsel also had a duty to understand disclosure rules and that directing no expert not to prepare a report or to express an opinion and purposely trying to skirt the rules would result in adverse consequences.[13] There was no legitimate reason to turn over all of Dr. McCoy's work product. Counsel's failure to exercise the skill and knowledge of competent attorneys constitutes deficient performance. *See Strickland*, 466 U.S. at 689.

Mr. Talman was not under any obligation to provide the prosecutor with Dr. McCoy's Mitigation Materials. Three regulatory provisions are controlling on this issue: (1) Tennessee Rule of Criminal Procedure 16(b); (2) Tennessee Rule of Criminal Procedure 26.2; and (3) Tennessee Rule of Evidence 705.

Rule of Criminal Procedure 16(b)(2) specifically states that defense counsel must disclose "reports, memoranda, or other internal defense documents made by the defendant, or his

---

[13] Tenn. R. Crim. P. 16(b)(2)(A)(B); Tenn. R. Crim. P. 26.

attorneys or agents, or of statements made by the defendant, or by State or defense witnesses, or by prospective State or defense witnesses, to the defendant, his agents or attorneys." Tenn. R. Crim. P. 16(b)(2) (1996).[14] "On the other hand, the rule precludes discovery of "reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents. . or of statements made by . . . defense witnesses . . . to the defendant, his agents, or attorneys." *See State v. Nichols*, 877 S.W.2d 722, 729 (Tenn. 1994) (quoting Tenn. R. Crim. P. 1 6(b)(2)). Discoverability thus turns on whether the notes in question are the result of psychological testing and examination, or instead represent "statements" made to defense counsel or their agents. *Id.* Dr. McCoy testified at post-conviction that she "felt like a fish out of water" because, in Ms. Pike's case, she conducted no psychological evaluation and was instead limited to conducting mitigation interviews for the purpose of compiling a social history. (R.10-1, Add.5, Doc.21, Dr. McCoy, PCT, PageID# 6503). Because she never conducted any "physical or mental evaluations" of any prospective witness, Dr. McCoy's Mitigation Materials were protected under Rule 16(b)(1)(B). *Cf. Nichols*, 877 S.W.2d at 729-30. She was, in essence, a mitigation investigator.

Tennessee Rule of Criminal Procedure 26.2(a) states:

> Motion for Production. After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

[14] Ms. Pike cites to the regulations that would have been applicable at the time of this trial; so, for example, the year of publication for Rule 16(b) is 1996.

For purposes of Rule 26.2, "a statement" of a witness means: (1) a written statement made by the witness that is signed or otherwise adopted or approved by him; or (2) a substantially verbatim recital of an oral statement made by the witness. . . ." *Id.* at Rule 26.2(g). Under this rule, Dr. McCoy's Mitigation Materials would not have been discoverable because they contained annotations of statements made by Dr. McCoy's interviewees, not the statements of Dr. McCoy herself. *See State v. Schiefelbein*, 230 S.W.3d 88, 148 (Tenn. Crim. App. 2007). Dr. McCoy's Social History, if considered a statement under Rule 26.2, would have been discoverable only upon motion by the State after Dr. McCoy testified. Tenn. R. Crim. P. R. 26.2(a).

Finally, Rule of Evidence 705 states, "[t]he expert may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Tenn. R. Evid. 705. Under Rule 705, the raw data underlying an expert's opinion is thus discoverable only by order of the trial court. *Id.* Generally, trial courts make such determinations after viewing the raw data in camera and require disclosure only where the expert has not written a consolidated report. *Schiefelbein*, 230 S.W.3d at 148-49; *Nichols*, 877 S.W.2d at 729-30. There is no evidence in the record that the trial court ever reviewed Dr. McCoy's materials or made any decision that fairness required their disclosure. Furthermore, since Dr. McCoy had not conducted testing, she may never have been asked for an expert opinion. Her report contained no expert opinion.

In sum, neither Rules of Criminal Procedure 16(b) and 26.2, nor Rule of Evidence 705 would have required production of Dr. McCoy's Mitigation Materials and Social History to the

State. Because Talman was not required to turn over Dr. McCoy's work product to the State, it was error to do so without objection.

During post-conviction, trial counsel recognized that much of what he turned over was privileged and not subject to any disclosure. (R.9-20, Add.5, Doc.15, Bill Talman, PCT, PageID# 6033-36). He also admitted that if Dr. McCoy was not testifying, that her report would not be discoverable and that he should have decided this beforehand. (*Id*. at 6035, 6038). Many of the interviews could never have been discoverable since the person interviewed was not called to testify. (*Id.* at 6045-46). A review of Talman's testimony in post-conviction demonstrates that he was unsure, on the eve of the penalty phase, as to how he would be presenting his case. He turned over materials that never had to be turned over even if he planned to call the witness. And in the end, he never called that witness. He simply failed in his obligation to use his legal skill and knowledge to competently try his case.

Petitioner Pike was prejudiced because the State used information from the protected work product to cross-examine the witnesses presented during the penalty phase. This cross-examination undermined any mitigating evidence the witnesses had presented. This point is well illustrated by looking at the Tennessee Supreme Court's opinion on direct appeal in which the court says that "her own relatives testified that Pike previously had been violent, manipulative, and dishonest." *Pike*, 978 S.W.2d at 919. The court also pointed out that "the testimony of Pike's own relatives reveals that Pike has refused to abide by the applicable rules of society since a very young age." *Id.* at 920. This information and other damaging testimony was elicited on cross-examination with information obtained when defense counsel turned over privileged work product.

The Court of Criminal Appeals opinion finding no deficiency is unreasonable because its analysis is beside the point. The Court of Criminal Appeals finds that "the record still seems to indicate that the court, during the in-camera hearing, did, in fact, order production." *Pike*, 2011 WL 1544207, at *55. The issue was not whether counsel was "duty bound to comply with the orders of the court." *Id.* The state court appears to find that because counsel was following a court order, there can be no deficient performance. Petitioner cannot dispute that counsel must follow orders from the court. At the same time, counsel must make reasonable arguments to the court that discovery must be conducted according to the procedural rules. If counsel's arguments fail, then counsel must ensure that an appropriate objection is in the record for appellate review. To preserve issues on the record is one of the most basic duties of a trial lawyer, not to mention a criminal defense attorney. *See* ABA Standard 4-7.1(d) (1979) (stating that criminal defense attorney has a "duty to have the record reflect adverse rulings or judicial conduct which the lawyer considers prejudicial to his or her client's legitimate interests"). *Howard*, 405 F.3d at 480. In this case, there appears to be no question that counsel turned over much more than the rule required. If the court ordered such sweeping discovery over counsel's objection, then competent counsel has a duty to ensure that the record reflects that. There is no dispute that trial counsel failed in carrying out these duties.

The Court of Criminal Appeals opinion was also unreasonable in finding no prejudice. The court put the burden on Petitioner to "establish[] that this affected the outcome of the trial or that a different result would have been reached absent the information." *Pike*, 2011 WL 1544207, at *55. This outcome-determinative test runs contrary to *Strickland's* search for a "reasonable probability" of a different result. "We do not require a defendant to show 'that

counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Porter*, 558 U.S. at 456-57 (quoting *Strickland*, 466 U.S. at 693-94). The state court further failed to consider the broader implications of counsel's mis-step. Turning over the materials played a part in counsel's decision not to call Dr. McCoy to testify and thus cost Petitioner a wealth of mitigating evidence. *See infra* at pp.16-22, 23-26, 48-59. Not only was the State able to put on extremely negative evidence that counsel sought to exclude by not calling Dr. McCoy, but that evidence was used to "rip[] up" the witnesses from Christa's family. (R.9-17, Add.5, Doc.12, Julie Martin Rice, PCT, PageID# 5727-28). The prejudicial impact of counsel's errors came as a fatal one-two punch. The Court of Criminal Appeals finding that Petitioner was not prejudiced is therefore unreasonable in light of the state-court record.

