**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 1:12-cv-35** |
| **v.** | ) | **Mattice/Lee** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**RESPONDENT'S MEMORANDUM OF LAW SUPPORTING SUMMARY JUDGMENT**

On March 28, 2014, the petitioner, moved for partial summary judgment as to her claims that her judgment in Knox County, Tennessee, convicting her of first degree murder, conspiracy to commit the same, and sentencing her to death violate her constitutional rights. (D.E. No. 45-46.) In response in opposition thereto, the respondent relies on his own motion for summary judgment and supporting memorandum (D.E. No. 42-43) and further states:

**ARGUMENT/FACTS**

**I. IN LIGHT OF THE HORRIFIC FACTS OF THIS CRIME, THE PETITIONER CANNOT ESTABLISH PREJUDICE AS TO ANY ALLEGED ERROR**.

A brief summary of the facts as summarized by the Tennessee Supreme Court of the petitioner's gruesome murder follows:

> The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the [Petitioner], Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next [4] day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed [the Petitioner], along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, [the Petitioner's] boyfriend, walking away from the Job Corps center toward 17th Street. At approximately

10:15 p.m., Iloilo observed [the Petitioner], Peterson, and Shipp return to the Center. Slemmer was not with them.

Later that night, [the Petitioner] went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. [The Petitioner] showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. [The Petitioner] told Iloilo that the victim had begged "them" to stop cutting and beating her, but [the Petitioner] did not stop because the victim continued to talk. [The Petitioner] told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she had thrown those at the victim as well. [The Petitioner] told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, [the Petitioner] said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that [the Petitioner] was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw [the Petitioner] at breakfast the next morning, she asked [the Petitioner] what she had done with the piece of the victim's skull. [The Petitioner] replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."

During a class later that morning, [the Petitioner] made a similar statement to Stephanie Wilson, another Job Corps student. [The Petitioner] pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." [The Petitioner] then pulled a napkin from her pocket and showed Wilson a piece of bone which [the Petitioner] said was a piece of Slemmer's skull. [The Petitioner] also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. [The Petitioner] told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

. . .

According to [the Petitioner], she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, [the Petitioner] told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though [the Petitioner] refused to name the other parties involved in the incident, she said the group began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, [the Petitioner] and Slemmer exchanged words. [The Petitioner] then began hitting Slemmer and banging Slemmer's head on her knee. [The Petitioner] threw Slemmer to the ground and kicked her repeatedly. According to [the Petitioner], as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report [the Petitioner] so she would be terminated from the Job Corps program, [the Petitioner] again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with [the Petitioner] caught Slemmer and pushed her to the ground.

[The Petitioner] and the other person, who [the Petitioner] referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where [the Petitioner] cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," [the Petitioner] recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point [the Petitioner] said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, [the Petitioner] cut Slemmer's back, "the big long cut on her back." [The Petitioner] said Slemmer repeatedly tried to get up and run. [The Petitioner] recounted how Slemmer bargained for her life, begging [the Petitioner] to talk to her and telling [the Petitioner] that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. [The Petitioner] told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." [The Petitioner] said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked [the Petitioner] what she was going to do to her, at which point [the Petitioner] thought she heard a noise. [The Petitioner] left the scene to check out the surrounding area to make sure no one was around. When she returned, [the Petitioner] began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, [the Petitioner] cut Slemmer's throat several other times. [The Petitioner] said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that [the Petitioner] and the other person would push her back on the ground.

Slemmer attempted to run away again, and [the Petitioner] threw a rock which hit Slemmer in the back of the head. [The Petitioner] stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, [the Petitioner] continued to hit her. Eventually [the Petitioner] said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but [the Petitioner] "kept hitting her and hitting her and hitting her." [The Petitioner] eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, [the Petitioner] said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. [The Petitioner] said the episode lasted "for about thirty minutes to an hour." [The Petitioner] admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. [The Petitioner] also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. [The Petitioner] denied carving a pentagram in the victim's chest but said that the other person had cut the victim on her chest.

> After disposing of Slemmer's body, [the Petitioner] and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and [the Petitioner] returned the miniature meat cleaver to the person at Job Corps from whom she had borrowed it. [The Petitioner] never identified that individual. **[**[The Petitioner] told Investigator York that the bloodstained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. [The Petitioner] also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. [The Petitioner] gave Investigator York consent to search her room and then accompanied him to the Job Corps Center. From there [the Petitioner] retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that [the Petitioner] eventually directed him to the exact location where the victim's body was found.

*State v. Pike*, 978 S.W.2d 904, 908, (Tenn. 1998).

The evidence clearly demonstrates the petitioner's guilt. The brutality and callousness involved in this murder is almost unthinkable. Against this backdrop of evidence established at trial, it cannot be credibly argued that any determination of the Tennessee appellate courts that Pike failed to establish prejudice was unreasonable. In short, in light of the evidence, there is no reasonable chance of a different result of the petitioner's trial no matter what additional action counsel might have taken, or no matter what error the petitioner alleges. Hence, the respondent is entitled to judgment as a matter of law as to the petition.

## II. IN ANY EVENT, THE TENNESSEE COURT OF CRIMINAL APPEALS DID NOT UNREASONABLY REJECT THE PETITONER'S EXHAUSTED CLAIMS, AND THE UNEXHAUSTED CLAIMS ARE PROCEDURALY DEFAULTED AND WITHOUT MERIT.

### Ground One A: The TCCA correctly determined that trial counsel were not ineffective in failing to present certain mitigating evidence they had uncovered.

The petitioner contends that her counsel's "last minute change of plans" in presenting mitigation evidence was ineffective, and that the Tennessee Court of Criminal Appeals unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984) in finding the contrary.

