**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:12-cv-00035 |
| v. | ) | Judge Mattice |
| | ) | |
| VICKI FREEMAN, Warden | ) | |
| | ) | |
| Respondent. | ) | |

---

## RESPONDENT'S POST-HEARING BRIEF

---

## I. INTRODUCTION

Petitioner sought an evidentiary hearing to support her contention that she was deprived of her constitutional right to unconflicted counsel in violation of the Sixth and Fourteenth Amendments. (D.E. 52.) In particular, petitioner contends in Ground Two of her petition for writ of habeas corpus that: (A) lead trial counsel was conflicted by the "possibility of ethical and criminal charges based on a history of fraudulently over-billing the courts for his work in indigent cases" (D.E. 19, Page ID# 9864); and (B) that counsel created an unconstitutional conflict of interest that affected their performance when they procured a release of media rights from petitioner. (D.E. 19, Page ID# 9688.) Petitioner further contends, in Ground Six of her petition, that the Tennessee Court of Criminal Appeals ("TCCA") failed to address her argument that trial counsel's alleged overbilling conflict constituted structural error. (D.E. 19, Page ID#s 9703-04.)

Respondent opposed the grant of an evidentiary hearing on these issues as unnecessary in light of the extensive briefing previously conducted, and renewed her request for summary judgment. (D.E. 55.) Respondent's Motion for Summary Judgment argues that Grounds Two and

Six were reasonably determined by the TCCA on post-conviction appeal. (D.E. 43, Page ID#s 10551-10558.) *See Christa Gail Pike v. State of Tennessee*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *45-49 (Tenn. Crim. App. Apr. 25, 2011) *perm. app. denied* (Tenn. Nov. 15, 2011).

By order filed on October 24, 2014, this Court granted petitioner's motion for an evidentiary hearing limited to the presentation of "evidence on her claims of ineffective assistance of counsel based on the investigation into lead trial counsel's prior billings to the indigent defense fund, and trial counsel's procurement of media rights to Petitioner's story." (D.E. 58, Page ID#s 10765-10766.) At the start of proceedings on May 26, 2015, the Court acknowledged respondent's on-going opposition and clarified the purpose of the hearing:

> THE COURT: . . . And let me make this absolutely clear . . . That I have not made [the] determination yet of whether Ms. Pike has cleared that -- I will call it the 2254(d) standard which would require me . . . to make a finding that the State court . . . applied the wrong law, or that its factual determinations were unreasonable in light all of the evidence presented.
>
> Let me make clear, counsel, if it's not clear for the record, I have not made that determination yet. However, I have granted Ms. Pike's motion for an evidentiary hearing on that. Therefore, what happens over the next day or so may or may not be moot before this case is over.

Evidentiary Hearing Transcript, Volume I, Page 5, lines 22-25; Page 6, lines 1-16. (D.E. 84.)

The Court has ordered simultaneous post-evidentiary hearing briefs and instructed the parties to address:

(1) Whether the Court should consider the evidence presented during the evidentiary hearing, in light of 28 U.S.C. § 2254(d) and *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011); and

(2) How the evidence presented should bear on this case, if at all.

(D.E. 83.)

## II. EVIDENCE PRESENTED

### A. TRIAL

A brief summary of the facts at trial, as summarized by the Tennessee Supreme Court ("TSC") on direct appeal, is as follows:

> The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the [petitioner], Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed [petitioner], along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, [petitioner's] boyfriend, walking away from the Job Corps center toward 17th Street. At approximately 10:15 p.m., Iloilo observed [petitioner], Peterson, and Shipp return to the Center. Slemmer was not with them.
>
> Later that night, [petitioner] went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. [Petitioner] showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. [Petitioner] told Iloilo that the victim had begged "them" to stop cutting and beating her, but [petitioner] did not stop because the victim continued to talk. [Petitioner] told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she had thrown those at the victim as well. [Petitioner] told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, [petitioner] said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that [petitioner] was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw [petitioner] at breakfast the next morning she asked [petitioner] what she had done with the piece of the victim's skull. [Petitioner] replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."
>
> During a class later that morning, [petitioner] made a similar statement to Stephanie Wilson, another Job Corps student. [Petitioner] pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." [Petitioner] then pulled a napkin from her pocket and showed Wilson a piece of bone which [petitioner] said was a piece of Slemmer's skull. [Petitioner] also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. [Petitioner] told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.
>
> . . .

According to [petitioner], she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, [petitioner] told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though [petitioner] refused to name the other parties involved in the incident, she said the group began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, [petitioner] and Slemmer exchanged words. [Petitioner] then began hitting Slemmer and banging Slemmer's head on her knee. [Petitioner] threw Slemmer to the ground and kicked her repeatedly. According to [petitioner], as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report [petitioner] so she would be terminated from the Job Corps program, [petitioner] again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with [petitioner] caught Slemmer and pushed her to the ground.

[Petitioner] and the other person, who [petitioner] referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where [petitioner] cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," [petitioner] recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point [petitioner] said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, [petitioner] cut Slemmer's back, "the big long cut on her back." [Petitioner] said Slemmer repeatedly tried to get up and run. [Petitioner] recounted how Slemmer bargained for her life, begging [petitioner] to talk to her and telling [petitioner] that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. [Petitioner] told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." [Petitioner] said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked [petitioner] what she was going to do to her, at which point [petitioner] thought she heard a noise. [Petitioner] left the scene to check out the surrounding area to make sure no one was around. When she returned, [petitioner] began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, [petitioner] cut Slemmer's throat several other times. [Petitioner] said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that [petitioner] and the other person would push her back on the ground.

Slemmer attempted to run away again, and [petitioner] threw a rock which hit Slemmer in the back of the head. [Petitioner] stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, [petitioner] continued to hit her. Eventually [petitioner] said she could hear Slemmer

"breathing blood in and out," and she could see Slemmer "jerking," but [petitioner] "kept hitting her and hitting her and hitting her." [Petitioner] eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, [petitioner] said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. [Petitioner] said the episode lasted "for about thirty minutes to an hour." [Petitioner] admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. [Petitioner] also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. [Petitioner] denied carving a pentagram in the victim's chest, but said that the other person had cut the victim on her chest.

After disposing of Slemmer's body, [petitioner] and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and [petitioner] returned the miniature meat cleaver to the person at Job Corps from whom she had borrowed it. [Petitioner] never identified that individual. [Petitioner] told Investigator York that the blood-stained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. [Petitioner] also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. [Petitioner] gave Investigator York consent to search her room and then accompanied him to the Job Corps Center. From there [petitioner] retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that [petitioner] eventually directed him to the exact location where the victim's body was found.

. . .

Dr. Eric Engum, a clinical psychologist, testified for the defense and stated that he had conducted a clinical interview and had administered a battery of tests to the defendant. Dr. Engum described [petitioner] as an "extremely bright young woman." Dr. Engum explained that [petitioner] "is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustains concentration, can sequence, ah, has excellent receptive and expressive language skills." [Petitioner] had a full scale IQ score of 111 which is in the 77th percentile and which was characterized as "remarkable" by Dr. Engum since she had only completed the ninth grade. According to Dr. Engum, the tests unequivocally showed that [petitioner] had no symptoms of brain damage and that she was not insane. However, Dr. Engum concluded that the [petitioner] suffers from a very severe borderline personality disorder and exhibits signs of cannabis (marijuana) dependence and inhalant abuse. He testified that the [petitioner] is not so dysfunctional that she needs to be institutionalized, but instead opined that she has a multiplicity of problems in

interpersonal relationships, in controlling her behavior, and in achieving vocational and academic goals.

During direct examination, Dr. Engum opined that the [petitioner] had not acted with deliberation or premeditation in killing Slemmer. Instead Dr. Engum said she had acted in a manner consistent with his diagnosis of borderline personality disorder; she had lost control. He explained that she had danced around when relating the murder to Iloilo because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her relationship with Shipp. When questioned about the piece of skull found in the [petitioner's] coat, Dr. Engum explained that the [petitioner] actually has no identity and the action of taking and displaying a piece of Slemmer's skull to her friends was the [petitioner's] way of getting recognition, "no matter how distorted" the recognition.

On cross-examination, Dr. Engum stated that there was no question that the [petitioner] had killed Slemmer. He reiterated that his opinion that once the attack began, [petitioner] had literally lost control. However, Dr. Engum admitted that [petitioner] had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that [petitioner's] act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that [petitioner] had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statements of the [petitioner] and Kimberly Iloilo and the reports of Dr Engum, Dr. Elkins, and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the [petitioner] nor any of the other witnesses. Dr. Bernet admitted that he did not have enough information to offer an expert opinion as to whether [petitioner] acted with intent or premeditation in killing the victim.

. . .