**D. Counsel failed to present effective penalty phase arguments to the jury in this case.**

Counsel's penalty phase arguments highlighted counsel's poor performance. Counsel has a duty to make effective arguments at this most important phase of the capital defendant's trial. *See Strickland*, 466 U.S. at 688 (counsel has an "overarching duty to advocate the defendant's cause.") Counsel never argued to the jury that it should spare Ms. Pike due to her age or explain youth as a statutory mitigating factor. *See* Tenn. Code Ann. § 39-13-204(j)(7). Counsel failed to discuss any of the mental health evidence presented by Dr. Engum in the guilt/innocence phase. Counsel made no mention of Ms. Pike's mental illness or her history of abuse and neglect. Ultimately, Talman presented the jury with only one reason not to sentence Ms. Pike to death: because she "derives and gains her self-esteem, her self-worth from those around her," he

suggested that a life sentence would be the harshest punishment because it would deprive her of notoriety. (R.8-10, Add. 2, Doc.25, Talman Sentencing Phase Opening Argument, TT, PageID# 3045-46). This excerpt captures Mr. Talman conceding to the jury that Ms. Pike was deserving of the worst punishment they could imagine.

This hardly qualifies as effective argument from counsel when his client's life is at stake. Counsel's arguments fell below the standard of reasonableness and constitute ineffective assistance of counsel.

The Court of Criminal Appeals did not address this issue on the merits, finding that is was never fairly presented. *Pike*, 2011 WL 1544207, at *56. Respondent has argued that this issue is procedurally defaulted. In Petitioner's Reply to Respondent's Answer, Petitioner advanced her arguments for why this issue was not defaulted and if it was defaulted, why she can show cause and prejudice. (R.24, Reply to Respondent's Answer, PageID# 10398-10402). Rather than repeat those arguments here, Petitioner refers the Court to that document to show a lack of default.

**E. Counsel were ineffective when they failed to conduct a meaningful *voir dire* of potential jurors in this case.**

As argued in Ground Five, counsel failed to rehabilitate or object to the dismissal of potential juror Rutherford whose *voir dire* shows he was qualified to serve. *See infra* at pp.97-101. This failure is symptomatic of counsel's failure to conduct a thorough and constitutionally adequate *voir dire*. Counsel failed to tell potential jurors that youth was a statutory mitigating factor. *See* Tenn. Code Ann. § 39-13-204(j)(7). Nor did counsel *voir dire* on any other prospective mitigation themes such as asking questions related to juror views on mental illness,

psychology, and mental health experts. Counsel thus foreclosed the possibility of striking for cause those jurors who could not consider certain mitigation evidence. Any analysis of the death-qualification process in this case shows the lack of thoroughness on the part of defense counsel.

### F. Conclusion

Although counsel recognized that this case was one where the penalty phase was most important, counsel failed to present an effective case. This Court must examine the cumulative prejudice from counsel's multiple deficiencies to determine that there is a reasonable probability that but for counsel's ineffectiveness, a different outcome would have occurred. *See Strickland*, 466 U.S. at 694; *Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2006) (unreasonable application of *Strickland* because the state court weighed each error individually when the cumulative effect of the errors required reversal). "To assess [the] probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence . . . and reweigh it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 397-38 (internal quotation marks omitted)). The state-court record aptly demonstrates that trial counsel failed to adequately prepare their case for a life sentence using the legal expertise the constitution requires them to exercise. Either because of lack of knowledge, poor planning, or insufficient investigation, they failed to meet minimal constitutional standards. The wealth of available mitigating evidence shows prejudice. The Tennessee courts' decision to the contrary represents an unreasonable application of *Strickland* and this Court must issue the writ of habeas corpus.

## GROUND TWO

**Christa Pike's attorneys labored under a conflict of interest in violation of her Sixth and Fourteenth Amendments to the United States Constitution. The Tennessee courts' denials of this claim were contrary to or an unreasonable application of clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Petitioner Christa Pike's trial was marked by two distinct conflicts of interest that affected trial counsel's representation. First, Mr. Talman's legal and ethical troubles for over-billing the courts led him to protect his own interests ahead of those of his client who was on trial for her life. Second, counsel procured a release of media rights from Ms. Pike that authorized defense counsel to use or sell her story for pecuniary gain. (R.11-2, Add.6, Doc.2, PC Exh.13, Release, PageID# 7365).

Petitioner Pike does not seek summary judgment for this Ground for Relief. Should the Warden seek summary judgment of this ground, Petitioner Pike will oppose it because it is based on a dispute of material fact. The state court findings that it relied on in denying this claim are unreasonable in light of the state court record as a whole. *See* 28 U.S.C. § 2254(e). For that reason, summary judgment is not proper on this claim at this time.

## GROUND THREE

**Christa Pike's attorneys were constitutionally ineffective during the guilt/innocence phase of her capital trial for their failure to present available evidence that Christa Pike did not form the required *mens rea* to be guilty of first degree premeditated murder and her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. The Tennessee courts' denials of her claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law or were based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

In Ground One, Petitioner Pike argued that trial counsel were ineffective for failing to investigate and present available mitigating evidence reducing her moral culpability and which would have lessened the impact of any finding by the jury that she had acted with premeditation. Much of that same evidence could have been presented in the guilt/innocence phase of this case to negate the element of premeditation. Counsel's failure to investigate and present this evidence constituted ineffective assistance of counsel and undermines confidence in the reliability of Petitioner's conviction therefore violating her Sixth, Eighth and Fourteenth Amendment rights.

The facts that support this constitutional violation are not in dispute. The state court never made any factual findings that undermine Petitioner's arguments on the claim, only analyzed the legal impact of Petitioner's arguments. *See Pike*, 2011 WL 1544207, at *60-61; *see also* R.23, Respondent's Answer, PageID# 10377-79. The Tennessee Court of Criminal Appeals unreasonably applied federal constitutional law in resolving this issue against Petitioner. Because this Court does not need to conduct any further fact-finding and because the facts in the state-court record demonstrate Pike's right to relief, this Court must grant her Motion for Summary Judgment.

### A. Because counsel failed to effectively challenge the State's case for premeditation by effectively using the necessary experts supported by lay-witness testimony, counsel's performance fell below constitutional standards.

Trial counsel failed to present an effective case to undermine the State's proof of deliberate and premeditated murder. This was the result of two of the same fundamental errors that plagued Ms. Pike's representation in the penalty phase: failure to make appropriate use of expert witnesses, and failure to discover and use relevant lay witness testimony.

Premeditation was the most contested element during the guilt phase of Pike's trial and was the most difficult element for the State to prove. At the close of the guilt/innocence phase, the trial court charged the jury that in order to find Ms. Pike guilty of first degree murder, they must have found each the following elements proven beyond a reasonable doubt: "(1) that the Defendant unlawfully killed the alleged victim; . . . (2) that the Defendant acted intentionally; . . . (3) that the killing was deliberate . . . and (4) that the killing was premeditated." (R.8-10, Add.2, Doc.25, Judge Leibowitz, TT, PageID# 2985). "A deliberate act," the trial court explained, "is one performed with a cool purpose." (*Id.*). "Premeditation means that the intent to kill must have been formed prior to the act itself." (*Id.* at 2986). In particular, effective counsel would have been able to show that there was reasonable doubt as to whether Pike acted "with a cool purpose" and whether premeditation had been formed "prior to the act itself."