However, the petitioner's claim does not entitled him to relief under the deferential standards under which ineffectiveness claims are reviewed under 28 U.S.C. § 2254.

Federal habeas review as to a state-court determination of ineffectiveness is highly deferential. Seeking to surmount *Strickland*'s high bar is "never an easy task." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011). "[E]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is "doubly so." *Id*. Accordingly, in reviewing an ineffective-assistance claim that was adjudicated by a state court, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. A considered strategic decision by counsel does not give rise to an ineffective-assistance claim, even if the strategy did not prove effective. *Id*. at 790-91.

Here, there is at least reasonable argument that counsel's actions satisfied Strickland's deferential standard. The petitioner specifically complains to counsel's failure to call Dr. McCoy, who had testified during trial as to Pike's social history, to testify again at mitigation. The Court of Criminal Appeals determined this testimony would have been somewhat redundant to her prior testimony and would have cast the petitioner in a negative light. Specifically, the court stated:

> Much of the evidence presented by the petitioner here was presented to the jury in one of the phases of trial, but this court notes that it was not to the extent that the petitioner now asserts that she thinks it should have been. Some of the witnesses would have been redundant while others would have included some very negative information about the petitioner.
>
> Finally, the post-conviction court determined that there was "such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination." *See Goad*, 938 S.W.2d at 371. Additionally, the court made the following comments on the record.

> Considering all the circumstances and evidence, this court cannot fault counsel for having chosen not to use Dr. McCoy as a witness at the penalty phase of the petitioner's trial. [Lead counsel] was understandably uncomfortable with Dr. McCoy's statements and materials and while a different decision may seem best in hindsight, this court cannot judge counsel's decision with the situation with 20-20 hindsight and find fault merely because another choice may seem to be preferable today. Counsel's decision was not unreasonable.
>
> The post-conviction court also noted in its order the problematic information that lay witnesses called to testify could put before the jury and noted that:
>
>> With the potential for much of this plus other information to harm the petitioner's case in mitigation, counsel made a reasonable choice to try to limit what came before the jury and from whom. Counsel's original choice to have the information explained by an expert rather than lay witnesses who could not explain the petitioner's behavior was understandable. Once the exigent decision was made that Dr. McCoy would not testify, counsel strategically decided to have the petitioner's parents and aunt testify to bring out the petitioner's life history to be considered in combination with the information that had already been provided to the jury regarding her Borderline Personality Disorder.
>
> Following review of the record, we cannot conclude that the Petitioner has put forth sufficient evidence to preponderate against the trial court's findings. The court made clear its findings on the record after applying the appropriate analysis, and we agree with the post-conviction court.

*Pike*, 2011 Tenn. Crim. App. LEXIS 285, at *142-44.

The TCCA's ruling was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, the respondent is entitled to judgment as a matter of law as to this claim.

**Ground One B: The TCCA did not unreasonably determine that trial counsel were not ineffective in failing to discover certain mitigating evidence.**

The petitioner contends that trial counsel should have consulted with a neurologist prior to sentencing. This claims fails because the Tennessee Court of Criminal Appeals did not unreasonably determine that trial counsel was entitled to rely on the psychiatric opinions of the expert he hired, and there was no prejudice in any event.

Trial counsel is entitled to rely on the examination of a mental-health expert unless counsel "should have been aware" at the time that further investigation would have produced additional favorable results. *Black v. Bell*, 664 F.3d 81, 104 (6th Cir. 2011). Here, counsel met with Dr. Engum, a neuropsychologist, who advised that no further testing was necessary. *Pike,* 2011 Tenn. Crim. App. LEXIS 285, at 150-52. As such, the record does not indicate that counsel should have been aware that the experts needed additional background information beyond that on which he relied. Accordingly, counsel was entitled to rely on the conclusions of the evaluating psychiatrists without questioning them as to whether their diagnoses were properly informed. *McGuire v. Warden, Chilicothe Correctional Inst*., 738 F.3d 741, 758 (6th Cir. 2013) (counsel was entitled to rely on the conclusions arrived at by [the retained expert] in declining to seek additional information potentially relevant to diagnosis). Thus, it was reasonable for the Court of Criminal Appeals to conclude that counsel was not deficient in this regard. The petitioner cannot establish the Court's prejudice determination was unreasonable in light of the facts of her horrific crime in any event.

The TCCA's ruling was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It was also based on a reasonable determination of the facts in light of the evidence presented in the state court

proceedings. Accordingly, the respondent is entitled to judgment as a matter of law as to this claim.

**Ground One C-E: The TCCA did not unreasonably determine that trial counsel were not ineffective in disclosing certain materials to the State, presenting its penalty-phase argument or conducting voir dire.**

The respondent relies on his memorandum in support of summary judgment in response to these claims.

**Ground Two and Six:**

The petitioner has not moved for summary judgment as to grounds two or six, and thus the respondent need not here respond to these claims.

**Ground Three-Eleven:**

As to the remaining claims, the respondent relies on his prior briefing in the his memorandum supporting summary judgment.

## CONCLUSION

For the foregoing reasons, the Respondent respectfully asks that this Court deny the petitioner's motion for summary judgment and instead grant summary judgment in the respondent's favor.

Respectfully submitted,

ROBERT E. COOPER, JR.,
Tennessee Attorney General & Reporter

/s/ Andrew H. Smith
ANDREW H. SMITH
Senior Counsel
State of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-4349
B.P.R. No. 26594

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

Stephen A. Ferrell
Federal Defender Services of Eastern Tennessee
800 South Gay Street
Suite 2400
Knoxville, TN 37929-9714

/s/ Andrew H. Smith________
ANDREW H. SMITH
Senior Counsel