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called Carrie Ross, [petitioner's] aunt as a witness. Ross testified that the [petitioner] had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross said that [petitioner's] family has a history of substance abuse and that [petitioner's] maternal grandmother was

> an alcoholic who was verbally abusive to [petitioner]. Following the death of [petitioner's] paternal grandmother, [petitioner] was shuffled between her mother and father. According to Ross, [petitioner's] mother's home was very dirty. [Petitioner's] mother set no rules for her, and on the occasions that [petitioner] had visited Ross, the [petitioner] had behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin.
>
> On cross-examination, Ross admitted that she had previously described [petitioner] as a pathological liar and that she had been afraid to allow [petitioner] to associate with her own children. Ross also admitted that [petitioner] had been out of control since she was twelve years old.
>
> Glenn Pike, the [petitioner's] father, testified that he had kicked the [petitioner] out of his house twice, the last time in 1989. He admitted that he had signed adoption papers for the [petitioner] prior to her eighteenth birthday. On cross-examination, he admitted that he had forced [petitioner] to leave his home in 1989 because there had been an allegation that the [petitioner] had sexually abused his two-year-old daughter from his second marriage. According to her father, [petitioner] had been disobedient, dishonest, and manipulative when she had lived with him.
>
> The [petitioner's] mother, Carissa Hansen, a licensed practical nurse, testified that [petitioner] had lived with her 95 percent of the time since her paternal grandmother's death. Hansen admitted that she had smoked marijuana with the [petitioner] in order to "establish a friendship." Hansen related that the [petitioner] had attempted suicide by taking an overdose shortly after the death of her paternal grandmother. Hansen also testified that one of her boyfriends had whipped [petitioner] with a belt. Hansen had the boyfriend arrested.
>
> On cross-examination, Hansen admitted that [petitioner's] behavior had been problematic for years. The [petitioner] had begun growing marijuana in pots in her home at age nine. After threatening to run away from home and live on the street, [petitioner] had been allowed to have a live-in boyfriend at age fourteen. Hansen admitted that [petitioner] had wielded a "butcher-knife" against the boyfriend, who had been arrested for whipping her. Hansen also said [petitioner] had lied to her and stolen from her on numerous occasions and had quit high school. Hansen conceded that [petitioner] had been out of control since she was eight years old. Following Hansen's testimony, the defense rested its case.

*Pike*, 978 S.W.2d 904, 907-14 (Tenn. 1998).

## B. POST-CONVICTION EVIDENCE

Respondent set forth the entirety of the TCCA's post-conviction evidence summary in her summary judgment memorandum. (D.E. 43, Page ID#s 10498-10532.) For economy's sake,

respondent reproduces only that portion of the TCCA's summary corresponding with the issues raised in Grounds Two and Six of the amended petition, and which were the subject of the federal evidentiary hearing:

> Co-counsel testified that she was appointed to replace prior co-counsel and that much of the groundwork had already been done when she was appointed. She indicated that her initial thoughts upon reviewing the case were that it might be possible to prove second degree murder based upon "the frenzy" at the murder scene combined with the Petitioner's mental health issues. However, she noted that she saw sentencing as the critical phase and, from the beginning, began analyzing what proof would be needed.
>
> Co-counsel stated that Dr. McCoy had been retained as the mitigation expert prior to co-counsel's own appointment. She met with Dr. McCoy and lead counsel in March and reviewed the materials which had been prepared by Dr. McCoy. Co-counsel further indicated that she presumed these materials were also shared with Dr. Engum, who had produced a diagnosis of severe borderline personality disorder.
>
> Co-counsel testified that, in the penalty phase, the goal was to establish that the Petitioner came from a dysfunctional family with a history of drug and alcohol abuse. In hope of establishing this, the initial strategy was to call Dr. McCoy and to introduce her report. However, at the "ninth hour," a decision was made against having Dr. McCoy testify in the penalty phase. Co-counsel indicated that this decision was made because of several problems which arose with Dr. McCoy, namely her relationship with the prosecutor in the case and her statement that she was not in agreement with Dr. Engum's report. Despite the decision against calling Dr. McCoy, the defense team unsuccessfully attempted to get her report admitted into evidence, as well as the charts which had been prepared. Co-counsel acknowledged that only three witnesses were called to testify and stated that it might have been more helpful to the case to call other lay witnesses. However, by the time the decision was made not to use Dr. McCoy, it was too late. Co-counsel said that she attempted to present their mitigation theme as well as she could using the lay witnesses but acknowledged that they had no expert "to connect the dots." However, she stated that she attempted to do so in her closing argument.
>
> Co-counsel testified that she was aware that much of the material contained in the report by Dr. McCoy, including the incidents of the Petitioner's prior violence, were a "two-edged sword." She stated that they felt the defense had to be careful about the type of mitigation evidence which was presented because some of the proof "could hurt them as much as it helped." She stated that they were faced with "a horrible case with horrible facts and someone that confessed ad nauseam and kept confessing over and over and over in letters that she was passing out."

. . . [Co-counsel] also acknowledged that Dr. McCoy's entire report was given to the prosecution despite the fact that it contained information which would have been privileged, especially in light of the decision not to call Dr. McCoy to the stand. She further acknowledged that the prosecution's cross-examination of the witnesses, utilizing information contained in the report, was damaging to their case. However, she also testified that the decision not to call Dr. McCoy resulted in the State not being able to use many other damaging facts which were contained in the report . . . .

On cross-examination, co-counsel stated that she was aware of lead counsel's overbilling issues but did not discuss it with him. She testified that she did not think the issue affected lead-counsel's representation of the Petitioner and described him as very zealous. Co-counsel acknowledged that she and lead counsel had the Petitioner sign a release which would allow them to profit from the Petitioner's story. However, she explained that the document only referred to public aspects, not information protected by the attorney/client privilege. She testified that the main purpose of the document was to protect the Petitioner's rights and eliminate any ethical concerns. Co-counsel specifically testified that the release in no way affected any trial strategy or decision.

Co-counsel reiterated that the goal in the guilt phase was to try to convince the jury to convict the Petitioner of second degree murder based upon the frenzy of the scene and the controlling nature of the Petitioner's relationship with Shipp. However, she acknowledged that some witnesses, as well as the Petitioner's own statement, undercut the theory that Shipp had committed most of the acts during the murder. In addition, co-counsel stated that some aspects of Dr. McCoy's report also undermined this theory.

. . .

Next, the Petitioner called William Crabtree to testify. General Crabtree testified that he had been employed as a District Attorney General for more than thirty years and had been the lead prosecutor in the Petitioner's trial. He also indicated that knew Dr. Diana McCoy, the mitigation expert employed by the defense team, and had dated her for a period of time. General Crabtree indicated that the relationship had occurred prior to the Petitioner's trial and that he and Dr. McCoy were not involved at all during the trial. Further, General Crabtree testified that he was not aware that Dr. McCoy was employed in the Petitioner's case until he received her notebooks and report during the penalty phase of the Petitioner's trial. He also indicated that he was not happy to get the large report so late in the proceeding. He was unable to recall what information was contained in the report or if he found specific information in it that he used to cross-examine the Petitioner's witnesses.

General Crabtree testified that he saw no reason to withdraw as the prosecutor because of his previous relationship with Dr. McCoy. He indicated that he did not see that a conflict of interest was created. He testified that he had prosecuted several

other cases in which Dr. McCoy was involved. He indicated that only in one instance did he withdraw and that was because he had generally discussed the facts of that case with her prior to learning of her involvement.

Next, the Petitioner's lead counsel at trial testified that he had been practicing law in Knoxville since 1986. He indicated that his practice was exclusively criminal defense at the time and that, prior to his appointment in the Petitioner's case, he had handled several murder cases but had not previously handled a capital case.

In 1993 or 1994, lead counsel learned from an article in the newspaper that the Comptroller's Office was conducting an audit of the indigent defense system and that he would likely be one of the attorneys involved in the audit. As a result, he conducted a "self-audit" and discovered that, in certain instances, he had billed more than twenty-four hours in a day. He self-reported to the Board of Professional Responsibility on the advice of counsel. In April of 1995, one month prior to his appointment in the Petitioner's case, he had to repay approximately $67,000 to the fund. Prior to repayment, he had refrained from taking any appointments and withdrew from some cases to avoid an appearance of impropriety.

Lead counsel testified that he was not concerned that the investigation would affect his representation of the Petitioner because he had been "cleared to practice law" at the time of the appointment. Despite the fact that his name had been in the newspaper, he was not concerned about the issue affecting potential jurors during voir dire. At the time of the appointment, the only complaint pending was the disciplinary complaint, which he had self-reported. That issue was not resolved until 1998, and lead counsel never received an active suspension nor was his practice interrupted. Lead counsel testified that he had several murder cases prior to his involvement in the Petitioner's case. He estimated he had taken a dozen or more felony cases to jury trial. He could not recall whether he had called an expert witness to testify in those trials, but he did indicate that he often used investigators, pathologists, and psychologists. He also stated that, at some point prior to trial, he contacted the Capital Case Resource Center.