Counsel's performance in addressing this key issue was constitutionally inadequate. First, defense counsel presented scant expert testimony with regard to Ms. Pike's mental state

surrounding the killing in this case. Dr. Engum was the only defense witness to testify to Ms. Pike's state of mind surrounding the offense. He testified:

> My opinion is, and it is particularly based on the test results and on a review of her statement, that she basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, borderline personality disorder, which meant that she basically went out of control.
>
> (R.8-7, Add.2, Doc.22, Dr. Engum, TT, PageID# 2753).

Although Dr. Engum offered a valid opinion, his testimony was insufficiently substantiated. The State was able to exploit this fact on cross-examination by repeatedly pointing out that the factual basis for Dr. Engum's opinion was limited to the statements made by Ms. Pike. (R.8-8, Add.2, Doc.23, Dr. Engum, TT, PageID# 2764-65, 2777). Because Dr. Engum had no alternative basis for his information, and never asserted that he had reviewed her social history nor how her history of impulsive or explosive behavior was applicable to the issue, he could provide no adequate response. Consequently, the State was able to get him to admit that, if Ms. Pike had lied to him, he might be forced to change his opinion. (*Id*. at 2777). This greatly weakened the impact of his testimony and was completely avoidable if counsel had given their expert adequate preparation to lay a sound foundation for his opinion.

The State also pursued a cross-examination strategy that played into the common distrust of jurors for expert witnesses. With a line of questioning concerning Dr. Engum's compensation on this case, during which he revealed that he worked only with criminal defense teams and relied on this work for twenty percent of his income, the State tried to paint him as an untrustworthy "hired gun." (*Id.* at 2766-67). Later, the State launched an attack on Dr. Engum's

entire field of expertise, implying that Ms. Pike suffers from a "phantom" mental illness because the evidence of her disorder is psychological and thus not tangible. (*Id.* at 2775-76).[15]

Dr. Engum's opinion testimony was thoroughly discredited. Had counsel adequately prepared their expert by asking him to review and base his testimony on more extensive evidence, he could have responded differently to the State's cross-examination and could have fully supported his opinion. Once counsel had made the strategic decision to rely on expert testimony, it was inexcusable to provide that expert with sufficient information to support his opinions under cross-examination. Counsel's failure constitutes deficient performance.

Counsel made another significant error in their use of Dr. William Bernet during the guilt/innocence phase. Dr. Bernet was called on to testify that Ms. Slemmer's killing was not a satanic ritual, but, rather, was consistent with a phenomenon called "collective aggression." (R.8-9, Add.2, Doc.24, Dr. Bernet, TT, PageID# 2877-78). The relevance of this testimony was never made clear. (*Id.* at 2868-76). While Dr. Bernet's testimony offered no apparent benefit to Ms. Pike's defense, it was highly prejudicial and represented a wasted opportunity. Dr. Bernet's testimony was prejudicial because it opened the door to a lengthy discussion of satanism and the various details of Ms. Slemmer's killing that bore satanic overtones, such as the carving of a pentagram in her chest. (*Id.* at 2897-99). Dr. Bernet's testimony represented a wasted opportunity because he might have provided meaningful testimony regarding Ms. Pike's state of mind at the time of the offense. Dr. Bernet, however, never met or evaluated Ms. Pike. (R.8-8, Add.2, Doc.23, Dr. Bernet, TT, PageID# 2854). In defense counsel's direct examination of Dr.

---

[15] Unlike Dr. Engum's diagnosis, Dr. Kenner's diagnosis of brain damage was substantiated by a brain wave examination and brain scan, both which showed organic brain damage.

Bernet, Mr. Talman asked if Dr. Bernet could testify to a reasonable degree of medical certainty as to Ms. Pike's mental state. (R.8-9, Add.2, Doc.24, Dr. Bernet, PageID# 2880). Dr. Bernet was forced to respond that he could not, "not having interviewed her, and with the limited information I have, I . . . do not have an opinion with that degree of certainty." (*Id.*) By asking this question, Talman once again showed that he did not know exactly what role his experts were supposed to take. Due to counsel's ineffectiveness, Dr. Bernet was unable to offer any evidence that could be of assistance in Ms. Pike's case.

**B. Evidence presented in post-conviction demonstrates that Petitioner Pike was prejudiced by her counsel's failure to ensure that their experts' opinions were adequately supported.**

In the end, the State's tactics were effective and the jury found Ms. Pike guilty of first degree murder. There is a reasonable probability that this outcome could have been avoided. Dr. McCoy's Social History contained a wealth of information from witnesses that Christa had extreme mood swings and acted impulsively. Lay witnesses could have testified that Christa was incapable of calming down on her own, and needed to be physically restrained while in the midst of a manic rage. (R.9-11, Add.5, Doc.6, Orlando Powell, PCT, PageID# 5055-56, 5064). This would have demonstrated that once she had become enraged, she was incapable of "cool purpose" that would have indicated that the intent to kill was formed prior to the act itself. Had trial counsel: (1) called these witnesses; (2) called Dr. McCoy; or, (3) asked Dr. Engum questions based on her social history, the lone witness testifying to Ms. Pike's mental state would not have been forced to testify that his opinion was only as good as the defendant's word.

The limited presentation with such inadequate foundation on this key issue constituted substandard performance where a thorough presentation could easily have been made. There is a

reasonable probability that the outcome would have been different. *See Strickland*, 466 U.S. at 694. This prejudice is shown by an examination of the post-conviction record, particularly the testimony of Drs. Pincus and Kenner. According to Dr. Pincus, Christa suffers from three disabilities that, in combination, correlate strongly with incidents of violence. These disabilities are frontal lobe damage, mental illness, and a history of abuse and neglect. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4770-74, 4750-51).

As Dr. Pincus explained, individuals exhibiting all three of the characteristics are significantly impaired in their powers of moral-reasoning and self-control, and are significantly more likely to commit serious acts of violence. (*Id.* at 4751). Petitioner also presented evidence that the circumstances leading up to and including Ms. Slemmer's death were of exactly the sort to trigger her latent potential for violent outbursts. While a student at Job Corps, she was surrounded by violence, which was rampant among the student body. (R.9-12, Add.5, Doc.7, Andrew Drace, PCT, PageID# 5219; R.9-13, Add.5, Doc.8, William Mode, PCT, PageID# 5306, 5309-13; *id.*, Kimberly Rhodes, PCT, PageID# 5339-40). Christa became fixated and completely dependent on Tadaryl Shipp, a manipulative and violent gang member who played into Ms. Pike's insecurities by cheating on her. (R.9-12, Add.5, Doc.7, Andrew Drace, PCT, PageID# 5221-26; XIII: 7671; R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6911-13). Among Shipp's lovers was Ms. Slemmer, whom Ms. Pike considered a threat to her relationship with Mr. Shipp. (R.10-5, Add.5, Doc.25, Dr. Kenner, PCT, PageID# 6912). Ms. Slemmer had been having problems with Ms. Pike for a long time, and provoked her by coming into her room and standing over her with a box cutter, calling her names, and damaging photos of her Grandmother

Pike, the one family member who had cared about Ms. Pike. (R.8-15, Add.2, Doc.30, T. Exh. 28, Pike Statement, PageID# 3377-78; R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4806).

Ms. Pike was raised to believe that the appropriate response to a threat was physical violence. (R.9-7, Add.5, Doc.2, Carrie Ross, PCT, PageID# 4691-93; R.9-23, Add.5, Doc.18, Carrie Ross, PCT, PageID# 6233-44). This message inhered in her familial culture as a child, and had been reinforced throughout her life. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4801). As a result, Ms. Pike planned to beat up Ms. Slemmer to resolve their conflict. However, because of Ms. Pike's disabilities, the attack escalated tragically. Whereas an ordinary person would have recoiled at the physical damage wrought on Ms. Slemmer, Ms. Pike was normalized to the sight of blood and gore from her childhood experiences watching horror movies and playing in her grandfather's slaughterhouse. (R.9-10, Add.5, Doc.5, Faye Guy, PCT, PageID# 5033-35; R.9-8, Add.5, Doc.3, Carrie Ross, PCT, PageID# 4733; R.9-23, Add.5, Doc.18, Carrie Ross, PCT, PageID# 6253-57).