Lead counsel testified that early in his representation, he engaged Dr. Engum to do psychological testing on the Petitioner. He met with Dr. Engum on several occasions to discuss the findings. In the late summer or early fall of 1995, lead counsel also engaged the services of Dr. Diana McCoy as a mitigation specialist and indicated that he communicated with Dr. McCoy frequently. According to lead counsel, his strategy was that he and Dr. Engum would concentrate on the guilt phase where he knew they would "take a beating" and then Dr. McCoy would "come out and save the day" in the penalty phase. Lead counsel indicated that he looked at the social history as a tool to be used in the penalty phase because he wanted Dr. McCoy to take the social history and tie it back to Dr. Engum's report. However, he specifically recalled at least one meeting during trial preparation when both doctors were present.

. . .

Lead counsel indicated that he was aware that the case was complex. While the Petitioner was very cooperative, it was not a "who done it." The Petitioner had confessed to a "grizzly murder," and lead counsel indicated that going into trial, he was fairly certain that there would be a penalty phase. Therefore, in his mind, sentencing issues were the most important, and he would have considered it a victory if the Petitioner did not receive death. Lead counsel acknowledged that, in hindsight, there were things he wished he had done differently. While not specifically recalling a discussion with Dr. McCoy of which witnesses to call, he assumed that he did discuss this with her. Lead counsel also indicated that he was not dissatisfied with Dr. McCoy's work.

Lead counsel testified that during the guilt phase of the proceeding, he tried to attack the elements of intent and premeditation. The defense team attempted to "soften [the Petitioner] as best we could, make her a person." Lead counsel indicated that he spent a great deal of time investigating the case, even traveling to North Carolina to interview family and friends of the Petitioner.

According to lead counsel, the strategy of using Dr. McCoy during the penalty phase to give an overview of the Petitioner's life remained in place throughout the trial. He also indicated that he had planned to call the Petitioner's parents and aunt as witnesses. At the time, he believed that was a sufficient number of witnesses. Despite his intent to use Dr. McCoy as a witness, lead counsel made clear that there were certain things contained in her report that he had concerns about being admitted into evidence. According to lead counsel, the decision not to call Dr. McCoy was based on multiple reasons, with the primary reason being that she would not corroborate Dr. Engum's report because she did not personally conduct an evaluation of the Petitioner. He testified that, until that moment after the penalty phase when he spoke with Dr. McCoy about this, he had believed that the two doctors were in agreement.

Lead counsel also indicated that he was uncomfortable with Dr. McCoy's relationship with General Crabtree, although he did not doubt Dr. McCoy's integrity. Lead counsel testified that he had been aware of the relationship which, according to Dr. McCoy, had involved some anger and jealousy. The final decision not to use Dr. McCoy was a last minute decision, which lead counsel acknowledged "could" have been wrong. He testified that he wished that he had called additional witness, but he did not know if it would have made a difference in the outcome. Lead counsel could not recall exactly when the decision was made to proceed with only three witnesses.

Lead counsel was unable to recall when he received a copy of Dr. McCoy's final report, although Dr. McCoy's billing records indicate that the report was bound on March 20, after jury selection in the trial. Lead counsel testified that he did not recall reviewing the entire report before trial, but he stated that he had seen prior

drafts. Lead counsel did recall an in-camera hearing during which he gave Dr. McCoy's report to the State. He recalled that General Crabtree was unhappy with the timing as it only gave the State one night to review the report prior to the opening of the penalty phase. He acknowledged that he turned over the final report, as well as the notes of interviews and other information contained in Dr. McCoy's folder, because he was still planned to use Dr. McCoy at that point. Lead counsel stated that, in retrospect, he probably should have just given the report only, as he did not plan to use the other supporting documents. At the time, he believed they were not protected under the privilege.

. . .

Lead counsel also testified that, after the case, he talked with the Petitioner's aunt, Carrie Ross, about the possibility of writing a book. However, nothing ever became of the idea. He specifically testified that he never profited from the Petitioner's story, although he acknowledged that a document had been signed by the Petitioner which would have allowed him to do so.

. . .

Lead counsel testified that he did not recall asking Dr. McCoy to lie. He did recall receiving an angry letter from her after trial alleging that he was responsible for her not being hired to work on another capital case.

Lead counsel acknowledged that the Petitioner did not receive a "perfect defense." He said that, in retrospect, there were things which could have been done differently. However, given the sheer brutality of case, he was unable to say that doing anything different would have resulted in a different outcome.

On cross-examination, lead counsel again addressed the overbilling issue and stated that he had considered the matter closed prior to his appointment in the Petitioner's case. A settlement had been reached, and he had paid it. The State was again paying him for appointments, and the Tennessee Supreme Court had appointed him in another case prior to his taking the Petitioner's case. There was no issue of criminal liability pending at the time. Furthermore, lead counsel testified that he had discussed the matter with the Petitioner, and she was not bothered by it. Lead counsel stated that the billing issue had no effect on his performance or zealousness in his representation of the Petitioner.

. . . [Lead counsel] also reiterated that the timing of Dr. McCoy's report had no bearing on the decision not to call her as a witness. Lead counsel stated that he felt that the damaging information in Dr. McCoy's report was too prejudicial to present to the jury if Dr. McCoy was not going to support Dr. Engum's diagnosis. Lead counsel acknowledged that the decision to give the State the report did allow some damaging information to be used on cross-examination; however, by not calling Dr. McCoy, other damaging evidence was kept out.

. . .

The next witness to take the stand was Dr. Diana McCoy, the mitigation expert employed to handle the Petitioner's case at trial. She testified that her role in the case was to collect information by interviewing people and reviewing records and to analyze that information in order to develop themes for the attorneys to present in the penalty phase. She also testified that it was her responsibility to assist in choosing additional lay witnesses who would show the jury the Petitioner's human side during the penalty phase. However, she testified that, in this case, her job did not involve forming a diagnosis for any conditions from which the Petitioner might suffer. She indicated that she was retained by lead counsel in this case.

Dr. McCoy indicated that she recalled only one meeting between the entire defense team. She stated that most of her interaction was with lead counsel, with the record indicating at least fourteen face-to-face meetings and more than forty telephone conversations. She testified that they worked together a great deal and had good interaction. She indicated that she was specifically told to prepare a report, not an opinion, in the case. She testified that she provided the final bound version of her report to the attorneys on March 24, 1996, although she had previously gone over the material contained in the report with the attorneys. She stated that lead counsel was as familiar with the materials as she.

Dr. McCoy testified that she met with the Petitioner on nine occasions prior to trial in order to build a rapport with the Petitioner so that she might gain the entire truth of the Petitioner's life. She indicated that she was aware of Dr. Engum's diagnosis of borderline personality disorder and that she was in agreement with that diagnosis. Dr. McCoy testified that she reviewed her report with lead counsel and co-counsel on March 15, and that they had previously discussed who should be called to testify as lay witnesses. At this meeting, Dr. McCoy indicated to them that the final report would soon be done. According to Dr. McCoy, lead counsel indicated that there was no hurry, as he planned to wait till the last possible minute to give the report to the prosecution.

She went on to note that, in her opinion, family members alone would not be able to sufficiently explain who the Petitioner was and why she had committed the crime. Dr. McCoy indicated that although she was not specifically informed, she assumed that these witnesses had been subpoenaed or that arrangements had been made for them to be at the trial. She testified that several of the professionals from Swannoa and Shaeffer, who had worked with the Petitioner and liked her, would have been greatly beneficial to call as witnesses. She also testified that Matthew Martin and the Petitioner's aunt would be good witnesses, but the Petitioner's mother would not make a positive witness for the defense. Dr. McCoy testified that, as of March 14, she was under the impression that several lay witnesses would be called to testify and that she would then testify in order to tie the diagnosis together.

Dr. McCoy indicated that her work developed into a three-volume social history. She testified that she was in agreement with the diagnosis of borderline personality disorder and never told either attorney that she disagreed with the diagnosis. As part of her testimony, Dr. McCoy explained some of the characteristics of borderline personality disorder, such as fear of abandonment, unstable relationships, mood swings, unstable self-image, and impulsivity. . . .

Next, Dr. McCoy discussed a March 24th meeting in which she was informed that she would be the only witness to testify during the penalty phase. She believed that the decision to rely strictly on her testimony was a bad one. Dr. McCoy testified that, in her opinion, the mitigation evidence which she had gathered was relatively strong, but she felt that she could not convey that alone. According to her, it would take a number of people to "paint the whole picture." She also opined that it was important to show the early physical and emotional abuse with the true depth of the problems. She indicated that it was important to include the negative aspects of the Petitioner's life and that the jury would not be expecting her to be a "girl scout" if she had already been convicted of first degree murder.