Furthermore, Christa was only eighteen at the time. An ordinary eighteen- year-old lacks the impulse control, accountability, and solidity of identity of an older adult. For Ms. Pike, whose cognitive development was already impeded by brain damage and mental illness, the abilities to reign in her impulses, regain rationality, and resist peer influence were that much more underdeveloped.

Counsel had a duty to fully investigate and develop evidence that Christa Pike had not formed the required *mens rea* for first degree murder due to mental illness and brain damage. Counsel's failure to do so constituted deficient performance. Because this evidence was compelling, there is a reasonable probability that its presentation would have resulted in a

different outcome. *See Strickland*, 466 U.S. at 694-96. This Court must grant summary judgment and issue the writ.

## GROUND FOUR

**The imposition of the death sentence on Christa Pike, an immature, mentally ill, and brain-damaged eighteen-year-old violates the Eighth Amendment prohibition against Cruel and Unusual Punishment. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Clearly established case law from the United States Supreme Court supports a categorical bar to the execution of older adolescents suffering from serious mental illness or brain defect. A reasonable application of the rationale underpinning *Roper v. Simmons*, 543 U.S. 551 (2005) and *Atkins v. Virginia*, 536 U.S. 304 (2002) compels the finding that the Tennessee state courts should have recognized that a brain-damaged, severely-mentally-ill eighteen year-old, such as Christa Pike, is exempt from capital punishment under the Eighth Amendment to the United States Constitution.

In *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court held that a capital punishment statute would be held constitutional so long as it: (1) reflected contemporary public values, as evidenced by objective indicia; (2) satisfied the proportionality requirement that the punishment fit the crime; and (3) entailed no unnecessary infliction of pain. *Id.* at 173. Use of this three-factor analysis has expanded since *Gregg*. Although initially developed to test the facial constitutionality of a given statute, the Gregg analysis has since been used to determine whether particular groups merit categorical exception from capital statutes as applied. This practice began with groups defined by their alleged crimes. *Coker v. Georgia*, 433 U.S. 584

(1977) (death penalty for rape of adult woman unconstitutional); *Enmund v. Florida*, 458 U.S. 782 (1982) (death penalty for felony murder unconstitutional where defendant did not kill, attempt to kill, or intend death or use of force). In *Ford v. Wainwright*, the Supreme Court proceeded to analyze groups defined by the characteristics of the members themselves, but only in relation to the effects of those characteristics after the fact of conviction. *Ford v. Wainwright*, 477 U.S. 399 (1986) (death penalty for insane person at time of execution, unconstitutional). In the past 20 years, the Supreme Court has taken the next logical step, considering the propriety of execution for groups whose defining characteristics suggest a lesser degree of culpability for capital crimes. *See Thompson v. Oklahoma*, 487 U.S. 815 (1988), *overruled by Roper*, 543 U.S. 551; *Penry v. Lynaugh*, 492 U.S. 302 (1989), *overruled by Atkins*, 536 U.S. 304.

In tandem with the expanding use of the *Gregg* analysis, the Supreme Court has arrived at a more precise understanding of each of the three *Gregg* factors. Under the first factor, which calls for an assessment of public values, the courts look to legislation, polls, juror surveys, jury verdicts, positions taken by professional and advocacy organizations, and any other objective data to determine whether public sentiment disfavors execution of the group in question. *See Atkins*, 536 U.S. at 313-17. The second factor--proportionality analysis--entails judicial scrutiny of prevailing scientific and social science literature with an eye towards evidence that the group in question may be physiologically incapable of full culpability. *See Roper*, 543 U.S. at 569-71. Third, and finally, in determining whether execution would result in the unnecessary infliction of pain or suffering, the courts ask whether execution of group members is likely to further either of the purposes of capital punishment in retribution and deterrence. *See id*. at 571-72.

In arriving at the decision that certain groups must be categorically barred from capital punishment, the Supreme Court explicitly found insufficient the prospect of group members defending against execution on a case-by-case basis. The Court reasoned that existing means of fighting a death sentence--an insanity defense, or presentation of sentencing phase mitigation--provided insufficient protection. In *Roper*, the Court elaborated on the shortcomings of mitigation evidence in the particular circumstances of adolescent defenders who commit violent crimes:

> The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime could overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective maturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him.

*Roper*, 543 U.S. at 572-73.

Only categorical exceptions to the death penalty can insure the protection against cruel and unusual punishment for certain groups of less culpable individuals.

Under the factors outlined in *Gregg*, older adolescents who suffer from brain damage or severe mental illness must not be subject to the death penalty. First, adolescents lack sufficient cognitive capacities to achieve the requisite degree of culpability for imposition of the death penalty. For this reason, individuals under the age of eighteen are immune from capital prosecution under federal constitutional law. *Roper*, 543 U.S. at 575. The evidence presented during Petitioner Pike's state-court litigation shows that she, along with other older adolescents, suffers from the same lack of cognitive development. Healthy individuals raised in stable

environments may reach cognitive maturity in their early twenties. When the variables of mental illness or environmental abuse and neglect are factored in, cognitive development, and therefore moral reasoning, may take place even later.

In addition, a national consensus is building against the execution of older adolescents as evidenced in the *Roper* decision. At the same time, the diminished culpability of older adolescents may not be adequately protected through the presentation of mitigating evidence. The reasons that full culpability is lacking are often the very same reasons that youthful offenders are capable of particularly offensive crimes: maturity, defenses to peer pressure, and impulse control are not fully formed. That phenomenon was prominently manifested in Christa's case.

Just as the Supreme Court found youth to justify a categorical exemption from the death penalty in *Roper*, it also found that cognitive impairment justified such an exemption in *Atkins*. Even earlier, the Court had recognized the importance of mental illness and impairment when it held that individuals must be mentally competent at the time of execution in *Ford v. Wainwright*, 477 U.S. 399 (1986). That same reasoning from *Ford* and *Atkins* justifies the exemption of brain damaged individuals, particularly those suffering from severe mental illness.

Banning the execution of mentally-ill, cognitively-impaired adolescents satisfies constitutional requirements of proportionality, due process. It is also in accord with evolving standards of decency. *See Trop v. Dulles*, 356 U.S. 86, 101 (1958).

The state-court record in this case shows that Christa Pike was indeed a mentally-ill, cognitively-impaired, immature adolescent at the time of the offense and the state courts did not make any contrary factual findings. She was only eighteen years old. Her frontal lobe has been damaged since she was a developing fetus. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID#

4770-75). In addition, due to the abuse she suffered as a young child, the development of her brain was affected. (R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, PageID# 6830-35). She also suffers from a severe mental illness, bipolar disorder, that is dominated by long periods of hypomania in which she becomes increasingly irritable. (R.9-8, Add.5, Doc.3, Dr. Pincus, PCT, PageID# 4774; R.10-4, Add.5, Doc.24, Dr. Kenner, PCT, Page ID# 6778-79). All of these elements match or surpass the reasons for exempting juveniles and the mentally retarded from the death penalty. She is less able to control her emotions and actions due to mental illness and brain damage. Her frontal lobe, as an eighteen-year-old at the time of the offense, was not just incompletely developed, but was also damaged. The conditions surrounding her case are thus indistinguishable from those of juveniles or the mentally retarded. Under these circumstances, Christa's death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner presented this issue in her post-conviction appeal to the Tennessee Court of Criminal Appeals which addressed this issue on the merits. *Pike*, 2011 WL 1544207, at *62-68. The state-court decision to deny relief was contrary to or an unreasonable application of clearly established federal law. That court failed to accord due weight to current national trends in death penalty jurisprudence. Since the time of Pike's death sentence, six states[16] have exempted individuals like Pike from the death penalty by abolishing capital punishment altogether. At the present time, the Supreme Court is poised to strike down Florida's application of the *Atkins* decision which it applies only to individuals who score 70 or below on formal IQ tests. *Hall v.*

---

[16] Information obtained from Death Penalty Information Center web page. (http://www.deathpenaltyinfo.org/states-and-without-death-penalty).