. . .

Dr. McCoy testified that she recommended that Dr. Bernet be used as an expert in regard to the Satanism aspect of the case. She testified that lead counsel had expressed some concern because of the reference to Satanism in the report from Swannoa. However, Dr. McCoy testified that she felt that it was fairly normal under the circumstances and that she saw the Petitioner as struggling with spirituality.

Dr. McCoy testified that she learned on Friday following the guilty verdict that she would not be called to testify. According to her, lead counsel, who was very upset, telephoned her after an in-camera conference with the trial court and the State. He informed her that the prosecutor had gone "ballistic" about receiving the mitigation report so late and that the prosecutor believed it was all hearsay. Dr. McCoy testified that lead counsel then asked her to lie and say she had just given him the report the previous day, but she refused. Dr. McCoy testified that she asked lead counsel if he would like her to call Herb Moncier, a local attorney, to ask his opinion. When Dr. McCoy was unable to reach Mr. Moncier, lead counsel informed her that he would not have her testify in the case.

Despite being informed that she would not be called to testify, she met with lead counsel later that evening to discuss the options. Dr. McCoy stated that they talked for several hours and that lead counsel was upset, saying they will "probably post-convict me on this." After their discussion, the decision was made to call three witnesses to testify, those being the Petitioner's parents and her aunt. Dr. McCoy met with the witnesses the next morning to prepare them to testify. Dr. McCoy stated that it was extremely important to show the reasons the Petitioner had turned

out the way she had. She stated that it was impossible to do so by calling only three family members. She described the mitigation presented as "pun[y] and pathetic."

. . .

Dr. McCoy also testified that she had engaged in a brief dating relationship with General Crabtree. She stated, however, that the relationship was over prior to her beginning to work on the Petitioner's case. She indicated that, early on in the case, she informed lead counsel of this fact, and he said he had no problem with it. When Dr. McCoy heard rumors that lead counsel and co-counsel were indicating she had withheld this information, leading to their decision not to call her as a witness, she contacted Herb Moncier. He advised her to let it go, as it would come out on post-conviction.

Although Dr. McCoy was not asked to prepare an opinion for the trial, she did prepare one for the post-conviction hearing. She used charts and graphs to support the borderline personality diagnosis.

. . .

Dr. McCoy stated that, at the time of the murder, the Petitioner felt that her identity, which she felt centered around Shipp, was slipping away. She also opined that because of the Petitioner's problems at the Job Corp and her problems with the victim, the Petitioner felt that she was losing her sense of self-esteem and identity. Because of the Petitioner's borderline personality disorder, she felt frantic and experienced irrational anger. Dr. McCoy referenced and discussed prior times in the Petitioner's life when she became extremely angry and stated that the Petitioner simply did not have the control of a normal person.

On cross-examination, Dr. McCoy acknowledged that, although she had previous capital case experience as a mitigation specialist, she had never testified in any of those trials. She reiterated that she was comfortable with Dr. Engum's diagnosis and again stated that it was not her responsibility to reach a diagnosis in this case. She acknowledged that she did not necessarily look for things which would contradict Dr. Engum's conclusions. She also testified that because Dr. Engum was a neuropsychologist, she assumed that if a neurologist was needed, he would have made that suggestion.

*Christa Gail Pike v. State of Tennessee*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *29-39 (Tenn. Crim. App. Apr. 25, 2011) *perm. app. denied* (Tenn. Nov. 15, 2011).

### C. FEDERAL HABEAS EVIDENTIARY HEARING

On May 26th and 27th, 2015, this Court conducted an evidentiary hearing at which the following testimony was received:

#### 1. William Talman, Lead Counsel

#### a. Overbilling

In the late 1980's and early 1990's, counsel made his living almost exclusively from appointed criminal cases. In early 1993, there was some movement to raise the hourly rate for appointed attorneys which resulted in a state-wide examination of billing practices. Evidentiary Hearing Transcript, Volume I, Page 16 (D.E. 84.) Counsel learned of a state-wide audit by the State Comptroller ("Comptroller") from a newspaper article, and realized he was likely to be included, having billed the Administrative Office of the Courts ("AOC") more than $100,000. *Id.* at pp. 17, 85.

Upon advice of counsel, Talman "self-reported" a potential ethics violation to the Board of Professional Responsibility ("Board" or "BPR") due to overbilling, and began his own internal audit. *Id.* at pp. 17, 85. Counsel was not contacted or interviewed by anyone from the State, and the possibility of criminal charges was mentioned only by the newspaper article. *Id.* at pp. 18, 88. Talman hired an attorney who actively sought information regarding the audit, and declined to provide information regarding his internal audit to the Board until the issue regarding possible prosecution was resolved. *Id.* at pp.19, 86-87. It was Talman's position that any overbilling issue was a civil matter as opposed to a criminal, matter. *Id.* at p. 19. No criminal prosecution was ever brought. *Id.* at p. 25.

Approximately 9 or 10 months later, counsel reached an agreement with the Comptroller and the AOC. The Comptroller's Office determined counsel owed the State approximately

$67,000, just a few thousand dollars more than reflected counsel's own audit results. *Id.* at pp. 19-20, 89-90. Counsel did not wish to argue over the relatively small difference and repaid the agreed upon amount. The AOC cleared him to bill again and he immediately resumed receiving appointments and filing new billings. *Id.* at pp.20 -21.

Counsel believes the Comptroller filed a report with the legislature and the BPR upon completion of the State's investigation. However, at the time of the financial settlement, only counsel's self-reported ethics complaint remained pending. Counsel continued practicing without restriction for two or three years which included the time frame encompassing petitioner's trial. The conditional guilty plea eventually entered by counsel was approved after petitioner's trial and appeal. It did not result in an active suspension of his practice and was negotiated prior to the filing of any formal complaint. *Id.* at pp. 22-24, 91, and 100-101. As a result, counsel was not concerned about any unresolved ethical issues pending during petitioner's trial. Rather, he was relieved that the civil matter, investigation, and audit, were over and behind him so he could start billing and receiving payment from the State again. *Id.* at pp. 25, 91. Having the issue in the back of his mind did not stop him from working. *Id.* at p. 25.

**b. Decision not to call McCoy**

Petitioner's case was the first capital case counsel took to trial, and was entirely his responsibility as lead counsel. *Id.* at p. 26. Counsel anticipated this was primarily a penalty phase case and did not recall any unanticipated surprises presented by the State. He would have considered any result but a death sentence to be a victory. *Id.* at p. 27.

In preparing for trial, the "team concept" was new to counsel; meaning he had an unfamiliarity with dealing with multiple people, meeting regularly, and having a second attorney involved. *Id.* at pp. 29, 42. Obtaining funding was more of a managerial/administrative headache.

Investigators and experts were asking for huge amounts. *Id.* at p. 43. However, he hired an investigator, a forensic psychologist (Dr. Eric Engum); a mitigation expert (Dr. Diana McCoy); and an expert to address the satanic element allegations (Dr. Burnett.)[1] *Id.* at p. 28. Counsel expected to call Engum in the guilt phase followed by McCoy in the penalty phase, and to utilize Bernet to address the satanic elements of the state's case. *Id.* at p. 29.

Counsel did not specifically recall whether Engum opined that petitioner suffered from borderline personality disorder, but conceded that it sounded right. He also did not recall submitting Engum's report expressing that opinion, but was sure they probably did because he believed it would have been required in order to rely on it. Counsel did not recall whether they presented a report from Dr. Bernet on the subject of satanic ritual. *Id.* at pp. 29-30.

Counsel hired Dr. Diana McCoy, also a clinical psychologist, as a mitigation specialist. She worked on mitigation investigation and prepared a "social history" of the petitioner. Counsel felt they worked well together, kept in touch as to what was expected in her work, and had regular team meetings. *Id.* at pp. 30-31. To the best of counsel's recollection, McCoy kept him informed of her work and, at the time, he thought they communicated enough. *Id.* at p. 32. Counsel expected her to support Engum's psychological evaluation. *Id.* at pp. 92, 102.

Counsel was satisfied with McCoy's work until a week or two before trial when he learned she had been dating the lead prosecutor. *Id.* at pp. 32, 93. This caused him to lose a little confidence in McCoy and to pull back, but did not cause him to question her work. *Id.* at p. 32. Counsel thought the relationship might have been ongoing during petitioner's trial, but had no reason to disagree with the prosecutor's post-conviction testimony that it was not. *Id.* at p. 93. At the time,

[1] Although identified as "Dr. Burnett" in the federal evidentiary transcript, the record will reflect that the satanic expert was "Dr. Bernet." Respondent will utilize the spelling "Bernet" for consistency with the state court record.

however, counsel took McCoy's disclosure to mean it was ongoing, and admitted he should have queried both McCoy and the prosecutor or brought it to the court's attention. *Id.* at p. 94.