*Florida*, 109 So. 3d 704 (Fla. 2012), *cert. granted*, 134 S. Ct. 471 (2013). Just as the Supreme Court will find that such a rigid application of *Roper* is unconstitutional, so must this Court find that the Tennessee courts' application of recent Eighth Amendment law is also too rigid. This Court must grant summary judgment and issue the writ of habeas corpus.

## GROUND FIVE

> **The death sentence in this case violates Christa Pike's rights to a fair jury and due process of law because the trial court dismissed for cause a juror who was qualified to serve. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d)**.

As presented in Ground One above (p.82), defense counsel failed to object when the trial court improperly struck prospective juror Rutherford for cause because he had expressed his reluctance to vote for the death penalty for someone as young as Christa Pike. In this Fifth Ground, Petitioner relies on the same facts to argue that it was structural error for the trial court to excuse prospective juror Rutherford. Because there is no need for additional factual development of this claim, this Court may grant Petitioner Pike's Motion for Summary Judgment.

After prospective juror Mr. Rutherford had been initially determined to be death-qualified under *Witherspoon* and *Witt*, he told the court that he was having difficulty with the idea of imposing the death penalty due to Ms. Pike's youth. This exchange followed:

> Trial Court: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I, I need you to tell me how you feel.
>
> Mr. Rutherford: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.

. . .

> General Crabtree: And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.
>
> Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?
>
> Mr. Rutherford: I have problems just because of the death penalty.
>
> . . .
>
> General Crabtree: . . . So let's see if we can make it clear–as far as her, the sole factor of her age, that would be something that you could not do?
>
> Mr. Rutherford: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem–
>
> . . .
>
> General Crabtree: . . . I understand you to be saying that because of her age that one factor would keep you from returning the death penalty, is that correct?
>
> Mr. Rutherford: I think so.

(R.8-1, Add.2, Doc.16, TT, PageID# 2048; 2050-52). Thereafter, the court excused Mr. Rutherford for cause. (*Id*. at 2053).

In affirming the dismissal of prospective juror Rutherford, the Court of Criminal Appeals applied federal law unreasonably. Because Mr. Rutherford never said that he would be unable to follow instructions and conscientiously follow the law, he was qualified to serve.

The trial court never told Mr. Rutherford that Ms. Pike's youth was a statutory mitigating factor. *See* Tenn. Code. Ann. § 39-13-204(j)(7). Nor did anyone inform Mr. Rutherford that he could accord that factor great weight if he found that Ms. Pike was emotionally immature for someone her age. Nor, conversely, was he told that he could accord this factor less weight if he found that she was more mature or if he simply found that her actions were premeditated and not

mitigated by youth. In fact, Mr. Rutherford expressed his belief that it was not age, *per se*, that made him hesitate about the death penalty, but rather the immaturity that generally goes with it: "you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem." (*Id*. at 2051). Consideration of age and maturity as a mitigating factor was not only permissible in this case, it was required. *See Eddings v. Oklahoma*, 455 U.S. 104, 115-17 (1982). Mr. Rutherford's recognition of this was not a legitimate reason to strike him from jury service.

Mr. Rutherford's views, according great weight to immaturity due to age, are not at all unlike the views expressed by the Supreme Court when it held that the death penalty was unconstitutional for defendants who were under eighteen at the time of their offense. In *Roper v. Simmons*, the Court held that immaturity due to youth was such a strong factor in mitigation that the death penalty was excluded no matter how strong the aggravation. *Roper*, 543 U.S. at 570-71. Mr. Rutherford's belief, that Ms. Pike's youth would be a strong mitigating factor because she was only eighteen at the time of the offense, and therefore only barely eligible for the death penalty, is hardly surprising and should not have disqualified him from service.

Mr. Rutherford's excusal violated Ms. Pike's constitutional rights to a fair trial and impartial jury. In *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968), the Supreme Court held that striking a juror who had conscientious scruples against the death penalty but who, nevertheless, could consider it, violated the defendant's right to an impartial jury under the Sixth and Fourteenth Amendments. In *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the Court clarified the *Witherspoon* standard, proclaiming the critical issue to be "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with

his instructions and his oath." Later, in *Morgan v. Illinois*, 504 U.S. 719, 731 (1992), the Court held that *Witherspoon* "was in reality a limitation of a State's making unlimited challenges for cause to exclude those jurors who 'might hesitate' to return a verdict imposing death." *Morgan*, 504 U.S. at 731 (citing *Witherspoon*, 391 U.S. at 512-13).

The Tennessee court's decision on this issue represents an unreasonable application of federal law. While the state court recognized the correct constitutional decisions from the Supreme Court that applied to this issue, it failed to respect the unambiguous directive from the Court to only excuse a juror whose "views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). Because potential juror Rutherford never said that his views would substantially impair his performance, he should not have been excused.

In applying Supreme Court precedent to the facts in this issue, the Court of Criminal Appeals erroneously mis-characterized the facts and Mr. Rutherford's statements to the court. He stated that he would not have a problem applying the death penalty to someone who is "more mature." (R.8-1, Add.2, Doc.6, Potential Juror Rutherford, TT, PageID# 2051). This is the essence of the youth mitigating factor and the basis of the Supreme Court's decision in *Roper v. Simmons*, 535 U.S. 551 (2005).[17] Potential juror Rutherford may have given great weight to the

---

[17] Justice O'Connor's dissent in that case illustrates how Juror Rutherford's *voir dire* must be understood: "[T]he rule decreed by the Court rests, ultimately, on its independent moral judgment that death is a disproportionately severe punishment for any 17-year-old offender. I do not subscribe to this judgment. Adolescents *as a class* are undoubtedly less mature and therefore less culpable for their misconduct, than adults. But the Court has adduced no evidence impeaching the seemingly reasonable conclusion reached by many state legislatures: that at least *some* 17-year-old murderers are sufficiently mature to deserve the death penalty in an appropriate case." *Roper*, 543 U.S. at 588 (O'Connor, J., dissenting). A reasonable reading of Juror Rutherford's *voir dire* would certainly put his views in line with those of Justice O'Connor.

mitigating factor of age, but that would not disqualify him from service under *Witt*. His statements in *voir dire* did not foreclose the possibility of the State proving that despite her chronological age, the defendant was mature or that the aggravating factors in this case were so substantial as to outweigh any consideration of her youth. The State always bears such burdens in death penalty cases.

For these reasons, it was constitutional error for the trial court to exclude potential juror Rutherford. It was also ineffective assistance of counsel for Petitioner Pike's attorneys to fail to lodge an objection to his removal. (*See* Ground One). Where the court has wrongfully excluded a juror for his views on the death penalty, the death penalty cannot stand. *Witherspoon*, 391 U.S. at 521-22. The state court's denial of these claims is an unreasonable application of clearly established law and this Court must grant summary judgment and issue the writ of habeas corpus.