Counsel did not recall whether he ever gave McCoy direction with which she disagreed; but he believed he would have told her if there had been any disagreement. *Id.* at p. 33. Counsel anticipated that McCoy would uncover both negative and positive information about the petitioner; so the fact that the information she found was a "mixed bag" was not surprising. Counsel felt the information helped explain how petitioner got to where she was, but not whether it helped him understand the contradiction between the person he met and the one that could have committed this crime. *Id.* at pp. 33-34.

Counsel did not recall telling McCoy how to do her job or not to pursue an avenue of mitigation she thought was important. He did not recall telling her not to include something in her report because he did not want to present it. *Id.* at p. 35. Counsel did not recall whether he gave input to McCoy, but was sure he would have. *Id.* at p. 37. Counsel would expect he reviewed draft of McCoy's report before it was finalized, and that it would be within his purview to say if he did not like something about it. However, counsel is always cautious when dealing with experts so opposing counsel cannot say he told the expert what to say or write. *Id.* at p. 44. Counsel felt his job was to take what McCoy developed, along with what he learned through the investigator, and try to give the jury a reason not to impose a death sentence. *Id.* at p. 36.

Counsel did not expect McCoy to know rules of evidence or discovery, and he agreed there was no obligation to present everything McCoy uncovered, unless he was going to use it. His position was that he did not have to turn over any mitigation material until they actually began the penalty phase. *Id.* at pp. 37, 47. Counsel expected to turn over McCoy's report at some point, and believed he did turn over the entire report. *Id.* at pp. 36, 45.

Counsel considered McCoy's work important and planned to call her as witness during the penalty phase. He received the social history, written report, and supporting documentation prepared by McCoy at some time prior to close of guilt phase. However, counsel did not recall going to McCoy's office on March 15, 1996 (the Friday before voir dire) to review it. Counsel did not dispute McCoy's post-conviction testimony to that effect, but noted it has been almost 20 years, and he did not remember. *Id.* at pp.39-41.

Counsel recalled having dinner with McCoy, but did not think it was as close to trial as March 24, 1996 (the Sunday before the penalty phase) as stated by McCoy. Counsel did not recall telling McCoy that she would be the sole mitigation witness. He thought he always planned to call petitioner's family. *Id.* at p. 46. Counsel recalled that McCoy's materials were given to the trial court and the prosecution after he made a side comment (not in open court) that he had McCoy's report and was probably going to call her as a witness. *Id.* at pp. 46-47. He initially could not recall if this happened while the jury was out on the guilt phase, or whether they had already returned the guilty verdict. Counsel later agreed that the in-chambers conference took place following the guilty verdict, but before the penalty phase. *Id.* at p. 47.

According to counsel, the prosecutor was "furious" that McCoy's report had not been provided sooner and, in-chambers, counsel received a "dressing down" from the judge for not providing the report earlier as discovery. *Id.* at pp. 47-48, 64. Counsel objected in-chambers to the characterization of the report as discovery, but did not get the objection placed on the record. The prosecutor's anger upset counsel a little upset, but counsel felt he was correct on this point. When counsel suggested a mistrial, the prosecutor backed off and he turned over McCoy's materials as ordered by the trial court. *Id.* at pp. 47-48. At the time he turned over the report, counsel intended to call McCoy as a witness. *Id.* at p. 50.

Counsel's usual practice is to get a written report from experts, in which they give an opinion and say how they arrived at it. He did not recall what he asked of McCoy in this regard, but if reviewed McCoy's report and did not see an opinion, he should have asked her for one. *Id.* at p. 50.

The mitigation/penalty phase was the most important part of the case. *Id.* at p. 51. But, ultimately, counsel did not call Dr. McCoy at the penalty phase. He offered a number of reasons for this decision: (1) a week or two before trial, he learned of her relationship with the lead prosecutor; (2) McCoy appeared on the news during jury selection in petitioner's trial; (3) McCoy discussed a desire to be finished with her testimony quickly due to a vacation; (4) the lead prosecutor did not participate in the questioning of the other mitigation witnesses due to preparation for his cross-examination of McCoy; and (5) McCoy would not corroborate Dr. Engum's diagnois of borderline personality disorder. *Id.* at pp. 51-55.

Counsel recalled learning of McCoy's relationship with the lead prosecutor a week or two before trial. During a meeting, someone commented that the prosecutor was seen with a woman other than McCoy; and McCoy was upset about it and later called counsel to ask what he knew about it. *Id.* at pp. 51, 93-95. When asked why she had not disclosed the relationship, counsel recalled McCoy's response to be that she would not have been retained on petitioner's case. *Id.* at pp. 51, 96. It was counsel's understanding that the relationship was on-going, but did not have any reason to disagree with the prosecutor's post-conviction testimony that the relationship ended before trial. *Id.* at pp. 52-53, 94. Counsel had no reason to doubt McCoy's truthfulness when she said she did not discuss the case with the prosecutor, but he was beginning to have a lack of confidence in her. *Id.* at p. 52-53, 96, and 103-104. Counsel did not question the prosecutor about

the relationship and did not believe the prosecutor knew of McCoy's involvement with the case. *Id.* at p. 53, 97.

On the first day of jury selection, counsel recalled seeing Dr. McCoy in the news. Although not specifically talking about petitioner's case, she generally discussed what the defense was looking for. Counsel called McCoy and expressed his discomfort with her having done that. *Id.* at pp. 53-54. At the start of the penalty phase, counsel recalled McCoy wanting to go on vacation and asking if she could "get in, and out real quick." (p. 54.)

Counsel was "teetering" about whether he wanted to call McCoy as a witness when, during the mitigation proof, he saw the lead prosecutor with McCoy's report and "he had about a million . . . little sticky notes, in the report." The lead prosecutor was going through report making little notations while his less aggressive co-counsel was essentially trying the penalty phase. *Id.* at pp. 54-55.

And finally, counsel recalled testifying at post-conviction that McCoy would not corroborate Engum's diagnosis of borderline personality disorder. In discussing her testimony, counsel told her he would start with her and have her agree with Engum's diagnosis. McCoy told counsel she could not do that because she did not do the psychological testing. *Id.* at p. 55

Counsel then reviewed a letter written by Dr. McCoy, dated March 5, 1997, approximately one-year post-trial.[2] The letter purported to set forth Dr. McCoy's recollection of counsel's decision not to call her as a witness. Counsel vaguely remembered receiving the letter. *Id.* at p. 57. The letter asserted that the prosecutor was very upset at receiving McCoy's materials so late. Counsel again testified that he was not bothered or surprised by the prosecutor's upset, he was

[2] Petitioner's Exhibit 1 which was previously entered into evidence as Post-Conviction Exhibit 8. (D.E. 11-2, Page ID# 7352.)

bothered that the prosecutor was trying to bully the judge. *Id.* at pp. 58-59. Counsel did not ask McCoy to lie for him; he did not recall ever asking her to say she had just given her materials to him; and could not imagine asking her to do so when believed they did not have to be provided to the state until they would be used. *Id.* at pp. 58-59.

Counsel remembered the prosecutor saying he would raise a hearsay objection if the defense tried to introduce McCoy's report into evidence, but did not recall whether the judge indicated she would sustain such an objection. Counsel also thought the threatened objection related solely to the report, not to McCoy's potential testimony. *Id.* at p. 60. Counsel did not recall whether McCoy had her own, different, diagnosis for petitioner; or whether he was concerned that she did not express an expert opinion in her social history. *Id.* at p.71. He agreed that he would have expected to see her opinion in the written report and that without it, her testimony might be subject to a hearsay objection. *Id.* at p. 72.

Counsel did not recall speaking with Dr. McCoy after the in-chambers conference, but is sure he probably did. He did not recall McCoy offering to call other attorneys regarding the potential hearsay objection. He never intended to introduce McCoy's report itself as evidence; he intended call McCoy to testify. He also did not recall McCoy coming to his office that evening to help prepare for next day's penalty phase. It was counsel's recollection that after the guilty verdict, he went home and went to bed. *Id.* at pp. 60-62, 65.

Counsel's best recollection was that it was a split-second decision not to call McCoy, made after the other mitigation witnesses testified. *Id.* at p. 63. The prosecutor had been so distracted going through McCoy's report that he did not participate in penalty phase. Counsel felt they had gotten everything out to show petitioner's life growing up; and that calling McCoy to bring in more information could only hurt the case. *Id.* at pp. 63, 66, and 67.