**GROUND SIX**

**The appointment of counsel with an active conflict of interest known to the trial court constitutes a violation of Christa Pike's Sixth Amendment right to counsel and this Court must issue the writ of habeas corpus due to this structural error.**

As set out in the Statement of Facts, trial counsel Bill Talman was appointed to defend Christa Pike who was on trial for her life and being prosecuted by the same prosecutors who could potentially bring charges against him for fraudulent billing. *See generally*, *infra* at pp.11-13. Mr. Talman carried out this appointment beyond trial to eventually argue Ms. Pike's case before the Tennessee Supreme Court, the same court that was considering what sanctions to impose against him for his earlier unethical conduct. The trial court was aware of all of these facts. The trial court admitted, "I knew; we all knew that Mr. Talman had his own problems."

(R.10-7, Add.5, Doc.27, Judge Leibowitz, PCT, PageID# 7083). Mr. Talman's own fate was in the hands of his adversary in this adversarial process and his credibility and ethics were being judged at the same time he was supposed to be arguing to save his client's life. This situation was more than just unseemly. It had an influence on Mr. Talman in ways that may be difficult to quantify and represents the type of error that the Supreme Court has found to be structural error for that very difficulty.

During the state post-conviction process, Petitioner Pike argued "that the appointment of counsel who the court knew had a high risk of conflict constitutes a structural error requiring that her conviction and sentence be set aside." (R.13-1, Add.7, Doc.1, PC Appellant's Brief, PageID# 9027). Petitioner cited to Supreme Court cases that hold that "the assistance of counsel is among those 'constitutional rights so basic to a fair trial' that their infraction can never be treated as harmless error;" *Holloway v. Arkansas*, 435 U.S. 475, 489 (1979) (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)); and that, "[w]hen a defendant is deprived of the presence and assistance of this attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) (quoting *Holloway*, 435 U.S. at 489) (Where a Petitioner shows structural error, no showing of prejudice or effect is necessary.)

This claim was presented to the Court of Criminal Appeals during the post-conviction process. Although that court found that no conflict of interest existed because of Petitioner's alleged failure to show prejudicial impact, that court never specifically addressed the structural error aspect of this claim. *Pike*, 2011 WL 1544207, at *46, *48. The court made no finding of procedural default. Because there is no state court decision to defer to, this Court must address

this issue *de novo*. Accordingly, Petitioner Pike does not include it in her Motion for Summary Judgment. Rather, should the State move for summary judgment, she will oppose the granting of that motion and will ask this Court to conduct a federal evidentiary hearing.

## GROUND SEVEN

**The trial court erred in violation of Christa Pike's rights to due process guaranteed by the Fourteenth Amendment to the United States Constitution by allowing television and photographic coverage of the pretrial proceedings. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

The present case had extensive media coverage. The constitutional fairness of the trial was implicated by this extensive pretrial publicity which continued throughout the trial. This was due to television and photographic media coverage in the courtroom that occurred both during the pretrial stages as well as the trial itself. The Petitioner objected to the presence of television and newspaper photographers during pretrial proceedings. (R.7-1, Add.1, Doc.1, T. Tech. Rec., PageID# 88-89). Her motion was made to limit the public's exposure to the specific details of the case so as not to taint potential jurors. However, the trial court overruled Petitioner's objections and the media coverage continued, denying Petitioner Pike a fair trial by an unbiased jury. (*Id.* at 124).

The basis for allowing cameras in the courtroom was the then-experimental rule promulgated by the Tennessee Supreme Court. That court was testing the feasibility of allowing cameras in the courtroom during proceedings. On direct appeal, the Tennessee Supreme Court affirmed the trial court's application of this rule to Ms. Pike's case finding that Ms. Pike "ha[d] failed to demonstrate that the media coverage of the pretrial and trial proceedings in this case

impinged upon her right to a fair trial." *Pike*, 978 S.W.2d at 917. That decision is contrary to or is an unreasonable application of federal constitutional law. Furthermore, it is based on an unreasonable assessment of the facts in light of the trial record.

The only federal case law cited by the Tennessee Supreme Court in support of its affirmance was *Chandler v. Florida*, 449 U.S. 560 (1981). However, the Supreme Court in that case expressly limited its holding to "the limited question of the Florida Supreme Court's authority to promulgate" the rule allowing electronic media and still photography coverage of public judicial proceedings. *Id.* at 570. That case did not examine whether the application of such a rule to a specific set of facts might cause a trial to be fundamentally unfair. *Id.* Such an application shows that an unfair trial was the result of a similar rule in Petitioner Pike's case.

Many of the jurors and potential jurors in the present case were aware of the inordinate media attention this case had received. Furthermore, and more importantly, many potential jurors were exposed to media coverage during *voir dire* and pretrial hearings that immediately preceded their reporting for jury service. For one thing, potential jurors discussed the fact that there had been a confession while they were waiting to be questioned on *voir dire*. (R.7-12, Add.2, Doc.9, Potential Juror Strickler, TT, PageID# 1318). In addition, Juror Green admitted that he had been exposed to media coverage of the *voir dire* process. (R.7-16, Add.2, Doc.13, Juror Green, TT, PageID# 1791). Other potential jurors were exposed to media coverage of the *voir dire* process. Potential jurors Hayner and Qualls were both exposed to media coverage about the jury selection. (R.7-5, Add.2, Doc.2, Potential Juror Hayner, TT, PageID# 622-23; R.7-8, Add. 2, Doc.5, Potential Juror Qualls, TT, PageID# 930-31). Media coverage in this case

made jury selection extremely difficult and the result was a jury panel that was already familiar with the alleged facts of this case as reported by the news media.

Most importantly, some of the actual jurors in this case had been exposed to the idea that the killing was "satanic" or a "cult." Jurors Clarence Darden and LeVaughn Davis remembered that from the media coverage. (R.7-13, Add.2, Doc.10, Juror Darden, TT, PageID# 1425-26; R.7-17, Add.2, Doc.14, Juror Davis, PageID# 1338-39). Juror Davis remembered that the victim "was killed and then they carved something on her chest" and that this was "a pretty horrible thing." (R.7-17, Juror Davis, PageID# 1338-39). These details of the crime were naturally sensationalized by the media.

The opinion of the Tennessee Supreme Court failed to engage in a fact-specific analysis of the effect of continuing media coverage in this case. *See Pike*, 978 S.W.2d at 916-17. The court's dismissal of Petitioner's fair trial concerns despite the jurors' exposure to the facts of the case (*see* Ground Eight) represents an unreasonable application of clearly established law. It ignores the *voir dire* where such a high percentage of jurors had been exposed to facts that included many inflammatory details. The Tennessee court's holding that a fair trial could be held with local jurors in the middle of this media circus was unreasonable. The trial court's decision to allow television cameras in the courtroom during the trial only compounded this denial of due process and fundamental fairness. This Court must grant summary judgment in favor of Petitioner Pike and issue the writ of habeas corpus.

## GROUND EIGHT

**Christa Pike's Sixth Amendment right to a fair and impartial jury was violated by the trial court's refusal to grant her motion for a change of venue. The Tennessee courts' denial of this claim was contrary to, or an unreasonable application of, clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

The pretrial publicity generated in this case was very extensive with the media portraying Ms. Pike as being guilty before her trial ever took place. Due to the nature and extent of the media coverage, Ms. Pike filed a motion for change of venue from Knox County where the offense had occurred. (R.7-1, Add.1, Doc.1, T. Tech. Rec., PageID# 93-94). The trial court denied this motion. Through questioning during *voir dire*, Ms. Pike was able to demonstrate that an overwhelming majority of the prospective jurors had heard detailed information about this case. While some jurors remembered general facts about the case (R.7-5, Add.2, Doc.2, TT, PageID# 614-16), many others remembered specific details. (R.7-9, Add.2, Doc.6, TT, PageID# 1011-23; 1033-38). Furthermore, some of the prospective jurors admitted that they had been discussing the media details of the case in the hallway during jury selection. (R.7-9, Add.2, Doc.6, TT, PageID# 1021; R.7-11, Add.2, Doc.8, TT, PageID# 1310; R.7-12, Add.2, Doc.9, PageID# 1315-20). As a result of this questioning, defense counsel renewed the motion for change of venue. (R.7-12, Add.2, Doc.9, Bill Talman, TT, PageID# 1321). The trial court reaffirmed its denial and the trial proceeded before a jury composed of residents of Knox County, Tennessee. (*Id*. at 1321-22).