Counsel did not recall communicating with McCoy the evening of March 29, 1996, and did not recall whether she was actually in courthouse on day of March 30, 1996. *Id.* at p. 66. His practice was to have in-town expert witnesses on call. *Id.* at p. 67.

Counsel acknowledged that, being closer in time to trial, his post-conviction hearing testimony was probably more accurate regarding his reasons for not calling Dr. McCoy. In that testimony, he described a huddle during which McCoy said she couldn't testify that petitioner suffered from borderline personality disorder. Counsel imagined that would have occurred outside the courtroom, in the lobby of the courthouse but he did not remember where it took place. *Id.* at pp. 68-70. On that basis, it would be reasonable to infer that McCoy was in the courthouse. *Id.* at p. 71. Counsel was under the impression that she was going to back up everything Engum said until the meeting outside the courtroom. *Id.* at 102.

Counsel agreed that most of petitioner's life was spent outside of Tennessee, and that most people who knew her lived out of state. He did not know who they subpoenaed, or who said they would just be at trial; but at the time, he believed they had everyone they needed and did not recall any desired mitigation witnesses who did not show up. *Id.* at pp.73-74. Counsel was keeping options open, and would say he planned on calling MCoy right up to the last moment. He remembered saying at some point that he would not need her. He ultimately concluded: "I don't know if it was split second or teetering. It was just a bunch of things, and I finally just decided to not call her." *Id.* at pp. 69, 104-106.

**b. Media Release**

Counsel remained petitioner's attorney through the direct appeal. He thought to write a book about the petitioner's human side, and recalled the general media rights release drafted by

him and executed by petitioner.[3] *Id.* at pp. 74, 101. Although nothing ever came of it, the agreement allowed for financial gain if counsel took any action to tell petitioner's story, and counsel acknowledged he probably should not have obtained the release. *Id.* at p.74, 77.

Following petitioner's trial, there were numerous media projects[4] and requests unrelated to the media release. *Id.* at pp. 77, 98. Petitioner participated in several of those projects; and counsel recalled that she enjoyed the attention. *Id.* at pp. 77, 78, and 91. Counsel did not participate in the interviews or receive any compensation for his presence. *Id.* at p.77.

Counsel obtained the media rights release in May 1996, after petitioner's trial, but while still representing her on appeal. *Id.* at p. 81. He thought petitioner's involvement in the media projects would show a more sympathetic side. But counsel did not believe that her involvement would generate more interest in further media projects or provide a boost to his law practice or reputation. *Id.* at pp. 81-83. As counsel noted: "I don't know how losing a case and having a client sentenced to die is good for business." *Id.* at p.83.

**2. Diana McCoy**

Dr. Diana McCoy is a licensed psychologist who was hired to be the mitigation specialist at petitioner's trial. *Id.* at p. 110. Her duty as a mitigation specialist was to make a case for life. This was done by getting record and interviewing people suggested through records; attempting to find "collaterals" who can say something during penalty phase to promote the idea that the defendant is a human being; and that there are reasons for why this person acted as she did. *Id.* at

---

[3] Petitioner's Exhibit 3.

[4] The projects included stories by television programs Hard Copy, Death Row Diaries, and Fox Files.

p. 111. This is a definition that McCoy has developed through experience now that she has been working on these cases for awhile. *Id*.

According to McCoy, counsel did not ask her to reach a psychological diagnosis for petitioner; nor did he instruct her to include a diagnosis in her report or social history. *Id.* at pp.111, 115. McCoy understood that Dr. Engum was working the guilt phase; doing psychological, personality and neuropsychological testing to address petitioner's state of mind at time of the crime. Engum's diagnosis was borderline personality disorder and she did not disagree with the diagnosis. *Id.* at p. 112.

McCoy reviewed her February 29, 1996, correspondence to counsel.[5] It reflected her exploration of ways to illustrate the causes or features of borderline personality disorder, which would indicate that she agreed with Engum's diagnosis. *Id.* at pp. 113-114.

McCoy reviewed a document entitled "Mitigating Themes,"[6] which she explained was her "description of the themes [she] thought that the defense attorneys would want to weave through the penalty phase of the trial." *Id.* at p. 114. McCoy was unable to recall when she prepared that document and did not indicate whether she actually provided it to counsel. *Id.* In developing those possible mitigation themes, McCoy relied upon Engum's work and did not disagree with it. *Id.* at p. 115.

McCoy thought her relationship with counsel was good. She described there being a lot of communication along with some direction, but not orders, for her work. She did not recall him ever criticizing her work or asking for it to be done differently. *Id.* at pp. 115-116. She recalled

[5] Post-conviction Exhibit 24. (D.E. 11-2, page ID# 7416.)

[6] Petitioner's Exhibit 2, Post-Conviction Exhibit 6 (D.E. 11-2, Page ID# 7340.)

counsel expressing some unease about the references to Satanism in petitioner's records from Swannanoa. *Id.* at p. 116.

The social history prepared by McCoy was a 60-page document summarizing petitioner's life from childhood up to the murder, and a summary of what records and other people told her. *Id.* at pp. 116-117. Counsel never asked her to omit mention of anything she found. McCoy only met co-counsel once before trial when both attorneys reviewed the social history in her office on March 15, 1996. *Id.* at p.117. McCoy only recalled meeting with the entire defense team one time in November a couple months after she started working on the case. *Id.*

Both defense counsel reviewed her report and social history. Neither asked her to edit its content or omit any aspects of her findings. Neither asked her why there was no independent diagnosis and neither asked her whether she disagreed with Engum's diagnosis. *Id.* at p.120. According to McCoy, she discussed her concern that the report did not include an opinion, because it was the first time in her career she ever submitted a report without opinions. However, she did not recall counsel's response. *Id.* at p.120. According to McCoy, she was also concerned that counsel had not provided a deadline for her report to be complete. When she informed counsel the report would be ready by March 20, 1996, he indicated he would need copies for himself, the court, and the prosecution. *Id.* at p. 121.

On Sunday, March 24, 1996, counsel met McCoy at her home so she could give him the report and go over her direct examination. At that time, counsel informed McCoy that he intended to call her as the sole witness in the penalty phase. *Id.* at pp. 121-122. McCoy understood counsel had no doubt there would be a penalty phase; and although she did not know what the specific date would be, she denied having any concern about upcoming vacation. *Id.* at p.123.

Regarding her relationship with the prosecutor, McCoy asserts she had a handful of dates with him, but that the relationship was terminated prior to her beginning work on petitioner's case. *Id.* at pp. 117-118. She asserted that she informed counsel of the relationship shortly after the team meeting (presumably in November 1995.) *Id.* at p. 118. McCoy denied asking counsel if he knew who the prosecutor was dating at the time, or that she would have discussed that issue with him. *Id.* at p.119. According to McCoy, counsel never expressed reservations about calling her as a witness based on that information, and did not ask any questions to probe the extent of the relationship. *Id.* at p. 119.

McCoy was at home when the jury returned its verdict on Friday, March 29, 1996. She learned of it in a phone call from counsel. According to McCoy, counsel was very upset and told her the prosecutor was angry about receiving her report and records at the last minute. McCoy claimed counsel asked her to say she had given them to him the day before. When she refused, counsel began talking about "hearsay." Though she did not understand what he meant, she offered to call other attorneys about the issue. She was unsuccessful in reaching other counsel. *Id.* at pp. p. 124-125.

When McCoy next spoke to counsel, he said he could not have her as a witness. McCoy believed counsel to be mostly upset by her refusal to say she had just given him her records and the hearsay issue. *Id.* at p. 125. She offered to meet with him to discuss the penalty phase strategy and went to his office early that evening. She recalled counsel advising co-counsel that McCoy was not going to be the penalty phase witness. They concluded that he needed to call other people as witnesses and counsel contacted petitioner's family. McCoy agreed to meet with the family the next morning. *Id.* at pp. 125-126.

McCoy denied that counsel asked her opinion on Engum's borderline personality disorder diagnosis. She also denied that he asked her about her relationship with the prosecutor; expressed any qualms about the negative aspects of petitioner's social history; discussed possible strategies for keeping out the negative information he had already given to the prosecution; or pressed her for information about her vacation plans. *Id.* at pp.127-128. In changing the penalty presentation, they discussed who to call, but did not discuss the possibility of asking for a continuance to contact out-of-state witnesses who were not there. *Id.* at p.128.

The next morning, counsel asked McCoy to remain in the courthouse lobby so the prosecutor would think she was still going to testify. *Id.* at pp. 128-129. McCoy did not recall any "huddle" in the courthouse hallway or lobby; her recollection was that the decision not to have her testify was made the night before. *Id.* at p.129.