Petitioner Pike raised this issue during the direct appeals process. Although the Tennessee Supreme Court did not address the issue, it attached the merits review from the Court

of Criminal Appeals to its Opinion as an Appendix. *Pike*, 978 S.W.2d at 923-28. The opinion from the Court of Criminal Appeals was an unreasonable application of federal constitutional law as interpreted by the Supreme Court in *Irvin v. Dowd*, 366 U.S. 717 (1961).

In *Dowd*, two-thirds of the jurors actually seated had been exposed to a barrage of pretrial publicity right up until the time of trial, had already formed an opinion that the defendant was guilty, and acknowledged familiarity with material facts and circumstances of the case. 366 U.S. at 725-28. In addition, even the headlines of one of the local newspapers reported during jury selection that "impartial jurors are hard to find." *Id.* at 727. Although each of the jurors said that he could be impartial, the U.S. Supreme Court concluded that, "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." *Id.* at 728.

The circumstances in the present case were similar to the circumstances in the *Dowd* case. Here, almost every prospective juror indicated that they had heard about the case and could recall details of the case. Most importantly, many of the jurors who actually served in this case were familiar with it. Juror King had heard that it involved a "love triangle" at the Job Corps. (R.7-12, Add.2, Doc.9, Juror King, TT, PageID# 1324). Juror Darden remembered there was a "satanic" element to the crime. (R.7-13, Add.2, Doc.10, Juror Darden, TT, PageID# 1425-26). Juror Davis heard that a young lady had something carved on her chest that, "might be a cult sign," and that it was "a pretty horrible thing." (R.7-17, Add.2, Doc.14, Juror Davis, PageID# 1867-68). Other jurors remembered media coverage or discussions of the crime around the time it happened. *See, e.g.*, Juror Lambert *voir dire*. (R.7-17, Add.2, Doc.14, Juror Lambert, TT,

PageID# 1906-08). The Tennessee Supreme Court itself recognized that "jury selection was lengthy, in part, due to the media coverage of the crime[.]" *Pike*, 978 S.W.2d at 917. Respondent has never challenged this finding of fact.

Although the Court of Criminal Appeals correctly cited to the *Dowd* opinion, it applied it summarily and unreasonably. The court dismissed Ms. Pike's appeal because "every juror who said that he or she was familiar with the case said that he or she could disregard the reports and render an impartial decision." *State v. Pike*, No. 03C01-96119CR-408, 1997 WL 732511, at *12 (Tenn. Crim. App. Nov. 26, 1997). This is a very simplistic reading that ignores the reality that while jurors may honestly believe they can be fair, they may harbor hidden biases. *See Morgan v. Illinois*, 504 U.S. 719, 735 (1992) (general questions that jurors could "follow the law" and be fair was insufficient to detect biased jurors). The Court of Criminal Appeals failed to recognize that such general questioning was the trial court's chief tool in its attempt to uncover biased jurors. *See, e.g.*, R.7-17, Add.2, Doc.14, Judge Leibowitz, TT, PageID# 1871. While the jury actually seated consisted of people who stated that they could be impartial, the *Dowd* rule would compel that with her life at stake, Pike should have been tried in "an atmosphere undisturbed by so huge a wave of public passion." *Dowd*, 366 U.S. at 728. Furthermore, the court failed to conduct any analysis of the evidence of pretrial publicity or the impact of the continuing publicity during the trial, including television coverage of the actual proceedings. *See* Ground Seven, pp.103-05. When this Court considers the further warnings from *Morgan*, it must reach the conclusion that Petitioner Pike's capital trial was unfair and that the state court applied federal law unreasonably. For these reasons, this Court must grant summary judgment and find habeas relief is warranted.

## GROUND NINE

**Christa Pike's Sixth Amendment rights to a fair and impartial jury as well as her right to equal protection were violated when the trial court applied a new rule in violation of the *ex post facto* clause that gave the State the same number of peremptory challenges as the Defendant. The Tennessee courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on the state court's unreasonable determination of the facts. 28 U.S.C. § 2254(d).**

Petitioner Pike's constitutional rights were violated when the trial court applied a new law on how to go about selecting a fair and impartial jury that was not in effect at the time the offense was committed. The application of this law during the trial for an offense that took place before its enactment violated the *ex post facto* rule of the United States Constitution and merits habeas relief.

At the time the offense was committed in this case, January 12, 1995, the Tennessee statute on jury selection in effect gave a greater number of peremptory challenges to the Defendant (fifteen) than it did to the State (eight). *See* Tenn. R. Crim. P. 24(d) (West 1995). By the time the trial took place, the state legislature enacted a new law that gave the State the same number of peremptory challenges as the Defendant. *See* Tenn. R. Crim. P. 24(d) (West 1996). The trial court applied the new law to jury selection in Petitioner Pike's case and allowed the State to exercise as many peremptory challenges as the Defendant. (R.7-4, Add.2, Doc.1, Judge Leibowitz, TT, PageID# 502). Ms. Pike objected and raised this issue during the direct appeal process. (R.8-16, Add.3, Doc.1, Pike Direct Appeal Brief, PageID# 3489-90). Although the Tennessee Supreme Court did not address the issue, it attached the merits review from the Court of Criminal Appeals to its Opinion as an Appendix. *Pike*, 978 S.W.2d at 925. That opinion from the Court of Criminal Appeals is an unreasonable application of federal constitutional law.

Petitioner now asks this Court to grant summary judgment in her favor on this issue because there are no factual issues in dispute and because she is entitled to relief as a matter of law.

Although the Court of Criminal Appeals correctly identified controlling precedent on this issue, it unreasonably applied *Miller v. Florida*, 482 U.S. 423 (1987) and *Dobbert v. Florida*, 432 U.S. 282 (1977) to the facts in this case. Under *Miller*, the court recognized that in order to show a violation of the *ex post facto* clause, Petitioner Pike had to show that the enactment of a new law was applied to events occurring before its enactment and that it must disadvantage the offender. *Pike*, 978 S.W.2d at 925 (quoting *Miller*, 482 U.S. at 430). Since the trial court applied a new law not in effect at the time the offense in this case occurred, the Court of Criminal Appeals recognized that the trial court applied a new law affecting Pike's rights during jury selection. *Id*. However, the court unreasonably concluded that there was no *ex post facto* violation because the change in law only affected "rules of procedure" that "do not affect any substantial right of a defendant . . . ." *Id*. at 926.

The Sixth Amendment right to trial by jury is one of the most fundamental rights of criminal defendants in this country. Because Tennessee changed the way capital defendants exercise that right, it affected Petitioner Pike's substantial rights. The change disadvantaged Petitioner Pike in her exercise of her the Sixth Amendment right to a fair and impartial jury. Therefore, the Court of Criminal Appeals' decision saying that the change in law did not affect substantial rights was unreasonable.

By adding to the number of peremptory strikes for the prosecution, the new law unquestionably disadvantaged Pike from where she would have stood under the old law. The Tennessee Court of Criminal Appeals nonetheless concluded that the conviction could stand

because Pike could not "proffer[] any evidence that the jury, as it was composed by the State's using the additional peremptory challenges, prevented her from receiving a fair trial." *Id.* at 926. This holding is unreasonable in light of *Gray v. Mississippi*, 481 U.S. 648 (1987), where the Court declined to adopt any sort of harmless error test to the possible wrongful exclusion of jurors in a capital case. *Id.* at 669 (Powell, J., concurring). Nothing in the Supreme Court precedents cited by the state court required that Petitioner bear the further burden of showing that she was denied a fair trial. Yet, this was the standard imposed by the Court of Criminal Appeals. The imposition of this requirement was therefore unreasonable. Where the application of clearly established law is unreasonable, this Court must grant summary judgment in favor of the Petitioner and issue the writ of habeas corpus.