**3. William Walter Hunt**

Petitioner offered the testimony of William Walter Hunt III as an expert on attorney ethics. Evidentiary Hearing Transcript, Volume II, Pages 5-7. (D.E. 85.) The Court permitted the presentation of Hunt's testimony over respondent's objection that such testimony was irrelevant to the narrow issues before the Court. *Id.* at pp. 8, 13, and 27.

Mr. Hunt reviewed a number of materials and exhibits related to this case and prepared a declaration as to his ethical opinion in this case.[7] *Id.* at p. 15. Over respondent's objection, the declaration was entered into evidence. *Id.* at p. 16.

**a. Overbilling Issue**

Hunt reviewed materials to familiarize himself with the circumstances surrounding the Comptroller's investigation and the BPR's handling of trial counsel's self-reported overbilling

[7] Petitioner's Exhibit 6.

issues. *Id.* at pp. 16-19. He also reviewed the formal petition for discipline that was filed by the BPR disciplinary counsel after trial counsel reached a negotiated agreement for resolution of that petition. *Id.* at pp. 19-21. According to Hunt, the petition raised questions relating to deceit and fraud which the Board "generally considers . . . the most serious offenses" which carried "the possibility of a substantial suspension, if not disbarment." *Id.* at 21. Hunt's review also included the conditional guilty pleas presented to Justice Adolpho Birch and the TSC for resolution of the pending disciplinary charges. *Id.* at pp. 21-23. Based on his review, Hunt testified that trial counsel's disciplinary matters were pending during the time of petitioner's trial and there was still a possibility of criminal charges being brought. *Id.* at p. 23. In Hunt's experience, the BPR disciplinary counsel and District Attorney work in conjunction with one another to determine whether the disciplinary charges or the criminal charges should be resolved first. *Id.* at 24. This, Hunt opined, poses a potential conflict of interest. *Id.*

Petitioner's counsel presented Hunt with a number of hypothetical scenarios based on trial counsel's actions during petitioner's trial. Based upon those hypothetical scenarios, Hunt identified a laundry list of ethical violations potentially committed by trial counsel. *Id.* at pp. 24-28.

On cross-examination, Mr. Hunt acknowledged that he was not involved in the BPR's handling of the ethical complaint against trial counsel. *Id.* at p. 43. He further acknowledged that the BPR disciplinary counsel was not involved in any civil enforcement actions with the AOC and Comptroller's Office relating to trial counsel's overbilling issue. *Id.* at p. 45. Hunt admitted that the record did not reflect any involvement of the BPR disciplinary counsel with the District Attorney's decision whether to prosecute trial counsel for the overbilling issue because disciplinary counsel does not decide whether to prosecute criminally. *Id.* at pp. 45-46.

### b. Media Rights Release

Hunt reviewed the media rights agreement between petitioner and both trial counsel. *Id.* at 41. In Hunt's opinion, the agreement raised ethical concerns because "[t]he basic rule is that an attorney can't have any financial interest" in the litigation over and above their compensation for legal services. *Id.* at p. 42. Petitioner's counsel again presented Hunt with hypothetical scenarios[8] based upon trial counsel's procurement of a media rights release. And again, Hunt agreed that such scenarios raised ethical concerns. *Id.* at p. 42-43.

On cross-examination, Hunt acknowledged that an attorney is not ethically responsible for a client's decision to participate in media interview where the attorney does not participate. *Id.* at 52. And he admitted that he was unaware of any citation against trial counsel for violation of the media rules. *Id.* at pp. 52-53

Hunt admitted that neither the post-conviction trial court, the TCCA nor the TSC referred any of the potential ethical matters developed at the post-conviction hearing to the Board for discipline upon review of the trial court's denial of post-conviction relief. *Id.* at pp. 46-49. The only matter under investigation by the Board during the pendency of petitioner's trial was related to the overbilling question. *Id.* at p. 49. And Hunt did not dispute that a month before trial counsel was appointed to represent petitioner, the TSC specifically reached out to counsel for appointment on a case that was on appeal to that court. *Id.* at 50. Ultimately, Hunt acknowledged that despite what he considered the potential penalties facing trial counsel as a result of the ethics complaint pending at the time of petitioner's trial, trial counsel did not receive any substantial suspension or disbarment; and never had a break in his practice of law. *Id.* at 51.

---

[8] "If an attorney entered into this agreement and advised his client to work with those news orgnaizations to promote interest or sales in an eventual book, could that have brought concerns before the [BPR]?" Evidentiary Hearing Transcript, Volume II, Page 42.

## III. ARGUMENT

A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides the standard for addressing claims that have been adjudicated in the state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The petitioner carries the burden of proof for this "difficult standard to meet" and "highly deferential [AEDPA] standard" which "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (U.S. 2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (U.S. 2011), and *Woodford v. Viscotti*, 537 U.S. 19 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A rule applied by a state court contradicts established Supreme Court precedent if it is "diametrically different," "opposite in character or nature," or "mutually opposed" to it. *Williams*, 529 U.S. at

405. An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 412-13. The state court's application of clearly established federal law must be "objectively unreasonable." *Id*. at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 130 S. Ct. 1855, 1862 (U.S. 2010) (citing *Williams*, 529 U.S. at 411).

There is less case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 130 S. Ct. 841, 849 (U.S. 2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).

In seeking a federal evidentiary hearing, petitioner must explain how evidence presented at the hearing will further his claim. *See, e.g., Cardwell v.Greene*, 152 F.3d 331, 338 (4th Cir. 1998.) Where there are no disputed material facts, an evidentiary hearing is not required. *See e.g.*¸ *Jeter v. Keohane*, 739 F.2d 257, 258 (7th Cir. 1984.) If petitioner's claim can be resolved on the existing record, a federal evidentiary hearing is unnecessary. *Schiriro v. Landrigan*, 127 S.Ct. 1933, 1940 (2007) (evidentiary hearing unwarranted where "the record refutes the applicant's factual allegations or toherwise precludes habeas relief); *see also Anderson v. Attorney General of*

*Kansas*, 425 F.3d 853, 859 (10th Cir. 2005)("an evidentiary hearing is unnecessary if the claim can be resolved on the recor.; *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998)(holding that where petitioner's claims can be resolved by references to the state court record, an evidentiary hearing will be regarded as futile and, accordingly, will be denied); *Villafuerte v. Stewart*, 111 F.3d 616, 633 (9th Cir. 1997)(a petitioner's request to have the district court hear the same evidence heard by the state court is "not a valid reason for an evidentiary hearing in district court").

*Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011), ruled that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400. § 2254(d) "refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court." *Id.* at 1398.

Accordingly, review by this court should be limited to the record that was before the state court at the time it made its rulings in this case. And, in any event, the record developed at the federal evidentiary hearing provides no further clarification of the issues, as is obvious upon comparison of that testimony with the testimony received by the state court at the trial and post-conviction proceedings.

**Ground Two and Six: The TCCA reasonably determined that the Petitioner was not deprived of the right to unconflicted counsel.**

In Ground Two, the Petitioner claims that she was deprived of the right to unconflicted counsel because: (A) the State was investigating lead counsel for overbilling (D.E. 19, Page ID# 9684-88); and (B) trial counsel procured media rights to the Petitioner's story (D.E. 19, Page ID# 9688-90.) In an extension of Ground Two A, the Petitioner also claims, as Ground Six, that the TCCA failed to address her argument that trial counsel's alleged overbilling conflict constituted structural error. (D.E. 19, Page ID# 9703-04.)

**1. Grounds Two A and Six: The TCCA reasonably determined that lead counsel was not conflicted by the State's investigation into his billing practices.**

The TCCA stated the following in rejecting this claim:

> The Petitioner's first contention of a conflict is based upon the Comptroller's investigation into lead counsel's prior billings to the indigent defense fund. There is no dispute in the facts that lead counsel was investigated for overbilling the Indigent Defense Fund and repaid more than $60,000 to the fund. Nor is it disputed that lead counsel self-reported to the Board of Professional Responsibility and that the claim remained unresolved at the time of trial. Eventually, as a result, the Tennessee Supreme Court suspended lead counsel's license for eleven months, twenty-nine days. The sanction, however, was not entered until November 24, 1998, one day after the supreme court affirmed the Petitioner's conviction and sentence. Neither lead counsel nor any other attorney involved in the fraudulent billing was prosecuted criminally for their actions.
>
> The Petitioner's claim on appeal, although somewhat unclear, appears to be that lead counsel was conflicted between his representation of the Petitioner and his own fear of being prosecuted by the State. The argument centers around the in-camera meeting in which lead counsel turned over Dr. McCoy's report and, at least according to the testimony of Dr. McCoy, later asked her to lie about when the report was delivered to him because the State was "furious" at receiving the materials at the late date. The Petitioner contends this resulted in lead counsel not calling Dr. McCoy, the key mitigation witness, allegedly because of his own fear of angering the court or the State. The Petitioner also contends that any testimony by lead counsel regarding other possible reasons as to why Dr. McCoy was not called was not credible and not supported by the testimony of other witnesses. The Petitioner asserts that "given this understanding of the facts, [lead counsel's] penalty phase decisions must be considered as products of a conflict of interest."