## GROUND TEN

**Christa Pike's death sentence must be set aside because the Tennessee death penalty scheme is unconstitutional; its protocol for lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment.**

The Tennessee death penalty statute and its application as interpreted by the Tennessee courts violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Because this claim does not need any further factual development, this Court may grant summary judgment in favor of Petitioner Pike.

### A. Tennessee's death scheme fails to meaningfully narrow the class of death eligible defendants.

The scheme of a capital sentencing must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring). Several of the aggravating

circumstances set forth in Tenn. Code Ann. § 39-13-204(i) have been so broadly and disparately interpreted that they fail to provide a meaningful basis for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. These include:

1. The Tenn. Code Ann. § 39-13-204(i)(2) aggravating circumstance has been construed and applied in an overbroad manner;[18]

2. The Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance has been construed and applied in such a manner as to be duplicative of the (i)(7) aggravating circumstance and is overbroad;

3. The Tenn. Code Ann. § 39-13-204(i)(5) aggravating circumstance is vague and overbroad;

4. In combination, subsections (i)(5), (i)(6), and (i)(7) encompass most homicides committed in Tennessee.

Furthermore, Tennessee's appellate review process in death penalty cases is constitutionally inadequate because it is not meaningful and because the statutorily-mandated proportionality review is conducted in violation of due process and equal protection. The appellate review process is not meaningful for the following reasons:

1. The Tennessee Supreme Court cannot reweigh proof due to the absence of written findings concerning mitigating circumstances;

2. The information relied upon by the Tennessee Supreme Court for comparative review is inadequate and incomplete; and

3. The Tennessee Supreme Court's methodology is flawed.

By creating a statutory requirement that the appellate courts conduct proportionality review, there is a constitutional right that the proportionality review be conducted consistent with

---

[18] While this aggravating circumstance and other aspects of the Tennessee death penalty statute may not have been an issue in Christa Pike's case, the application of these aspects of the statute contributes to the unconstitutional application of the death penalty as a punishment in the State of Tennessee.

the elements of due process. *See, e.g.*, *Olim v. Wakinkona*, 461 U.S. 238 (1983). Tennessee's proportionality review process is not conducted in a manner sufficient to satisfy due process.

**B. The death penalty is imposed capriciously and arbitrarily under the Tennessee statute.**

"The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring). "Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976).

Provisions of the Tennessee death penalty statute and other provisions of the State's criminal law have resulted in the arbitrary and capricious infliction of the death penalty. Death sentences are imposed not because the defendant has been found to be one of the most blameworthy or culpable of offenders, but for other improper, illegal and unconstitutional reasons. These are:

1. Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty;

2. The death penalty is imposed in a discriminatory manner depending on the defendant's race, gender, and the location where the crime occurs;

3. There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter;

4. The death qualification process skews the make-up of the jury and results in a jury more prone to be prosecution oriented and more prone to find guilt.

Allowing Tennessee's elected district attorneys to indiscriminately seek or forego the death penalty in any given case violates the principles set out in *Bush v. Gore*, 531 U.S. 98 (2000), and *Furman*. This practice also ignores the long-held understanding that death is different in kind from all other punishments. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

**C. Execution by Tennessee's protocol for lethal injection would violate Christa Pike's rights under the Eighth and Fourteenth Amendments to the United States Constitution.**

Because the State of Tennessee's protocol for lethal injection has changed since this Petition was filed, this claim can no longer be litigated as it was pled. Rather, the constitutionality of the protocol adopted on September 27, 2013, is currently being litigated in the Tennessee courts at the present time. *See West v. Schofield*, Davidson County Chancery Court No. 13-1627-I. Because the protocol may be found unconstitutional or be changed prior to any execution date for Petitioner Christa Pike, this claim is not ripe for federal habeas review at this time.

**D. The death sentence is unconstitutional because it infringes on Christa Pike's fundamental right to life, and imposition of the death penalty is not necessary to promote any compelling state interest.**

Under the Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, the death sentence must be set aside because it unconstitutionally impinges upon Petitioner Pike's fundamental right to life. Convicted murderers retain a fundamental right to life under the Eighth and Fourteenth Amendments to the United States Constitution. *Ford v.*

*Wainwright*, 477 U.S. 399, 409 (1986). The constitution explicitly recognizes the right to life as fundamental in both the due process clause of both the Fifth and the Fourteenth Amendments.

**E. The indictment returned by the Grand Jury in this case was unconstitutional.**

The State of Tennessee denied Ms. Pike's rights under the Fifth and Eighth Amendments to the United States Constitution because the aggravating factor making her eligible for the death sentence was neither in the indictment nor returned by the Grand Jury. *See Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Therefore, this Court must set aside the death sentence in this case.

Ms. Pike presented these issues to the state courts in post-conviction and they were rejected on the merits. *Pike*, 2011 WL 1544207, at *70. As to the issue of standards for jury selection, those issues were presented to the Tennessee Supreme Court on direct appeal. *Pike*, 978 S.W.2d at 924-25. Because of the state court's failure to grant relief represents a decision that is contrary to, or an unreasonable application of, federal law, habeas relief is merited, and this Court may grant summary judgment in favor of Petitioner Pike.

## GROUND ELEVEN

**In violation of the Fifth, Sixth and Fourteenth Amendment, the cumulative effect of the errors addressed above deprived Christa Pike of due process and a fair trial.**

"That the reliability of a state criminal trial can be substantially undermined by a series of events, none of which individually amounts to a constitutional violation, is an idea that has been accepted by nearly every federal court to have addressed the issue." *Pursell v. Horn*, 187 F.

Supp. 2d 260, 374 (W.D. Pa. 2002) (citing *Taylor v. Kentucky*, 436 U.S. 478, 487-88 (1978)) (other citations omitted).

Even if this Court were to find that Ms. Pike failed to show prejudice from any one of the claims for relief enumerated in this petition, the Court must still grant relief because the combined effect of those errors acted to deprive her of a fair trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

The prejudice that flowed from the many errors at her trial demonstrates a fundamental denial of due process of law such that Ms. Pike is entitled to a new trial on guilt and punishment. "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990); *see also United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993). Cumulative error analysis "focus[es] on the underlying fairness of the trial." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Cumulative error has also led to a grant of habeas relief in an AEDPA case. *See Thomas v. Hubbard*, 273 F.3d 1164 (9th Cir. 2002). As in *Thomas v. Hubbard*, the cumulative error occurring in Ms. Pike's case dictates that her trial was fundamentally unfair and relief is warranted. *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *Kyles v. Whitley*, 514 U.S. 419 (1995); *United States v. Bagley*, 473 U.S. 667 (1985); *Brady v. Maryland*, 373 U.S. 83 (1963). However, this claim can only be adjudicated once the Court has considered all of Petitioner Pike's grounds for relief. It is therefore improper to resolve it until then.

## RELIEF REQUESTED

For the reasons stated in support of summary judgment for Grounds One, Three, Four, Five, Eight, Nine and Ten, this Court must grant Summary Judgment in favor of Petitioner Pike and issue the Writ of Habeas Corpus. Petitioner Pike reserves the right to ask for a federal evidentiary hearing and will file that motion in response to Respondent's Motion for Summary Judgment.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY: /s/Stephen A. Ferrell
Stephen A. Ferrell
Asst. Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2014, notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/Stephen A. Ferrell
Stephen A. Ferrell