A conflict of interest does not, in and of itself, constitute ineffective assistance of counsel. In order to establish a violation of the Sixth Amendment, a [petitioner] who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) (holding that the mere possibility of a conflict of interest is not enough to establish ineffective assistance of counsel where the defendant raised no objection to multiple representation at trial.) However, unless the petitioner establishes that counsel was burdened by an actual conflict of interest, he must prove both deficient performance and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Prejudice is presumed only if the petitioner demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350. Until a petitioner shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim. *Id*.

Where an attorney is placed in a position of divided loyalties between himself and his client, an actual conflict is created. *State v. Culbreath*, 30 S.W.3d 309. 315 (Tenn. 2000). Among the class of potentially conflicting interests are the personal interests of defense counsel. *McCullough v. State*, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003). Yet another recognized conflicting interest is preoccupation with fear of instigating prosecution for one's own misdeeds. *U.S. v. Montana*, 199 F.3d 947, 949 (7th Cir. 1992).

First, as an aside, the Petitioner contends that the post-conviction court erred in finding the conflict claims waived. The court found that "[lead counsel] testified that he had informed [the Petitioner] of the issue and that she actually liked him more because of it. No issue was raised either pretrial or at trial." As such, the court found the issue waived but, nonetheless, ruled on the issue and found it to be without merit. Likewise, we also elect to review the issue, so it is not necessary to rule on the issue of waiver.

In denying relief on this claim, the post-conviction court found that the proof did not establish an actual conflict of interest which adversely affected lead counsel's performance. The court entered multiple findings of fact, upon which it based this conclusion. Prior to the lead counsel's appointment to the Petitioner's case, the trial court inquired into the status of the investigation and discovered that the reimbursement had been paid in full. The actual investigation had concluded prior to lead counsel's appointment as the Petitioner's attorney. Lead counsel had been appointed by the Tennessee Supreme Court in another matter in March 1995, two months prior to his appointment in this case. Lead counsel remained a licensed attorney, in good standing, throughout the entire investigation. Lead counsel stated that he had deemed the matter concluded prior to his appointment in the Petitioner's case. Lead counsel further testified that he informed the Petitioner of the investigation and that she "seemed to like him more because of it."

> The Petitioner has failed to provide any proof which preponderates against these findings. *See Henley v. State*, 960 S.W.2d at 579. The record simply fails to offer anything more than supposition that the overbilling issue affected lead counsel's representation of the Petitioner. All the evidence presented appears to support lead counsel's own testimony that the investigation was concluded and the matter settled prior to his appointment in this case. Lead counsel consistently testified that he considered the matter concluded prior to appointment in the case and that he never spoke with anyone in the district attorney's office regarding the matter. He further indicated that he never would have settled the matter civilly if there were potential criminal charges pending.
>
> Moreover, the assertion that fear of prosecution led lead counsel to lie to the court at the in-camera meeting and then deciding not to call Dr. McCoy is mere supposition as the allegations rest on speculation and disputed testimony. Each witness who was present at the in-camera hearing testified that they were unable to recall what occurred in that meeting. Lead counsel testified that he had never asked Dr. McCoy to lie, and the court accredited this testimony. As noted, questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court. *Henley*, 960 S.W.2d st 579. This court does not reweigh such determinations. Lead counsel, along with co-counsel, testified that there were multiple reasons as to why the decision was made to not use Dr. McCoy as a witness, the primary one being that she could not corroborate the testimony of Dr. Engum. The post-conviction court also noted that the record did not support Dr. McCoy's testimony based upon a statement made on the record following the in-camera meeting in which lead counsel stated he had received the documentation from Dr. McCoy "earlier this week," not the day prior as Dr. McCoy indicated lead counsel wanted her to say.
>
> The Petitioner offers only speculation as the reason for "counsel's penalty phase collapse." This speculation as to what might have been the reason for the decisions made is not sufficient meet her burden of establishing that a conflict existed.

*Pike*, 2011 WL 1544207, at *45-48.

In Ground Six, the Petitioner presents, as a separate claim, the proposition that the TCCA failed to address her contention that lead counsel's situation presented an actual conflict of interest which does not require a showing of prejudice. *See Cuyler v. Sullivan,* 446 U.S. 335 at 348-49 (1980). Petitioner argues that the TCCA instead "found that no conflict of interest existed because of the alleged failure to show prejudicial impact." (D.E. 19, Page ID# 9704.) This is incorrect. The TCCA acknowledged that prejudice is presumed in the event of an actual conflict of interest.

*Pike,* 2011 WL 1544207, at *46-48. Although the first sentence of its factual analysis perhaps could have been more artfully drafted ("the post-conviction court found that the proof did not establish an actual conflict of interest which adversely affected lead counsel's performance"), the remainder of the TCCA's discussion makes clear its conclusion that no actual conflict of interest existed. *Id*. Among other things, it credited the post-conviction court's findings that lead counsel had reimbursed the indigent defense fund in full and considered the matter concluded before being appointed to represent the Petitioner. *Id*. at *47. The TCCA reasonably addressed both the legal and factual aspects of the Petitioner's claim of structural error.

Petitioner alleges that lead counsel was conflicted due to an overbilling investigation taking place contemporaneous with her trial. Petitioner also, however, refers to this issue in a general attempt to cast doubt on the reliability of the factual findings made by both the TCCA and the TSC in her appellate proceedings, arguing that because lead counsel's self-reported BPR complaint was still pending during those proceedings, "the [TSC] itself was a party to proceedings that affected the outcome of the state court litigation, [and] its findings of fact are inherently suspect." (D.E. 19, Page ID# 9663.) However, the factual determinations of the state courts are presumed to be correct, and petitioner must rebut that presumption with clear and convincing evidence, rather than mere allegations. 28 U.S.C. § 2254(e)(1). Unless petitioner can plead and prove facts meeting this burden, the federal court must presume the state courts' determination of the facts to be true, and review the reasonableness of the state courts' application of federal law. *Dukes v. Hunt,* 952 F.Supp. 276, 280 (E.D.N.C. 1996); see also *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004) (federal court presumes state courts' factual determinations are correct unless rebutted by clear and convincing evidence). Petitioner's unfounded aspersions on the propriety of state proceedings do not meet the burden of overcoming this presumption in this case.

As respondent noted in his prior answer, petitioner's contentions are unconvincing for three additional reasons. First, the TSC denied petitioner permission to appeal her denial of post-conviction relief, meaning that all factual findings relating to lead counsel's trial and appellate performance were made by the TCCA, not the TSC. The record, of course, contains no factual basis for the proposition that lead counsel's BPR proceeding was in some way related to the TSC's decision to deny petitioner permission to appeal. Second, even if there were evidence of relatedness, it is not at all clear why the TSC's knowledge of an investigation into lead counsel's billing practices would lead the TSC to look *unfavorably* on petitioner's claims that lead counsel was thereby conflicted or ineffective. Finally, as the TCCA concluded, there is no evidence that the overbilling investigation was anything other than a nonissue during lead counsel's representation of petitioner. When that representation started, lead counsel believed himself free of any threat of criminal charges (D.E. 9-19, Page ID# 5917), had paid a civil settlement, and had resumed taking appointments. (D.E. 9-21, Page ID# 6117-23.)

Ultimately, this case involves a horrific murder about which the facts, as well as petitioner's guilt, were never seriously in dispute. Trial counsel provided competent if inevitably unsuccessful representation in an effort to obtain a non-capital sentence. Tennessee's appellate courts then reasonably applied federal law to an equally reasonable interpretation of the facts of this case.

The TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It is also based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, the respondent is entitled to judgment as a matter of law.

## VI. CONCLUSION

Based on the foregoing, it remains respondent's position that the evidence received at the federal evidentiary hearing, conducted May 26 and 27, 2015, has no bearing on this federal habeas corpus proceeding and should be disregarded by the Court.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General & Reporter

/s/ Shannon E. Poindexter
SHANNON E. POINDEXTER, BPR #18424
JENNIFER L. SMITH, BPR #16514
Assistant Attorneys General
Law Enforcement & Special Prosecutions
P.O. Box 20207
Nashville, Tennessee 37202
Phone: (615) 741-3486
Shannon.Poindexter@ag.tn.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2015, a copy of the foregoing was sent via the Court's electronic filing system to:

Stephen A. Ferrell
Federal Defender
800 South Gay Street, Suite 2400
Knoxville, Tennessee 37929

/s/ Shannon E. Poindexter
SHANNON E. POINDEXTER, BPR #18424